In The Matter Of:
## *Lamar vs. Wal-Mart Stores East*


Deposition Of:
## *Dr. Joseph Martino*


Taken On:
## *10/23/2025*


Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



EXPERIENCED · PROFESSIONAL · DEPENDABLE

1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF GEORGIA
2                       MACON DIVISION

3                                  )
                                   )
4    JANET LAMAR,                  )
                                   )
5                                  )
          Plaintiffs,              ) Case No.:
6                                  ) 5:24-cv-00276 (CAR)
                                   )
7    vs.                           )
                                   )
8                                  )
     WAL-MART STORES EAST, LP,     )
9    and JOHN DOES 1-5,            )
                                   )
10        Defendants.              )

11

12

13              _____

14        The video deposition of Dr. Joseph A. Martino taken

15   remotely before Derek Boyd, CCR, 6755-3684-0320-8003,

16   Certified Court Reporter, commencing at 10:15 a.m. on

17   Thursday, October 23, 2025, via Zoom.  The reading and

18   signing of the deposition was reserved.

19

20

21

22

23

24

25

```
 1                   APPEARANCES (via TELECONFERENCE)

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4    Nick Schnyder Law Firm, LLC
      Drew Gilliland
 5    351 Atlanta St. SE
      Marietta GA 30060
 6    Phone: 404-999-1111
      dgilliland@schnyderlawfirm.com
 7

 8    ON BEHALF OF THE DEFENDANTS:

 9    McLain Merritt, P.C.
      Nicholas E. Deeb
10    3445 Peachtree Road, NE
      Suite 500
11    Atlanta, GA 30326-3240
      (404) 365-4535
12    ndeeb@mmatllaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lamar vs. Wal-Mart Stores East              Dr. Joseph Martino                    10/23/2025

```
 1                          I N D E X

 2    CROSS-EXAMINATION

 3    BY MR. GILLILAND                                      Page 5

 4    DIRECT-EXAMINATION

 5    NONE

 6
                             E X H I B I T S
 7
      EXHIBIT                                    PAGE MARKED/
 8    NUMBER              DESCRIPTION              IDENTIFIED

 9    P - 1         Composite Exhibit of Document      82

10

11

12

13

14

15

16

17

18

19
                         TRANSCRIPT LEGEND
20
      . . .(ellipsis)      Halting speech or an unfinished
21                         sentence in dialogue or an omission
                           when reading written material
22    --   (dashes)        Break in speech continuity
      (ph)                 Spelled phonetically
23    (sic)                In its original form

24

25
```

```
 1              P R O C E E D I N G S

 2                                        10:15 a.m.

 3          (Whereupon, the court reporter complied with

 4      the requirements of O.C.G.A. 9-11-28(d).)

 5          THE VIDEOGRAPHER:  The date is October 23rd,

 6      2025, and the time is 10:15 a.m.  This will be the

 7      remote video deposition of Dr. Joseph A. Martino.

 8      Counsel, please introduce themselves and any

 9      objection to the witness being sworn in remotely.

10          MR. GILLILAND:  Drew Gilliland for Janet

11      Lamar, no objections.

12          MR. DEEB:  Nicholas Deeb for defendant, no

13      objections.

14          THE VIDEOGRAPHER:  Thank you.  Would the court

15      reporter please swear in the witness?

16          THE COURT REPORTER:  Mr. Martino, will you

17      raise your right hand?

18   (Whereupon, the witness was sworn.)

19          THE COURT REPORTER:  You may lower your right

20      hand.

21          MR. GILLILAND:  Hi, good morning, Dr. Martino,

22      how are you today?

23          THE DEPONENT:  Good morning.

24          MR. GILLILAND:  Nice to see you.  I, uh, am

25      going to be taking your deposition this morning in
```

```
 1        the Janet Lamar versus Walmart case.  And, uh, I

 2        believe we have four hours reserved, and I have a

 3        lot to go through.  So I'm -- you'll see me looking

 4        away a lot, looking at my notes, just because I

 5        have a lot of questions I need to ask.  So I'm not

 6        doing that to be rude or anything.  I'm just doing

 7        that because I don't want to waste any time.  Um,

 8        all right.  Well, if you're ready, we can get

 9        going.

10             THE DEPONENT:  Yes, sir.

11             MR. GILLILAND:  Okay.  All right.  So, Dr.

12        Martino, I understand -- oh, uh, and this

13        deposition is being taken pursuant to the Federal

14        Rules of Civil Procedure.  It's being taken for all

15        purposes allowed under the law, and I propose that

16        any objections, um, uh, except as to the form of

17        the question or responsiveness of the answer be

18        reserved until the first use of the transcript.

19             MR. DEEB:  That's agreed.

20             MR. GILLILAND:  Okay.  Thank you.

21   Whereupon,

22                  DOCTOR JOSEPH A. MARTINO

23   was called as a witness herein and, having been duly

24   sworn, was examined and testified as follows:

25                  CROSS-EXAMINATION
```

```
 1   BY MR. GILLILAND:

 2        Q.   All right.  I understand that you are a

 3   board-certified orthopedic surgeon.  Is that true?

 4        A.   Yes, sir.

 5        Q.   Okay.  And I have some prior depositions of

 6   yours, um, and I'm not asking this question to bring up

 7   a bad memory or anything, but it's my understanding that

 8   you had some kind of hand injury in 2002 and went on

 9   disability at that time?

10        A.   Correct.

11        Q.   Okay.  And was that like a -- and I'm sorry,

12   this is just my ignorance, I don't know.  Is it like a

13   short-term disability or is it a long-term disability

14   or, uh...

15        A.   Long-term disability.

16        Q.   Okay.  And, again, I'm sorry to hear that.

17   I'm not trying to bring up, you know, bad memories or

18   anything.  Is that something that, um --or do you -

19   since your hand injury, are you no longer a surgeon, or

20   how does that work?

21        A.   No.  Uh, once a surgeon, always a surgeon.

22        Q.   Okay, okay.  What, um -- how-how has the

23   injury changed your medical practice?

24        A.   Well, from what perspective, currently or..

25        Q.   Yeah, well, in other words, what can you not
```

```
 1  do today that you used to do before your hand injury?

 2      A.   So the injury affected my ability to do the

 3  material and, uh, substantial aspects of my prior, uh,

 4  career.

 5      Q.   Can you elaborate on that?

 6      A.   No.

 7      Q.   Okay.  That-that -- I'm just not sure I

 8  understand what you said.  You said it impacted your --

 9  just maybe repeat you -- repeat the answer because I

10  didn't follow it.

11      A.   Sure.  So it impacted the substantial and

12  material ability to do the activities of an orthopedic

13  surgeon in my occupation prior to the injury.

14      Q.   It impacted the substantial -- Okay.  Are

15  there certain surgeries that you can't do today that you

16  could do before your injury?

17      A.   Well, I would say today, uh, yes, that's

18  correct.

19      Q.   Okay.  Are you doing surgeries, uh, today?

20      A.   No.

21      Q.   Okay.  Um, when is the last time you -- and-

22  and when you were doing surgeries before your injury,

23  what kind of surgeries -- like on an average surgery

24  day, what were those surgeries that you would perform?

25      A.   What time period are you talking about?
```

1    Q.   Before your hand injury.

2    **A.   So prior to 2002?**

3    Q.   Yeah, if that's the year, yes.

4    **A.   Well, I practiced, uh, as a general orthopedic**

5    **surgeon and I performed, uh, all of the, uh, full range**

6    **of procedures and surgeries that a general orthopedic**

7    **surgeon would perform.**

8    Q.   Okay.  And are those -- and I'm not an

9    orthopedic surgeon, so I don't know what a general

10   orthopedic surgeon, what they typically perform.  Did

11   you specialize in like a body part or -- but you said

12   general, so I guess not?

13   **A.   Correct.**

14   Q.   Okay.  Were you, um -- did you do spine

15   surgeries before 2002?

16   **A.   Yes.**

17   Q.   Okay.  And -- so what kind of spine surgeries

18   did you do?

19   **A.   So I assisted one of my partners, Herschel**

20   **Beker, on lumbar and, uh, thoracic and cervical**

21   **surgeries, both for degenerative spinal conditions, uh,**

22   **as well as scoliosis.**

23   Q.   Okay.  And that was -- you said that you

24   assisted a surgeon in those before your injury?

25   **A.   Correct.**

1    Q.   Okay.  And, um, again, this is just my

2    ignorance, but for a spine surgery, if you're assisting

3    another surgeon, what does that -- are you an assistant

4    surgeon or what's the term for that in your field?

5    **A.   I think the term would be first assistant.**

6    Q.   First assistant.  Okay.  Did you, um -- and

7    then so what would the surgeon that you were assisting,

8    what would he be called in your field?

9    **A.   I would call him primary surgeon.**

10   Q.   Okay.  Um, were you ever the primary surgeon

11   in any spinal surgeries before 2002?

12   **A.   No.**

13   Q.   Okay.  Okay.  Um, well, regardless, you are a

14   board-certified orthopedic surgeon, that's not easy to

15   do, I take it.  Is that a fair statement?

16   **A.   Uh, uh, you know, I guess that would be true.**

17   Q.   Okay.  You had to study a lot to become an

18   orthopedic surgeon?

19   **A.   Yes.**

20   Q.   Okay.  And I'm sure you had to work very hard

21   to become an orthopedic surgeon?

22   **A.   Correct.**

23   Q.   Okay.  And I see your wall back there has a

24   lot of diplomas on it.  Is it...

25   **A.   Among other things, yes.**

1    Q.    Okay.  Okay.  And would it be fair to say that

2    as an orthopedic surgeon, uh, you know, I guess you

3    probably take a lot of pride in doing that work?

4    **A.    Well, I'm proud of my profession, yes.**

5    Q.    And to get where you did, uh, you probably

6    can't take any shortcuts, I would -- I would assume.  Is

7    that fair?

8    **A.    I'm not sure what a shortcut would be.  I -- I**

9    **don't think there are any shortcuts.**

10    Q.    Okay.  Okay.  And I see from your CV you also,

11    uh, teach residents?

12    **A.    Correct.**

13    Q.    Okay.  And I assume you take pride in that

14    work as well.

15    **A.    I enjoy it.  For me, it's a fulfilling way of**

16    **giving back to the profession.**

17    Q.    And, um, when you teach your, uh, residents,

18    do you -- especially when treating a patient, do you

19    tell them that it's important to conduct a thorough

20    examination of a patient?

21    **A.    Well, I-I -- I'm not providing clinical**

22    **instruction, I'm doing didactic lectures, so that**

23    **wouldn't be appropriate.  But I do believe that's true.**

24    Q.    Okay.  Okay.  Do you also believe it's true

25    that you should listen to the patient?

1       **A.    Yes.**

2       Q.    Okay.  And that's, I guess, because the -- the

3    health of the patient is probably the most important

4    thing for a doctor?

5       **A.    Well, the health and welfare of the patient**

6    **and, uh, managing whatever problem it is that they**

7    **brought -- that brought them to-to see the doctor.**

8       Q.    Okay.  Um, now, Walmart hired you in this case

9    to be an expert witness.  Is that true?

10      **A.    That is correct.**

11      Q.    Okay.

12      **A.    But I'm not sure if it Walmart directly, but I**

13   **was contacted by Mr. Deeb's office sometime, I think, in**

14   **March of this year to review records and to provide a**

15   **report with opinions.**

16      Q.    Okay.  Okay.  That's fair.  Um, and so would

17   you agree that your job as an expert witness is to be

18   sort of like an umpire you call balls and strikes?

19      **A.    Um, that's a metaphor that I've used in the**

20   **past.  Yes, that's correct.**

21      Q.    Okay.  And you have to be objective?

22      **A.    Correct.**

23      Q.    Okay.  And I believe we had a discovery

24   disclosure.  It looked like Walmart has hired you 29

25   times in the past?

```
 1        A.   I don't keep track of those types of things.

 2   If that's what was provided to you, I don't know.

 3        Q.   Okay.  Okay.  If that was provided to us, you

 4   don't have any reason to dispute it?

 5        A.   Uh, I can neither refute or dispute it.

 6        Q.   Okay.  Um, would Walmart have gotten that

 7   information from, it sounds like they wouldn't have

 8   gotten it from you, but maybe someone in your office?

 9        A.   I'm really not sure what you're referring to.

10   I don't know what the information is.

11        Q.   Okay.  Um, so we asked for, uh, information

12   about what you were paid by Walmart, and there was an

13   issue with the court.  We ended up having to go in front

14   of the judge, and we agreed that they would just

15   disclose how many times they hired you in the past, and

16   that's what they told us was 29 times.

17        A.   Okay.

18        Q.   Okay.  Okay.  Um, all right.  Let's see here.

19   So let's go through your report.  I'm going to start

20   with opinion two, and I'm going to go ahead and read

21   this.  And what I have is, the only possible injuries

22   that Ms. Lamar suffered from her ground-level fall were

23   contusions to her left shoulder, left wrist, uh, Coccyx,

24   I don't know if I pronounced that correctly, left knee

25   and left trapezius muscle strain.  And then you also
```

```
 1  said that none of these injuries were either serious or

 2  permanent from a medical perspective.  These are all

 3  known to be self-limiting injuries, which resolve within

 4  three to four weeks.  Did I summarize that fairly?

 5       A.   Yes, sir.  I think you did.

 6       Q.   Okay.  Um, and you also -- we got an index of

 7  records that you reviewed for your opinions.  And one --

 8       A.   Yes, sir.

 9       Q.   Yeah.  And one of the records was Spine Center

10  Atlanta?

11       A.   Yes, sir.

12       Q.   Okay.  And so Ms. Lamar, as you know, she went

13  to Spine Center, Atlanta multiple times, and she saw a

14  Dr. Adams and a Dr. Rosenberg.  Um, and on October 6th,

15  2022, Ms. Lamar, um, saw Dr. Rosenberg on that day for

16  her left knee pain.  Um, and Dr. Rosenberg at that visit

17  said that Ms. Lamar's fall aggravated her underlying

18  knee arthritis.  Do you remember that?

19            MR. DEEB:  Objection to form.

20  BY MR. GILLILAND:  (Resuming)

21       A.   I don't remember that, but I have the records

22  in front of me.  I can refer to that if you'd like me

23  to.

24       Q.   If you want to.  I can represent you, that's

25  what the record says, but if you want to double-check
```

```
 1   me, you can.

 2        A.   Sure.

 3            MR. DEEB:  Same objection.

 4   BY MR. GILLILAND:  (Resuming)

 5        Q.   And then Dr. Rosenberg also diagnosed Ms.

 6   Lamar with a meniscus tear, true?

 7            MR. DEEB:  Objection to form.

 8   BY MR. GILLILAND:  (Resuming)

 9        A.   Um, no, that is not true.  I don't -- I don't

10   believe that's true.

11        Q.   Okay.  Um, and again, I can represent to you

12   that did happen, but this diagnosis, uh, was based on

13   his physical exam of Ms. Lamar.

14        A.   Well, I don't mean to contradict you, but I'm

15   looking at the record right now, and I don't see any

16   diagnosis of a meniscal tear.

17        Q.   Okay.  Give me one second.  Are the set of

18   records you had 93 pages long?

19        A.   Uh, they're not bates stamped, so I don't know

20   how many pages, but I'm looking at September 8th, 2022.

21   Um, which is the record that -- that you had referred to

22   with, uh, Dr. Rosenberg.

23        Q.   I said October 6th, 2022.

24        A.   Oh, October 6th, okay.  I'm on September 8th,

25   so let me look at -- I looked at the first one.  October
```

1    **6th, would be number five.  Okay.  October 6th.**

2        Q.   I...

3        **A.   I'm not seeing where he made a diagnosis.  I**

4    **see a diagnosis of arthritis of the -- of the knee and**

5    **contusion of the knee.**

6        Q.   Okay.  I have my -- can you see your screen --

7    do you see the record on your screen?

8        **A.   I will need to expand it, but I think I do.**

9    **Yes, sir.**

10       Q.   Okay.  All right.  So, um, she was originally

11   diagnosed with a partial ACAL -- ACL tear on an MRI, but

12   then on this date, Dr. Rosenberg did a physical exam,

13   and if you see here under plan, it says she has no

14   evidence of instability on exam, and I do not recommend

15   ACL construction.  I believe she aggravated her

16   underlying arthritis from the accident with the

17   possibility of a subtle meniscus tear that was not

18   picked up on MRI.

19       **A.   Yeah, I'm reading that, but if you look above**

20   **there, she has a negative McMurray's test, which is a**

21   **provocative test for meniscal tears.  And a negative**

22   **McMurray's test would indicate that there's no clinical**

23   **evidence of a meniscal tear.**

24       Q.   Okay.  But you didn't mention any of this in

25   your report, did you?

```
 1        A.   Well, not specifically.  I did mention that
 2   she did not have any serious or permanent injuries to
 3   any part of her body, so that would include a meniscal
 4   tear.  I also, uh, just to clarify, disagree with the,
 5   uh, radiology report, uh, which indicated an ACL sprain.
 6   There's only one image that indicates the signal
 7   intensity that the radiologist referred to, and that
 8   finding on the MRI, based on my review of the MRI image
 9   of the knee, is only consistent with a blood vessel, uh,
10   which there's a small artery that runs through the ACL.
11   And, uh -- and so the radiology report, in my opinion,
12   with regard to the ACL sprain, is inaccurate and a false
13   positive.  And the clinical examination, uh, that was
14   documented, um, on October --or I'm sorry, on September
15   8th, is also not consistent with either a meniscal tear
16   or an ACL tear.  So, I respectfully disagree with the
17   opinion or the memorialization by Dr. Rosenberg that
18   there was either an ACL tear or a meniscal tear.  It's
19   my expert opinion, to a reasonable degree of certainty,
20   that there was no meniscal tear and that there was no
21   ACL sprain.
22        Q.   Okay.  Um, and I'm not disagreeing with you on
23   that, but, uh, Dr. Rosenberg said that she had
24   pre-existing knee arthritis.  Do you agree with that?
25        A.   He did say that.
```

1    Q.   And do you agree with that?

2    **A.   Uh, I think for her age, she had a little bit**

3    **of what I would consider some minor degenerative**

4    **findings, yes.**

5    Q.   Okay.  And you didn't conduct a physical exam

6    on Ms. Lamar, did you?

7    **A.   No, I relied upon the documentation in the**

8    **clinical record as well as the imaging studies that I**

9    **reviewed.**

10    Q.   Okay.  And arthritis can be very painful,

11    true?

12    **A.   It may or may not be.**

13    Q.   Okay.  Well, suffering trauma to a joint that

14    is arthritic can be painful, true?

15    **A.   That is possible.  However, when we look at**

16    **the diagnosis from the ER from the day of the event, we**

17    **find that there was no aggravation of the arthritic**

18    **condition and that she simply had a contusion with no**

19    **swelling of the knee.  If you had, uh, aggravation of**

20    **the pre-existing condition, as you, uh, just held, you**

21    **would have swelling and an effusion, and there was no**

22    **such swelling and there was no such effusion on the day**

23    **of the event.**

24    Q.   And on the day of the event, she complained of

25    left-sided neck pain with radiculopathy down her left

```
 1   arm?

 2        A.   I don't recall that. I'd have to look at the

 3   record to review, uh, that specifically.  I can tell you

 4   that the ER diagnosis did not include a diagnosis of

 5   cervical radiculopathy.

 6        Q.   She complained of numbness and tingling in her

 7   left arm on the day of the fall at the ER?

 8        A.   Uh, she -- I believe she did have that

 9   complaint of mild numbness and tingling that starts in

10   her neck and radiates to her shoulder.  But on physical

11   examination, she had a supple examination of her neck

12   with normal range of motion and a normal neurological

13   examination.  NV intact refers to normal sensation and

14   motor examination, that's on page 125.

15        Q.   She was also tender to palpation on physical

16   exam in her neck, wasn't she?

17        A.   Uh, the lateral aspect of her neck would be

18   where she was tender, but not in the midline.  She had

19   no midline tenderness in her back or her neck.

20        Q.   But you left that out of your report, didn't

21   you?

22        A.   Well, no, I think my report, uh, again,

23   summarizes that there was no serious or permanent

24   injury.  So, you know, of course, in a five-page report,

25   I can't articulate all of the detail that perhaps you
```

1    would have liked to have seen, which is why we're doing

2    this four-hour deposition.  But I'm happy to articulate

3    the foundation of my opinions in that report, uh, by

4    provider and by, you know, page by page if you'd like

5    to.

6        Q.   Is a meniscus tear a self-limiting injury?

7        A.   So a meniscus tear could be a self-limiting

8    injury.  But in this case, Ms. Lamar did not have a

9    meniscus tear as proven by the MRI and also by the

10    negative McMurray's test.  In the hypothetical --

11        Q.   And arthritis --

12        A.   But in the hypothetical scenario of a meniscus

13    tear, small meniscus tears can be self-limiting and they

14    can resolve on their own with simple physical therapy.

15        Q.   Okay.

16        A.   But to be clear, so there's no confusion, Ms.

17    Lamar did not suffer a meniscal tear as a consequence of

18    that slip and fall.

19        Q.   Okay.  And arthritis is certainly not a

20    self-limiting injury, is it?

21        A.   Arthritis is not an injury at all.  It's a

22    natural progression of wear and tear with aging.

23        Q.   Post-traumatic arthritis is a self-limiting

24    injury then?

25        A.   Well, post-traumatic arthritis is a separate

 1   **category and Ms. Lamar does not have post-traumatic**

 2   **arthritis.**

 3        Q.   Okay.  And arthritis -- or post-traumatic

 4   arthritis, neither one resolves within three to four

 5   weeks, does it?

 6        A.   **Well, arthritis itself is -- is a condition**

 7   **that can be dormant or can be quiet or quiescent.  Uh,**

 8   **many people have the diagnosis of arthritis, myself**

 9   **included, that may or may not be symptomatic from day to**

10   **day.**

11        Q.   Okay.  But that wasn't the answer to my

12   question.  I asked if arthritis, uh, resolves within

13   three to four weeks?

14        A.   **Well, symptoms affiliated with arthritis can**

15   **resolve, uh, within three to four weeks.**

16        Q.   Okay.  And she got a cortisone, uh, injection

17   on that date when she saw Dr. Rosenberg?

18        A.   **Uh, on the date of October 6th, yes, that's**

19   **correct.**

20        Q.   Okay.  And, um, that was to relieve her knee

21   pain?

22        A.   **Um, I think -- truthfully, I don't think that**

23   **it was medically necessary or reasonable to do a**

24   **cortisone injection at that point in time, based on the**

25   **findings on the physical exam and the MRI study.  But I**

| | |
|---|---|
| 1 | believe that the rationale was to relieve -- alleviate |
| 2 | pain, but I don't think it was necessary. |
| 3 | Q.    Okay.  And, um -- |
| 4 | A.    I mean to be more clear. |
| 5 | Q.    -- a cortisone injection is not something you |
| 6 | give for a knee bruise, is it? |
| 7 | A.    Exactly.  So, you know, just to clarify, and |
| 8 | it's not a criticism of Dr. Rosenberg.  I mean, with |
| 9 | informed consent, if he chose to do that and she chose |
| 10 | to have the injection, that's fine.  But I want to be |
| 11 | clear, my testimony is that the injection that was done |
| 12 | on October, uh, 6th, I believe, uh, the -- the August |
| 13 | 5th, 2022, event that happened several months before |
| 14 | that played no role in the need for that cortisone |
| 15 | injection that was done in October. |
| 16 | Q.    Okay.  Nowhere in, uh, Dr. Rosenberg's record |
| 17 | did he mention a knee contusion, he talked about a |
| 18 | meniscus tear, an ACL tear, and arthritis, and you left |
| 19 | all of that out of your report, didn't you? |
| 20 | A.    Well, I mean, in terms of my report, I don't |
| 21 | think I really did.  I think my -- my opinions that I |
| 22 | expressed on my report essentially made it very clear |
| 23 | that the event that happened on August 5th, 2022, did |
| 24 | not cause any serious or permanent injuries.  So I think |
| 25 | that that would encompass the treatment of the, uh, |

Lamar vs. Wal-Mart Stores East          Dr. Joseph Martino          10/23/2025

1    **phantom, uh, ACL tear and the phantom meniscal tear that**

2    **was diagnosed.**

3         Q.   Okay.  And let's go to opinion three.  Uh,

4    your third opinion is that it is your expert opinion to

5    a reasonable degree of medical certainty that Ms. Lamar

6    did not suffer any new disc herniations, neurological

7    injuries or any serious and permanent injuries to her

8    left shoulder, left elbow, left knee or left wrist.  Did

9    I read that correctly?

10        **A.   You did.**

11        Q.   Okay.  Good.  On September 2nd, 2022, at Spine

12   Center Atlanta, she complained of neck pain radiating

13   between the bilateral shoulders and down her left arm.

14   True?

15        **A.   I'm sorry, I didn't catch the date.**

16        Q.   September 2nd, 2022.

17        **A.   Gotcha.  So let me -- I have that here in**

18   **front of me, so let me go ahead and open that up.  Yes.**

19   **At that time, she was complaining of neck pain radiating**

20   **between the shoulders and down the left arm with**

21   **stinging, burning, and shooting of nature.  So at that**

22   **point in time, which was approximately a month after the**

23   **slip and fall, she did have those symptoms.  That is**

24   **correct.**

25        Q.   Okay.  And radiating pain down the left arm,

```
 1   that would be a neurological finding?
 2        A.   It -- I consider it one, yes.  It can be, yes.
 3        Q.   Okay.  And radiating pain is a neurological
 4   injury?
 5        A.   Well, no radiating pain is a symptom.  It does
 6   not reflect an injury.
 7        Q.   Okay.  On September 19th, 2022, at Spine
 8   Center Atlanta, Ms. Lamar got a cervical epidural
 9   injection for her cervical radiculopathy.  Is that
10   correct?
11        A.   Dr. Adams performed an epidural at that time,
12   uh, correct, on September 19th.
13        Q.   And the purpose of an epidural is to relieve
14   radicular pain caused by a compressed or inflamed nerve
15   in the neck?
16        A.   Well, I think it's a little bit more
17   complicated than that.  An epidural is a form of
18   treatment that's reserved for after a patient fails
19   conservative management after three months of physical
20   therapy.  So it's a tool in the armamentarium of
21   treatment, but it's not a tool that we rush in and use
22   on every patient that might have, uh, radicular like
23   symptoms.  And just more to the point, in my experience
24   in dealing with many patients having this particular
25   symptom in my career, only one in ten patients actually
```

 1    **goes on to require an epidural for management of those**

 2    **symptoms.  But, you know, in terms of the appropriate**

 3    **use criteria and the clinical guidelines for, uh, both**

 4    **the North American Spine Society and also the American**

 5    **Academy of Orthopedic Surgeons, you have to exhaust**

 6    **conservative measures, which would be skilled,**

 7    **supervised physical therapy.  And it's my recollection**

 8    **at that point in time when Dr. Adams elected to offer**

 9    **the epidural, Ms. Lamar had only had two visits of**

10    **skilled, supervised physical therapy.  So I think to --**

11    **on the point of this question, I think that the epidural**

12    **was premature and not medically necessary.**

13          Q.   So I noticed that you again are answering

14    questions I'm not asking.  Did you learn to do that in

15    that expert witness training program you went to in

16    Massachusetts in 2015?

17          **A.   No.**

18          Q.   Okay.  Now, the epidural, uh, took her pain

19    level down from a six out of ten to a zero out of ten.

20    Is that true?

21          **A.   Well, no, I don't think that is a conclusion**

22    **that I would reach.  I think a patient's symptoms can**

23    **resolve on their own, regardless of whether you stick a**

24    **needle in their neck.**

25          Q.   The pain level that Ms. Lamar reported before

1    the procedure was a six out of ten, and after the

2    procedure, it was a zero out of ten.  Is that correct?

3        A.   **Well, immediately following, that's what was**

4    **documented.  But that's what you would expect if you put**

5    **Novocaine into somebody's neck.**

6        Q.   And Ms. Lamar had no documented --

7        A.   **It just...**

8        Q.   -- excuse me.  Ms. Lamar had no documented

9    radicular neck pain twelve months before her fall, did

10   she?

11       A.   **Oh, that's not correct.**

12       Q.   Okay.  Where did she have the documentation of

13   radicular neck pain twelve months before her fall on

14   August 5th, 2022?

15       A.   **Well, it may have been more than twelve months**

16   **as I -- as I reflect on that.  But we have an incident**

17   **in which she was involved in a motor vehicle accident,**

18   **August 9th, of 2020, in which she had neck pain and**

19   **radicular symptoms.  And she had treatment at resurgence**

20   **for that radiating pain down to the left shoulder.  So**

21   **in August 17th, of 2020, it was documented that she had**

22   **cervical radiculopathy.**

23       Q.   Okay.  And let's go ahead and talk about that

24   prior car wreck.  How fast were the cars going in that

25   car wreck?

1      **A.    Well, it was a hit and run accident, so I'm**

2  **not sure of the details.  I didn't see a police report.**

3      Q.    Okay.  Well, you produced a police report to

4  us, and the property damage on the car is minor.  Do you

5  remember seeing that?

6      **A.    I don't remember seeing that.  But in terms of**

7  **the speed of the accident, I don't recall the speed was**

8  **memorialized.**

9      Q.    Where was her head positioned at the time of

10  the wreck?

11      **A.    I don't recall.**

12      Q.    Okay.  Was she driving or was she a passenger?

13      **A.    I believe she was driving.**

14      Q.    Okay.  And did her airbags go off?

15      **A.    No, airbags -- and, uh -- I don't know.  I**

16  **don't recall if the airbags went off.  And I'm trying to**

17  **see where that particular police report is.  I don't**

18  **know where the -- I don't know that I have that.  But I**

19  **do have on that same -- on that same point, I do have**

20  **documentation from Resurgens that she had possible**

21  **cervical radiculopathy radiating to the left shoulder.**

22  **In addition to a cervical strain.  But as far as the**

23  **question of airbag, I'm not sure if -- I don't think the**

24  **airbag went off.**

25      Q.    And that note from Resurgens was from August

1   17th, 2020, but did you happen to read the record from

2   resurgence on December 7th, 2020?  And you see in that

3   record, she denied numbness, paresthesia and weakness in

4   her left arm?

5        **A.   I do have that record.  Yes, I do.**

6        Q.   And you left that out of your report, didn't

7   you?

8        **A.   Well, it's not included in my report.  Um, and**

9   **again, as I said, the report was not meant to be a**

10  **regurgitation of every record that I had read in this**

11  **case.  It was a -- it was a memorialization of my**

12  **opinions.**

13       Q.   Okay.  And she also had a negative Spurling's

14  test on that day as well at Resrugens, didn't she?

15       **A.   I don't recall, so let me take a look.  And**

16  **that would be, again, you're on the December 7th date?**

17       Q.   Uh, yeah.

18       **A.   That is correct, negative Spurling's.**

19       Q.   And she had a positive Spurling's test after

20  her fall at Walmart, didn't she?

21       **A.   The day of the event?  No, she did not.**

22       Q.   Not on the day of the event, but later with

23  Spine Center Atlanta?

24       **A.   So let's take a look at that.**

25       Q.   Well, I'll get -- I'll get to that on.  Um --

1    **A.   Well, I would have to refer to the record to**

2    **respond to the question.  But if you -- if you'd like to**

3    **move on, I'll move on.**

4        Q.   Yeah, I'll move on.  Now, the, um -- a disc

5    herniation can be pre-existing and asymptomatic and

6    become symptomatic after trauma.  Is that correct?

7        **A.   That is possible, but it's my expert opinion**

8    **to a reasonable degree of certainty that that does not**

9    **apply in this case.**

10       Q.   Okay.  And trauma such as a fall can change a

11   disc's position.  Is that true?

12       **A.   In my experience, a fall from height, that is**

13   **true.  A ground level fall, I've never seen that happen.**

14       Q.   Okay.  And trauma such as a fall can increase

15   pressure on a nerve root.  Is that true?

16       **A.   From a ground level fall, in my experience,**

17   **that's not true.**

18       Q.   Okay.  And then there are no MRIs of her neck

19   before August 5th, 2022.  Is that true?

20       **A.   That is true.  However, there was a CT scan**

21   **that was available that was done at Piedmont Henry on**

22   **August 9th, 2020.**

23       Q.   That's correct.  And it was -- it showed the

24   same findings as the CT scan that was taken on August

25   5th, 2022.  Is that correct?

 1      A.   I don't have the CT scan from August 5th, of

 2   2022, so I can't -- I can't affirm or dispute that.

 3      Q.   Okay.

 4      A.   But I believe -- I believe that is true based

 5   on the report that was provided.  But I don't have, uh -

 6   - at this point in time, I've requested them.  But I

 7   don't have any of the imaging studies from the day of

 8   the event, only the reports.

 9      Q.   Okay.  So on September 30th, 2022, Ms. Lamar

10   goes back to Spine Center Atlanta, and this time her

11   neck pain and radiculopathy had returned after the

12   epidural.  True?

13      A.   So, again, I'd have to refer to that because I

14   don't recall the specifics of that September 30th, date,

15   but I do have my file here and I will go to that tab to

16   pick it up.  And so she reported some improvement in her

17   symptoms, but the neck pain and radiation has returned.

18   She did report that the pain was radiating bilateral

19   shoulders and down the left arm.  Uh, and just in terms

20   of temporal relationship, this was, uh, September 30th.

21   That's Correct.  And the epidural had apparently been

22   done on September 19th, so two weeks before.

23      Q.   Correct.  And at this visit, the doctor

24   recommends plasma injections for her radicular neck

25   pain.  True?

 1    **A.    Let me refer to the record.  I believe that's**

 2    **true, but let me confirm that.  Yes, she would like to**

 3    **try cervical PRP is what the documentation says.**

 4        Q.    Okay.  And that was to provide, uh, relief for

 5    her neck pain and radicular pain?

 6        **A.    Well, I'm not sure why she would like to try**

 7    **that, but I presume -- you know, I would presume it was**

 8    **to improve her symptoms.  But there's no documentation**

 9    **as to why she chose the PRP.**

10        Q.    Okay.  Well, a doctor wouldn't let the patient

11    dictate what injections they do, would they?

12        **A.    Well, I would leave that to Dr. Adams's, uh,**

13    **opinion or testimony as to what -- what his rationale**

14    **for proceeding was.**

15        Q.    Okay.

16        **A.    I will say this, that there's no scientific**

17    **evidence to support that a PRP injection was medically**

18    **necessary or reasonable for the treatment of muscle**

19    **spasm. Uh, and I would also --**

20        Q.    But she did have muscle spasms, didn't she?

21        **A.    Yeah, and I wouldn't use PRP to treat that.**

22    **And the scientific evidence --**

23        Q.    Okay.  You left that out of your report didn't

24    you --

25            MR. DEEB:  Hold on.  Drew, Drew, you're

```
 1        interrupting.  Drew, you're interrupting him.

 2             MR. GILLILAND:  He's answering questions I'm

 3        not asking.  And we only have four hours.

 4             MR. DEEB:  No, you have to -- no, Drew, you

 5        have to let him --

 6             MR. GILLILAND:  I'm taking this time back.

 7             MR. DEEB:  Drew, you have to let him answer

 8        you can't cut him off.

 9             MR. GILLILAND:  Done.  Go ahead.

10             THE DEPONENT:  Well, I was going to explain my

11        answer, but I'll defer.

12             MR. GILLILAND:  Okay.  Thank you.

13   BY MR. GILLILAND:  (Resuming)

14        Q.   And you left the cervical epidural injection

15   out of your report.  You also left the plasma injection

16   out of your report.  And you left out the fact that she

17   was complaining of radicular pain in her left arm out of

18   your report.  Why would you do that?

19        A.   Well, actually, I don't think I did.  Um, on

20   item number six, page four or five, I specifically

21   stated that the August 5th, 2022, ground level fall did

22   not cause the need for any future medical treatment

23   procedures or testing beyond the initial E.R. evaluation

24   and some follow up and some skilled supervised physical

25   therapy at an estimated cost of fifteen hundred to
```

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                         10/23/2025

```
 1   twenty five hundred dollars.  So that statement on

 2   number six, page four or five, includes the opinion that

 3   the procedures that were performed were not -- the

 4   August 5th, event played no role in the need for those

 5   procedures.  So I did address that.

 6        Q.   Okay.  Where did you mention radicular pain

 7   that she was experiencing radicular pain in her left arm

 8   in opinion six?

 9        A.   Oh, no, whatever happens subsequent to the

10   event is due to superseding factors.  It's not due to

11   the event itself that happened on that slip and fall.

12   Just to be clear, I'm not I'm not criticizing or here to

13   disagree that subsequently a month later that she had

14   some radiculopathy.  But I'm here to testify as a

15   medical expert and as a double board certified

16   orthopedic surgeon that the August 5th, 2022, event

17   played no role in the need for those procedures.  And in

18   fact, the documentation from the ER and the primary

19   evaluation with chiropractor showed that she was 90

20   percent improved after two visits to chiropractic

21   treatment.

22        Q.   So would it be --

23        A.   So whatever happened -- whatever happened a

24   month later had nothing to do with the prior event.  And

25   if you're looking for superseding factors, I'd be glad
```

1    to list a few for you.

2        Q.   Okay.  So your report says that she was

3    involved in a motor vehicle collision in 2020.  Is that

4    the reason why she's experiencing neck pain and

5    radicular pain after her fall at Walmart in 2022?

6        A.   Well, I -- I think there's insufficient

7    evidence to to to draw a conclusion one way or the

8    other.  I would say that that's a superseding factor

9    that may be related to her subsequent symptoms that she

10   developed.

11       Q.   Okay.  What other subsequent -- or superseding

12   factors are there besides the car wreck in 2020 and the

13   ground level fall on August 5th?

14       A.   Sure, her age.  Number one, her age, 52 years

15   old.  It's not uncommon for people in their fifties to

16   start having radicular symptoms due to their preexisting

17   degenerative findings, which is documented in this case.

18   Both the MRIs that were done after the event, as well as

19   the CT scan that was done prior to the event, clearly

20   document that she has degenerative disc disease.  It's

21   included in the report from the CT scan done two years

22   prior.  It's also included, in my opinion, in my review

23   of the imaging, uh, that Ms. Lamar had significant

24   preexisting degenerative changes in her neck.  So that

25   would be one preexisting condition, her age -- or I'm

```
 1    sorry, superseding factor, her age.  Number one of 52
 2    and also the preexisting condition that she had, number
 3    two.  Number three, uh, the other preexisting condition
 4    would be her obesity.  Morbid obesity is associated with
 5    increased risk of both lumbar and degenerative disc
 6    symptoms.  And that's certainly another superseding
 7    factor in this case.  I would add, based on her, um,
 8    occupation or description, um, of things that she, uh,
 9    activities that she does, writing and screen time, et
10    cetera, perhaps computer work.  Um, that type of
11    lifestyle, that type of work, if you will, has clearly
12    been associated with causing or aggravating, uh,
13    symptoms of radiculopathy.  Um, North American Spine
14    Society did a patient education blast two years ago, uh,
15    basically showing that, uh, sedentary lifestyle and sit
16    in front of a computer screen is the new smoking,
17    meaning that it's the new, uh, sort of factor associated
18    with increased back and neck symptoms in our society.
19    So, uh, there are a number of different superseding
20    factors, but I think the number one at the list would be
21    her age.
22         Q.   Okay.  So her age, the car wreck, obesity and
23    the fact that she writes, those are the reasons why she
24    has neck pain with radiculopathy?
25         A.   Well, again, I don't have the burden to show
```

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 36 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                    10/23/2025

```
 1    why she has neck pain with radiculopathy, you do.   I

 2    have the responsibility for explaining whether or not

 3    the August 5th, 2022, event played any role.  And it's

 4    my expert opinion to a reasonable degree of certainty

 5    that that event only caused a cervical strain of the

 6    trapezius muscle and had no midline tenderness.  She had

 7    normal range of motion in the ER the day of the event,

 8    which is certainly not consistent with the narrative

 9    that she had an aggravation of a preexisting disc

10    herniation or that she created a new disc herniation.

11         Q.   Well, you actually do have the burden because

12    you're the expert in this case.  So I'm asking you --

13         A.   Uh --

14              MR. DEEB:  Objection to form.

15    BY MR. GILLILAND:  (Resuming)

16         Q.   -- the reason she has neck pain with the

17    reason she has neck pain with radiculopathy is, in your

18    opinion, not because of the fall.  It's because of her

19    one age, two the car wreck in 2022, three obesity, four

20    her occupation?

21              MR. DEEB:  Objection of form.  Foundation.

22    BY MR. GILLILAND:  (Resuming)

23         A.   I'm not going to argue with you with who has

24    the burden here, but I will say that that you've

25    mischaracterized my testimony.  I don't have a
```

1   responsibility to determine why she had radiculopathy a

2   month later, but I am offering the possibility of

3   superseding factors as explaining that.  You have the

4   burden to prove that those superseding factors did not,

5   in fact, cause that in my opinion.

6        Q.   So if she did not fall at Walmart that day,

7   it's your opinion that she would have gone to the

8   hospital that day anyway for her neck pain.  She then

9   would have gone to Spine Center Atlanta for her neck

10  pain and her radiculopathy.  She would have gotten

11  epidural injections, plasma rich in injections, radio

12  frequency ablations.  She would have gotten all that if

13  she didn't fall at Walmart.  Is that your testimony?

14       A.   Well, no, I wouldn't have said it quite that

15  way.  But the way I would say it would be that the

16  August 5th, 2022 event played no role in the need for

17  any of those procedures that she subsequently had a

18  month later.  And that I would also state that, as I had

19  stated at the outset, that she did sustain injuries that

20  were consistent with contusions and abrasions as

21  memorialized and documented by the ER staff the day of

22  the event and that she did not suffer any ridiculous

23  symptoms.  She had a normal neurological exam.  She --

24  her neck was supple with normal range of motion.  She

25  had no midline tenderness, as you would expect on

1   physical exam if -- if she did have aggravation of her

2   preexisting condition.  She had no midline tenderness in

3   the cervical spine or the lumbar spine.  And in fact,

4   the day of the event following -- shortly following the

5   accident, it's clearly documented that she did not have

6   cervical radiculopathy and she did not have lumbar

7   radiculopathy.  Um, and radiographic evidence also is in

8   support of that based on the subsequent MRI study.  What

9   I would add to that is it's my expert opinion to a

10   reasonable degree of certainty that it's more likely

11   than not that if the August 5th, 2022, event had never

12   happened, she may have still needed those procedures

13   that were done subsequently.

14      Q.   And what, uh, peer reviewed published studies

15   are you relying on to say that her age would have

16   caused, um, neck pain with left sided radiculopathy?

17          MR. DEEB:  Objection to form.

18   BY MR. GILLILAND:  (Resuming)

19      A.   Well, I think you can refer to the CDC.  CDC

20   data shows that in the last 90 days, 38 percent of the

21   adult population has had back and neck pain, including

22   pain associated with radicular symptoms.  That's over

23   100 million Americans.  I have literature that shows in

24   last year, you know, in 20 -- actually 2024 that 1.6

25   million Americans adults had neck surgery and back

1  surgery for that particular problem.  It's a very common

2  problem associated with age.  Uh, in terms of age

3  specific prevalence and estimates of degenerative spine

4  disease, uh, I have an article, I believe I gave it to

5  you.  Brzezinski is the lead author.  I think it was

6  published in American College of Radiology.  And there's

7  a chart in that particular study that shows by decade,

8  uh, the likelihood of disc degeneration going up by

9  decade.  And for a 50 year old who is asymptomatic, by

10  the way, based on a review of thirty two hundred MRI

11  studies of asymptomatic subjects who are volunteers in,

12  in this particular meta analysis.  Age 50, 80 percent of

13  the population has disc degeneration.  And in terms of

14  disc protrusions or herniations, 36 percent of 50 year

15  olds who are asymptomatic have the exact same findings

16  that Ms. Lamar had.

17      Q.   And how many of those, uh -- how many of those

18  subjects in that study were African-American females in

19  their fifties who suffered a ground level fall before

20  the onset of these symptoms?

21      A.   Well, I think that the question, um, is hard

22  to answer.  I don't know because they don't list the

23  detail of the demographics.  But what I can say, which I

24  guess answers this question, is that the patients in

25  these studies, which was a meta analysis looking at 30

1   **separate studies combined into one study looking at**

2   **thirty two hundred people, uh, they were all**

3   **asymptomatic.  So I don't know that that question would**

4   **apply.**

5       Q.   Okay.  Now, on October 31st, 2022, at Spine

6   Center Atlanta, Dr. Adams performed a physical exam and

7   said that Ms. Lamar had a positive Spurling's test and

8   you left that out of your report.  Why did you leave

9   that out of your report?

10      **A.   Well, in my report, again, I'm not sure what**

11  **your impression of my report was supposed to be, but the**

12  **report that I provided to, uh, defense council was a**

13  **memorialization of my opinion.  So I don't think that,**

14  **that necessarily would have been included in a five page**

15  **report.**

16      Q.   Okay.  She also had muscle spasms in her neck

17  at this visit.  Is that true?

18      **A.   Is it true that he said that or is it true**

19  **that she had that?**

20      Q.   Well, is it true that she had that?  I --

21      **A.   I wasn't there, so I can't say, but the**

22  **records document that that's true.**

23      Q.   Okay.  And you couldn't contradict that

24  because you never did a physical exam of Ms. Lamar, did

25  you?

```
 1         A.   So, no, that's true.  I did not do a physical
 2    exam on Ms. Lamar.
 3         Q.   Okay.  And you can't fake muscle spasms, can
 4    you?
 5         A.   I-I don't think that that would be something -
 6    - I think that's an objective finding, that's correct.
 7         Q.   Okay.  And at this visit --
 8         A.   What was the date of that again?
 9         Q.   That was October 31st, 2022, page 44 of 93 and
10    the Spine Center records.
11         A.   Yeah, I mean, it's curious at that point in
12    time, um --
13         Q.   I don't -- I don't have a question
14    outstanding, doctor.
15         A.   Okay.
16         Q.   My next question is a radiofrequency ablation,
17    uh, is what was recommended by Dr. Adams at this visit.
18    And a radiofrequency ablation is when you burn the
19    nerves to help reduce pain.  Is that true?
20         A.   I think in a layperson's perspective, that
21    would be true.
22         Q.   Okay.  And you left that out of your report,
23    didn't you?
24         A.   No, again, if we refer back to my report on
25    page four or five and item number six, I specifically
```

```
 1    state that the August 5th, 2022, ground level fall
 2    played no role in the need for any procedures, including
 3    that L3S1 RFA done in November, uh, or the medial branch
 4    block done at L3S1 or the PRP injections of the cervical
 5    spine or the left knee injections.  You know,
 6    essentially all these procedures that you're mentioning,
 7    I made very clear that the August 5th, 2022, event that
 8    happened months prior had nothing to do with that.  It
 9    played no role in the need for any of those procedures.
10        Q.    Okay.
11        A.    I include that in my report.
12        Q.    Okay.  And the records from Benchmark,
13    November 9th, 2022, the physical therapist observed that
14    Ms. Lamar was suffering from severe limitations in her
15    neck.  True?
16        A.    Well, if you bear with me, I'll have to go to
17    that particular, uh -- unless you have it, you can put
18    in the screen, but I can probably look at it more easily
19    through my binder.
20        Q.    Okay.
21        A.    Let me find that.
22              MR. DEEB:  Objection ton form.
23    BY MR. GILLILAND:  (Resuming)
24        A.    Chapter five.  Okay.  And if you'd be kind
25    enough to repeat your question, I've got the -- I've got
```

 1    the Benchmark records available now.

 2        Q.   Yeah.   November 9th, 2022, the physical

 3    therapist observed that Ms. Lamar was suffering from

 4    severe limitations in her neck.   The physical therapist

 5    also wrote that Ms. Lamar is suffering from severe

 6    radicular pain in her left arm.

 7             MR. DEEB:  Same objection.

 8    BY MR. GILLILAND:  (Resuming)

 9        A.   So, um, is the question is -- you want me to

10    affirm that the therapist said that?

11        Q.   Is that what -- is that what you see?

12             MR. DEEB:  Same objection.

13    BY MR. GILLILAND:  (Resuming)

14        A.   I don't have a tab on that page.  November 9th

15    -- unfortunately, my P.T. records are not tabbed, so I'm

16    going to have to go through page by page.  October 12th

17    -- you know, by October 12th, there's no complaint of

18    neck pain or radiculopathy.  October -- just pain in the

19    left knee and muscle stiffness.

20        Q.   I'm not --

21        A.   But let me let me find the date that you're

22    talking about.  October --

23        Q.   9th, 2022.

24        A.   November 9th.

25        Q.   Yeah.

```
 1          A.   Okay.  Yeah, I think by that time she did -- I
 2   do recall vaguely.  Yeah.  By -- it's interesting.
 3   September 9th, she didn't -- October 9th -- or I'm
 4   sorry.  September 27th, she didn't.  Ironically, October
 5   12th, 2022, prior to that November 9th, date, she had no
 6   such radiculopathy.  So something's happened since
 7   October 12th.  And by now -- you're exactly right, by
 8   November 9th, now she has symptoms again.
 9          Q.   Okay.  And I didn't ask about those other
10   dates, did I?
11          A.   No, you did not.
12          Q.   You're volunteering information because you
13   want to be an advocate for Walmart, aren't you?
14          A.   No, no.
15               MR. DEEB:  Objection to form.  Objection to
16          form.  Argumentative.  Calls for speculation.
17   BY MR. GILLILAND:  (Resuming)
18          A.   Yeah.  To answer your question, I'm not being
19   an advocate for anybody other than the facts.  And the
20   facts are that on the dates that I just mentioned, she
21   had no such symptoms.
22          Q.   Okay.  But she did --
23          A.   If you're an advocate for the facts, you'd be
24   interested in that.
25          Q.   She did have those symptoms on November 9th?
```

```
 1        A.   Well, you know -- should she have?

 2        Q.   The physical therapist reported her having

 3   those symptoms on November 9th.  True?

 4        A.   That is true.

 5             MR. DEEB:  Objection to --

 6   BY MR. GILLILAND:  (Resuming)

 7        A.   My way of explanation as I'm entitled to, she

 8   did not have those symptoms on September 26th.  And she

 9   did not have those symptoms on October 12th.

10        Q.   And you left all of that out of your report,

11   didn't you?

12        A.   No --

13             MR. DEEB:  Objection.

14   BY MR. GILLILAND:  (Resuming)

15        A.   I think my report actually covers that.

16        Q.   Okay.  Let's go to December -- I'm sorry,

17   January 11th, 2023, she goes to Sierra Summit where she

18   gets an EMG.  Is that true?

19        A.   I'm not sure, I'd have to -- let me -- unless

20   you have it, you can pull it up.  I'd have to go to see.

21   Yes, I have that in the in my reports section, January

22   11th.  That's tab number five.  And yes, sir, I have

23   that open.  That is --

24        Q.    Okay.  The EMG showed electrophysiological

25   evidence of radiculopathy bilaterally at C3 C4, true?
```

1    A.   Uh, that's true.  And in fact, C3, C4, C5, C6

2    and C7, C8 bilaterally, um, at that time in January of

3    2023, that is correct.

4        Q.   Okay.  And Ms. Lamar never had an EMG before

5    her fall at Walmart.  True?

6            MR. DEEB:  Objection to form.  Calls for

7        speculation.

8    BY MR. GILLILAND:  (Resuming)

9        A.   I don't have any evidence that she had an EMG

10   prior to that.  But I would add to that that she on the

11   date of the event on, uh, August 5th, 2022, had no

12   indication for doing that procedure because she had no

13   evidence of radiculopathy.  So --

14       Q.   And --

15       A.   -- it's a test that was done later down the

16   road when she did develop many months later when she did

17   develop radiculopathy.

18       Q.   And at C3, C4, she had a disc herniation that

19   was indenting the spinal cord.  True?

20       A.   The MRI did show -- the MRI that was done on,

21   I have to check my dates, August 30th, did show an old

22   chronic degenerative disc at that level.  Comparison of

23   the CT scan that was done in 2020 confirmed that she had

24   had that same finding in 2020, as well as a spur at C6,

25   7 with a disc spur complex at C6, C7 and disc

1   herniations at C5, C6, C4, C5.  So these are old

2   findings.  But the one thing I'll point out, you know,

3   in way of my explanation to your question about the

4   January 11th, 2023 EMG.  Is that the August 5th, 2022,

5   event played no role, and there's no evidence that it

6   played any role in these findings that were documented

7   six months later.

8       Q.   Where in the MRI report does the radiologist

9   say the disc herniation at C3, C4 is a -- is chronic and

10  degenerative?

11      A.   Oh, he didn't say that.  Uh, you know, that --

12  that's a description that he refrained from commenting

13  about for whatever reason, and I won't go there.  But

14  it's based on my opinion and my review of the images

15  from that study in which there was no evidence of edema,

16  no evidence of inflammation and no evidence of

17  aggravation of the preexisting condition.

18      Q.   And edema resolves within two to three weeks

19  typically?

20      A.   No, that's not correct.  Not, not on an MRI.

21      Q.   Okay.  And so, uh, if her radiculopathy is due

22  to -- due to degeneration is the fact that she just

23  started experiencing this radiculopathy after her fall a

24  coincidence?

25      A.   That's exactly what it is.  The fall had no --

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

```
 1   played no role in the development of radiculopathy
 2   because if it had, based on my training knowledge,
 3   specialized knowledge and experience and treating
 4   thousands of patients with radiculopathy, the -- the
 5   timing of it is immediate.  In other words, if someone
 6   has an event, whether it be a traumatic event or whether
 7   it be something as simple as a sneeze, the radiculitis
 8   or the radicular symptoms, the shooting pain, et cetera,
 9   is almost immediate.  And so from a temporal
10   relationship, the fact that there was no radiculopathy
11   the date of the event proves that the event did not
12   cause the subsequent radiculopathy that she suffered.
13        Q.   Except the numbness and tingling that the
14   hospital noted on the day of her fall, true?
15        A.   Well, no, that's incorrect.  Because when we
16   look at the physical exam findings on -- physical
17   examination, she was nervoscularly intact with no
18   numbness, no tingling documented in a normal
19   neurovascular exam, as well as a supple neck with normal
20   range of motion.  All physical exam findings, which
21   refute the -- the narrative that she had a disc
22   herniation.  I'll add to that, that the objective
23   measure of her pulse done the day of the event, which I
24   believe if I'm not mistaken was 64 you know, the
25   physical exam findings that were documented again, are
```

1   **not consistent with the notion that she sustained a**

2   **cervical radicular problem the day of the event.**

3       Q.   And Dr. Chappuis is on January 11th, 2023,

4   sent Ms. Lamar back for more conservative treatment,

5   which are injections.  And he also said if those failed,

6   she would be a candidate for an anterior cervical disc

7   fusion at C3, C4 and C6, C7.  Is that true?

8       **A.   Uh, I'd have to go back to that.  What was the**

9   **date of that again?**

10      Q.   January 11th, 2023.

11      **A.   So in terms of the opinions, I do believe that**

12  **-- yeah, the doctor, he referred him back.  Dr. Chappuis**

13  **referred (sic) Ms. Adams back, uh, to consider injection**

14  **therapy again, and that he did opine that she may be --**

15  **if it didn't improve, she may be a candidate for fusion.**

16  **So, so that's correct, but --**

17      Q.   Was she recommended for a fusion before her

18  fall at Walmart?

19         MR. DEEB:  Objection to form.

20  BY MR. GILLILAND:  (Resuming)

21      **A.   Not, not that I believe -- not that I'm aware.**

22      Q.   And what is the purpose of an anterior

23  cervical disc fusion?

24      **A.   So generally speaking?**

25      Q.   Yeah.

```
 1        A.    It's to relieve symptoms, relieve pain and to

 2   fuse the degenerative joints.  It's a procedure that's

 3   reserved for degenerative arthritis, which in this case

 4   is the chronic preexisting condition that Ms. Lamar had

 5   and why she was suffering.

 6        Q.    Okay.  And --

 7        A.    It's the appropriate treatment for

 8   degenerative arthritis.

 9        Q.    Okay.  And it's your opinion that if Ms. Lamar

10   did not experience a ground level fall on August 5th,

11   2022, she would have been recommended for an anterior

12   cervical disc fusion at those same levels on that same

13   date?

14        A.    Yeah, it's not an uncommon procedure.

15              MR. DEEB:  Objection to form.  But go ahead.

16   BY MR. GILLILAND:  (Resuming)

17        A.    I'd say, it's not an uncommon procedure.  I

18   think that it's something that, again, as I mentioned

19   earlier, about 1.6 million patients had this exact type

20   of operation in 2024.  It's a common operation.  And

21   it's one that, um, is reserved for patients that fail

22   conservative management for treatment of degenerative

23   arthritis of their neck.

24        Q.    Okay.  And she would have been recommended for

25   that procedure on that same date, even if she didn't
```

```
 1   fall at Walmart?

 2       A.   Well, I can't speculate as to what date she

 3   would have been told that, but I can tell you based on

 4   my review of the CT scan that was done in 2020, that it

 5   would be more likely than not that she would be a

 6   candidate in the future for interventional pain

 7   management and, or possibly surgery based on her

 8   condition in 2020.  And that the trajectory of her

 9   destiny, if you will, the trajectory of her need for

10   procedures and treatment had already been put into

11   motion in 2020.  And therefore the -- the event that

12   occurred in August 5th, 2022, played no role in changing

13   the trajectory of that destiny.

14       Q.   Did you see her fall on video?

15       A.   You know, it's a good question I saw on the

16   deposition that she had been shown that the video I've -

17   - I've not been provided the video.

18       Q.   Okay.  So you don't -- you didn't see her

19   fall?

20       A.   That's what I just told you, I have not seen

21   the video.

22       Q.   Okay.  And so you don't know what speed -- at

23   what speed her ground hit the body.  I'm sorry.  At what

24   speed her body hit the ground?

25       A.   Um, actually -- that's actually -- I don't
```

```
 1   know the answer specifically, but you know, uh, gravity

 2   is 9.8 meters per second.  So, you know, I presume if

 3   she fell from a ground level fall, she fell at 9 meters

 4   -- 9.8 meters per second.

 5       Q.   Okay.  And ground level falls can cause

 6   serious injuries, true?

 7       A.   You know, it's possible, but fortunately in

 8   this case, the evidence, this shows that she did not

 9   suffer any serious injuries.

10       Q.   Okay.  Do people, uh, break hips when they

11   fall?

12       A.   Correct.  But Ms. Lamar did not break her hip

13   in this fall.

14       Q.   Okay.  But serious injuries can come about

15   from a fall?

16       A.   I think in the world of possibilities, uh, it

17   is possible for people to break bones and have, uh, you

18   know, potentially, uh, serious injuries.  Uh, but the

19   evidence here in this case, based on the clinical

20   evidence and the ER evidence the day of the event, and

21   the MRI study that was done shortly thereafter prove

22   that she did not suffer any serious or permanent

23   injuries.

24       Q.   Except the disc herniations, radiculopathy,

25   uh, aggravated knee arthritis, and facet inflammation in
```

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

```
 1  her lower back.  Other than that no injuries?

 2     A.   Those are your non-expert opinions.  It's my

 3  expert opinion that those things are --that -- that that

 4  statement is false.

 5     Q.   Okay.  Well, her treating physicians say that,

 6  and you're disagreeing with them.  Is that right?

 7     A.   Well, I actually didn't read the treating

 8  physicians' depositions or any testimony from them.  I

 9  haven't read any sworn testimony from any of the experts

10  in this -- or any of the treating physicians in this

11  case.

12     Q.   Okay.  The treating physicians actually did a

13  hands-on exam of Ms. Lamar?

14     A.   Well, as treating physicians, you'd be

15  expected to do that.  That's correct.

16     Q.   And take a history?

17     A.   Correct.  But for a causal analysis, you have

18  to do something much more sophisticated and do a

19  reliable scientific method, which neither of the

20  treating physicians, uh, memorialized or articulated any

21  of that.

22     Q.   Okay.  Um, now on January 31st, 2023, she

23  gets, uh, medial branch blocks at four sections of her

24  cervical spine.

25     A.   Is that a statement or a question?
```

1        Q.   I'm asking you if that's -- do you remember

2   seeing that in the records?

3             MR. DEEB:  What date was that?

4             MR. GILLILAND:  January 31st, 2023, page 63 of

5        93 in the spine center records.

6             MR. DEEB:  Gotcha.  Okay.

7   BY MR. GILLILAND:  (Resuming)

8        **A.   I'm sorry.  I didn't catch the date again.**

9        Q.   January 31st, 2023.

10       **A.   Yes.  Uh, January 31st, I have that in my**

11  **procedure section.  So yes, that's correct.  Dr. Adams,**

12  **uh, performed a C3 to C7, uh, medial branch block at**

13  **that time.**

14       Q.   And she never got medial branch blocks before

15  her fall at Walmart, true?

16            MR. DEEB:  Objection to form.  Calls for

17       speculation.

18  BY MR. GILLILAND:  (Resuming)

19       **A.   Oh, I don't have any evidence that she had.**

20  **I've not seen any evidence that she had.**

21       Q.   Okay.  Um, and it's your testimony that, uh,

22  Ms. Lamar's car accident from 2020, her age, her weight,

23  and her career is what caused the need for these medial

24  branch blocks?

25            MR. DEEB:  Objection to form.

```
 1    BY MR. GILLILAND:   (Resuming)

 2         A.   No, that's not my testimony.

 3         Q.   Okay.  So she got these medial branch blocks

 4    for no reason then?

 5         A.   No, that's not my testimony either.

 6         Q.   Okay.  Um, now, on February 20th, 2023 -- um,

 7    I'm sorry, February 16th, 2023.  Uh, the doctor

 8    recommended radiofrequency ablations at C3-C4, C4-C5,

 9    C5-C6, and C6-C7.  Is that true?

10         A.   Let me go take a look at that date, that's in

11    the clinical records.  I have the procedures in a

12    separate section.  So, let's take a look at that date

13    and I can confirm what you said.  Uh, that was on --

14    which date again, did you say?

15         Q.   February 16th, 2023.

16         A.   Okay.  So Ms. Lamar had a telemedicine visit

17    with, uh, Susanna Johnson, the nurse practitioner at

18    that time.  And based on the telemedicine visit, um, Ms.

19    Lamar reported only about 50 percent of relief of her

20    symptoms following the injection.  Which does not meet

21    the criteria for moving forward with an RFA, I might

22    add.  But nonetheless, uh, they recommended moving

23    forward with the RFA.

24         Q.   Okay.  And, she ends up getting the RFA on

25    February 20th, 2023, her pain level is down to a zero
```

 1    out of ten.  Is that true?

 2        A.   Well, I don't know that that's true, but that

 3    may be what the note memorialized.

 4        Q.   Would Ms. Lamar have any reason to lie about

 5    her pain level going down?

 6        A.   Well, Ms. Lamar did not create the note Dr.

 7    Adams did.

 8        Q.   Would they have any reason to lie about her

 9    pain level going down?

10        A.   I don't have no reason to believe that he's

11    lying, but at the same time, I'm not there to confirm

12    what he's saying is true.

13        Q.   Okay.  How about --

14        A.   I would add to that, that, uh, my experience

15    with RFA, and I've assisted in, uh, patients that I've

16    referred for RFA, that it's quite painful.  So that's

17    kind of an unusual finding, uh, in my experience.

18        Q.   Okay.  And the procedure, if her pain level

19    went to a zero, this procedure helped alleviate her

20    pain?

21        A.   No, I would say that you can't conclude that

22    I, um, uh, uh -- of the opinion that RFA typically takes

23    several weeks before the effect is or the benefit, any

24    benefit that you may have is resolved.  So in the event

25    that you have zero out of ten pain, the only explanation

1  **for that would be, uh, would be that there was novocaine**

2  **that was injected at the point in time that the RFA was**

3  **performed.  And of course, novocaine is simply blocking**

4  **the nerve endings temporarily so that you don't feel**

5  **what, what, uh, has transpired.**

6      Q.   Okay.  And on March 28th, 2023, uh, Ms. Lamar

7  returned to Spine Center Atlanta after, uh,

8  radiofrequency ablations and she reported 98 percent

9  relief from, from the ablations.  Is that true?

10     **A.   Let me take a look at that.  That was March**

11  **28th, did you say?**

12     Q.   Yeah.

13     **A.   No, she did not return, that was another**

14  **telemedicine visit, so she did not return there.  That's**

15  **not true.**

16     Q.   So she didn't have a visit either by

17  telemedicine or in person that day?

18     **A.   I'm sorry.  I thought you said she returned**

19  **there.**

20     Q.   Well, returned telemedicine, she had an

21  appointment.

22     **A.   Well, there is a difference.**

23     Q.   Okay.

24     **A.   Uh, but she did report on the telemedicine**

25  **visit 98 percent relief.**

1    Q.   Okay.  And that's a good thing, would you

2  agree?

3    **A.   Well, I think it's a good thing, but I don't**

4  **think that you can necessarily conclude that the**

5  **procedure had anything to do with it.**

6    Q.   Okay.  So the procedure, which, uh, is

7  supposed to disrupt, uh, the pain signals going to the

8  brain, that, that didn't have any role.

9    **A.   Well, it may or may not have, I, I think**

10  **there's certain circumstances where, you know, RFA, uh,**

11  **can have an effect on, uh, on more than just the local,**

12  **uh, nerves that you're talking about.  You know, many**

13  **times, uh, you know, you can have that particular**

14  **procedure and have a placebo effect.**

15    Q.   Okay.  Um, and she never had any, uh, radio

16  frequency of lesions before her fall at Walmart.  True?

17          MR. DEEB:  Objection to form.

18  BY MR. GILLILAND:  (Resuming)

19    **A.   Uh, I don't have any evidence that she did,**

20  **no.**

21    Q.   Okay.  And on May 9th, 2023, uh, she returns

22  and I don't know if it's in person or telemedicine.  It

23  doesn't matter, she had an appointment.  And at this

24  time she had reached maximum, uh -- maximum medical

25  improvement.  True?

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

```
 1        A.    Uh, which was the date of that?  Was that the
 2    May 9th?
 3        Q.    May 9th, 2023.
 4        A.    Uh, essentially that's correct.  She said she
 5    has occasional mild pain when she overexerts herself or
 6    wears heavy jewelry or wigs for long periods of time.  I
 7    guess we can add those to the superseding factors that
 8    may explain her symptoms.
 9        Q.    A wig explaining disc herniations in her neck?
10        A.    Well, no aggravation.  As she said, it can
11    aggravate, uh, if she exerts herself or wears heavy
12    jewelry or wigs for long periods of time, those are
13    other documented -- in the records they're documented
14    here as aggravating her symptoms.
15        Q.    And the pain relief, uh, she experienced from
16    this procedure, again, that's a good thing for the
17    patient, right?
18        A.    Oh, absolutely.  I think that any, uh,
19    positive response in terms of the treatment is a good
20    thing.  Uh, unfortunately she developed some
21    complications as a, uh, consequence of the procedures,
22    but I think the pain relief would be a good thing, sure.
23        Q.    Yeah.  And she -- the, the complication she
24    experienced was the injection from the plasma, the
25    plasma injections, she went to the Macon -- to a
```

1   hospital in Macon.  Is that right?

2        A.   Um, I'd have to review.  Let me take a look.

3   Let's see.

4        Q.   And while you're looking, you can also see

5   where the doctor recommended that her -- she take -- she

6   increase her blood pressure medication for her neck

7   pain?

8        A.   So according to the review that I have, she

9   had neck pain after the procedures in October of 2022,

10  she did have some hypertension at that time as well.

11  And in may of 2023, she was complaining about a lump or,

12  uh, I think she characterized it as a chunk of meat in

13  her neck.  Uh, what etiology undetermined.

14       Q.   Okay.

15       A.   Hunk of meat on her neck.

16       Q.   And, uh, someone can develop chronic pain from

17  an acute injury.  Is that true?

18       A.   I think in the -- in the realm of

19  hypothetical, that's true, but in my -- in my expert

20  opinion to a reasonable degree of certainty, the August

21  5th, 2022, event did not cause any chronic pain or did

22  not cause the need for any of the procedures that Ms.

23  Lamar had.

24       Q.   And chronic pain is a real medical condition?

25       A.   It -- yes, it is.

1      Q.    And it's a serious medical condition?

2      **A.    Well, it can be, yes.**

3      Q.    In fact, it causes mental health problems,

4  doesn't it?

5      **A.    I think that that would be possible.**

6      Q.    It increases suicide risk?

7      **A.    Well, I would say that, that all of those**

8  **things are possible, but there's no evidence in this**

9  **case that that applies.**

10     Q.    Okay.  And, um, what peer reviewed published

11 studies are you relying on to conclude that trauma from

12 her fall did not aggravate her preexisting degeneration?

13     **A.    So to be clear, my opinions are based on my**

14 **review of the records and my review of the evidence and**

15 **my review of the imaging studies.  And the application**

16 **of a scientific method, that is published by the**

17 **American Medical Association, and taught as an**

18 **instructional course lec -- lecture or postgraduate**

19 **course by the American Academy of Orthopedic Surgeons.**

20 **There are publications that support the use of that**

21 **particular, uh, scientific method, which is held as**

22 **being the gold standard for establishing cause when**

23 **cause is otherwise not obvious.**

24     Q.    What --

25     **A.    Uh, there are references that I have used, um,**

 1  in the past, uh, that are part of the base of knowledge

 2  that I use as an expert in the subject matter of

 3  causation analysis.  And I'd be happy to provide you

 4  that, that set of references or the bibliography, but to

 5  be clear in this specific case, there's no scientific

 6  study that came out and gave me the opinion that I'm

 7  holding.  I hold my opinions and the foundation for my

 8  opinions is based again, on the use of a reliable

 9  scientific method and the records that we have

10  available.

11      Q.   Okay.  And the records that we have available,

12  the doctors are coming to different conclusions than

13  you, aren't they?

14      A.   Well, I don't know that.  I mean, I don't

15  really see a lot of, uh, causal opinions in there, not

16  that I -- not that any -- that stand out to me.  But

17  I'll say this in explanation of my answer, it's not

18  uncommon for treating physicians who have a completely

19  different role than I have.  My role in this case, which

20  is a civil matter now, and not a matter of treating

21  patients.  My role in this case is to provide a forensic

22  analysis and a scientific analysis, applying a reliable

23  scientific method to establish whether or not that

24  August 5th, 2022, event caused any serious or permanent

25  injuries and caused the need for these procedures.  As

 1   treating physicians, the doctors involved in treating

 2   and managing Ms. Lamar, their role is very different.

 3   Their role is to, uh, treat and manage her symptoms and

 4   to relieve suffering.  And to be an advocate for Ms.

 5   Lamar.  Uh, I would add that it's no more, uh,

 6   appropriate for them to establish cause than it would be

 7   for a oncologist to determine what caused lung cancer.

 8   If a patient presents to them to be treated for lung

 9   cancer, uh, in the event that -- you know, by the way,

10   25 percent of people that have lung cancer don't smoke.

11   So it's not a treating physician's job or role to

12   establish causation.

13        Q.   What peer reviewed published studies were you

14   relying on to conclude that trauma from her fall did not

15   aggravate her preexisting degeneration?

16        A.   So I, I hold that that question doesn't apply.

17   Uh, there's no article that specifies anything regarding

18   to Ms. Lamar.  That wouldn't be an appropriate use of

19   scientific literature.  However, there is scientific

20   literature that shows that minor trauma does not lead to

21   a long-term, uh, back or neck problems in the future.

22   And as I offered earlier, I'm happy to give you, uh, a -

23   - I can have my staff send you a bibliography that

24   contains, uh, numerous, uh, both publications as well as

25   textbooks in support of my opinion.

1    Q.   And how many of those studies, uh, include

2  African-American females in their fifties who suffered a

3  ground level fall and developed radiculopathy neck pain

4  after a fall?

5    **A.   Sure.  So I think to answer the question**

6  **clearly, I -- I'm not aware.  I'm not aware of any of**

7  **those studies that do that.**

8    Q.   Is it generally accepted in the medical

9  community that -- that a ground level fall will not

10  aggravate preexisting disc herniations?

11    **A.   I wouldn't know.  Uh, I only expressed my own**

12  **opinions.  I don't think that the -- that there, uh --**

13  **there's any, uh, consensus on that particular scenario**

14  **that's been published.  So I'm not aware of any**

15  **published data that's -- that, uh, would support that.**

16  **But, uh, it's my experience and based on my, uh,**

17  **treating of many patients involved in ground level falls**

18  **that they typically do not result in serious or**

19  **permanent injuries.**

20    Q.   And there are no MRIs of Ms. Lamar's cervical

21  spine before her fall, true?

22    **A.   I think you asked me that question before and**

23  **I'll repeat again, that's correct.  However, there was a**

24  **CT scan done in August of 2020.**

25    Q.   Okay.  And a disc herniation that indents the

```
 1    spinal cord, that's a pretty concerning finding wouldn't
 2    you say?
 3        A.   It may or may not be.  I have examples of
 4    patients with six disc herniations that are compressing
 5    the spinal cord and they're completely asymptomatic.  So
 6    the MRI finding in and of itself, as the radiologist
 7    himself pointed out in his report has to correlate with
 8    the clinical findings and clinical evidence.  And
 9    fortunately we have to -- we do have good clinical
10    evidence the day of the event that there was a normal
11    neurological exam and that she was neurovascularly
12    intact with no evidence on physical exam of any sensory
13    deficits or any focal deficits.
14        Q.   And there was no evidence that she walked into
15    Walmart that day, experiencing neck pain that radiated -
16    - that radiated down her left arm, true?
17            MR. DEEB:  Objection to form.  Calls for
18        speculation.
19    BY MR. GILLILAND:  (Resuming)
20        A.   Yeah.  I'm not aware of any answer or any, uh,
21    evidence of that.
22        Q.   Okay.  And on -- on, uh, one of the other
23    records we have that you reviewed are Georgia Orphans --
24    Georgia Spine and Ortho, uh, that she went to after her
25    car wreck on August 9th, 2020.  And on, uh, January
```

 1  31st, 2021, at Georgia spine, the treating provider said

 2  that Ms. Lamar did not have any numbness and tingling in

 3  her left arm.  And feel free to check me on that.  But

 4  is that -- is that accurate?

 5       **A.   Um, I don't have the note in front of me, but**

 6  **I can refer to it.  Uh, let's see, that'd be chapter**

 7  **eight.  So I have a record from January 13th, 2021, and**

 8  **as I go through the record, uh, Dr. Bendiks had**

 9  **recommended some injections of her shoulder at that**

10  **time.**

11       Q.   Any -- any, uh, injections recommended for her

12  neck?

13       **A.   No.**

14       Q.   Okay.

15       **A.   And in terms of, uh, findings, the findings**

16  **were sent -- the physical exam findings and, uh, records**

17  **from that time are regarding a chief complaint of left**

18  **shoulder pain.  Um, we don't have a complete**

19  **neurological exam documented and we don't have an**

20  **examination of the neck documented, but the conclusion**

21  **was that the patient may benefit from PRP injections in**

22  **the left shoulder.**

23       Q.   Okay.  And there is -- Ms. Lamar did not have

24  any numbness and tingling in her left arm at that visit,

25  true?

```
 1                MR. DEEB:  Objection to form.

 2    BY MR. GILLILAND:  (Resuming)

 3        A.    Well, we don't know that.  When we go to the

 4    review systems, which would address that typically, uh,

 5    we don't have any -- uh, the record is mute on that

 6    topic.

 7        Q.    Okay.  Um, because you did not see Ms. Lamar

 8    in person, uh, you cannot see any nonverbal responses

 9    she would have given to orthopedic tests, true?

10        A.    Uh, the only record I would have would be if

11    it was documented or memorialized in the record.

12        Q.    Patients can wince and make uncomfortable

13    looking faces during a physical exam, true?

14        A.    That's true.

15        Q.    Okay.  And nonverbal clues can be very

16    important, true?

17        A.    Sure.  Yes.

18        Q.    Um, your opinions in this case were developed

19    for litigation, weren't they?

20        A.    Um, I think in the context of civil

21    litigation, that'd be fair to say.  I was -- I was asked

22    to come in and provide expert opinions to the finder of

23    fact, you know, should this case go to trial.

24        Q.    Your analysis, uh, was created for this case,

25    not part of any clinical practice, true?
```

```
 1        A.   Correct.  I have no role in the treatment of

 2   Ms. Lamar, uh, particularly since the, the period of

 3   time that she was injured was over three years ago.  Um,

 4   and apparently resolved based on the records that we

 5   have, uh -- that I have available.  Um, so that's

 6   correct.  My role here is essentially, as I stated

 7   before, to provide a forensic analysis as a subject

 8   matter expert on the area of injury causation analysis.

 9        Q.   The opinions you developed in this case were

10   not from Ms. Lamar's medical care, true?

11        A.   That's correct.

12        Q.   There's no published error rate for diagnosing

13   orthopedic injuries solely from a medical record review,

14   true?

15             MR. DEEB:  Objection to form.

16   BY MR. GILLILAND:  (Resuming)

17        A.   I'm not sure I understand the question.

18        Q.   Are there any peer reviewed published studies

19   that have error rates on them that -- for medical record

20   reviews?

21             MR. DEEB:  Objection to form.

22   BY MR. GILLILAND:  (Resuming)

23        A.   Well, I'm not aware of any, if there are, but,

24   uh, I'm not doing a simple medical record review.  I'm

25   doing a causation analysis.
```

1     Q.   Can you say to a reasonable degree of medical

2    certainty that an orthopedic surgeon, uh, hired by the

3    court under federal rule 706 would reach the same

4    conclusion as you after reviewing Ms. Lamar's medical

5    records?

6    **A.   I think.**

7         MR. DEEB:  Objection.  Objection to from.

8    Calls for speculation.

9  BY MR. GILLILAND:  (Resuming)

10    **A.   Sure.  I think that's a speculative question.**

11  **I think that I would stand by my opinions and my expert**

12  **opinions based on my specialized knowledge, training and**

13  **experience of doing so.**

14    Q.   Do you think another orthopedic surgeon who

15  reviewed Ms. Lamar's medical records would come to a

16  different conclusion than you?

17         MR. DEEB:  Same objection.

18  BY MR. GILLILAND:  (Resuming)

19    **A.   Well, I think that would depend on the**

20  **qualifications.  I think someone who is not qualified or**

21  **trained or, uh, has an understanding of causation**

22  **analysis or someone who does not use a reliable**

23  **scientific method, I couldn't speculate what kind of a**

24  **conclusion that can come up with.  Um, you know, I**

25  **basically, you know, I would use the analogy that I've**

1    **been trained, uh, uh, you know, to, to do this**

2    **particular type of scientific method.  And then I think**

3    **if someone else with reasonable training, uh, applies**

4    **the same methodology, they would come up with the same**

5    **conclusion.**

6         Q.   And the scientific method includes, uh,

7    testing hypotheses, ruling out causes, ruling in causes.

8    Is that true?

9         **A.   Well, what you're referring to is the**

10   **scientific method in general.  I'm talking about a**

11   **specific scientific method that's been established as**

12   **the gold standard for establishing injury causation**

13   **analysis.**

14        Q.   Um, was Ms. Lamar bleeding after her fall at

15   Walmart?

16        **A.   The records indicated that she had some**

17   **scratches and that she had also testified that she was**

18   **bleeding, yes.**

19        Q.   Okay.  And so are you saying that even though

20   the doctors that treated Ms. Lamar from roughly August,

21   2022, to May, 2023, um, are you saying that, you know,

22   more than them by reviewing their medical records?

23             MR. DEEB:   Objection to form.

24   BY MR. GILLILAND:  (Resuming)

25        **A.   Oh, no, I have no -- no.  I have no, uh, ax to**

1    grind with their knowledge or any of their treatment,

2    you know, the decisions that they stand by.  You know, I

3    -- again, my role here was not as a treating physician,

4    but as someone to come in as an expert and apply a

5    scientific -- reliable scientific method and bring some

6    science to, uh, uh, the court and to the finder of fact.

7    It -- to enable them to make the, uh, the decision,

8    should it come to that, uh, as to the outcome?

9        Q.    Okay.  The, um, scientific method that you're

10   referring to is the six step method that you, uh, you

11   gave us a document outlining six steps?

12       A.    Yeah, essentially the answer is yes.  The

13   American Medical Association published -- publishes a

14   guide to the evaluation of disease and injury causation.

15   That particular guide, uh, is a description of the

16   scientific method that I apply.  It's also a part of the

17   syllabus of the course that's taught each year by the

18   American Academy of Orthopedic Surgeons.  Um, but

19   there's numerous other, uh, reviews and summaries of the

20   particular method.  And by way of history, I think it's

21   relevant to explain, um, that the guide and the six step

22   method is predicated on what's called the Bradford Hill

23   criteria, which are actually nine steps.  And that's the

24   -- that's -- that particular set of criteria is what the

25   CDC uses when they establish cause when causes otherwise

```
 1   not obvious.  And sp for example --

 2        Q.    Example --

 3        A.    -- some examples of that would be that a

 4   determination that, uh, cigarette smoking causes lung

 5   cancer many years later.  The Bradford Hill criteria is

 6   what was used to establish that.

 7        Q.    Right.

 8        A.    Uh, the other criteria that, uh, multiple

 9   concussions can lead to chronic traumatic encephalopathy

10   many years later, the Bradford Hill criteria was what

11   was used to establish that.  So AMA method is, uh, pared

12   down to six steps because it is more of a clinical, uh,

13   uh, scientific method, uh, applied in medicine

14   specifically.  And it has been held to be the gold

15   standard by members of the AMA, the American Academy of

16   Orthopedic Surgeons and the American, uh, College of

17   Occupational Medicine and, uh, Environmental Medicine.

18   So, um, I can provide you some literature if you choose

19   to review that establishes that the AMA method is the

20   only gold standard for establishing causation -- medical

21   causation, when otherwise not obvious.

22        Q.    And it's the gold standard and so it's

23   authoritative and you rely on it, true?

24        A.    Well, I use it, yeah.  I've been using it

25   since, uh, 2020.
```

```
 1         Q.   And you wouldn't use it if it wasn't

 2   authoritative, right?

 3              MR. DEEB:  Objection to form.

 4   BY MR. GILLILAND:  (Resuming)

 5         A.   Well, I use it because it is a scientific

 6   method that's been proven to be reliable.

 7         Q.   Well, it's the gold standard, right?

 8         A.   In my opinion, it is the gold standard.

 9         Q.   And this method was designed for a chronic

10   disease causation, not acute trauma, true?

11         A.   No, that's not true.

12              MR. DEEB:  Objection to form.

13   BY MR. GILLILAND:  (Resuming)

14         Q.   Okay.  What epidemiological studies can you

15   point me to that say African-American females in their

16   fifties who suffer a ground level fall will never suffer

17   disc herniations in their cervical spine?

18              MR. DEEB:  Objection to form.

19   BY MR. GILLILAND:  (Resuming)

20         A.   Yeah, I'm not aware of any studies that would

21   say that.

22         Q.   What epidemiological studies can you point me

23   to that say African-American females in their fifties

24   will never suffer aggravation of preexisting arthritis

25   in their spine from a ground level fall?
```

1           MR. DEEB:  Objection to form.

2    BY MR. GILLILAND:  (Resuming)

3       **A.   Yeah.  I think same response, I'm not aware of**

4    **any literature that's looked at that specific, uh,**

5    **demographic and that subset.**

6       Q.   There's no need for an exposure analysis in a

7    one-time injury event, is there?

8           MR. DEEB:  Objection to form.

9    BY MR. GILLILAND:  (Resuming)

10      **A.   I'm not sure I'm understanding your question.**

11   **Can you rephrase your question or be more specific?**

12      Q.   Yeah.  I think it's the first step says you

13   need exposure to an event or to a, uh -- to a condition.

14          MR. DEEB:  Objection.

15   BY MR. GILLILAND:  (Resuming)

16      **A.   Third -- the third step in the AMA step or**

17   **methodology, the third step relates to evidence of**

18   **exposure and evidence of exposure is something that I**

19   **addressed in this particular case.**

20      Q.   The document you provided us, the first step

21   is evidence of disease.  Ms. Lamar does not have a

22   disease, does she?

23      **A.   Well, essentially that's what the textbook --**

24   **it's also evidence of a diagnosis and technically an**

25   **injury is a part of a disease continuum or a diagnosis.**

1    Q.   So disc -- two disc herniations in the

2    cervical spine is a disease?

3    **A.   Well, a disc herniation is part of a -- yeah.**

4    **Yeah, I think, degenerative disc disease.  Yes, that's**

5    **correct.**

6    Q.   Okay.  And that's a disease in the same way,

7    like you mentioned, lung cancer is a disease?

8        MR. DEEB:  Objection to form.

9    BY MR. GILLILAND:  (Resuming)

10   **A.   Well, I'm not -- I, I -- I'm not getting the -**

11   **- I'm not getting the question.  Is that a question?**

12   Q.   Yeah, that is a question.

13   **A.   It sounded like a statement.  I don't know.**

14   **Is that a statement or a question?**

15   Q.   No, that was a question.  Is cervical --

16   **A.   Can you rephrase the question?**

17   Q.   Are cervical disc herniations similar to

18   cancer?

19       MR. DEEB:  Objection to form.

20   BY MR. GILLILAND:  (Resuming)

21   **A.   No.  In that particular specific question, the**

22   **answer is no, I don't consider degenerative disc**

23   **herniations the same as lung cancer.**

24   Q.   The -- but the first step is you have to have

25   evidence of a disease.  And we'll just go with your

```
 1   phrasing that she had, uh, degenerative disc disease, so

 2   we do have evidence of a disease in this case, true?

 3        A.   Well, actually the first step in terms of

 4   causation analysis is what diagnosis is supported by the

 5   evidence.

 6        Q.   I have the document right here, doctor, your

 7   office produced this.  Do you see it?

 8             MR. DEEB:  Objection to form.  Let him finish,

 9        please.

10   BY MR. GILLILAND:  (Resuming)

11        A.   I can't see that, it's very blurry, but -- and

12   I don't dispute that that's what you were provided.  But

13   at the same time, I'm here to explain that step number

14   one is what diagnosis is supported by the evidence, by

15   the clinical evidence.

16        Q.   Okay...

17        A.   Based on the ER record, the only diagnosis

18   that supported in terms of any traumatic injury was that

19   she suffered a contusion or contusions to her left

20   elbow, her knee and a sprain or a muscle strain to her

21   paracervical or paravertebral, uh, muscles, lateral to

22   her neck, the trapezius muscle, I believe.  Uh, that's

23   the --

24        Q.   Okay.  So the ER records --

25        A.   -- if I could finish my sentence.  So that's
```

1    **the diagnosis that's supported by the evidence.  Now the**

2    **CT scan did also establish that she had chronic**

3    **preexisting degenerative arthritis in her neck and her**

4    **back.  And it also confirmed the CT scan that there was**

5    **no evidence of paravertebral swelling to indicate any**

6    **sort of traumatic event on the CT scan.  There's no**

7    **evidence.  That's why CT scans done in the ER to**

8    **establish whether or not there's any evidence of any**

9    **acute trauma and there was no acute trauma to the**

10   **cervical spine.  So again, to be clear, the diagnosis,**

11   **step number one, in this case is essentially just to**

12   **paraphrase, as my report says, abrasions and contusions.**

13        Q.   Okay.  Dr. Martino, it seems like you don't

14   want to answer my questions and you want to keep

15   speaking.  When I answer one question and answer a bunch

16   of questions I didn't answer -- that I didn't ask.

17        **A.   I would disagree.  I think you don't like --**

18             MR. DEEB:  Objection to --

19   BY MR. GILLILAND:  (Resuming)

20        **A.   I think you don't like to hear my answers.  I,**

21   **I don't mind your questions, but I think it's you don't**

22   **care for.**

23        Q.   I don't mind you're answers.

24             MR. DEEB:  Objection to form.

25   BY MR. GILLILAND:  (Resuming)

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

1      Q.   I'm going to read step number one from the

2   document you provided.  It says evidence of disease, it

3   is important to note that a symptom or set of symptoms

4   does not represent a disease.  A diagnosis of one or

5   more specific diseases must be supported by the

6   available evidence, such as history, physical

7   examination findings, resulted and resulted diagnostic

8   testing.  Evidence of disease must be established prior

9   to advancing to step two.  Here we have evidence that

10  Ms. Lamar has cervical disc herniations in her neck and

11  radiculopathy down her left arm and we'll call that

12  degenerative disc -- whatever it is, degenerative disc

13  disease.  There's evidence of disease, true?

14      **A.   I, I say -- I disagree.  I'd say that's not**

15  **true.  That long winded sentence that you just rattled**

16  **on about is not true and not supported by the evidence**

17  **from the ER.  She did not have, uh, symptomatic disc**

18  **herniations the day of the event.**

19      Q.   Okay.  And so she does not have degenerative

20  disc disease then?

21      **A.   No.  As I testified earlier, the CT scan does**

22  **show that she had preexisting degenerative changes in**

23  **her cervical spine.  And, uh, in fact, those are**

24  **preexisting they date back to 2020, when we look back at**

25  **a CT scan from 2020 after the motor vehicle accident.**

1    So no, in terms of the, of the evidence, it's clear she

2    had chronic preexisting degenerative disc disease.  But

3    the clinical records and the rest of the remainder of

4    the clinical evidence, which is what the diagnosis is

5    founded upon, the day of the event, not a month later,

6    not a month later.  The evidence shows that that they,

7    on the date of the event that she is not having evidence

8    of cervical radiculopathy or lumbar radiculopathy or any

9    serious head injury or any other serious injuries.  She

10   had physical signs of a normal, supple range of motion

11   of her neck.  You know, in essence, she can move her

12   neck up and down.  That's not consistent with any

13   serious or permanent injury to her neck.  The CT scan

14   showed no evidence of paravertebral swelling and no

15   evidence of any, uh, acute injury.

16        Q.   Do you have any peer review published studies

17   showing that this gold -- that this six step method is

18   reliable for single event injuries?

19             MR. DEEB:  Objection to form.

20   BY MR. GILLILAND:  (Resuming)

21        A.   Yes.

22        Q.   What are they?

23        A.   Well, I can provide it to you -- I mean, I

24   don't have the -- I'll give you one right off the bat.

25   I can give you one published by the American Academy of

 1    **Orthopedic Surgeons titled A Comprehensive Review of**

 2    **Injury Causation Analysis Methodology for the Assessment**

 3    **of Workers' Compensation and Motor Vehicle Collisions.**

 4    **That would be one response.**

 5        Q.   Okay.  Who was the author of that?

 6        **A.   Lead author is, uh, Erick Santos, published in**

 7    **journal of American Academy of Orthopedic Surgeons,**

 8    **March 1st, 2025, volume 33, number five.**

 9        Q.   Okay.  And this six step method is based on

10    population level risk, true?

11            MR. DEEB:  Objection to form.

12    BY MR. GILLILAND:  (Resuming)

13        **A.   Well, I think what you're saying, if I'm**

14    **understanding your question, it is based on --**

15    **epidemiology is the second step.  So epidemiology is the**

16    **science of studying a -- the prevalence and the**

17    **incidents and associated factors of a particular**

18    **diagnosis in a given population.  So I think the answer**

19    **is yes.**

20        Q.   And what epidemiological peer review papers

21    say that this six step method should be used in a slip

22    and fall disc herniation case?

23            MR. DEEB:  Objection to form.

24    BY MR. GILLILAND:  (Resuming)

25        **A.   Well, I'm going to take the first position**

 1    that I'm not aware of any, and that's my first response.

 2    But by way of explanation, there's nothing in the

 3    scientific literature that said that says that you

 4    should not do that.

 5         Q.   Okay.  Isn't epidemiology -- isn't

 6    epidemiological analysis inherently more appropriate for

 7    disease of gradual onset or cases involving population

 8    level risk rather than immediate, uh, trauma?

 9         A.   No, no.

10              MR. DEEB:  Objection to form.

11    BY MR. GILLILAND:  (Resuming)

12         A.   There are many epidemiological studies that

13    look at the prevalence of traumatic events related to,

14    for example, motor vehicle accidents.  In fact, there's

15    an excellent study lead authors name is Kent who

16    published based on the review of two national databases,

17    one, uh, hospital based database involving over 40

18    states and hundreds of hospitals and hundreds of

19    thousands of people involved in motor vehicle accidents.

20    And then a second database published by a federal

21    registry, which I think is a branch of the national

22    highway and traffic safety administration, looking

23    specifically at the incidence of certain injuries

24    diagnoses with single solitary traumatic events.  And,

25    uh, for example, the incidence of traumatic disc

Lamar vs. Wal-Mart Stores East            Dr. Joseph Martino            10/23/2025

1    **herniation from a car accident is extremely rare**

2    **reported at 0.01 per 10,000, that's one in a million.**

3    **So there is data out there that does look at trauma in**

4    **terms of epidemiological evidence.**

5           Q.    Okay.   Um, there's also epidemiological data

6    looking at just the baseline prevalence of people with

7    all sorts of musculoskeletal complaints, including back

8    and neck, including upper extremity, lower extremity.

9    And the reality is, is that in -- I guess it's for me,

10   it's why I went into orthopedics.   That musculoskeletal

11   problems are very common in adult and children

12   populations.   And that the frequency or the incidence,

13   if you will, of having symptoms very similar to what Ms.

14   Lamar had is very common in the general population.   And

15   so by ignoring the baseline prevalence, essentially the

16   -- any treating physician would be committing a

17   cognitive bias by not realizing what the baseline

18   prevalence of a particular condition is in the

19   population.

20              MR. GILLILAND:   Okay.   All right.   We have --

21              THE DEPONENT:   Maybe this would be a good time

22        to take a break.

23              MR. GILLILAND:   Yeah.   If you want to take a

24        break, we can do that.

25              THE DEPONENT:   We'll take a 10 minute break

```
 1          and start back at noon?

 2               MR. GILLILAND:  Okay.

 3               THE VIDEOGRAPHER:  We're off the record.  The

 4          time is 11:50 a.m.

 5     (Recess at 11:50 a.m.)

 6     (Resume at 12:02 p.m.)

 7     (Whereupon, P-1 was marked and identified.)

 8               THE VIDEOGRAPHER:  We're back on the record.

 9          The time is 12:02 a.m.

10     BY MR. GILLILAND:  (Resuming)

11          Q.   Okay.  On page three of eight of your resume,

12     Dr. Martino, you said that you were currently active in

13     academic medicine as a faculty member with Jack Houston

14     Memorial Hospital residency program, where you teach

15     orthopedic residents.  We sent a subpoena to you and we

16     asked for your class schedules and syllabi for those

17     classes you teach.  We got a syllabi for, uh, a course

18     called biomechanics course.  Um, are you a biomechanical

19     engineer?

20          A.   No.

21          Q.   Have you ever published any articles about

22     biomechanical engineering in any peer review published

23     journals?

24          A.   No.

25          Q.   Do you have any graduate degrees besides your
```

1   medical degree?

2       **A.    No.**

3       Q.   Are you an engineer?

4       **A.    No.**

5       Q.   What days do you teach the biomechanics course

6   at Jack Houston?

7       **A.    So on the topic of biomechanics, biomechanics**

8   **is a requirement, uh, in residency training for all**

9   **orthopedic surgeons.  It's a requirement set forth by**

10  **the American College of Graduate Medical Education.**

11  **It's not required to be taught weekly, but there are**

12  **certain numbers of hours per year that residents must be**

13  **taught biomechanics.  We, uh -- in terms of my teaching**

14  **on that, I teach approximately six hours per semester on**

15  **the topic of biomechanics as it applies to orthopedics.**

16      Q.   What days do you teach?

17      **A.    So currently my teaching schedule, I don't go**

18  **back, I don't return, I was down there two weeks ago and**

19  **I don't return again until the end of, I believe the end**

20  **of November.**

21      Q.   What days do you teach the course?

22      **A.    So I teach a number of different courses, but**

23  **it's typically on a Friday.**

24      Q.   Okay.  Um, is that -- are you currently

25  teaching this biomechanics course on Fridays?

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                    10/23/2025

```
 1        A.   Well, again, as I said, it's not a -- it's not
 2    a recurring weekly course.  It's a course that's taught
 3    once per semester.  I also teach a number of other
 4    subjects to the residents, including injury causation
 5    analysis.  I do a lab in ultrasound and learning how to
 6    use a musculoskeletal ultrasound diagnostic imaging.  I
 7    teach a course in, um, masters of radiology and
 8    interpretation of MRI studies, but on the specific topic
 9    of biomechanics, it's part of my scope of practice.
10    Orthopedic surgeons are trained in biomechanics as it
11    applies to orthopedics I think I provided you some
12    textbooks on the topic that relates specific
13    specifically to orthopedics.  But probably most relevant
14    in terms of, uh, the relevancy of your question, I don't
15    really expect to give any opinions on biomechanics in
16    this case.
17        Q.   Do you teach every Friday or one Friday a
18    semester?
19        A.   It depends.  My, my flex -- my schedule is
20    flexible.  It depends, uh, on the needs of the
21    curriculum and the needs of the faculty, the other
22    faculty there.  Um, I was last down in Columbus, uh, for
23    two different events.  One was for journal club about
24    two weeks ago.  And then also, uh, for a research
25    project that we are, uh, myself and a resident and
```

```
 1   another attending in Columbus at the Houston clinic

 2   we'll be working on.  I have another research project

 3   that I've been working on, I'm active in both research

 4   as well as teaching.  So my time is spent bouncing

 5   between doing research and occasionally doing teaching.

 6   I do not teach every, uh, every week though.

 7        Q.   Okay.  So do you teach every one -- you teach

 8   this course once a semester on a Friday?  If so, when is

 9   the last Friday you taught this course?  What date was

10   it?

11        A.   I don't recall.  Uh, it was actually last

12   semester.  So it was in 20 -- uh, I don't believe that

13   biomechanics was this year.  I think it was last year.

14        Q.   Okay.

15        A.   We try to do it in the -- this season right

16   now, the residents are training or preparing for what's

17   called an in training examination.  So, uh, most of the

18   curriculum for the didactic training that they're

19   getting is in preparation for testing.

20        Q.   So you taught this course last year on one

21   Friday?

22        A.   I believe it was a Friday sometime in the, in

23   the past year or so.

24        Q.   Okay.  Past year being 2024?

25        A.   Past 12 months.
```

1    Q.    Okay.  Was it spring or fall semester?

2    A.    I don't remember.

3    Q.    Okay.  How many students were in this class?

4    A.    So the residency program, uh, is comprised of

5    three residents per year, uh, for five years.  Uh, not

6    all the residents can always attend, sometimes they're

7    on call or they're in the OR.  Uh, last year we had two

8    medical students that were doing research, uh, uh, a

9    one-year research fellowship, uh, one or two, I think --

10   I think two.  Um, so it, it depends.  I don't recall how

11   many.

12   Q.    Okay.  Um, and how many times have you taught

13   this course?

14   A.    I only started this particular -- that

15   subject, uh, in the past, uh, year.

16   Q.    Is it unusual for a non biomechanical engineer

17   to teach biomechanical engineering?

18   A.    No.  It's not biomechanical engineering that

19   I'm teaching.  So I think you're misunderstanding what

20   biomechanics is.  Biomechanics, uh, as an engineer is a

21   completely different, uh, uh, subject matter compared to

22   biomechanics as it applies to orthopedics.  Uh, in the

23   realm of orthopedics, we are required to learn how to

24   apply biomechanical principles to the human body.  Uh,

25   just for example, you know, calculating, uh, linear

 1  force, uh, in terms of sports medicine injuries, um, ACL

 2  injuries.  You know, how much force does it take to, uh,

 3  to transect or to rupture an ACL, things like that.  Uh,

 4  I've done research in the past in biomechanics as well.

 5  Uh, many years ago, I did a project, uh, at RPI,

 6  Rensselaer Polytech Institute, while I was a chief

 7  resident in 1992 and 1993.  Um, working with

 8  biomechanical engineers, but applying their science to

 9  the specialty of orthopedics.

10      Q.   Okay.  So you taught this course one time in

11  the last year, and you don't remember how many students

12  are in the class.  Is that true?

13      A.   Correct.

14      Q.   Okay.  We also got a syllabus for something

15  called masters and MSK radiology course.  You were not a

16  board certified radiologist, true?

17      A.   That is true.  But by way of explanation,

18  orthopedics also requires us to, uh, as a scope of

19  practice, um, to be able to interpret MRI imaging.  And

20  so part of our training as residents and also continuing

21  medical education once we're in private practice is to

22  continue to maintain, uh, our skills and our knowledge

23  in interpreting both MRI, CT scans, x-rays and

24  ultrasound.  So radiology and musculoskeletal radiology

25  specifically is part of the scope of practice of an

1    **orthopedic surgeon.  Um, if you have any doubt, there's**

2    **a policy position published by the American Academy of**

3    **Orthopedic Surgeons that addresses that very issue.**

4         Q.   Okay.  Is it normal for an orthopedic surgeon

5    to teach radiology?

6         **A.   No.**

7         Q.   Okay.  What days did you teach this course?

8         **A.   I think I actually incorporated that with my**

9    **injury causation analysis case -- or course.**

10        Q.   When did you teach this course?

11        **A.   Last -- it was sometime earlier this year.**

12        Q.   Can you be more specific?

13        **A.   No.**

14        Q.   Okay.  How many residents were in this course?

15        **A.   Again, uh, we had, I think, one medical**

16   **student who was the fellow, the, the, um, research**

17   **fellow, fellow Daniel.  And then I think we had -- we**

18   **did not have all the residents there because again, some**

19   **of them had other responsibilities, but we had, I would**

20   **say at least half a dozen to maybe ten of the residents**

21   **were there.**

22        Q.   So if I found -- if I got syllabi from other

23   radiology courses from medical schools across the

24   country, would they look like yours?

25        **A.   I don't know.**

1    Q.    Okay.  Um, now you list the two books in your

2    radiology course, the AMA Guides to the Evaluation of

3    Disease and Injury Causation and the Biomechanics of

4    Impact Injury.  What do those two books have to do with

5    radiology?

6    **A.    I guess I'd have to see the syllabus.  I**

7    **don't, um -- I don't have it in front of me, so I don't**

8    **remember what, what textbooks were listed in there.  I**

9    **don't, I don't, um -- in terms of radiology, I don't**

10   **think that those, those would apply.  I don't -- I'm not**

11   **sure if that got mixed in there accidentally or not.**

12   Q.    Okay.

13   **A.    Those textbooks would apply to the injury**

14   **causation analysis and, uh, and the biomechanics**

15   **subjects.**

16   Q.    Okay.  And the, um, class schedule that we

17   requested, we did not get that.  Can you get that to us,

18   please?

19   **A.    So I don't have a class schedule per se.  I --**

20   **basically, I touch base with the chief residents, uh,**

21   **or, uh, the secretary and I establish, you know, when**

22   **they next have an opening and then I fill that opening.**

23   **So it's a flexible schedule.**

24   Q.    Okay.  We got the syllabus for the course you

25   just referenced causation analysis course.  At the top

```
 1   of the syllabus it says injury causation analysis, the

 2   medical science of establishing cause when cause is not

 3   otherwise obvious.  Now, would you agree that a ground

 4   level fall causing neck back and knee injuries is

 5   obvious?

 6              MR. DEEB:  Objection to form.

 7   BY MR. GILLILAND:  (Resuming)

 8       A.   Well, in the context of Ms. Lamar, I think

 9   that that is obvious that the contusions and the

10   abrasions, uh, were obvious.  I think the question that

11   was not so obvious is the one -- the alleged, uh,

12   complaints of cervical and lumbar radiculopathy and the

13   alleged complaints of a head injury, I believe was in

14   there as well in the initial complaint.  And so, uh, as

15   an injury causation expert, my role is to come in and

16   clarify what is real and what is not real and bring the

17   science to the table.

18       Q.   Okay.  And, um, what days do you teach this

19   course?

20       A.   So again, it's not a daily or a weekly course.

21   It's typically once a semester.  I'm not sure when I'll

22   be teaching it again, but I taught it earlier this year.

23   And, uh, at the request of the residency director.  And,

24   uh, I anticipate teaching again later this year.

25       Q.   When did you teach it earlier in the year?
```

1    **A.    I don't remember exactly, I think it might've**

2    **been January or February.  It may have been March.  I**

3    **don't, I honestly don't remember.**

4    Q.    Okay.  And how many students were in this

5    course?

6    **A.    Well, again, about the same that I mentioned**

7    **earlier, about ten.  And not all the residents are able**

8    **to make it, sometimes they are on call and -- from the**

9    **previous evening and then they're required to make --**

10    **you know, stay in the OR on cases that they've started**

11    **in the evening.  So not all the residents are able to**

12    **attend, but most of them are there.  Most of them were**

13    **there.**

14    Q.    Your CV also says that you're the principal

15    investigator on a scoliosis research study for

16    Children's Healthcare of Atlanta.  We asked for

17    documents of that and we got something called a research

18    proposal.  Um, would you say that's -- that's different

19    than an actual, uh, study?

20    **A.    No, it's an ongoing study.  It's not**

21    **completed.  It's a research project, which I'm heading**

22    **up, uh, both, you know, attempting with CHOA, although**

23    **the bureaucracy of going through the, uh, institutional**

24    **review board takes about a year.  But I'm also doing the**

25    **same study, the same research with, uh, as I mentioned**

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

```
 1    earlier, one of the orthopedic residents and one of the
 2    orthopedic attendings, uh, at the Houston clinic in
 3    Columbus.  So it's a -- it's a multi-center study, if
 4    you will, but it's not been completed yet.  We're, we're
 5    still awaiting permission -- excuse me, uh, to, uh,
 6    examine the, the, the, the patients or enroll subjects
 7    in that study.
 8        Q.    What are the names?
 9        A.    I'm sorry.
10        Q.    What are the names of the people you are
11    dealing with at Children's Healthcare of Atlanta that
12    are on this board that approve these studies?
13        A.    So I'm not aware of the members of the board
14    for the IRB board.  I don't know who they are.  Uh, but
15    the doctor that I'm affiliated with or been talking to
16    about this particular study is Dr. Murphy.
17        Q.    Okay.  And he's the pediatric spine surgeon
18    that you're collaborating with?
19        A.    He is a pediatric spine surgeon at CHOA.
20    That's correct.  And he and I have discussed the project
21    and his level of interest in the project.  He's very
22    interested in, uh, pursuing the project, but again, with
23    the, uh, necessary steps that you have to go through
24    with an IRB to get approval, um, we we've begun that
25    process in the spring, but we haven't gotten an answer
```

1    yet.

2        Q.    Who's going to fund this study?

3        A.    So some of the funding will be provided by me.

4    Um, I have purchased the equipment for the study and the

5    necessary, uh, physical items that are necessary to do

6    the, the -- to perform the methods of this procedure.

7    Uh, additional expenses, for example, for, um,

8    compensation of volunteers that enter into the study,

9    um, is, is yet to be negotiated.  But I think there's

10   some funding that's going to be considered from either

11   CHOA for the subjects that we do there and, or the, uh,

12   there's some budget at the Houston clinic to provide

13   things like gift cards, things like that, that are

14   incentivized subjects to enroll in the study.

15       Q.    Okay.  Besides, uh, Dr. Murphy -- is Dr.

16   Murphy a pediatric spine surgeon with CHOA and what,

17   what is his first name?

18       A.    Yes, he is.  Uh, he's a pediatric orthopedic

19   spine surgeon at Children's Healthcare of Atlanta on

20   staff.  He's an orthopedic surgeon fellowship trained in

21   spine surgery.  Um, and his first name is Josh.

22       Q.    Okay.  And who, uh -- and you don't know the

23   names of the people you're working with at CHOA who are

24   on the board?

25       A.    I -- I'm not familiar with the IRB, no.

1    Q.   Okay.  Your resume also says that you

2    published two textbook chapters in the field of

3    orthopedic surgery.  Uh, we asked for those textbook

4    chapters and we received a printout that says chapter

5    40-PE of the shoulder.  Uh, but what is the name of this

6    book?

7    **A.   Sure.  So actually have it here.  So it's a**

8    **textbook that was, uh -- the editor was my residency or**

9    **my fellowship director, Dr. Champ Break Che -- sorry,**

10   **Dr. Champ Baker, Jr.  Um, um, and I was asked by Dr.**

11   **Baker to, uh, contribute to two chapters.  One of the**

12   **chapters I did in conjunction with Dr. George McCluskey.**

13   **Uh, and that was the chapter that refers to the**

14   **examination of the shoulder.  Uh, a second chapter that**

15   **I did the first draft of, uh, for Dr., uh, Baker was**

16   **knee arthroscopy, the chapter on knee arthroscopy.**

17   Q.   Okay.  So that --

18   **A.   Published in 1994, I think.**

19   Q.   When did you, uh, graduate your residency

20   program in orthopedic surgery?

21   **A.   I completed my residency, uh, at Albany**

22   **medical center hospital in Albany, New York in 1993.**

23   Q.   Okay.  And so you authored chapter 40 of that

24   book you just held up and chapter 78, the deals with

25   arthroscopy of the knee?

Lamar vs. Wal-Mart Stores East          Dr. Joseph Martino          10/23/2025

1      **A.   I, I, I did the initial draft, uh, for the**
2  **arthroscopy chapter and I did the complete draft, uh,**
3  **for the examination of the shoulder along with Dr.**
4  **McCluskey.**
5      Q.   Okay.  So you're listed as -- as one of the
6  authors of that textbook?
7      **A.   I got specific recognition for the chapter on**
8  **the shoulder examination.  Um, I did not get any**
9  **specific recognition for the chapter on arthroscopy.**
10     Q.   When you say recognition, is your name listed
11  as an author in that book?
12     **A.   In the book it is, yes.**
13     Q.   Okay.  Where can that book be -- uh, where can
14  we find that book?
15     **A.   I have no idea.  The library -- I think a**
16  **medical library would be one source.**
17     Q.   Okay.  Now on page three of eight of your CV,
18  you said that you were a member of the research
19  committee at the Houston clinic where you are a
20  principal investigator leading a sports medicine
21  research study and a second study developing a deep
22  learning model for injury causation analysis.  How many
23  members are on this research committee?
24     **A.   Uh, it's changed, the, uh, the former director**
25  **left in August, um, Dr. Ponce.  Uh, so we lost three**

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 97 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

```
 1    members from the committee when he left.  Um, so

 2    currently we have, I think approximately five members.

 3         Q.   What are their names?

 4         A.   So Dr. Ponce was the lead, uh, right now

 5    Doctor -- I think Dr. Wojciechowski is the, uh, new

 6    director or, or temporary director.  Um, Challie Minton

 7    is in charge of the IRB process and, uh, she's my --

 8    she's the person that I probably talk to the most when I

 9    talk or communicate with him.

10         Q.   Uh, how often does this research committee

11    meet?

12         A.   We had been meeting every Monday morning.  And

13    again, uh, as of August, uh, with the former director

14    having moved on to greener pastures, we're, uh, now

15    meeting every other week.

16         Q.   Okay.  And then the research --

17         A.   I mean -- I just, by way of clarification, I

18    typically don't go down there for the meetings.  I will

19    jump in on a tele-zoom call, um, you know, for a portion

20    of the meeting.

21         Q.   How far along is the research committee in

22    finishing this study?

23         A.   So if I'm -- if I'm understanding your

24    question, uh, the research committee is not doing the

25    research.  I'm doing these two projects that I mentioned
```

Lamar vs. Wal-Mart Stores East                 Dr. Joseph Martino                          10/23/2025

```
 1   in the, in the document you're talking about.  The study
 2   on the, uh, cardiology, um, and the use of, uh,
 3   augmented auscultation or listening, uh, basically,
 4   there's a study that I've already collected the data on
 5   looking at the, um -- the use of a, uh, a new technology
 6   for a stethoscope.  It's a digital stethoscope that uses
 7   a, uh, deep learning model or an artificial
 8   intelligence, uh, algorithm for listening to heart
 9   murmurs.  And the study specifically is looking at using
10   that tool, that specific stethoscope, which the company
11   that manufactures the stethoscope is called Eko, E-K-O.
12   And I've used that particular stethoscope for examining,
13   uh, doing the cardiac examination during school
14   physicals for sports, pre-participation physicals.  Uh,
15   we've collected data in two separate years, uh, this
16   past year and the year prior.  Uh, the first year's data
17   has been analyzed along with a pediatric cardiologist.
18   And we're awaiting, uh, the review of the second batch
19   of data, which I think is about 500 or 400 recordings,
20   um, before we go to the next stage of data analysis and,
21   uh, preparing publication.
22        Q.   And this research --
23        A.   It's essentially, uh -- it's essentially a,
24   uh, a novel use of a new technology to improve the, uh,
25   screening process, uh, of the cardiac exam portion of
```

1    school physicals.

2        Q.    Okay.  And this research committee is

3    affiliated with Houston clinic.  Do you know where we

4    could find this on the Houston clinics website?

5        A.    I know it's probably related to the foundation

6    itself, the Houston Foundation.

7        Q.    Are they funding it?

8        A.    Uh, the cardiology study I funded, uh, I

9    purchased the equipment.  And then the, um, several

10   residents volunteered to assist in the study.  Uh, the

11   AI study, um, is still in what I would call the

12   beginning phases.  And, uh, we, uh, there -- there's

13   been no, um, funding for that yet.

14       Q.    Okay.  Do you have -- did you hire a software

15   engineer to help with the deep learning model?

16       A.    Well, you know, it's kind of a complicated

17   question.  The answer is no, that part's easy.  But the

18   second part of the question is that actually, uh, I have

19   approached or begun the process of trying to solicit,

20   uh, a software engineer and I'm learning that the

21   availability, et cetera, uh, for that particular subject

22   matter is quite in short demand.  And so I am embarking

23   on, uh, learning how to use an AI platform and I have a

24   professional, uh, account now with, uh, uh, an AI

25   account and, um, I'm literally using AI to teach me how

```
 1   to do that particular process.  So it's been an
 2   interesting kind of a novel, uh, rabbit hole that I'm
 3   going down and actually finding that I'm going to have
 4   to self-learn a lot more about, uh, AI and AI
 5   assistance, which helped basically replace the need for
 6   a software engineer.
 7        Q.   Okay.  And to clarify, you're not board
 8   certified in radiology, neurology, or pain management,
 9   are you?
10        A.   That is correct.  I am double board certified
11   in orthopedic surgery, and, uh, I'm also a former board
12   examiner for the American Board of Orthopedic Surgeons.
13   And, uh, about to be, uh, begin working on the committee
14   for ethics and professionalism with the North American
15   Spine Society.
16        Q.   Okay.  You have two board certifications,
17   one's in orthopedic surgery.  I must've missed the other
18   one.  What's the other one?
19        A.   They're both in orthopedic surgery.  Uh, one
20   is from the board, uh, which is the American Board of
21   Orthopedic Surgeons.  That is one, uh, uh, agency that
22   I'm boarded with.  And the other is the National Board
23   of Physicians and Surgeons, but I'm board certified as
24   an orthopedic surgeon with both of those boards.
25        Q.   Okay.  And have you published any peer
```

1    reviewed research on disc injury causation?

2        **A.    No.**

3        Q.    Okay.  Um, your record review causation

4    analysis, um, can that be objectively tested by another

5    physician to determine its reliability?

6        **A.    Well, I mean, that's a reasonable question.**

7    **It's not really an experiment, uh, such as, you know,**

8    **the federal requirements in terms of being able to**

9    **recapitulate the, the experiment.  Um, but it is a**

10   **process.  It is a, uh, a stepwise process, as we talked**

11   **about earlier.  And, uh, each of those steps, uh, can be**

12   **followed by, you know, someone familiar with and trained**

13   **in doing that.  So the answer is yes, if someone is**

14   **qualified to be able to follow the steps.  And if they,**

15   **uh, for example, if they've attended the instructional**

16   **course lecture, and if they've got some training and**

17   **perhaps some additional knowledge, uh, then I think it**

18   **is possible to do that.**

19       Q.    Okay.  And, uh, unless I missed it, your

20   report cites no peer reviewed, uh, publication

21   validating the process of diagnosing, uh, an injury

22   solely through the use of medical records that I'm --

23   unless I missed it.  Did I miss that?

24       **A.    Well, no, I didn't include any references, but**

25   **I'm happy to provide you some references.  As I said, at**

1    the earlier part of the deposition, I can provide you 13

2    pages of references that, that, uh, that would fulfill

3    that particular question that you have.

4        Q.   And these publish --

5        A.   And all you have to do is merely send, you

6    know, a request, uh, you know, to, uh, if -- you know,

7    you don't need to send a subpoena, but you can send a,

8    you know, production request and we'd be happy to take a

9    look at it and comply with that.

10       Q.   Okay.  Um, your methodology of determining

11   injury causation without examining the patient or taking

12   a patient's history, has that been published in the

13   spine journal?

14       A.   I'm not really following your question.  You

15   say my method, it's not my method.  The method that I

16   use, do you mean?

17       Q.   Okay.  The gold standard method, the six step

18   method.

19       A.   Yeah.  I've already given you one reference, a

20   review article published in the American Academy of

21   Orthopedic Surgeons journal, A Comprehensive Review of

22   Injury Causation Analysis Methodology.  Um, that would

23   be a good start.  Uh, Eugene -- uh, just in the general

24   topic of the general subject of causation, yes.  Um,

25   there, there's other, uh, ample literature on that

 1   topic.  It's, uh, uh -- you know, there's a prolific

 2   amount of information, uh, relating -- in the scientific

 3   literature relating to the Bradford Hill criteria, uh,

 4   since the 70s.  And, um, as I mentioned from this

 5   American Academy of Orthopedic Surgeons article, the AMA

 6   method as well.

 7        Q.   And those publications would certainly have,

 8   uh, an error rate for this, uh, six step method?

 9        A.   Well, you know, the question on error rate, I

10   think does not apply, um, in terms of, uh, published

11   data.  And the reason I say that is because the, uh, you

12   know, the -- just for example, in my, in my experience

13   in applying this methodology, um, and the error rate

14   that is associated with that.  Uh, I think the error

15   rate approaches zero because when you're looking at each

16   of the six steps, uh, it is overwhelmingly conclusive

17   with at least a 95% medical certainty, uh, that the

18   conclusion is accurate.  And I think that's borne out in

19   the peer review literature as well.  Again, I'll give

20   you the example, just one example, you know, the issue

21   of, you know, does cigarette smoking cause lung cancer?

22   I think it's irrefutable that, uh, cigarette smoking

23   causes lung cancer.  And so the error rate for that

24   particular causation analysis study is zero.  There's a

25   hundred percent association of smoking and cancer, lung

1    cancer, uh, as well as COPD.  So I think the question is

2    actually an, uh, kind of an inappropriate question or a

3    question that doesn't, uh, that doesn't make sense.  And

4    I'll, I'll, you know, I'll leave it at that, but if you

5    have further follow up questions that I'd be happy to

6    address that in more detail.

7         Q.   Can you tell the court how often two experts

8    using your approach might, uh, reach different causation

9    opinions?

10             MR. DEEB:  Objection to form.

11   BY MR. GILLILAND:  (Resuming)

12        A.   Sure.  So I think the answer that I'm going to

13   have to that is no, I can't tell the court that.  I

14   think what I can tell the court is this is a reliable

15   scientific method that I have used hundreds of times in

16   coming to a conclusion based on the facts and the

17   evidence and the application of a scientific method.

18   And I can also tell the court that I've been qualified

19   specifically as an expert on injury causation analysis

20   in several courts in the state of Georgia.

21        Q.   And can you point the court to any published

22   data quantifying how accurate your approach is compared

23   to physicians who perform actual physical exams?

24        A.   Well, I think I can.  Uh, there are studies

25   that have shown that physicians are -- treating

```
 1   physicians, which is what you just characterized.  The

 2   treating physicians that rely upon self-reporting, uh,

 3   notoriously, uh, have unreliable conclusions when it

 4   comes to causation.  And there are two studies in

 5   specific that address that very issue.  So for example,

 6   80 percent of patients that are -- 80 percent of people

 7   -- based on scientific publications, 80 percent of

 8   people that hire an attorney under-report prior

 9   symptoms, under-report comorbidities, under-report,

10   don't tell the whole story, if you will.  And so the

11   conclusions of these scientific studies has been that,

12   that for a treating physician to solely rely upon the

13   self-reporting of a patient for causal opinions, which

14   again, treating physicians by and large have zero

15   training in, they're not qualified to speak on

16   causation.  They, the, the reliance on, uh, on the

17   self-reporting of patients has been shown to be a

18   historically horrible way of coming up with a causal

19   opinion.  And that if a treating physician is going to

20   rely upon the validity of self reporting of a patient

21   and who's reporting that this event caused that problem,

22   the treating physician has a duty to verify what that

23   patient says is actually true.  So for example, in this

24   case with Ms. Lamar, self-reporting, uh, as we know that

25   that event caused all the need for these procedures,
```

```
 1   that's in her complaint.  Well, the treating physician,

 2   if they're going to rely on that self-reporting, they're

 3   going to have to go through and look at the prior

 4   primary care records, which have not been provided to

 5   me.  And look at the primary care records prior to this

 6   event to verify that she in fact did not have any back

 7   or neck pain or knee pain. Uh, the primary care

 8   physician is going to have to look at all -- or the

 9   treating physician, I misspoke.  If they're going to

10   rely on the validity of self-reporting is going to have

11   to look at all 1200 pages of the records, all of the

12   imaging studies, the totality of the evidence before

13   they can come to the conclusion that the validity of her

14   self-reporting is accurate.  So that's what I would tell

15   the court.

16       Q.   Okay.  And was Ms. Lamar a subject in any of

17   those studies?

18       A.   Uh, the validity studies, of course not.  No,

19   these were done at Stanford in California.

20       Q.   Okay.  And the doctors in this case, weren't

21   relying on just her history coming from her mouth.  They

22   had EMG studies, they had MRIs, they did diagnostic

23   testing.  Would you agree with that?

24            MR. DEEB:  Objection to form.

25   BY MR. GILLIlAND:  (Resuming)
```

1        A.    No, I think the way you've phrased this

2    question, where we have been talking about causation,

3    and now you're talking about treatment, I think you're

4    running the risk of confusing the finder of fact.  So,

5    uh, if I were to phrase the question, I would say that

6    they did nothing other than rely upon the validity of

7    her self-reporting in their causal opinions, because we

8    would all agree there's nothing on the EMG study that

9    shows that the August 5th, event caused those findings.

10   We would all agree that there's nothing on the, uh,

11   September -- or August MRI studies that proved that the

12   event on September -- or on August 5th, caused those,

13   uh, MRI findings on August 25th, and August 30th.  We

14   would all agree that there's nothing in the objective

15   evidence, including the ER evidence that would support

16   the conclusion that the event caused the need for those

17   procedures.  The only evidence you have is the testimony

18   or the self-report of Ms. Lamar.  And so it's -- to be

19   clear, that's the distinction is that the treating

20   physicians only are relying on what Ms. Lamar told her.

21        Q.    Okay.  Is the six-step method generally

22   accepted within the orthopedic community as a substitute

23   for a physical exam of the patient?

24              MR. DEEB:  Objection of form.

25   BY MR. GILLILAND:  (Resuming)

1    **A.    So, you know, you deserve an answer to the**

2    **question.  So the answer, the direct answer is going to**

3    **be no.**

4        Q.    Okay.  Standard orthopedic textbooks emphasize

5    the importance of clinical correlation and hands-on

6    assessment, true?

7    **A.    So again, you deserve an answer to your**

8    **question.  So just as the prior question, I said that**

9    **that's true.  I need to clarify by way of explanation**

10   **that the causation, what you're talking about are**

11   **parameters and, uh, criteria that are used for the**

12   **establishment of a diagnosis and a treatment of a**

13   **patient.  Okay.  So treatment of a patient, those things**

14   **are very true, but in a causal analysis, they're not**

15   **true.  In a causal analysis, we rely upon the**

16   **documentation in the medical record.  We rely upon the**

17   **objective evidence of the radiology images themselves.**

18   **And we rely upon the use of a reliable scientific**

19   **method.  We have to look at the baseline prevalence in a**

20   **given population for a given condition.  None of those**

21   **things are necessary for treating physicians.  So, so**

22   **that we don't blur the lines and so that we maintain**

23   **clarity, you know, it's not an accident that the name of**

24   **my practice, my expert practice is Clarity Medical**

25   **Experts.  My role is to bring clarity to that issue.**

```
 1    And for clarity sake, it's important to know that those

 2    things are not essential for establishing a causal

 3    relationship.  I'm relying upon what is documented.  I'm

 4    not treating Ms. Lamar.  Those doctors were treating Ms.

 5    Lamar, that was their role.  A treating physician's role

 6    is to merely treat and relieve suffering.  It is not to

 7    establish cause.  And as I mentioned earlier, to the

 8    best of my knowledge, I've not seen any evidence that

 9    any of the treating physicians in this case have any

10    qualifications in the subject matter of injury causation

11    analysis.

12       Q.   Did you --

13       A.   I'm fine treating physicians, but as far as

14    causal opinions, I really don't -- it's my expert

15    opinion and I really don't feel that there's any

16    evidence that they have any qualifications to give an

17    expert opinion on causation.

18       Q.   Did you know Dr. Adams has a master's degree

19    in biomechanical engineering?

20       A.   I didn't know that, but I did realize he's not

21    board certified.  And so that's to me more significant

22    than that particular fact.

23       Q.    Is there a board certification for

24    biomechanical engineering?

25       A.    No, but there is a board certification as a
```

 1   treating physician and he's not board certified, so I

 2   think that's relevant.  And I don't know that he's held

 3   out any opinions on causation that I can see

 4   specifically.  And I've not seen his report, if he's

 5   published one or prepared one, I'd love to see his

 6   report.  I'd love for him to read my report.  But on the

 7   topic of credentials, I don't see any qualifications and

 8   have not seen any qualifications in, in my exam -- in my

 9   investigation that Dr. Adams has any qualifications on

10   causation analysis.

11        Q.   Okay.  So to determine the causation in a

12   single event trauma, such as a slip and fall, are you

13   saying that a clinical evaluation and hands-on

14   evaluation is irrelevant?

15             MR. DEEB:  Objection to form.

16   BY MR. GILLILAND:  (Resuming)

17        A.   I'm going to say the answer to you -- and I'll

18   try and give you pointed answers because I know time is

19   limited for you.  I'm going to say the answer to your

20   question would be no, as the way you phrased that

21   question.

22        Q.   Okay.  Rephrase it.

23             MR. DEEB:  Objection to form.

24   BY MR. GILLILAND:  (Resuming)

25        A.   Well, I think specifically you're talking

 1   about Dr. Adams, Dr. Adams did not meet the patient

 2   until September 19th, and the event happened on August

 3   5th.  So is Dr. Adams able to tell me that nothing else

 4   happened between August 5th, and September 19th, that

 5   also could have explained those symptoms.  And I think

 6   that's a, you know, that's a question that, uh, I don't

 7   think he has an answer to.

 8        Q.   Do you believe something happened in that time

 9   period?

10        A.   I think it's possible.  I think there's a

11   possibility, although I don't have any evidence of that.

12   But I can tell you with certainty as a medical expert

13   and a subject matter expert on causation and also as a

14   board certified orthopedic surgeon, I can tell you that

15   it's my expert opinion to a reasonable degree of

16   certainty that the August 5th, 2022, event is not what

17   led to the need for Ms. Lamar to see or be treated by

18   Dr. Adams.  That I can tell you with certainty.

19        Q.   Okay.  So would a causation -- would a

20   hands-on clinical -- I mean, would a hands-on clinical

21   exam of a patient be irrelevant in determining

22   causation?

23             MR. DEEB:  Objection, asked and answered.

24   BY MR. GILLILAND:  (Resuming)

25        A.   So I would say that, you know, on the topic of

```
 1   causation analysis, as I've tried to explain before,
 2   that it is not necessary for an expert, who is qualified
 3   in the subject matter of causation, to examine the
 4   patient.  And in fact, in this case, it's not possible
 5   because I was not asked to look at this case until 2025.
 6   And it's self-evident that the event happened in 2022.
 7   So for example, you know, by way of just, uh, comparison
 8   for your question, it would be like saying, you know,
 9   when the experts had established that cigarette smoking
10   led to causing lung cancer 20 years later, does that
11   mean that the experts that came to that conclusion had
12   to be there 20 years before to examine that patient?  I
13   think it's the same sort of an analogy, the answer is
14   no.  Causation analysis, you're relying on the facts and
15   the evidence.  No more -- no different than the jury is
16   relying on the facts, evidence and expert opinions when
17   they formulate a conclusion and a verdict.  They don't
18   have to examine the patient or be there at the time that
19   Ms. Lamar fell on August 5th, 2022, they merely have to
20   assess the evidence and the testimony.  And then they
21   come up as the finder of fact with a, with a, with a
22   verdict based on the evidence.  I'm no different.  And
23   so, you know, I get your point, uh, certainly for a
24   clinical treating physician, you must examine the
25   patient.  Um, and I think it's incumbent on you to
```

1    **examine the patient and do a thorough history and**

2    **physical as your role as a treating physician in your**

3    **role as a treating physician.**

4        Q.   Okay.  Um, so you think developing lung cancer

5    from smoking is similar to having aggravation of

6    preexisting disc herniations from a fall?  You think

7    those are similar?

8             MR. DEEB:  Objection to form.

9    BY MR. GILLILAND:  (Resuming)

10       **A.   Well, I, I don't know that I said that, but,**

11   **um, if that's your interpretation, I'll, I'll set the**

12   **record straight.  No, I don't think they're equivalent.**

13       Q.   Okay.  And so the six-step method is, uh,

14   equally reliable for a single event trauma as it is for

15   studying cancer in populations?

16            MR. DEEB:  Objection to form, asked and

17       answered.

18   BY MR. GILLILAND:  (Resuming)

19       **A.   Yeah, I think the six-step method, which is**

20   **predicated on the Bradford Hill criteria is a reliable**

21   **scientific method that can be used for establishing**

22   **cause when cause is otherwise not obvious.**

23       Q.   And a fall on the ground causing neck and back

24   injuries is not obvious, right?

25            MR. DEEB:  Objection to form, asked and

```
 1        answered.
 2    BY MR. GILLILAND:  (Resuming)
 3        A.    Well, I think in, in the case of Ms. Lamar,
 4    there are some, uh, diagnoses, which I've, I've
 5    explained, which are attributable to the event.  And
 6    those particular events, you know, those particular
 7    diagnoses are abrasions and contusions.  So we have an
 8    explanation for why she had pain the day of the event.
 9    Um, you know, but on the topic of the disc herniations
10    that you mentioned, those are chronic preexisting
11    findings as established by the imaging studies and also
12    the clinical findings the day of the event.
13        Q.    Okay.  And those, assuming they are
14    preexisting, uh, herniations, is it your testimony that,
15    that those herniations cannot go from being asymptomatic
16    to symptomatic from a fall?
17        A.    It's my testimony that they did not go from
18    symptomatic -- or from asymptomatic to symptomatic from
19    this fall.
20        Q.    Okay.  And what peer review published studies
21    are you relying on to come to that conclusion?
22        A.    So I'm basing that on my specialized
23    knowledge, training, and experience as a board certified
24    orthopedic surgeon who's practiced for over 35 years and
25    who spent, uh, 11 years examining well over 10,000
```

 1   **patients involved in motor vehicle accidents from the**

 2   **years, 2013 to 2024.  So it's based on my clinical**

 3   **knowledge and specialized knowledge as a board certified**

 4   **orthopedic surgeon.**

 5          Q.   And in your -- all your years of being a board

 6   orthopedic surgeon, you've never seen a patient, uh -- a

 7   patient's disc herniations go from being asymptomatic to

 8   symptomatic from a fall or any other single event

 9   trauma?

10          MR. DEEB:  Objection to form.

11   BY MR. GILLILAND:  (Resuming)

12          Q.   Um, I would say that in turn -- on the topic

13   of disc herniations and traumatic -- the involvement of

14   trauma in disc herniations, uh, I have seen -- in my

15   experience, I have seen examples of where you can have

16   an aggravation of a preexisting.  Uh, which I think is

17   your question, but I want to be very clear.  I sought

18   out specifically in this case to determine whether or

19   not that, that was the case in this particular case for

20   Ms. Lamar.  And it is my expert opinion based on review

21   of the records and the imaging studies that that did not

22   happen.  The clinical evidence goes against that.  And

23   the MRI image from, you know, the same -- done the same

24   month shortly after the event proves that there is zero

25   evidence of any aggravation of a preexisting condition.

1    Q.   How can you conclude that when you don't have

2    the baseline MRI to compare it to?

3    A.   Well, that -- to me that would not be

4    necessary because what I'm looking for is evidence of

5    edema.  And on the MRI study specifically, I'm looking

6    for, you know, one doc -- or one attorney once asked me,

7    you can't see pain on an MRI.  Which is true, you cannot

8    see pain on an MRI, but what I told him, and I'll tell

9    you now is you can see the cause of pain.  And you can

10   see -- that's why we do the MRI.  Okay.  That's the

11   purpose of doing a diagnostic MRI to establish, is there

12   a correlation on the MRI with the clinical findings.

13   And I can tell you that there on the specific sequences

14   of the T1 sagittal images and the STIR images, S-T-I-R,

15   images, there is no evidence of edema or inflammation on

16   the MRI study of her cervical or lumbar spine.  And in

17   addition to that, I can tell you that the CT scan done

18   in August of 2020, shows obvious preexisting

19   degenerative disc herniations at that time.

20   Q.   Okay.  And --

21   A.   As was read by the radiologist, by the way, in

22   2020.

23   Q.   Okay.  And so is it your testimony that

24   aggregation of a preexisting condition would show up on

25   an MRI?

1      **A.    Yes.**

2      Q.    Okay.

3      **A.    Yeah.  And not just my testimony, that's been**

4      **my experience.  And in fact, I have a demonstrative MRI**

5      **that I use in testimony that, uh -- that shows just**

6      **that.**

7      Q.    Okay.  One of the journal articles you

8      produced to us was, uh, our first time episodes of

9      serious low back pain associated with new MRI findings

10     that was published in the spine journal.

11     **A.    Yes.  That's Eugene Carragee.  He's the**

12     **chairman of the orthopedic department at Stanford.**

13     Q.    And the spine journals and authoritative

14     publication, true?

15     **A.    He actually was the former editor, but the**

16     **answer is true.  Yeah.**

17     Q.    Okay.  And this study followed 200 subjects

18     who are observed over a five year period?

19     **A.    Uh, my recollection is yes.**

20     Q.    The authors found that most subjects with new

21     serious low back pain episodes did not show new MRI

22     abnormalities, true?

23     **A.    I believe so, yes.**

24     Q.    How many subjects in this study experienced a

25     ground level fall?

```
 1        A.   I don't know.  I guess that's the oddest first
 2    answer I'll give you is I'm not, I'm not sure.
 3        Q.   There were two.  I can represent to you that
 4    there were two.  You'd agree that no reliable scientific
 5    conclusions can be drawn from two subjects would you?
 6             MR. DEEB:  Objection to form.
 7    BY MR. GILLILAND:  (Resuming)
 8        A.   I think, uh, I think when I look at the study
 9    in its totality, I think it's a reliable study and I
10    think it was obviously went, went through the peer
11    review process and was acceptable for publication in the
12    spine journal.  So I'll, I'll, I'll let that be the
13    answer to my question is that I'll let the journal
14    article speak for itself.
15        Q.   In fact, that journal article won awards,
16    didn't it?
17        A.   I don't recall.  It may have.
18        Q.   Okay.  And the MRI abnormalities on these
19    studies were determined to be unrelated to trauma, true?
20        A.   Well, I don't recall the article verbatim, but
21    I believe that's true.
22        Q.   And just like Ms. Lamar, you're saying that
23    her abnormalities are unrelated to trauma, true?
24        A.   Well, right.  And as I mentioned earlier,
25    there was a study, which I think I referenced for you, a
```

```
 1    lead author's name is Brzezinski, I think it's a Finnish

 2    name.  And they had -- that, that particular study was a

 3    meta analysis, which was essentially one study

 4    coalescing or combining, I think, 30 MRI studies into

 5    one paper.  Uh, and it's considered the highest level of

 6    evidence that you can publish, level one evidence.  And

 7    in that meta analysis, they actually established by

 8    looking at 3,200 patients out of the 30 studies, they

 9    established a normal baseline prevalence of MRI findings

10    in asymptomatic individuals.  So, um, you know, much

11    like the, the study relating to the trauma by Dr.

12    Carragee, the fact of the matter is, is that the

13    findings on MRI that we have for Ms. Lamar are very

14    common findings.

15        Q.   Okay.

16        A.   Especially in that age group.

17        Q.   And so this article shows that back pain

18    occurs independently of new or worsening MRI findings,

19    true?

20        A.   I believe so, yes.

21        Q.   So MRI images that show abnormalities cannot

22    tell us if someone has pain or not, true?

23        A.   I think I said --

24             MR. DEEB:  Objection to form.

25    BY MR. GILLILAND:  (Resuming)
```

```
 1          A.   Sorry.  I think I said that earlier that MRI
 2    does not show pain, but it helps you identify the cause
 3    of pain.  So for example, in those particular examples
 4    where there were no MRI changes, despite a history of
 5    falling, for example.  You have to realize in the
 6    differential diagnosis process, the medical and clinical
 7    diagnostic process, when we do an MRI, we're ruling out
 8    causes so that we come down to a narrower, shorter list
 9    of possibilities for explaining -- explaining the pain.
10    So what is the most common cause of back pain,
11    myofascial pain, muscle, by far, by far.  And that will
12    not show up on an MRI per se, but in the absence of any
13    other spinal column pathology, active traumatic disc
14    herniations, edema, et cetera, then by way of
15    differential diagnosis, the differential diagnosis
16    method of diagnosing people, you can establish that the
17    cause of pain is myofascial.  Which a ground level fall,
18    that's exactly what you would expect.
19          Q.   Okay.
20          A.   Or vehicle accidents, that's exactly what you
21    expect.  I can tell you that in the thousands and
22    thousands and thousands of patients that I've treated
23    who've been victims of trauma, whether it be a fall from
24    height, a ground level fall, motor vehicle accident, you
25    name it, motorcycle accident.  I can tell you the
```

 1   majority of the patients are suffering myofascial

 2   symptoms of pain, which is essentially what we're

 3   talking about here with Ms. Lamar.  And the significance

 4   of that is, is that myofascial pain does not require

 5   injections, does not require surgery, and does not

 6   require the subsequent treatment recommendations that

 7   are treating physicians have recommended.  So again, I

 8   come back to the same conclusion based on the MRI

 9   evidence, the CT scan evidence, and the clinical

10   evidence from the ER the day of the event, and also the

11   chiropractor evidence shortly after this event.  It's

12   clear to me that as an expert, I'm going to come to the

13   conclusion that that August 5th, 2022, event played no

14   role in the need for those subsequent procedures that

15   were offered and performed on Ms. Lamar.

16        Q.   Where does the article say that the -- that an

17   MRI can show the cause of pain?

18        A.   Well, I don't know that the article says that

19   that's something that I said.

20        Q.   Can you point me to -- or can you point the

21   court to any articles that say that?

22        A.   Well, you know, when you talk about articles,

23   I don't -- you know, at the tip of my fingers, I don't

24   have an article that you know, specifically -- at this

25   moment that specifically addresses that question.  I'm

1    giving you that testimony based on my own knowledge,

2    training, and experience.  Now, if you ask if there's

3    any scientific literature that supports my opinion, you

4    know, I can -- I can do a brief search on that and try

5    to find something for you.  But at the -- you know, at

6    the top of my head right now, I can't think of any.

7         Q.   Has your knowledge, training and experience

8    ever been subject to peer review?

9         A.   Well, I would say yes.

10        Q.   What publication?

11        A.   Well, peer review is not necessarily a

12   publication.  Part of the board certification process

13   and the maintenance of certification, you do -- a member

14   such as myself or a board certified doctor, such as

15   myself, uh, I go through peer review every 10 years.

16   And peer review by the American Board of Orthopedic

17   Surgeons, which verify and validate my knowledge,

18   training and experience as well as my, my, my peer

19   relationships.  So, yes, I do go through -- I have been

20   through peer review.  And in fact, I just recently

21   successfully went through my most recent 10 year

22   maintenance of certification.  And I'm board certified

23   through the year 2037 based on peer reviews.

24        Q.   Okay.

25        A.   One of the -- peer review is one of the

1  **pillars of the process of maintaining board**

2  **certification.**

3      Q.    Okay.   When I said peer review, I met peer

4  review publications.   Sorry, I wasn't clear about that.

5      **A.    Yeah.   I don't think I'm interesting enough**

6  **to, to, to merit any publication.**

7      Q.    Okay.   And did your six step causation

8  analysis, was that subject to peer review with the board

9  certification?

10     **A.    Well, as I mentioned earlier, the six step**

11 **method, the AMA method, and I'm, I'm happy to provide**

12 **you the reference has been peer reviewed and has been**

13 **established as the gold standard for a reliable**

14 **scientific method for establishing causation.   Now the**

15 **American board of orthopedic surgeons has nothing to do**

16 **with opinions about causation analysis.**

17     Q.    As your application of a six step method as

18 applied to a single injury event been subject to peer

19 review as part of the board certification process?

20     **A.    No.**

21     Q.    Okay.   Another article you gave us was MRI

22 Findings in Asymptomatic Subjects, it was a chart.   This

23 chart provides age specific prevalence estimates of

24 degenerative spine imaging findings in asymptomatic

25 patients.   You'd agree that Ms. Lamar is not

 1    asymptomatic, true?

 2         A.    Well -- I agree with that, yes.

 3         Q.    Okay.  In fact, she underwent a cervical MRI

 4    because she was symptomatic, true?

 5         A.    Again, correct.  But you're missing the point

 6    of the article.  The article, which is -- again the lead

 7    author Brzezinski, the purpose of that article is to

 8    establish the baseline prevalence in a general

 9    population of people that happen to be asymptomatic.

10    And so the point of the article is, is that those are

11    very, very common findings that are not responsible for

12    causing symptoms.  Now you've jumped to the conclusion

13    that because you see an MRI with a disc herniation, or

14    you've read a report that says that, aha, August 5th,

15    must've caused that.  But I'm here to clear the mud, if

16    you will, and clarify that, no, that is, that is a

17    common finding and -- number one.  And number two, there

18    is no evidence of edema or inflammation to support the

19    notion that we aggravated the preexisting condition.  So

20    that's the purpose of the article is to frame the

21    baseline prevalence of those very common findings that

22    are on Ms. Lamar's MRI study done in August of 2022.

23         Q.    Do the findings in that chart apply to the

24    cervical thoracic or lumbar spine?

25         A.    That's a good question.  I think it's a

 1   combination of both or all three.

 2        Q.   How many patients in the study were male?

 3        A.   I don't, I don't recall.

 4        Q.   And --

 5        A.   It was actually -- again, as I said, it was a

 6   combination of, I believe 30 studies into one.  So I

 7   don't know what the, uh, what the relationship or the

 8   gender was, uh, of the 3,200 some odd people in the

 9   study.

10        Q.   Okay.  Do you know how many of the patients

11   were female?

12        A.   Uh, I do not.

13        Q.   Do you know how many patients in this study

14   were in their fifties and experienced a ground level

15   fall?

16        A.   Again, I do not.  I mean, again, the purpose

17   of the study was to show what the baseline prevalence

18   was in the adult population from age 20 to age 80.  I

19   don't believe that there was any conclusion that there

20   was any gender differences, if you will.  Uh, I don't

21   think there's any evidence that there's any difference.

22   I don't think women, uh, or men have a significant

23   difference in the aging of their spine.  No more than,

24   uh, we have any differences in the development of

25   wrinkles or gray hair.  I think aging is aging

 1    regardless of your gender.  Um, ground level fall, I

 2    don't know that that really, uh, uh, is something that's

 3    memorialized in any of those studies.

 4         Q.   And your statement just then about the

 5    findings in the spine being in the same with males and

 6    females, would that be supported in any peer reviewed,

 7    uh, published article?

 8         A.   I don't know.  I -- you know, I, I've never,

 9    uh, looked specifically at that.  I can tell you from my

10    own personal experience, um, that gender, I don't think

11    really plays that much of a role.  I think you can have

12    aging of the discs and the spine, um, of roughly the

13    same proportion, um, for the most part in general.  You

14    know, we're talking in general, uh, regardless of the

15    gender.  There are so many other factors, genetic

16    factors, uh, that I think play a significant role.  You

17    know, we're learning now through research that the, the

18    aging process at the molecular and the cellular level,

19    um, is regulated by hormones.  So there may be some

20    evidence that females age faster, uh, as they lose, uh,

21    estrogen and, um, and the effective estrogen on their

22    bodies.  Um, but I don't know specifically of any

23    evidence one way or the other, that would show that

24    females would have any higher or any lower, uh,

25    prevalence when compared to males.  Um, the study -- I

```
 1   don't remember the study really coming to a conclusion

 2   about that.  I'd have to relook at the study to have an

 3   answer for that question.

 4        Q.   How many of the patients in the study were

 5   involved in a car accident two years before a ground

 6   level fall?

 7        A.   I don't know.  I don't know if any.  And I --

 8   and I, I guess I, uh, you know, I don't mean to be

 9   disrespectful, but I don't think that's a relevant

10   question.

11        Q.   Okay.  Another paper you gave us was called

12   Evidence-Based Clinical Guidelines for Diagnosis and

13   Treatment of Cervical Radiculopathy From Degenerative

14   Disorders.  And this paper discussed the diagnosis and

15   treatment of cervical radiculopathy while resulting,

16   just like the title says from degenerative disorders.

17   Um, now this paper does not apply to patients who suffer

18   from radiculopathy from an acute cervical injury, true?

19        A.   I mean, I don't recall the paper to be honest

20   with you.

21        Q.   Okay.  There is no evidence that Ms. Lamar is

22   diagnosed with a cervical disc herniation before her

23   fall, true?

24        A.   False.

25        Q.   Okay.  What date did she get an MRI done of
```

1    her cervical spine before this fall?

2         A.    Well, your question supposes that the MRI is

3    the only way of making that diagnosis.  And, and that

4    presumption is incorrect.  A CT scan, although not as

5    sensitive as an MRI, a CT scan, and I'm old enough to

6    tell you that back in the day when I was training in the

7    eighties, we only use CT scan, we didn't use MRI.  But a

8    CT scan can also be a method of establishing a disc

9    herniation.  CT scans and the techniques -- the soft

10   tissue visualization techniques on CT scans is capable

11   of seeing a disc herniation.  And if you go to August

12   9th, 2020, and you look at the report, which I verified

13   by looking at the images myself, and you look at that

14   report, you can see -- uh, it's on page 102, Piedmont

15   Henry hospital.  Talks about history of the neck pain.

16   And then it goes through the, the technique.  And then

17   the second paragraph, it talks about the alignment in

18   the cervical spine.  It shows calcification in the

19   posterior longitudinal ligament seen at C5, that's

20   arthritis.  You see mild spinal stenosis is associated,

21   again, arthritis, which can cause neck pain.  And then

22   you see small posterior right-sided C5-6 disc protrusion

23   is present, that's a disc herniation.  A disc protrusion

24   is referring to a disc herniation.  So we have a disc

25   herniation at C5-C6 that's documented by the radiologist

 1    and August 9th, of 2020.  When I look at those images,

 2    I'm going to expand upon that, there's actually disc

 3    herniations and a spur complex at C6-C7 and another

 4    additional disc herniation at C4-C5.  So my eyeballs saw

 5    three disc herniations, the radiologist saw at least

 6    one.  And so that's my response to your question.  No,

 7    she did have a history of a disc herniation prior to

 8    that event.

 9        Q.   Okay.  But neither you nor the radiologist saw

10    a disc herniation at C3-C4 that indented the spinal

11    cord, true?

12        A.   You know, I have to have -- you know, I'm

13    pausing because I can't remember.  I'd have to go back

14    and look specifically at that.

15        Q.   Okay.  But that's what she was diagnosed with

16    25 days after her fall at Walmart, true?

17        A.   Well, I'll be very clear with you.  The

18    protrusion at C3-C4, and I don't have the image up in

19    front of me, was clearly preexisting.  And the basis or

20    the foundation for that is that there were specific

21    characteristics and findings on the MRI when looking at

22    T1 sagittal and STIR images and STIR sequences,

23    particularly that proved that that was a cold, uh, not

24    hot image.  And as I teach the residents, if it's cold

25    on MRI, it's old.  Cold equals old.  So the evidence

1    from that MRI done a few weeks after the slip and fall

2    is showing an incidental finding that at least 38

3    percent of the population is walking around with.  And

4    it's a very common finding for this age group.  So it is

5    not evidence of trauma.

6         Q.    Okay.

7         A.    I'll add to that.  That disc bulges, a disc

8    bulge is not evidence of a trauma or traumatic event.

9         Q.    Would you teach you --

10        A.    And in fact, there's no evidence of any

11   traumatic injury, recent traumatic injury based on that

12   MRI.  And that's my expert opinion to a reasonable

13   degree of certainty as a board certified orthopedic

14   surgeon qualified to speak on diagnostic imaging.

15        Q.    Would you teach your residents to use a CT

16   scan to diagnose a disc herniation when an MRI is

17   available?

18        A.    Yes.

19        Q.    Okay.

20        A.    And by way of explanation, many times -- and

21   there's a good reason for this.  CT scan and

22   particularly with software upgrades right now, CT scans

23   can show some amazing high resolution, soft tissue

24   characteristics of any part of the body.  And by way of

25   example, during COVID when it was suspected that a

```
 1   patient had a particular form of a pneumonia that was

 2   associated with COVID, they didn't put the patient in an

 3   MRI machine to look for that, did they?  No, they put

 4   them in a CT scanner.  And by way of also example, in

 5   any traumatic situation where you suspect a possible

 6   spinal column injury, CT scan is your first line of

 7   diagnostic testing in the emergency room.  Which is why

 8   they did a CT scan for Ms. Lamar because she was

 9   complaining of neck pain.  Um, but CT scan is your first

10   line of defense.  And there are many situations where

11   you cannot do an MRI.  Um, you know, MRI takes about 35

12   to 45 minutes.  CT scan takes 2 minutes.  CT scan is

13   fast, it's quick, it's easy.  And you don't lose access

14   to the patient.  If you have a patient that is in, uh,

15   uh, some sort of duress or you need a speedy answer and

16   you can't wait 35 minutes.  So no, I would teach my

17   residents the value of a CT scan.  And having said that

18   I will acknowledge, and there's no question, no

19   argument, MRI is a higher resolution, uh, method of

20   taking a look at, at disc herniations.  And that's, you

21   know, that -- there's no argument there.  But CT scan

22   certainly is a valuable tool.  I think the literature is

23   bearing out, the last time I looked about 80 to 85

24   percent sensitivity for disc herniation on CT Scan.

25   Versus 95% and close to 99% with the new software and
```

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

```
 1    new machines today for MRI.  So CT scan is a good second
 2    alternative for looking at soft tissue injuries of the
 3    spine and neck.  And in our case, we have clear evidence
 4    based on the CT scan done the day of the event, that
 5    there was no soft tissue injury and there was no
 6    evidence of new disc herniations as a consequence of
 7    that event.
 8        Q.   Okay.  Um, would you -- would the orthopedic
 9    community agree with you that you should use a CT scan
10    to diagnose a disc herniation over using an MRI?
11            MR. DEEB:  Objection to the form.
12    BY MR. GILLILAND:  (Resuming)
13        A.   I think I've just answered the question, but
14    maybe I wasn't clear.  There's no argument that MRI is a
15    higher resolution and not -- and it has a higher
16    sensitivity for seeing MRI -- I mean, for seeing spinal
17    disc herniations.  So the answer is -- I agree that the
18    MRI is a better way of doing it.  But I also here to
19    testify and clarify, and I would teach the residents
20    this as well, as well as the jury, that a CT scan is an
21    acceptable way.  And it's how we used to do it.  Uh, you
22    know, I'm old enough to remember the old days, which
23    that's all we had.  And it was very infrequent when I
24    first began training to do an MRI.  Because again, it
25    took so long.  It took 35 minutes to 45 minutes.  It was
```

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

 1   a small tunnel and you lost access to the patient.  So

 2   in a traumatic situation, you rarely would want to do

 3   that.

 4        Q.   Okay.  She got an --

 5        A.   MRI -- you know, I agree, MRI is a, you know,

 6   the perfect world, MRI is a higher resolution way of

 7   doing it.

 8        Q.   Okay.  She got these CT scans in the emergency

 9   room.  Would you agree that a CT scan is more

10   appropriate for an emergency room than an MRI?

11        A.   I think I just said that, but I'll reiterate

12   or reemphasize.  The answer is, yes.  CT is your first

13   line of defense.  And then, and then if there are

14   clinical signs of radiculopathy, which there were not,

15   you know, by tacit implication, the fact that they did

16   not recommend an MRI and they sent Ms. Lamar home that

17   day with the diagnosis of abrasions and contusions,

18   unless you're inferring or suggesting that there's a

19   standard of care issue here, which I don't see.  Uh,

20   they obviously didn't do an MRI the day of the event

21   because it was not clinically indicated.

22        Q.   They were using a CT scan to look for

23   fractures, weren't they?

24        A.   No.  A CT scan is not simply to look for

25   fractures, although that's one reason to do it.  It's to

 1    **look for any evidence of spinal column injury.**

 2    **Ligamentous injury, I think in fact, CT scan is more**

 3    **valuable in discerning ligamentous disruption, um, as**

 4    **opposed to MRI.**

 5         Q.   Okay.  Another article you gave us was

 6    Guideline Summary Review, Evidence-Based Clinical

 7    Guidelines for the Diagnosis and Treatment of

 8    Degenerative Lumbar Spondylolisthesis and this was also

 9    published in the spine journal.  And again, we -- that

10    is an authoritative journal, true?

11         A.   It is.  I don't remember the article.  I think

12    **what we had provided, you know, because of the -- your**

13    **production of document requests was pretty extensive.**

14    **But I believe in addition to that article, you know, I**

15    **provided appropriate use criteria and clinical**

16    **guidelines from the North American Spine Society for**

17    **both the cervical spine, as well as the lumbar spine.**

18    **If those didn't make their way to you, let me know, and**

19    **I'll be happy to get them to you.**

20         Q.   On page 441 of this article, it says, in the

21    absence of evidence to address this question, it is the

22    working group's opinion that attaining an accurate

23    history and physical examination is important for the

24    diagnosis and treatment of patients with degenerative

25    lumbar spondylolisthesis.  You would agree she does have

```
 1   degenerative lumbar spondylolisthesis, true?

 2        A.   I don't -- I don't know that she has

 3   spondylolisthesis, I would have to go back and look at

 4   the images again.  I think she has spondylosis.

 5        Q.   Okay.

 6        A.   If that's the word that you're reading,

 7   spondylolisthesis is a slippage of a vertebrae and I

 8   don't recall that.

 9        Q.   Okay.

10        A.   Spondylosis, which is a similar word,

11   spondylosis is referring to a degenerative process of

12   the facet joints.

13        Q.   Okay.  And in this case, Ms. Lamar -- or in

14   this case, Ms. Lamar got facet joint injections for her

15   facet joints, true?

16        A.   Correct.  And as we go through here, just on

17   the topic of her spine, besides the spondylosis, you

18   know, it's worth mentioning, and this is from a chest

19   x-ray from 2015, that she has scoliosis.

20        Q.   Okay.  Okay.

21        A.   That's a superseding factor.  That's another

22   superseding factor for causing back and neck pain.

23        Q.   So her scoliosis that was diagnosed in 2015 is

24   the reason she's experiencing back pain today?

25        A.   No, I'm not saying that.  I'm saying that you
```

```
 1   have a burden to prove to me that the scoliosis is not

 2   the cause of the need for the procedures that she's

 3   having because scoliosis is a superseding factor that

 4   may be responsible for causing back and neck pain.  And

 5   I can get you literature on that for days.

 6       Q.   Okay.  And so we have -- now we have the, uh -

 7   - we have scoliosis as a cause for, is it for neck pain

 8   or back pain?

 9       A.   Well, Mr. Gilliland, you're mischaracterizing

10   what I'm saying.  What -- I'll repeat it for you and

11   I'll try to speak more slowly.  Scoliosis is a

12   superseding factor that may be a cause of back and neck

13   pain.  And it's my opinion that in the causal arena, the

14   -- anyone that has an opinion that the event that

15   occurred on August 5th, 2022, that was the cause of her

16   back and neck pain, has a duty to rule out scoliosis as

17   a possible cause.  If they're being intellectually

18   honest.  And so I pose to you, you have the burden to

19   prove to me that scoliosis is not the cause of her back

20   and neck pain.

21       Q.   There can be concurring causes of neck and

22   back pain, true?

23       A.   You still have the burden to prove to me it's

24   not just from scoliosis, which is a very common cause of

25   back and neck pain.
```

1    Q.   Okay.  Okay.  And so applying your six step

2    method, how would you fit in scoliosis, her obesity, her

3    career, the car accident in 2020, and I might be leaving

4    one out.  How would you apply it in that situation to

5    rule out the ground level fall as a cause of her, uh,

6    current pain?

7         **A.   Sure.  So all of those superseding factors,**

8    **what the legal system calls superseding factors in the**

9    **medical community and the causal community, we call**

10   **other relevant factors.  So all of those that we just --**

11   **that you just mentioned, will go into the fourth step of**

12   **the AMA process, other relevant factors.  And, uh, and**

13   **there are a number of other relevant factors that need**

14   **to be considered before jumping to the conclusion that**

15   **the August 5th, event is the cause of the need for all**

16   **of those procedures that she subsequently has.**

17        Q.   Okay.  So the step forward to other relevant

18   factors.  What are the other relevant facts -- what

19   other relevant factors exist?  Identify any individual

20   risk factors other than the event or environmental

21   exposure that could contribute to the development of the

22   disease, address any epidemiological evidence or data

23   that relates to these other relevant factors.  So, we

24   have the other relevant factors that we just listed and,

25   and those are other than the event.  What would the

```
 1   event be in this case, the ground level fall?

 2        A.   Correct.

 3        Q.   And then there's no environmental exposure

 4   here.  Is that correct?

 5        A.   Correct.

 6        Q.   Okay.  So what other relevant factors exist

 7   other than the event that could contribute to the

 8   development of the disease?  And here we are labeling

 9   the disease as disc degeneration.

10        A.   So for the -- yeah, I think essentially if you

11   want to substitute the word diagnosis for disease, I

12   think that would be more appropriate.

13        Q.   Well, the six step method doesn't say

14   diagnosis, does it?

15        A.   In that particular excerpt that you have, it

16   does not, but in -- I can tell you from the textbook

17   itself and from the, uh, instructional course lecture,

18   and just for the intent of the, of the method, you can

19   safely interchange diagnosis with the disease.

20        Q.   What chapter in the book differentiates

21   between diagnosis and disease?

22        A.   I don't, I don't know off the top of my head,

23   but I don't need the book to say.  It's my testimony

24   that you can interchange diagnosis with disease.  The

25   intent when you read diagnosis -- or I'm sorry, when you
```

 1    **read disease is revert -- is relating to a diagnosis in**

 2    **general.**

 3         Q.   So it's your testimony that disease and

 4    diagnosis are the same thing?

 5              MR. DEEB:  Objection to form.

 6    BY MR. GILLILAND:  (Resuming)

 7         A.   **To me in terms of the, the way we're dealing**

 8    **with the semantics of it right here, yes.**

 9         Q.   Okay.  All right.  So we need to consider the

10    other relevant factors that exist other than the ground

11    level fall that contribute to the development of the

12    disease.  And the disease in this case would be disc

13    degeneration.  And so does scoliosis contribute to disc

14    degeneration?

15         A.   **Well, essentially the answer, you know, just**

16    **generically speaking is yes.  Scoliosis and adult**

17    **scoliosis can absolutely cause back and neck pain.  And**

18    **it can also accelerate the degenerative process because**

19    **the spine is out of alignment, right?  Um, and so**

20    **malalignment, much like if you drive a car and your**

21    **tires are out of alignment or your wheels are out of**

22    **alignment, we all know you're going to wear out the**

23    **tires on one side more than the other.  And so**

24    **essentially that's the same kind of biomechanical**

25    **process that's going on to explain why people with**

1    scoliosis in their later years in 50 years of age after

2    a lifetime of scoliosis, uh, because it certainly didn't

3    go away from 2015 to 2020.  But people with scoli -- or

4    2022.  Scoliosis is absolutely from an epidemiological

5    point of view is associated with an increased risk of

6    back and neck pain.  Obesity is absolutely related to an

7    increased risk of back and neck pain in the scientific

8    literature.

9        Q.   And what weight --

10       A.   Age --

11       Q.   What weight does somebody have to be -- what

12   published studies say at what weight somebody has to

13   reach to develop disc degeneration?

14       A.   So it depend -- so that's a good question.  I

15   think the BMI of 30 or above is the threshold, but

16   obviously if you get to a BMI of 38, the more obese a

17   person is, the more load that they're placing on their

18   spine, a physical load.  But also, and the prevailing

19   theory right now is that in the terms of obesity, it's

20   not just a mechanical load that's increasing the, uh,

21   prevalence of arthritis and degenerative discs, but it's

22   also a microvascular issue too.  Because you know, folks

23   that are overweight and morbidly obese, which

24   unfortunately Ms. Lamar at the time was technically

25   morbidly obese with a BMI of 38, you know, the word

 1    morbid associated with obesity means it's really bad.

 2    And, and can both shorten your mortality and your

 3    lifespan, but it also can have significant deleterious

 4    effects on your organs and your spine and your body.

 5    The way it is felt to affect the cervical spine is

 6    through an effect on the microvasculature that, uh, that

 7    supplies nutrients and blood supply to the vertebrae and

 8    the disc themselves.  And it's felt that people that are

 9    obese have a tendency to have microvascular disease as

10    well.

11         Q.   At what weight do females in their fifties

12    start to experience disc degeneration due to their

13    weight?

14              MR. DEEB:  Objection to form.

15    BY MR. GILLILAND:  (Resuming)

16         A.   Yeah.  I don't know that I have an answer to

17    that question, the way you phrased it.  But in my

18    attempt to answer that question, I would say BMI over

19    30.

20         Q.   And what is that based on besides your own

21    opinion?

22         A.   So it's actually based on the literature.  So

23    there's studies that have been done that have looked at

24    the association of obesity with, uh, back pain and neck

25    pain.

1    Q.    Okay.    But what about disc degeneration?

2    **A.    Back pain and neck pain due to disc**

3    **degeneration.**

4    Q.    Okay.    What studies specifically say disc

5    degeneration?

6    **A.    I think the titles of the studies don't**

7    **specifically say that.    I think it's the content and the**

8    **discussion sections that say that.    And I, you know, I**

9    **don't have at my fingertips a citation for you, but I**

10    **can assure you I'd be happy to provide one.    And I'll**

11    **make a note of that to myself right now.    A citation for**

12    **obesity as a risk factor for back and neck pain and**

13    **degenerative disc disease.**

14    Q.    What published studies are out there that say

15    writers develop disc degeneration?

16    **A.    I don't think writers is what I testified to.**

17    **It's the general category of, uh, office work, working**

18    **in front of a computer monitor, um, you know, sedentary**

19    **sitting on your fanny in front of a computer for long**

20    **periods of time.    Um, that's the category that I think**

21    **might apply to Ms. Lamar based on her testimony.**

22    Q.    How many years do you have to sit on your

23    fanny to develop disc degeneration?

24    **A.    I have no idea.**

25    Q.    Okay.    Um --

1        A.    I just know that it's associated with an

2   increased risk of back and neck pain.

3        Q.    Is it associated with an increased risk of

4   disc herniations that indent the spinal cord at C3-C4?

5        A.    Well, again, as I said, the answer is, I don't

6   know.  But as I said before, the mere fact that a person

7   has a disc herniation is not evidence of trauma and that

8   there are two types of disc herniations, generally

9   speaking, degenerative and traumatic, and that the

10  degenerative type disc herniations make up 99.9 percent

11  of all herniations that are seen on an MRI.  That's the

12  first point I want to make.  The second point in

13  response to your question is that, that in the setting

14  of this age group, the findings on Ms. Lamar's, uh, MRI

15  study is quite common.  And when we refer to that table,

16  we can see that the likelihood of her having disc

17  degeneration is 80 percent.  It's a very, very common

18  finding.  And I equate it to be just part of the natural

19  aging process, no different than getting gray hair and

20  wrinkles.  As we age, it's not just what we see in the

21  mirror that's aging.

22       Q.    What published studies are out there that say

23  a morbidly obese individual will develop a disc

24  herniation at C3-C4 that indents the spinal cord?

25       A.    Oh gosh.  I think that there -- I'm not aware

```
 1   of any that say that.  And I think at the same time I

 2   use the inverse.  I don't think there's any out there

 3   that say that they're not.  Uh, I think that's such an

 4   esoteric subset of a patient population that I don't

 5   think there's a single study in the universe that

 6   addresses that patient population.

 7       Q.   What published studies are out there that say,

 8   uh, somebody with scoliosis will go on to develop a disc

 9   herniation at C3-C4 that indents the spinal cord?

10            MR. DEEB:  Objection to form.

11   BY MR. GILLILAND:  (Resuming)

12       A.   So, you know, again, I'm going to say that I

13   don't -- I think that's such as an esoteric minute slice

14   of a demographic that you're not going to find a single

15   study that looks at that question.  And I'm going to add

16   to that, you're not going to find -- I defy you to find

17   a single study that says that a 52 year old female with

18   a slip and fall can sustain a C3-C4 disc herniation.  I

19   think it's such an esoteric narrow question that it's

20   never been asked.  It's never been -- and nor should it

21   be.  I think that's -- that would be what I would

22   consider a case study, which is of low value that that

23   study would be of low value or low impact.  It would be

24   a low level of evidence and that the level of evidence

25   that I've offered you with the Brzezinski study in, in,
```

1    in specific that shows the baseline prevalence of those

2    findings in the general population, that's level one

3    evidence.  So I think the level one evidence would trump

4    any level five evidence that you might find for that

5    esoteric anecdotal case study.

6         Q.   How many subjects in the Brzezinski studies

7    experienced a ground level fall who are women in their

8    fifties and were African-American?

9         A.   I don't know that they looked at that.  I

10   don't know the answer to that, but, but I would say the

11   inverse to that is there are no studies that have shown

12   that a ground level fall in a 52 year old

13   African-American female, which I don't think really

14   applies here, it's not relevant, but there are no

15   studies that show that an African-American woman who's

16   obese that falls on yogurt in a Walmart is going to get

17   a C3-C4 disc herniation.  Show me that study.

18        Q.   Okay.  And how many studies are out there,

19   peer reviewed and published studies, that say somebody

20   will experience a disc herniation at C3-C4 that indents

21   the spinal cord that was involved in a minor car

22   accident?

23        A.   So there is a study I've referred to that I

24   think is responsive to your question, the Kent article,

25   um, which if you don't have, I can send it to you. But

```
 1   it basically looked at a huge number of patients in the
 2   nation, looking at two different databases, uh, of the
 3   prevalence of a motor vehicle accident involved --
 4   associated with a disc herniation of the cervical spine.
 5   And the three conclusions that the studies came up with
 6   looking at one year's worth of data of motor vehicle
 7   accidents is that number one, in the context of a car
 8   accident, we're not talking about a ground level fall.
 9   In the context of a car accident, A, it's very rare,
10   0.01 per 10,000.  That's one in a million.  B, that it's
11   always associated with other evidence of trauma,
12   vertebral body fractures, ligamentous injuries,
13   hematomas, edema, spinal cord injuries, you get what I'm
14   going at.  And then the third finding that they had
15   described was that they happened at very, very high
16   speeds, greater than 25 miles an hour, typically.  Or
17   Delta V change in velocity of 20 to 30 miles an hour.
18   So when you, when you look at that in terms of the
19   perspective of that degree of violent trauma at 20 to 30
20   miles an hour in a car, and it's one in a million that
21   you're going to have a disc herniation.  And then we
22   attempt to convey that knowledge into a slip and fall
23   onto the ground at 9.8 meters per second, the likelihood
24   you would -- by just inductive reasoning would
25   understand that it's more than one in a million.  As far
```

 1   as a possibility of having a traumatic disc herniation

 2   from a slip and fall.  But that doesn't mean it's zero

 3   and I acknowledge that.  And so that's why I

 4   specifically in looking at over 1200 pages of records

 5   and imaging studies of 844 images, I specifically sought

 6   out the answer to the question, did this event that

 7   occurred on August 5th, cause any serious or permanent

 8   injury?  And my expert opinion, based on my review of

 9   the evidence is the answer is no.

10       Q.   Okay.  So the scoliosis, the weight, her

11   career, and the car accident, um, are causing are the --

12   are the reason she's experiencing neck and back pain

13   today.  Is that, is that, is that true?

14            MR. DEEB:  Objection to form.

15   BY MR. GILLILAND:  (Resuming)

16       A.   No, I disagree with how you phrase that.

17   That's not what I said and that's not my testimony.

18       Q.   How would you phrase it?

19       A.   I -- all of those superseding factors, and

20   there may be others that we haven't mentioned, um, that

21   don't come to mind immediately, but any superseding

22   factor involved in, uh, in this case may explain, may

23   explain the need or the, the necessity for the

24   procedures that she later had.  And for me, what I would

25   put at the number one top of the list would be her age.

```
 1    These are very common problems that people in their
 2    fifties undergo.  Epidemiology shows us that it's very
 3    common to have these procedures.  Millions of people
 4    have medial branch blocks, epidurals, et cetera, that
 5    did not fall in a supermarket or get in a car accident.
 6    These are very, very common procedures done.  I don't
 7    have exact numbers for you, but I can tell you large
 8    percentage, millions of people, adults in the USA have
 9    these procedures for the treatment of degenerative --
10    the degenerative process and the natural progression of
11    the degenerative process that goes with aging.  So I'm
12    going to put age is the number one, most likely
13    superseding factor.  This, the prior -- the prior car
14    accident possibly may be related because we do have
15    evidence of a CT scan documenting disc herniations
16    associated with that car accident.  We don't have an MRI
17    of that.  We only have a CT scan.  MRI would be
18    interesting if she had one.  Um, and so again, I think,
19    uh, you know, not to beat a dead horse here, but, uh,
20    you know, the overarching theme of my opinion, which was
21    memorialized in my report is that the August 5th, event
22    played no role in the need for those procedures based on
23    the evidence and based on the totality of the evidence.
24         Q.   And so she just started -- it, it's a
25    coincidence that she started experiencing pain in her
```

 1   neck after her fall, the, the pain she's experiencing

 2   from age just happened to manifest after she fell at

 3   Walmart.  Is that what you're saying?

 4        A.   No, I'm not saying that either.  I'm saying

 5   something similar to that, but I'm not saying that.

 6   What I'm saying is that the procedures that she had, uh,

 7   you know, subsequent to the accident and initiated about

 8   a month after the accident, uh, were not caused by the

 9   fall, that there are some other superseding factor that

10   is related to that.  And that the fact that she had no

11   evidence of exposure and no evidence on clinical

12   findings to support the diagnosis of cervical

13   radiculopathy or lumbar radiculopathy, the day of the

14   event proves that our event did not cause the need for

15   those subsequent procedures.

16        Q.   Those procedures were done to alleviate her

17   pain, true?

18        A.   I'm not going to speculate as to the, the,

19   the, uh, intent of the treating physician or the

20   patient.  Uh, the presumption is that that is correct,

21   but that's not necessarily the default answer.

22        Q.   What else, what else would the reason be for

23   getting injections, radiofrequency ablations, except to

24   relieve pain?

25        A.   Oh, come on now, Mr. Gilliland, you wouldn't

```
 1    take into consideration financial bias --

 2        Q.   Okay --

 3        A.   (Indiscernible.)

 4        Q.   So this is about money then?

 5        A.   No, I answered your question.  You said, what

 6    else?  And that is a possibility.  I'm not, I'm not here

 7    to testify that it is about money, although I think it

 8    is about money, um, overall, obviously.  But, uh --

 9        Q.   So she's lying for money, is that what you're

10    saying?

11        A.   Oh, of course not.  Of course not.

12        Q.   Okay.  So what --

13        A.   I have no evidence.

14        Q.   -- do you mean by financial bias?

15        A.   I have no evidence in support of, of your

16    opinion that she's doing this for money.  I don't, I

17    don't agree with your opinion.

18        Q.   What is financial bias then?  Who's financial

19    bias, the treater or Ms. Lamar?

20        A.   Well, I think there's certainly, uh, the

21    possibility, and it's not for me to determine, but I

22    think there's, as you asked the open question, I think

23    there's certainly a possibility of financial bias on the

24    part of Dr. Adams.  Uh, when I look at the bill for over

25    $158,000, you know, I think that an argument could be
```

 1  made that perhaps there is some financial bias there.

 2  Um, uh, so, you know, when you asked me a question about

 3  why the procedures were done, I'm going to be honest

 4  with you.  I don't know.  Uh, the presumption is to make

 5  her better, but that's not necessarily the only

 6  possibility.  And I've just outlined, you know, the ugly

 7  fact that financial bias also drives some people's

 8  motivations.

 9      Q.   Does it drive your motivation too, you're

10  getting paid by Walmart?

11      A.   Yeah, I like to be paid.  I mean, I'm not

12  going to sit here and tell you I don't want to be paid.

13  Um, but I will testify under oath that my testimony and

14  my opinions are not payment -- I'm not being paid to

15  give my opinions.  I'm being paid for my time.  So I

16  have an expectation to be reimbursed at, you know, a

17  fair, reasonable amount that's commensurate with my

18  knowledge training and experience.  But, um, you know,

19  no different than anyone else, I think anyone in this

20  room right now is being paid.  So it's self-evident that

21  we like to be paid.  But I, uh, you know, I -- take it

22  from my word.  I don't offer opinions based on the

23  payment that I'm receiving.  I give my opinions

24  regardless.  Um, and I do call balls balls and strikes

25  strikes, regardless of whether it's a plaintiff's case

 1   or defense case.  I do testimony for both.

 2       Q.   Why would Dr. Adams risk his financial lice --

 3   and why did Dr. Adams risk his medical license

 4   performing unnecessary procedures for money?

 5       A.   Well, you know, that's a great question.  I

 6   think the issue of fraud and abuse is beyond the scope

 7   of my testimony, but there's no question that fraud and

 8   abuse, uh, is a topic in medicine that I receive on, uh,

 9   news feeds that I get on a weekly basis.  Every week I'm

10   reading about an issue or a case of fraud and abuse in

11   which doctors do just that.  Now I'm not accusing anyone

12   of doing that and I, I have no evidence that that's

13   what's going on, but you asked me about other potential

14   biases and I gave you my answer.

15       Q.   Okay.  Um, so Dr. Adams has a financial bias,

16   do you think Janet Lamar has a financial bias?

17       A.   No.  You know, my honest opinion, which is all

18   I have.  My opinion is that, uh, Ms. Lamar, you know,

19   is, uh, you know, a reasonable person that had an

20   unfortunate event happened to her.  Uh, it's very

21   unfortunate that she got hurt.  It's my opinion that she

22   did not get seriously hurt, but she was hurt

23   nonetheless.  Um, and I don't, I don't have any evidence

24   to believe that she has any other motivations and is not

25   necessarily, uh -- let's put it this way, I -- not that

 1    you asked this question.  I don't think that she's

 2    malingering or exaggerating.  I think that her pain is

 3    what she says it is.  And I think the reasons for her

 4    pain are not what she says it is, if that makes sense.

 5    But I think --

 6         Q.   How do you --

 7         A.   -- I think she's -- you know, I, I think that,

 8    uh, uh, that she believes what she believes.  And, um,

 9    uh, but for me, the facts and as an expert, I look at

10    the evidence and I don't think the evidence supports the

11    notion or the theory that that event caused the need for

12    all these procedures, the seven procedures that she

13    subsequently had.  And it's my testimony that that event

14    that happened in August of 2022, did not cause the need

15    or played any -- played no role in the need for any

16    surgery of her back or neck.

17         Q.   Okay.  How many peer-reviewed published

18    studies can you point me to that have someone who has

19    scoliosis, experiences a ground-level fall, starts

20    experiencing pain after the ground-level fall, but the

21    authors of the study can rule out the fall as a cause of

22    pain?

23              MR. DEEB:  Objection to form.

24    BY MR. GILLILAND:  (Resuming)

25         A.   Yeah.  I don't think that there's -- first of

```
 1    all, I don't think that there would be a peer-reviewed
 2    study that looked at any of those things ever published.
 3    Uh, I think because what you're talking about is a case
 4    report and case reports are now currently not, uh, are
 5    not accepted by most peer-reviewed journals, uh, because
 6    they're anecdotal.  Um, so to answer your question, I'm
 7    not familiar with anything, anything in the literature
 8    at all related to that scenario.  Uh, and I'll add to
 9    that the inverse.  There's nothing in the literature
10    that shows in that scenario that the cause is from a
11    ground-level fall.  So you're not going to find anything
12    in the literature to support the notion that the
13    ground-level fall, regardless of all the other
14    superseding factors is the cause of Ms. Lamar's
15    symptoms.  And the fact of the matter is, is because
16    it's not something that would be, uh, publishable.
17         Q.   Okay.  What, what part of the six step method
18    allows you to rule out the ground-level fall as a cause
19    of her pain and be able to say that her pain is coming
20    from her scoliosis, her weight, her career, the car
21    accident, and her age?
22              MR. DEEB:  Objection to form.
23    BY MR. GILLILAND:  (Resuming)
24         A.   Kind of a compound question, but I'll try and
25    break it down.  So the totality of the six steps is how
```

```
 1    you come to the conclusion that the August 5th, 2022,

 2    event did not cause any permanent or serious injuries.

 3    So it's the totality of the, uh, all of the five

 4    previous steps coming to the sixth step, which is the

 5    conclusion based on the five previous steps.  Now, on

 6    the topic of the superseding factors, those are other

 7    relevant factors.  I'm not saying nor could I say, and

 8    nor do I have to say what the cause of her subsequent

 9    symptoms are.  I'm merely putting out that these other

10    relevant factors may likely explain why Ms. Lamar did

11    require those procedures.  And it boils down to just a

12    very simple common sense explanation that those chronic

13    preexisting conditions that she had in her back and

14    neck, uh, the likelihood of the natural progression of

15    those chronic, uh, conditions, preexisting conditions is

16    the cause.  Uh, aging, if you will, uh, and going

17    through the aging process.  Now the obesity certainly

18    doesn't help.  Um, the scoliosis certainly can be a

19    contributing factor.  But you know, I'm not here, nor is

20    it my job to tell anyone why she had those procedures.

21    My job is to determine whether or not the August 5th,

22    2022, event played any role in the need.  And my opinion

23    is the answer is, no, the August 5th, 2022, event played

24    no role in the need for the six or seven procedures or

25    the recommendation for possible, uh, cervical fusions.
```

1    **It did play a role in the need for skilled supervised**

2    **physical therapy and -- which she underwent.  And, um,**

3    **and that would have been appropriate.**

4         Q.   What part of the six step method, um, allows

5    you to rule out the fall as a cause of her disc

6    herniation that, that indents her spinal cord at C3-C4,

7    um, uh, as, as, as -- I'm sorry, what part of the six

8    step method allows you to rule out the fall as a cause

9    of her disc herniation at C3-C4 that indents her spinal

10   cord?

11        MR. DEEB:  Same objection.

12   BY MR. GILLILAND:  (Resuming)

13        Q.   Sure.  So again, same answer.  It's the five

14   previous steps, but I'll walk you through it.  Step

15   number one, the diagnosis, the day of the event in the

16   emergency room is that she had abrasions and contusion.

17   If you read the diagnosis, and if you read the clinical

18   records from the ER that day, she had a neck that was

19   supple and non tender in the midline.  That rules out a

20   traumatic disc herniation or aggravation of the C3-C4.

21   That's number one.  Then you also have evidence of, uh,

22   epidemiology.  We know that the findings on the MRI that

23   were done three weeks later, those are common findings

24   on a baseline prevalence, 80 percent plus of the

25   population age 50 have those findings.  So that's step

```
 1   two.  Step three, evidence of exposure.  When we look in

 2   more detail at the MRI study done, and I'm talking on

 3   her neck specifically, uh, but same applies for the knee

 4   and the shoulder -- I mean the knee and the lumbar.  But

 5   the MRI of the neck does not show any evidence of

 6   exposure.  And what I mean by that is, there's no edema.

 7   There's no inflammation.  There's no nothing.  Okay.

 8   And in fact, when we look at the CT scan report from

 9   2022, and we look at the CT scan report from 2020 and

10   the images from 2020, we see, yeah, these are old

11   chronic preexisting conditions.  So that would be the

12   third step, the level -- the evidence of exposure.  The

13   fourth step that leads me to that conclusion is, hey

14   guys, there's several other explanations that someone's

15   not thinking about here, that someone is conveniently

16   ignoring.  That someone in their deductive process, not

17   inductive, where you weigh all the evidence, someone has

18   discarded some evidence out of the way they don't want

19   to look at it.  And I'm going to look at it.  And that

20   evidence includes age, the documented preexisting

21   degenerative condition, possibly related to a prior

22   motor vehicle accident, the, uh, BMI, obesity, the

23   scoliosis, and her occupation or her activities that she

24   likes to do.  So there's five other possible

25   explanations that need to be weighed when you do an
```

```
 1   inductive logical progression through the facts.  And
 2   then the fifth step would be validity of evidence.  And
 3   there's no validity to the notion that the event caused
 4   the need for those procedures.  There's just no validity
 5   to that.  You know, it's not supported by the ER record,
 6   the, uh, CT scan, uh, evidence, or the MRI study.  You
 7   know, we haven't even talked about, you -- we've talked
 8   a lot about the Spine Center Atlanta evidence, but we've
 9   talked nothing about Renovation Chiro.  Which shows on
10   August 11th, that her function has improved 90 percent.
11   When we look at the evidence, which is in answer to your
12   question, this is responsive to your question.  When we
13   look at what the -- what was documented, we see, you
14   know, a number of interesting findings such as for
15   example, her back and neck pain stop.  They stop.  And
16   that the knee pain eventually stops.  And then we have
17   what we call MMI or resolution of symptoms.  So there
18   are a number of different data points, but you know, I
19   don't want to belabor the point, the final conclusion
20   that I've come up with, with the foundation being the 12
21   -- or 1100 pages of records and, and the imaging studies
22   and, and the baseline prevalence and the epidemiology of
23   this particular topic.  Um, it's clear to me that our
24   event did cause some minor injuries, but not the major
25   injuries requiring all those procedures that were done.
```

1    Q.   Okay.  And this step one, the evidence of the

2    disease, you mentioned the ER records.  So all the other

3    subsequent records, except maybe the Chiro records are

4    irrelevant to your analysis?

5        **A.   Nothing's irrelevant to my analysis.**

6    Q.   Why are you putting more weight on the

7    hospital record and the Chiro record than the records at

8    Spine Center Atlanta?

9        **A.   I don't know.  I don't know why you say I'm**

10   **putting more weight on one than the other.  But in terms**

11   **of a causal opinion, the temporal relationship with the**

12   **day of the event, you would agree is more important than**

13   **a month later.**

14   Q.   Well, on the day of the hospital visit, she

15   was tender on her neck.  She had numbness and tingling

16   going down her left arm, right?

17       **A.   So let's examine that again because the**

18   **physical exam did not show that.  So we -- what, what**

19   **explanation could there be, right?  I guess that's the**

20   **question you're asking.  She said she had numbness and**

21   **tingling and then they fit -- they examined her and she**

22   **had no evidence of numbness and tingling.  Well, let's**

23   **explain that, you can have temporary paresthesias from a**

24   **contusion when you land on your elbow, right?  We've all**

25   **hit our funny bone.  What's that cause, numbness and**

```
 1    tingling.  Well, you know, spoiler alert, that's not
 2    from your neck.  Okay.  So contusions and soft tissue
 3    injuries landing on her buttocks, those are all things
 4    that can be associated with temporary symptoms that in
 5    medicine we call paresthesias, but they're not related
 6    to radiculopathy.  And when we see the physical
 7    examination, when we look at the physical examination,
 8    first of all, there's no weakness, which would be a sign
 9    of radiculopathy.  There's no midline tenderness in her
10    cervical spine.  She is tender to palpation in the
11    lateral neck extending to the shoulder, which would be
12    in the distribution of the trapezius muscle.  But
13    there's no midline pain.  She has cervical back exam,
14    normal range of motion.  That is not consistent with the
15    theory that the plaintiff is proposing.  A supple neck
16    is not consistent with the -- with a aggravation or new
17    disc herniation.  And there's no midline tenderness
18    along the back.  Again, that's not -- that physical exam
19    finding is in contradistinction to the notion that there
20    was any serious spinal column injury.
21        Q.   Okay.  And that --
22        A.   That's why we do that physical exam.  We
23    literally, you know, as doctors trained to examine
24    people in a trauma bay, we put our thumb right on the
25    midline of the spine and we push.  And if there's pain,
```

```
 1    that's significant.  If there's no pain, that's also
 2    significant.
 3         Q.   Okay.
 4         A.   So again, I mean, the totality of the
 5    evidence, uh, from the ER and the final diagnosis, uh,
 6    based on the review of the CT scans and the clinical
 7    evidence is that she had a contusion of the left elbow.
 8    Well, that can cause numbness and tingling, temporary.
 9    And she had a pain of the knee, which is consistent with
10    a contusion abrasion of the left elbow, that was the
11    bleeding.  And, um, I don't see anything here about a
12    lumbar radiculopathy or cervical radiculopathy.  So, um,
13    absent any evidence of that, I think it's, uh, a quantum
14    leap to a month later, uh, or so to a say, well, all of
15    these findings on the MRI must be from that event.  Um,
16    that, that that's simply, uh, a fictional, uh,
17    conclusion.
18         Q.   Well let's go --
19         A.   And it's not supported by the facts.
20         Q.   Let's go to the Renovation Chiropractic
21    records on August 9th, which is two days later.
22         A.   Yep.
23         Q.   Where she has a positive cervical compression
24    test.  Um, that is indicative of a disc injury, isn't
25    it?
```

```
 1          A.    Well, it can be.  And that -- I looked at
 2    that, but they also -- that can also be what we call a
 3    false positive.  So when you have a patient and let's go
 4    back to this, this is important.  The patient presents
 5    with what?  We go to her -- to the patient, the
 6    reporting -- the self-reporting, she's coming in
 7    complaining of back and neck pain.  Okay.  So when you
 8    do a Spurling's test or a compression test, to do an
 9    accurate or valid Spurling's test, which is what you're
10    talking about, I think you can't have neck pain.  And
11    why would that be?  Because it's a provocative maneuver.
12    To be valid, you have to provoke the symptom.  Well, if
13    the patient already has neck pain from myofascial muscle
14    pain, you really shouldn't do that test because when you
15    push on their head, they're going to hurt anyway.  So I
16    attributed that -- I looked at that.  And when I
17    attributed that, uh, that particular finding as being,
18    um, a false positive.  And when you go to page two of
19    their same note, um, on objective findings, they're
20    talking about muscle spasm, hypertonicity and spasm of
21    the musculature.  Well, okay, that's a strain.  We --
22    you know, we're, we're on the same page at that point.
23    She has a muscle.  Uh, when we look at the physical exam
24    findings, we look at all muscles tested were WNL within
25    normal limits.  When we go to sensory testing, it's all
```

```
 1    normal.  So, uh, other than a little numbness on her

 2    pinky, um, I think we saw that at that first visit.  Um,

 3    but in, in, in essence, the physical exam findings are

 4    consistent with, again, the same ER diagnosis of, uh,

 5    muscle strain of the trapezius.  Um, and then I think

 6    it's specifically in terms of that, uh, cervical

 7    distraction or compression testing, I think those are

 8    false positives because she's already hurting.

 9         Q.   But if --

10         A.   You have a patient that's got neck pain from

11    muscle strain, that's a very, uh, you know, uh,

12    non-specific finding.  And when you do compression

13    testing and stretching and stretching and moving of that

14    patient's neck, everything's going to hurt.

15         Q.   May I ask you a question, please?

16         A.   And so I challenge the validity of that

17    particular finding.

18         Q.   May I ask you a question now, please?

19         A.   Sure.

20         Q.   Is that okay?

21         A.   It's your deposition.

22         Q.   All right.  Thank you.  The chief complaint on

23    August 9th, uh, was neck pain sharp shooting radiates

24    down to the arm.  It's in the second, third, fourth, and

25    fifth digits.  It's present 100 percent of the day.
```

```
 1        A.    Right.

 2        Q.    It's eight out of ten pain.

 3        A.    Right.

 4        Q.    And she also has low back pain that's sharp

 5   radiating into the left bottocks -- buttocks 100 percent

 6   of the day.  Pain is five out of ten, it's unchanging.

 7   Um, she had muscle spasms in her neck and her lower

 8   back.  None of that is in your report.  And you're not

 9   considering any of that evidence in arriving at your

10   conclusions are you?

11        A.    Uh, two questions, I'm going to say, number

12   one, I think I do address that in my report.  Um, as

13   again, no serious or permanent injury, no evidence -- no

14   objective evidence of serious permanent injury.  So that

15   answers the first part of the question.  The second part

16   of the question is no, I, I actually, uh, I don't

17   disregard any of the evidence.  And when we look further

18   in response to that and follow up to that question, uh,

19   which my answer is no, I, I, um, I disagree.  I am

20   paying attention to Renovation Chiro, when we go to

21   August, August 11th, so eight days after the event.  I

22   mean, she's still in pain, but now we see that her

23   ability to function has improved 90 percent since the

24   last visit.  And since you started your care, what

25   condition have you improved?  What percentage has your
```

 1    condition improved?  Janet states that her condition is

 2    90 percent improved since they started under our care.

 3    So again, I'm not neglecting the evidence.  I am paying

 4    attention to the evidence, I wish you would too.  She's

 5    90 percent better a few days after this event, as would

 6    be expected.  And as is memorialized in my report, based

 7    on the minor injuries that she suffered.

 8        Q.    And she has tenderness to her neck at that

 9    visit.  And then on the next visit on August 16th --

10        A.    Sure.

11        Q.    -- she's referred for an MRI for these

12    symptoms she's experiencing, true?

13        A.    Both of those are true.  And I acknowledge

14    that, that she's still symptomatic.  But I would also

15    point out she has improved 90 percent since her last

16    visit.

17        Q.    And on August 18th, 2022, um, the continuation

18    of care is necessary.  Her neck pain is five out of ten.

19    Her low back is five out of ten.  Doctor, isn't it true

20    that pain kind of comes in waves that can come and go

21    one day you're having a good day.  The next day you have

22    pain.  Isn't that normal?

23        A.    Gosh, a lot of questions there.  I, I would

24    say to break that down, I think pain can wax and wane.

25    I don't think that's necessarily normal.  I think

 1  typically pain diminishes over time.  And I would also

 2  point out when we look at that, I believe it's the same

 3  date the August 16th, date.  Quote, active trigger

 4  points were discovered were discovered and stimulated

 5  until release by trigger point therapy.  So again, we

 6  have documentation in the Renovation Chiropractic

 7  because I'm here to testify trigger point, uh, releases

 8  don't treat radiculopathy.  Trigger point therapy, which

 9  is beneficial in making her better, right?  Is a muscle

10  -- it's, it's a response from treating the myofascial

11  cause of her pain.  So the evidence from Renovation

12  Chiropractic not only does it support the opinions that

13  I provided you, it also refutes the narrative that she

14  had a traumatic disc herniation that was aggravated by

15  the fall because she's 90 percent better within a week.

16      Q.   Okay.  And the does pain diminish over time

17  for a disc herniation at C3-C4 that indents the spinal

18  cord?

19      A.   Yes, it can.

20      Q.   Okay.  And what peer review published studies

21  are you relying on to come to that conclusion?

22      A.   So, um, I don't -- I'm not familiar with peer

23  reviewed studies offhand, but I can tell you based on my

24  knowledge, training and experience.  And in fact, I have

25  a demonstrative MRI of a patient with six disc

 1  **herniations in his spine.  Not one, not two, but six was**

 2  **not in a fall, was not in a traumatic event at all.**

 3  **There, there -- as I mentioned earlier, 99 percent plus**

 4  **herniation seen on an MRI, including Ms. Lamar's are**

 5  **preexisting degenerative findings, natural aging.  Uh --**

 6      Q.   Unlike that article you provided that talks

 7  about low back pain coming on, the MRI images are

 8  irrelevant when it comes to the onset of pain, true?

 9      **A.   So there are many causes of pain and muscle --**

10  **and myofascial causes are the most common cause of back**

11  **pain.  In terms of radiculopathy many patients have, as**

12  **the studies that we've talked about, many patients have**

13  **disc herniations that are not symptomatic.  So the, the**

14  **simple incidental finding of finding a disc herniation**

15  **on an MRI for Ms. Lamar is not evidence of anything**

16  **other than she's got a preexisting disc herniation in**

17  **her cervical and lumbar spine.**

18      Q.   On August 22nd, 2022, she goes to Renovation

19  Chiropractic and her neck pain is five out of ten and

20  she feels the pain about 70 percent of the day, true?

21      **A.   Yeah, I think --**

22          MR. DEEB:  Objection to form.

23  BY MR. GILLILAND:  (Resuming)

24      **A.   -- there are periods of time and I'm not, I'm**

25  **not on that same page, but I'm on November 21.  November**

 1    21, many months later and her neck pain's 70 percent,

 2    and back pain's 50 percent, and her knee pains better.

 3    So, you know, as I, I think I mentioned earlier in my

 4    testimony, I mean, it's been a long -- coming up on four

 5    hours.  But you know, many people, and I can provide you

 6    the studies that are published by the CDC and on the CDC

 7    website, when it comes to musculoskeletal complaints,

 8    you know, 58 to 60 percent of the population in the last

 9    90 days has had some orthopedic complaint.  I call that

10    job security.  You know, my profession is a profession

11    in which there's a demand or a need to help manage

12    people with musculoskeletal complaint.  They're very

13    common complaints.

14        Q.    Okay.

15        A.    And so with regard to, you know, the

16    complaints that Ms. Lamar had, these are very common

17    complaints.

18        Q.    And the disc herniation at C3-C4 from the AIC

19    MRI report, there is a, um -- ascending towards the left

20    -- there's an increased signal of that herniation.  That

21    indicates recent trauma, doesn't it?

22        A.    So I examined -- it could, it's possible.  But

23    I examined that and, and there's a technique which I

24    applied, which the radiologist apparently did not apply.

25    And let me get to that report so I can get it open.

1     Q.   And is this --

2     A.   But there's -- in other words, that, that

3  would be only valid, that particular finding of what

4  we're talking about, bright signal, hyper intensity.

5  It's only -- you know, there are many things that cause

6  bright signal, first of all, on T2 sequences and, blood

7  vessels are one of them.  And it's my opinion that that

8  was a incidental or false positive.  And that's a blood

9  vessel.  And the way I know that, and the way I can

10  prove that in court, and I'll show the jury, is that you

11  have to look at sequential slices.  Okay.  In this, in

12  this circumstance, I did specifically go to that image

13  and I looked at that finding, and it's only one

14  particular slice.  And that's what you would expect if

15  it's a blood vessel.  So I think that's actually a false

16  positive reading by the radiologist.

17     Q.   There's also a loss of the normal lordotic

18  curve in her spine.  Tat can be due to trauma too, can

19  it?

20     A.   No, that -- I see that finding.  And you're,

21  uh, uh, curious about the scientific literature.

22  There's nothing in the scientific literature that shows

23  that that's true.  I defy you to find anything that

24  does.  That is actually a phenomenon that's seen in

25  every single person that gets into an MRI.  And I can

```
 1   tell you having had an MRI of my neck as well, what
 2   position are you are -- in the majority, 95 percent of
 3   MRIs, you're lying flat on your back.  That's the
 4   natural posture of your neck when you're lying flat on
 5   your back.  So I see that in reports by radiologists all
 6   the time.  I guess the polite thing that I'm going to,
 7   uh, opine is I think that's nonsense.  I think that's a
 8   bunch of nonsense.
 9        Q.   And the disc herniation at C6-C7, the
10   herniation actually extends beyond the borders of the
11   osteophyte.  Wouldn't a herniation that extends beyond
12   the borders of the osteophyte indicate something that is
13   recent?
14        A.   No, no.
15        Q.   All --
16        A.   And in fact, we know from the CT scan from,
17   uh, two years prior, but that same finding exact finding
18   is there.
19        Q.   That it extends beyond the osteophyte.  That's
20   what it says in the CT report?
21        A.   No, that's based on my review of the MRI.
22   Now, I do believe that -- I'm going to clarify that.
23   First of all, that's my opinion based on my eyeballs,
24   looking at the 2020 CT scan.  Now on the second -- on
25   the report itself, I got to go back to it.  I think
```

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

1    that's in the report as well, but I've got to refer back

2    to it.   August 9th, 2020, that's number 11 and when I

3    look at the report, let me see what he says.   He or she.

4    On the CT scan.   Yeah.   They noticed a protrusion, which

5    is what you're talking about.   A protrusion pushing

6    through at C5-C6 in 2020.

7          Q.   Okay. And then --

8          A.   But yes, see -- the radiologist read that as

9    well.

10         Q.   The radiologist, uh, for the disc herniations

11   at -- in the cervical spine, he said, given the

12   patient's history, findings, an increased signal

13   involving the disc herniations at the levels of C3-C4

14   and C6-C7, it is medically probable, these are acute

15   disc herniation caused by the patient's recent slip and

16   fall accident.   And you would disagree with that?

17         A.   Well, I, I disagree with that on two different

18   -- uh, with two different, um, foundations.   Number one,

19   uh, that opinion, which is a boilerplate opinion that I

20   see, uh, from that particular radiology group in every

21   report.   That boilerplate, uh, terminology is not

22   consistent with the, nomenclature article version 2.0

23   recommendations on how to read an MRI of the spine.   Uh,

24   I know that --

25         Q.   Now --

1      A.    -- may not come up, but I'll give it to you

2    again.  Lumbar disc nomenclature, which applies to the

3    cervical spine as well.  Recommendations of the combined

4    task force of North American Spine Society, suffice it

5    to say that version 2.0 nomenclature article published

6    in the spine journal, 2014 contradicts that particular

7    description by the radiologist, that's my first point.

8    My second point is I looked at the imaging studies, uh,

9    I just -- I disagree based on my interpretation of the

10   imaging studies.  Uh, and I'll add to that that during

11   my tenure at AICA, I reviewed over 15,000 MRI studies of

12   the spine.  Uh, um, so I would put myself up against the

13   radiologist any day.  The third thing I'm going to say

14   is, and he leaves the back door in his report, let me

15   get to it.  Number four, and I'll read it out loud.  You

16   know, first of all, remember in the first paragraph of

17   his report, he says, quote, this is in findings, no

18   prevertebral or paravertebral masses or fluid

19   collections or swelling.  Okay.  If you have an acute

20   event, you're going to have swelling.  So he

21   acknowledges there's no swelling.  We then go to the

22   second page where you just read.  And the most important

23   thing of what you just read applies.  Clinical

24   correlation is recommended to confirm this.  So that's

25   why it's so important that we have to look at the

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

 1   clinical records at the time of the event on August 5th,

 2   2022.

 3       Q.   And we ignore the records from Spine Center

 4   Atlanta?

 5       A.   Well, no, sir, because he's talking about --

 6   is medically probable that these are caused by the

 7   recent slip and fall.  So doc on -- on August 5th, 2022.

 8   So doc, if the clinical correlation on August 5th, 2022,

 9   doesn't support that, then he's acknowledging that it's

10   not correct.  So no, he specifically says recent slip

11   and fall on August 5th, 2022.  And, you know, I'm not

12   sure if he would be willing to testify under oath to

13   what he's saying at this point in time, but the clinical

14   correlation does not confirm that the August 5th, 2022,

15   event caused that finding.

16       Q.   If we ignore all her subsequent treatment

17   after the day of her fall?

18       A.   Well, then you have to ignore every single

19   event that she participated in since August 5th.  Did

20   she get up from a chair during that period of time?  Did

21   she sneeze during that period of time?  Did she have a

22   bowel movement during that period of time?  Did she

23   sleep funny on her bed during that period of time?  Did

24   she twist her neck in some, you know, innocuous way at

25   home?  Did she -- you know, there are a million other

 1    possible events besides the, the slip and fall that may

 2    have also explained the, uh, finding on the MRI that was

 3    several weeks later.  And so again, again, in terms of a

 4    causal opinion, there's no foundation for a causal

 5    opinion based on that MRI.  That's merely a boiler

 6    plate, and I'm -- you know, I'll testify because I've

 7    read a lot of reports from a lot of radiology groups

 8    that have that boiler plate, including advanced imaging

 9    centers.  Every single report says that.  Every single

10    report says something like that.

11        Q.    Should we add the getting out of a chair,

12    bowel movement, turning funny to the other five factors,

13    obesity, career, car accident, age?

14        A.    Well, no, Drew, cause I don't have the bar to

15    prove how she got it.  But he's, he's neglecting.  He's

16    not considering other relevant factors, whatever they

17    are.  I don't know what they are, but he certainly

18    hasn't even addressed them.  And so if you're to say

19    that the -- that we are to ignore the ER event, which is

20    what you're doing.  And if you were to say we're only to

21    go I, I think you've referenced it no less than a dozen

22    times in this deposition, we only should look at the

23    Spine Center Atlanta.  Well, let me remind you that

24    Spine Center Atlanta was two weeks after the event.  So,

25    uh, for me, you have the burden to show me that

 1  something else didn't happen in those intervening two

 2  weeks to explain the fact that we know on the day of the

 3  event, she did not have radiculopathy.  We know she

 4  didn't.  Because we have a documented physical exam with

 5  a supple neck, normal range of motion and normal

 6  neurological exam and normal CT scan normal for her age.

 7  So again, you know, I don't want to be argumentative

 8  about it, but the radiologist opinion on causation, just

 9  to be clear, I feel the validity of his opinion is poor.

10  Leave it at that.

11      Q.   So you don't know what other factors would

12  have caused her disc herniation at C3-C4, but we just

13  know that they did cause her disc herniation at C3-C4?

14      A.   I know that there are many other possibilities

15  that could have created that, that pattern of

16  symptomatology, we know that.  Let's talk about what we

17  do know.  We know that there are many other causes of

18  aggravating symptoms of a patient's neck.  We also know

19  that on -- and in terms of an MRI finding itself in the

20  absence of any edema, there's no evidence of exposure

21  that the August 5th, event did anything to her neck.  We

22  know by the clinical records in the emergency room, the

23  day of the event, when they let her go home and did not

24  demand to get an MRI, we know that she did not have any

25  clinical signs or evidence of radiculopathy.  And we

```
 1    also know that the likelihood of her having incidental
 2    findings on the MRI, of what she had, is very high.
 3    Based on the baseline prevalence of at least 80 percent
 4    of patients that age having those findings.  So that's
 5    what we do know.
 6         Q.   Okay.  So the obesity, career car accident,
 7    age, bowel movement, head movement, things like that,
 8    all those factors manifested in her neck after her fall
 9    at Walmart?
10              MR. DEEB:  Objection to form.
11    BY MR. GILLILAND:  (Resuming)
12         A.   So again, I mean, that's -- that can be your
13    testimony.  That's not mine.  I'm saying those are
14    superseding factors that need to be ruled out because
15    they're all possible causes of the symptoms that the, uh
16    -- apparently the, the theory is that it was due to the
17    fall.
18         Q.   How did you rule them out?
19         A.   Sorry?
20         Q.   How did you rule them out?
21         A.   You see it's not my job to rule them out.
22    It's not -- that's not my job here.  My role here is not
23    to support your case. My role here is to look at whether
24    or not the August 5th, event caused the need for these
25    procedures.
```

```
 1        Q.   Did you --
 2        A.   My talk here is established.  If you talk,
 3   then you can't hear me.  My role here as an expert is to
 4   establish what, uh, if any, what role did the August
 5   5th, event play in the subsequent alleged hundreds of
 6   thousands of dollars of medical bills that the plaintiff
 7   has.  That's my role here.  Um, your role is to show, in
 8   my opinion, I'm not a legal expert, but I think you have
 9   the burden to show me that it is not the other relevant
10   factors.
11        Q.   Okay.  So --
12        A.   Well, not show me, but show the jury.
13        Q.   So her fall had, had nothing to do with the
14   pain she started experiencing in her neck and back and
15   her knee.  Is that right?
16        A.   So again, I think you're, you're
17   mischaracterizing what I said.  I do have an explanation
18   for the pain that she was explained -- that she was
19   identified of having the day of the event.  So there's
20   no question. She had a slip and fall.  There's no
21   question she was evaluated in a emergency room, uh, by
22   qualified staff.  And there's no argument that the
23   examination after physical examination and diagnostic
24   testing and CT scans and x-rays, there's no question
25   that the findings and the diagnosis was that she did
```

 1   suffer injuries.  What I'm telling you is that they were

 2   minor injuries only.  The evidence only supports that

 3   she had minor abrasions and contusions that can cause

 4   pain, but that she had no evidence.  And in fact, there

 5   was evidence on examination that refutes the notion or

 6   the theory that she had any serious or significant

 7   aggravation of disc herniations or new disc herniations.

 8   Um, and likely -- also since we've not talked about it

 9   for a while, but I might as well get it in there.  She

10   also had no evidence of any meniscal tears or any

11   aggravation of her knee arthritis or any condition of

12   her knee.  She had a knee contusion, physical exam

13   findings showed normal range of motion and he, and she

14   had no swelling that is not consistent with any serious

15   or, uh, uh, more significant injuries to the knee.  She

16   had injuries, she had a fall and she had a ground level

17   fall and sustained contusions and abrasions.

18        Q.   Okay.  So when did the pain from her abrasions

19   stop and become pain from the disc herniations and the

20   facet joints?

21        A.   Um, you know, I, I think sometime within the

22   next two weeks after that.  So, you know, uh, you know,

23   a period of time within two to three weeks, you begin

24   seeing those symptoms.

25        Q.   Okay.  So the symptoms for the disc herniation

```
 1   in her neck and the inflamed facet joints in her lower

 2   back manifested within two weeks after the hospital

 3   visit.  Do we know what --

 4        A.   I don't agree with that.  I don't think that

 5   she had symptoms from a disc herniation in her neck.  I

 6   think she had myofascial as documented by the

 7   chiropractor.  She had myofascial symptoms only in the

 8   neck.  Um, I think in terms of the, uh, response, we

 9   know by August 11th, so what's that, six days later, she

10   is showing 90 percent improvement.  So, you know, I

11   would say again, that the evidence clearly shows that

12   she did not suffer any serious or permanent injuries.

13   And that subsequent symptoms that she have -- has are

14   explained by, uh, her chronic preexisting condition.

15        Q.   And when did -- why did those chronic

16   preexisting conditions manifest within two weeks of her

17   fall?  And they didn't -- and they didn't manifest

18   before her fall?

19             MR. DEEB:  Objection to form.

20   BY MR. GILLILAND:  (Resuming)

21        A.   So we don't know that they didn't manifest

22   before her fall.  We don't have any primary care

23   records, which by way of consent, if you offer to

24   provide them to me, I'd be happy to look at them.  Would

25   you agree to get me those records?
```

1    Q.   Yeah, sure.

2    A.   Okay.  So if you could please provide those to

3    me, I could have a better answer for you, but at this

4    point in time I don't have any evidence that that's

5    true.  Uh, other than what she self reports.  And we

6    already know that the validity of self reporting and

7    under reporting prior conditions for whatever reason is

8    poor.  So I need to see objective diagnostic, you know,

9    information, clinical information to support that she

10   didn't have those symptoms before.  We know she had

11   those symptoms before -- two years before, and we are

12   already talked about how symptoms can wax and wane like

13   a roller coaster.  So maybe, maybe she had continued

14   waxing and waning conditions for two years.  We don't

15   know.

16   Q.   And the EMG study didn't show radiculopathy

17   from her disc herniation in her neck?

18        MR. DEEB:  Objection to form.

19   BY MR. GILLILAND:  (Resuming)

20   A.   So I'll -- two points about the EMG.  Um,

21   let's go to that again.  Because there's, there's one,

22   there's one issue I do have with that EMG.  It's a

23   validity issue.  And it's, uh, I need to go to the

24   report.  Let me go to it.  First of all, the EMG was

25   done on January 11th, 2023.  So we both would agree that

```
 1    that was at least six months after the event.  So

 2    there's nothing on the EMG that proves the August 5th,

 3    2022, slip and fall cause those findings.  That's the

 4    first point that I want to make and give you my --

 5    express my opinion, which you're entitled to.  The

 6    second point that I want to make is that that report

 7    curiously is not signed, it's not signed.  But it has

 8    Dr. Chappuis is his name at the bottom of it.  I know

 9    Jim Chappuis.  Jim Chappuis doesn't do EMG nerve

10    conduction studies that I'm aware of.  His brother was

11    my PA and I've spoken to Jim in the past several times.

12    And I'm very familiar with Dr. Chappuis, but I don't

13    know any fellowship trained spine surgeons that are

14    either qualified to do an EMG or do EMG nerve conduction

15    studies.  So I'm going to raise the question of validity

16    of who did this report.  It's not signed.

17         Q.   Okay.

18         A.   I don't know who did it.  It's not signed.

19         Q.   Okay.  So do you think the EMG study wasn't

20    done?

21         A.   Well, I don't know if it was done or not.  You

22    know, typically an EMG, um, you know, it was, it was

23    documented to have been done, but I don't know who did

24    it.  You know, when we go to the final, the third page

25    of that record, it says Comprehensive Neurodiagnostics
```

```
 1    in Dahlonega, Georgia.  And Dr. Chappuis doesn't have an

 2    office in Dahlonega, Georgia.  And then I go to the

 3    waveforms that's page three, and there's no waveforms

 4    printed as there should be.  Because when you do a

 5    diagnostic EMG looking for radiculopathy, one of the

 6    things that you look for, and I don't do EMGs, but I've

 7    ordered thousands and I review them.  I typically have

 8    either a physiatrist do them or a, uh, uh, occasionally

 9    a neurologist, but usually a physiatrist.  And the page

10    is blank on page three on the waveforms.  Now I'll point

11    out to you that that's not insignificant in terms of the

12    validity of this report, because that's where you would

13    see if this report was valid and that was omitted.  So

14    I'm going to challenge the validity of this particular

15    report because I don't know who did it.  Um, I see Dr.

16    Chappuis' name on the bottom, but I challenged that Dr.

17    Chappuis even did this report.  So I don't know.  I

18    think that there's some validity issues in terms of this

19    EMG, but let's assume for a minute, in our final minute,

20    we have three minutes left.  Let's assume that this was

21    a valid study and I'm not saying it wasn't, but I have

22    some questions about it.  Well, it doesn't prove that

23    what happened on August 5th, caused these findings.

24        Q.   That's not the --

25        A.   It doesn't prove anything other than she's got
```

```
 1   at that time, paresthesias in one hand and that she has

 2   a pain going down the arm.  Which by the way, she had

 3   two years before.  You know, if you look, pain going

 4   into the shoulder, that should sound familiar to you

 5   because she had that two years ago.  So that raises the

 6   question, well, did they miss the radiculopathy two

 7   years ago?  And that's a valid concern.  I think that

 8   there may have been symptoms that were overlapping and

 9   that's very common.  And that will be my testimony and

10   my experience.  Many times neck symptoms from a disc

11   herniation can overlap shoulder, very common.  And we

12   see here in the EMG pain going into the shoulder.  Well,

13   again, Drew, we've seen that before.  Okay.  FBI would

14   call that a clue.  We saw that two years before after

15   the car accident.  So again, if anything, this EMG

16   raises the specter of the possibility of the car

17   accident two years before being responsible for this

18   waxing and waning roller coaster of symptoms for Ms. --

19   poor Ms. Lamar's neck.

20        Q.   Okay.  So --

21        A.   And so I think the only question at this point

22   in time is, well, did the August 5th, event have

23   anything to do with it?  And I'm going to close my

24   testimony by saying it's my expert opinion based on the

25   1,200 pages of records and the totality of the evidence
```

 1  **and the application of a reliable scientific method that**

 2  **the August 5th, 2022, event played no role in the need**

 3  **for the seven procedures or the possibility of surgery**

 4  **that Dr. Chappuis opined about.**

 5       Q.   Okay.  So the neck pain is really her shoulder

 6  pain?

 7       **A.   Well, I can tell you that cervical**

 8  **radiculopathy can present, especially if it's C2, C3, C4**

 9  **as shoulder pain.  And I can get the dermotomal maps out**

10  **for you when I do my testimony in my, uh -- in court to**

11  **show that, but absolutely shoulder pain can be a**

12  **reflection of cervical radiculopathy at C3.**

13       Q.   Okay.  Okay.  So that's the shoulder pain from

14  the car wreck in 2020.  Got it.

15       **A.   It may be, you know, I don't think that we can**

16  **be as conclusive as your testimony is, but I'm raising**

17  **the specter or the possibility that it may be.**

18       Q.   And it may be her weight, it may be her

19  career, it may be her age, it may be that she had a

20  bowel movement, it may be that she turned her neck

21  funny, it may be that she slept funny, right?

22       **A.   There's possibilities in, in -- possibility**

23  **of, you know, any number of things, sneezing, you know,**

24  **activities of daily living are also associated with**

25  **forces on the spine.**

```
 1          Q.   So sneezing can cause a disc herniation in the
 2     neck, but a fall can't?
 3          A.   Well, I never said a fall can't.  I never said
 4     a fall can't.
 5          Q.   Just didn't this time?
 6          A.   No, I said in her case, the fall did not.
 7     That's a difference.
 8          Q.   Okay.
 9          A.   It's possible.  A ground level fall is
10     possible.  And in fact, I think we have an episode where
11     she falls again later in 2024.  But, uh, no, my
12     testimony is that this fall on August 5th, 2022, and
13     this ground level slip and fall did not cause a
14     traumatic disc herniation and did not cause cervical
15     radiculopathy and did not cause the need for any of the
16     invasive procedures that were performed or the
17     possibility of cervical fusion.  That fall did not cause
18     any of those things.
19               THE DEPONENT:  And at this point, I think
20          we're at our four hour limit.
21               MR. GILLILAND:  Okay.
22               THE DEPONENT:  If you need to extend or like
23          to have -- you're entitled to more time if you'd
24          like, we can do so, but I've got a hard stop coming
25          up in 15 minutes.
```

```
 1            MR. GILLILAND:  Um, no, just one last

 2       question.

 3   BY MR. GILLILAND:  (Resuming)

 4       Q.   You, you didn't see the fall, right?

 5       A.   So the simple answer is yes or correct, I did

 6   not see the fall.  I, I, I understood from her

 7   deposition transcript that there was a video that showed

 8   something.  I have not seen that video.

 9       Q.   Okay.  So you didn't see what her body struck

10   on the floor?

11       A.   I did -- I didn't see the video.  I read her

12   testimony about what she described, uh, in terms of the

13   fall.  I've asked for the video.  Um, we're in the

14   process of trying to get the video, but for some reason,

15   um, it's not been provided to me, but, uh, I'm seeking

16   out and I've been assured that it will be provided so I

17   can look at it.

18            MR. GILLILAND:  Okay.  Well, if you see it,

19       let us know.  Cause we haven't seen it either, but

20       that's it for today.  I think I have enough now.

21            THE DEPONENT:  Very good. Thank you.

22            MR. GILLILAND:  Thank you.  Oh, um, Ms. Court

23       Reporter, I'm sorry.  I, uh -- your name is gone.

24            THE VIDEOGRAPHER:  Um, Derek is actually the

25       court reporter.
```

```
 1        MR. GILLILAND:  Oh, I'm so sorry, Derek.

 2     Sorry about that.  I, um -- I'm going to -- can I

 3     get your email address?  I need to email you a lot

 4     of exhibits.

 5        THE COURT REPORTER:  Uh, you can just send

 6     them to the firm.

 7        MR. GILLILAND:  Pope?

 8        THE COURT REPORTER:  Yeah.

 9        MR. GILLILAND:  Okay.  All right.  I might

10     have to set up a link for them.

11        THE COURT REPORTER:  Yeah, a Dropbox folder

12     will work.

13        MR. GILLILAND:  Okay.  All right.

14        THE VIDEOGRAPHER:  Any other questions, cause

15     I will get us off the record if -- is everyone

16     done?

17        MR. GILLILAND:  I'm done.

18        THE VIDEOGRAPHER:  Mr. Deeb, you don't have

19     any questions?

20        MR. DEEB:  Oh, yeah, no, we're, we're good.

21        THE VIDEOGRAPHER:  Okay.  Um, the time is 2:17

22     p.m. and we're off the record.

23  (Whereupon, the above-entitled matter was concluded at

24  2:17 p.m.)

25                         o0o
```

1              C E R T I F I C A T E

2    STATE OF GEORGIA     )

3    COUNTY OF SPALDING   )

4       I hereby certify that the foregoing deposition was

5    taken down by me, as stated in the caption; and the

6    questions and answers were reduced to print by me; that

7    the foregoing pages 1 through 186 represent a true,

8    correct, and complete transcript of the evidence given

9    on October 23, 2025.  I am not a relative, employee,

10   attorney or counsel of any of the parties; am not a

11   relative or employee of attorney or counsel for any of

12   said parties; nor am I financially interested in the

13   action.  The reading and signing of the transcript was

14   reserved.

15      This certification is expressly withdrawn and

16   denied upon the disassembly or photocopying of the

17   foregoing transcript of proceedings or any part thereof,

18   including exhibits, unless said disassembly or

19   photocopying is done by the undersigned certified court

20   reporter and/or under the auspices of Pope Reporting &

21   Video, LLC, and the signature and original seal is

22   attached thereto.

23      Pursuant to Article 8.B of the Rules and

24   Regulations of the Board of Court Reporting of the

25   Judicial Council of Georgia, I make the following

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

1   disclosure:

2       I am a Georgia Certified Court Reporter.  I am here

3   as an independent contractor of Pope Reporting & Video,

4   LLC.  The firm was contacted by the offices of Schnyder

5   Law Firm, to provide court reporting services for this

6   deposition.  I will not be taking this deposition under

7   any contract that is prohibited by O.C.G.A. 15-14-37(a)

8   and (b).

9       I do not have a contract to provide reporting

10  services with any party to the case, any counsel in the

11  case, or any reporter or reporting agency from whom a

12  referral might have been made to cover this deposition.

13  I will charge the usual and customary rates of Pope

14  Reporting & Video, LLC, to all parties in the case.

15      I further certify that the original of said

16  deposition shall be filed under seal with Drew

17  Gilliland, Schnyder Law Firm, 351 Atlanta Street SE,

18  Marietta, Georgia, 30060.

19      This 29th day of October 2025.

20

21

22  _____

23              Derek Boyd, CCR

24              Certified Court Reporter

25              No.  6755-3684-0320-8003

VIA EMAIL


Date:  10/29/2025

To:  Nicholas Deeb, Esq.

Re:  Signature of Deponent Dr. Joseph Martino


Greetings:

The deponent has reserved the right to read and sign. Please have the deponent review the attached transcript, noting any changes or corrections on the attached Errata.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Pope Reporting (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time below, the original transcript may be filed with the court without the signature of the deponent.


Date Errata due back at our offices:  12/6/2025


Please send completed Errata to:
Pope Reporting & Video, LLC
1802 Crestwood Drive, NW
Acworth, Georgia 30102
(404) 856-0966
or email it to:
production@popereporting.com

ERRATA

JOB NUMBER:  28481


I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

_____   There are no changes noted.
_____   The following changes are noted:


Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.


PAGE _____ LINE _____ CHANGE _____


_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____


_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____


_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____


_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____


_____

REASON FOR CHANGE    _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

_____
DEPONENT'S SIGNATURE

Sworn to and subscribed before me this _____ day of

_____, _____.

_____
NOTARY PUBLIC

My Commission Expires: _____

Lamar vs. Wal-Mart Stores East          Dr. Joseph Martino                    10/23/2025

## WORD INDEX

**< $ >**
**$158,000**  149:25

**< 0 >**
**0.01**  81:2  145:10

**< 1 >**
**1**  3:9  187:7
**1,200**  182:25
**1.6**  37:24  49:19
**10**  81:25  121:15, 21
**10,000**  81:2
113:25  145:10
**10:15**  1:16  4:2, 6
**100**  37:23  162:25
163:5
**102**  127:14
**11**  113:25  170:2
**11:50**  82:4, 5
**1100**  157:21
**11th**  44:17, 22
46:4  48:3, 10
157:10  163:21
178:9  179:25
**12**  85:25  157:20
**12:02**  82:6, 9
**1200**  105:11  146:4
**125**  18:14
**12th**  42:16, 17
43:5, 7  44:9
**13**  101:1
**13th**  65:7
**15**  184:25
**1-5**  1:9
**15,000**  171:11
**15-14-37(a**  188:7
**16th**  54:7, 15
164:9  165:3
**17th**  25:21  27:1
**186**  187:7
**18th**  164:17
**1992**  87:7
**1993**  87:7  94:22
**1994**  94:18
**19th**  23:7, 12

**29:22**  110:2, 4
**1st**  79:8

**< 2 >**
**2**  130:12
**2.0**  170:22  171:5
**2:17**  186:21, 24
**20**  37:24  85:12
111:10, 12  124:18
145:17, 19
**200**  116:17
**2002**  6:8  8:2, 15
9:11
**2013**  114:2
**2014**  171:6
**2015**  24:16  134:19, 23  139:3
**2020**  25:18, 21
27:1, 2  28:22  33:3, 12  45:23, 24  50:4, 8, 11  53:22  63:24
64:25  71:25  77:24, 25  115:18, 22
127:12  128:1
136:3  139:3  156:9, 10  169:24  170:2, 6
183:14
**2021**  65:1, 7
**2022**  13:15  14:20, 23  21:13, 23  22:11, 16  23:7  25:14
28:19, 25  29:2, 9
31:21  32:16  33:5
35:3, 19  36:16
37:11  39:5  40:9
41:1, 7, 13  42:2, 23
43:5  45:11  46:4
49:11  50:12  59:9, 21  61:24  69:21
110:16  111:6, 19
120:13  123:22
135:15  139:4
152:14  154:1, 22, 23  156:9  164:17
166:18  172:2, 7, 8, 11, 14  180:3  183:2
184:12
**2023**  44:17  45:3
46:4  48:3, 10

**52:22**  53:4, 9  54:6, 7, 15, 25  56:6
57:21  58:3  59:11
69:21  179:25
**2024**  37:24  49:20
85:24  114:2
184:11
**2025**  1:17  4:6
79:8  111:5  187:9
188:19
**2037**  121:23
**20th**  54:6, 25
**21**  166:25  167:1
**22nd**  166:18
**23**  1:17  187:9
**23rd**  4:5
**25**  62:10  128:16
145:16
**25th**  106:13
**26th**  44:8
**27th**  43:4
**28th**  56:6, 11
**29**  11:24  12:16
**29th**  188:19
**2nd**  22:11, 16

**< 3 >**
**3,200**  118:8  124:8
**30**  38:25  118:4, 8
124:6  139:15
140:19  145:17, 19
**30060**  2:5  188:18
**30326-3240**  2:11
**30th**  29:9, 14, 20
45:21  106:13
**31st**  39:5  40:9
52:22  53:4, 9, 10
65:1
**33**  79:8
**3445**  2:10
**35**  113:24  130:11, 16  131:25
**351**  2:5  188:17
**36**  38:14
**365-4535**  2:11
**38**  37:20  129:2
139:16, 25

**< 4 >**
**40**  80:17  94:23
**400**  97:19
**404**  2:11
**404-999-1111**  2:6
**40-PE**  94:5
**44**  40:9
**441**  133:20
**45**  130:12  131:25

**< 5 >**
**5**  3:3
**5:24-cv-00276**  1:6
**50**  38:9, 12, 14
54:19  139:1
155:25  167:2
**500**  2:10  97:19
**52**  33:14  34:1
143:17  144:12
**58**  167:8
**5th**  21:13, 23
25:14  28:19, 25
29:1  31:21  32:4, 16  33:13  35:3
36:16  37:11  41:1, 7  45:11  46:4
49:10  50:12  59:21
61:24  106:9, 12
110:3, 4, 16  111:19
120:13  123:14
135:15  136:15
146:7  147:21
154:1, 21, 23  172:1, 7, 8, 11, 14, 19
174:21  175:24
176:5  180:2
181:23  182:22
183:2  184:12

**< 6 >**
**60**  167:8
**63**  53:4
**64**  47:24
**6755-3684-0320-8003**  1:15  188:25
**6th**  13:14  14:23, 24  15:1  20:18
21:12

Lamar vs. Wal-Mart Stores East                 Dr. Joseph Martino                          10/23/2025

**< 7 >**
**7**  45:*25*
**70**  166:*20*  167:*1*
**706**  68:*3*
**70s**  102:*4*
**78**  94:*24*
**7th**  27:*2, 16*

**< 8 >**
**8.B**  187:*23*
**80**  38:*12*  104:*6, 7*
124:*18*  130:*23*
142:*17*  155:*24*
175:*3*
**82**  3:*9*
**844**  146:*5*
**85**  130:*23*
**8th**  14:*20, 24*
16:*15*

**< 9 >**
**9**  51:*3*
**9.8**  51:*2, 4*  145:*23*
**90**  32:*19*  37:*20*
157:*10*  163:*23*
164:*2, 5, 15*  165:*15*
167:*9*  178:*10*
**9-11-28(d**  4:*4*
**93**  14:*18*  40:*9*
53:*5*
**95**  102:*17*  130:*25*
169:*2*
**98**  56:*8, 25*
**99**  130:*25*  166:*3*
**99.9**  142:*10*
**9th**  25:*18*  28:*22*
41:*13*  42:*2, 14, 23,
24*  43:*3, 5, 8, 25*
44:*3*  57:*21*  58:*2, 3*
64:*25*  127:*12*
128:*1*  160:*21*
162:*23*  170:*2*

**< A >**
**a.m**  1:*16*  4:*2, 6*
82:*4, 5, 9*
**ability**  7:*2, 12*

163:*23*
**ablation**  40:*16, 18*
**ablations**  36:*12*
54:*8*  56:*8, 9*
148:*23*
**able**  87:*19*  91:*7,
11*  100:*8, 14*  110:*3*
153:*19*
**abnormalities**
116:*22*  117:*18, 23*
118:*21*
**above-entitled**
186:*23*
**abrasion**  160:*10*
**abrasions**  36:*20*
76:*12*  90:*10*  113:*7*
132:*17*  155:*16*
177:*3, 17, 18*
**absence**  119:*12*
133:*21*  174:*20*
**absent**  160:*13*
**absolutely**  58:*18*
138:*17*  139:*4, 6*
183:*11*
**abuse**  151:*6, 8, 10*
**academic**  82:*13*
**Academy**  24:*5*
60:*19*  70:*18*  71:*15*
78:*25*  79:*7*  88:*2*
101:*20*  102:*5*
**ACAL**  15:*11*
**accelerate**  138:*18*
**acceptable**  117:*11*
131:*21*
**accepted**  63:*8*
106:*22*  153:*5*
**access**  130:*13*
132:*1*
**accident**  15:*16*
25:*17*  26:*1, 7*  37:*5*
53:*22*  77:*25*  81:*1*
107:*23*  119:*24, 25*
126:*5*  136:*3*
144:*22*  145:*3, 8, 9*
146:*11*  147:*5, 14,
16*  148:*7, 8*  153:*21*
156:*22*  170:*16*
173:*13*  175:*6*

182:*15, 17*
**accidentally**  89:*11*
**accidents**  80:*14, 19*
114:*1*  119:*20*
145:*7*
**account**  98:*24, 25*
**accurate**  65:*4*
102:*18*  103:*22*
105:*14*  133:*22*
161:*9*
**accusing**  151:*11*
**acknowledge**
130:*18*  146:*3*
164:*13*
**acknowledges**
171:*21*
**acknowledging**
172:*9*
**ACL**  15:*11, 15*
16:*5, 10, 12, 16, 18,
21*  21:*18*  22:*1*
87:*1, 3*
**action**  187:*13*
**active**  82:*12*  85:*3*
119:*13*  165:*3*
**activities**  7:*12*
34:*9*  156:*23*
183:*24*
**actual**  91:*19*
103:*23*
**acute**  59:*17*  72:*10*
76:*9*  78:*15*  126:*18*
170:*14*  171:*19*
**Adams**  13:*14*
23:*11*  24:*8*  39:*6*
40:*17*  48:*13*  53:*11*
55:*7*  108:*18*  109:*9*
110:*1, 3, 18*  149:*24*
151:*2, 3, 15*
**Adams's**  30:*12*
**add**  34:*7*  37:*9*
45:*10*  47:*22*  54:*22*
55:*14*  58:*7*  62:*5*
129:*7*  143:*15*
153:*8*  171:*10*
173:*11*
**addition**  26:*22*
115:*17*  133:*14*

**additional**  93:*7*
100:*17*  128:*4*
**address**  32:*5*  66:*4*
103:*6*  104:*5*
133:*21*  136:*22*
163:*12*  186:*3*
**addressed**  73:*19*
173:*18*
**addresses**  88:*3*
120:*25*  143:*6*
**administration**
80:*22*
**adult**  37:*21*  81:*11*
124:*18*  138:*16*
**adults**  37:*25*  147:*8*
**advanced**  173:*8*
**advancing**  77:*9*
**advocate**  43:*13, 19,
23*  62:*4*
**affect**  140:*5*
**affiliated**  20:*14*
92:*15*  98:*3*
**affirm**  29:*2*  42:*10*
**African-American**
38:*18*  63:*2*  72:*15,
23*  144:*8, 13, 15*
**age**  17:*2*  33:*14, 25*
34:*1, 21, 22*  35:*19*
37:*15*  38:*2, 12*
53:*22*  118:*16*
122:*23*  124:*18*
125:*20*  129:*4*
139:*1, 10*  142:*14,
20*  146:*25*  147:*12*
148:*2*  153:*21*
155:*25*  156:*20*
173:*13*  174:*6*
175:*4, 7*  183:*19*
**agency**  99:*21*
188:*11*
**aggravate**  58:*11*
60:*12*  62:*15*  63:*10*
**aggravated**  13:*17*
15:*15*  51:*25*
123:*19*  165:*14*
**aggravating**  34:*12*
58:*14*  174:*18*
**aggravation**  17:*17,
19*  35:*9*  37:*1*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 195 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

46:*17*  58:*10*  72:*24*
112:*5*  114:*16, 25*
155:*20*  159:*16*
177:*7, 11*
**aggregation**  115:*24*
**aging**  19:*22*
124:*23, 25*  125:*12,*
*18*  142:*19, 21*
147:*11*  154:*16, 17*
166:*5*
**ago**  34:*14*  67:*3*
83:*18*  84:*24*  87:*5*
182:*5, 7*
**agree**  11:*17*  16:*24*
17:*1*  57:*2*  90:*3*
105:*23*  106:*8, 10,*
*14*  117:*4*  122:*25*
123:*2*  131:*9, 17*
132:*5, 9*  133:*25*
149:*17*  158:*12*
178:*4, 25*  179:*25*
**agreed**  5:*19*  12:*14*
**aha**  123:*14*
**ahead**  12:*20*  22:*18*
25:*23*  31:*9*  49:*15*
**AI**  98:*11, 23, 24,*
*25*  99:*4*
**AIC**  167:*18*
**AICA**  171:*11*
**airbag**  26:*23, 24*
**airbags**  26:*14, 15,*
*16*
**Albany**  94:*21, 22*
**alert**  159:*1*
**algorithm**  97:*8*
**alignment**  127:*17*
138:*19, 21, 22*
**alleged**  90:*11, 13*
176:*5*
**alleviate**  21:*1*
55:*19*  148:*16*
**allowed**  5:*15*
**allows**  153:*18*
155:*4, 8*
**alternative**  131:*2*
**AMA**  71:*11, 15, 19*
73:*16*  89:*2*  102:*5*
122:*11*  136:*12*
**amazing**  129:*23*

**American**  24:*4*
34:*13*  38:*6*  60:*17,*
*19*  70:*13, 18*  71:*15,*
*16*  78:*25*  79:*7*
83:*10*  88:*2*  99:*12,*
*14, 20*  101:*20*
102:*5*  121:*16*
122:*15*  133:*16*
171:*4*
**Americans**  37:*23,*
*25*
**amount**  102:2
150:*17*
**ample**  101:*25*
**analogy**  68:*25*
111:*13*
**analysis**  38:*12, 25*
52:*17*  61:*3, 22*
66:*24*  67:*7, 8, 25*
68:*22*  69:*13*  73:*6*
75:*4*  79:*2*  80:*6*
84:*5*  88:*9*  89:*14,*
*25*  90:*1*  95:*22*
97:*20*  100:*4*
101:*22*  102:*24*
103:*19*  107:*14, 15*
108:*11*  109:*10*
111:*1, 14*  118:*3, 7*
122:*8, 16*  158:*4, 5*
**analyzed**  97:*17*
**and/or**  187:*20*
**anecdotal**  144:*5*
153:*6*
**answer**  5:*17*  7:*9*
20:*11*  31:*7, 11*
38:*22*  43:*18*  51:*1*
61:*17*  63:*5*  64:*20*
70:*12*  74:*22*  76:*14,*
*15, 16*  79:*18*  92:*25*
98:*17*  100:*13*
103:*12*  107:*1, 2, 7*
109:*17, 19*  110:*7*
111:*13*  116:*16*
117:*2, 13*  126:*3*
130:*15*  131:*17*
132:*12*  138:*15*
140:*16, 18*  142:*5*
144:*10*  146:*6, 9*
148:*21*  151:*14*

153:*6*  154:*23*
155:*13*  157:*11*
163:*19*  179:*3*
185:*5*
**answered**  110:*23*
112:*17*  113:*1*
131:*13*  149:*5*
**answering**  24:*13*
31:*2*
**answers**  38:*24*
76:*20, 23*  109:*18*
163:*15*  187:*6*
**anterior**  48:*6, 22*
49:*11*
**anticipate**  90:*24*
**anybody**  43:*19*
**anyway**  36:*8*
161:*15*
**apparently**  29:*21*
67:*4*  167:*24*
175:*16*
**APPEARANCES**
2:*1*
**application**  60:*15*
103:*17*  122:*17*
183:*1*
**applied**  71:*13*
122:*18*  167:*24*
**applies**  60:*9*  69:*3*
83:*15*  84:*11*  86:22
144:*14*  156:*3*
171:*2, 23*
**apply**  28:*9*  39:*4*
62:*16*  70:*4, 16*
86:*24*  89:*10, 13*
102:*10*  123:*23*
126:*17*  136:*4*
141:*21*  167:*24*
**applying**  61:*22*
87:*8*  102:*13*  136:*1*
**appointment**  56:*21*
57:*23*
**approach**  103:*8, 22*
**approached**  98:*19*
**approaches**  102:*15*
**appropriate**  10:*23*
24:*2*  49:*7*  62:*6, 18*
80:*6*  132:*10*

133:*15*  137:*12*
155:*3*
**approval**  92:*24*
**approve**  92:*12*
**approximately**
22:*22*  83:*14*  96:2
**area**  67:*8*
**arena**  135:*13*
**argue**  35:*23*
**argument**  130:*19,*
*21*  131:*14*  149:*25*
176:*22*
**Argumentative**
43:*16*  174:*7*
**arm**  18:*1, 7*  22:*13,*
*20, 25*  27:*4*  29:*19*
31:*17*  32:*7*  42:*6*
64:*16*  65:*3, 24*
77:*11*  158:*16*
162:*24*  182:2
**armamentarium**
23:*20*
**arriving**  163:*9*
**artery**  16:*10*
**arthritic**  17:*14, 17*
**arthritis**  13:*18*
15:*4, 16*  16:*24*
17:*10*  19:*11, 19, 21,*
*23, 25*  20:*2, 3, 4, 6,*
*8, 12, 14*  21:*18*
49:*3, 8, 23*  51:*25*
72:*24*  76:*3*  127:*20,*
*21*  139:*21*  177:*11*
**arthroscopy**  94:*16,*
*25*  95:*2, 9*
**article**  38:*4*  62:*17*
101:*20*  102:*5*
117:*14, 15, 20*
118:*17*  120:*16, 18,*
*24*  122:*21*  123:*6, 7,*
*10, 20*  125:*7*  133:*5,*
*11, 14, 20*  144:*24*
166:*6*  170:*22*
171:*5*  187:*23*
**articles**  82:*21*
116:*7*  120:*21, 22*
**articulate**  18:*25*
19:2

Lamar vs. Wal-Mart Stores East                 Dr. Joseph Martino                                    10/23/2025

**articulated** 52:*20*
**artificial** 97:*7*
**ascending** 167:*19*
**asked** 12:*11* 20:*12*
63:22 66:*21* 82:16
91:*16* 94:*3, 10*
110:*23* 111:5
112:*16, 25* 115:6
143:*20* 149:22
150:2 151:*13*
152:1 185:*13*
**asking** 6:6 24:*14*
31:*3* 35:*12* 53:*1*
158:*20*
**aspect** 18:*17*
**aspects** 7:*3*
**assess** 111:*20*
**Assessment** 79:2
107:6
**assist** 98:*10*
**assistance** 99:*5*
**assistant** 9:*3, 5, 6*
**assisted** 8:*19, 24*
55:*15*
**assisting** 9:2, 7
**associated** 34:*4, 12,*
*17* 37:22 38:2
79:*17* 102:14
116:9 127:*20*
130:2 139:*5* 140:*1*
142:*1, 3* 145:*4, 11*
147:*16* 159:4
183:*24*
**Association** 60:*17*
70:*13* 102:25
140:*24*
**assume** 10:6, *13*
181:*19, 20*
**assuming** 113:*13*
**assure** 141:*10*
**assured** 185:*16*
**asymptomatic** 28:*5*
38:*9, 11, 15* 39:*3*
64:*5* 113:*15, 18*
114:7 118:*10*
122:*22, 24* 123:*1, 9*
**Atlanta** 2:*5, 11*
13:*10, 13* 22:*12*
23:*8* 27:*23* 29:*10*

36:9 39:6 56:7
91:*16* 92:*11* 93:*19*
157:8 158:8 172:*4*
173:*23, 24* 188:*17*
**attached** 187:*22*
**attaining** 133:*22*
**attempt** 140:*18*
145:22
**attempting** 91:*22*
**attend** 86:6 91:*12*
**attended** 100:*15*
**attending** 85:*1*
**attendings** 92:2
**attention** 163:*20*
164:*4*
**attorney** 104:*8*
115:6 187:*10, 11*
**attributable** 113:*5*
**attributed** 161:*16,*
*17*
**augmented** 97:*3*
**August** 21:*12, 23*
25:*14, 18, 21* 26:25
28:*19, 22, 24* 29:*1*
31:*21* 32:*4, 16*
33:*13* 35:*3* 36:*16*
37:*11* 41:*1, 7*
45:*11, 21* 46:*4*
49:*10* 50:*12* 59:*20*
61:*24* 63:*24* 64:*25*
69:*20* 95:*25* 96:*13*
106:*9, 11, 12, 13*
110:*2, 4, 16* 111:*19*
115:*18* 120:*13*
123:*14, 22* 127:*11*
128:*1* 135:*15*
136:*15* 146:7
147:*21* 152:*14*
154:*1, 21, 23*
157:*10* 160:*21*
162:*23* 163:*21*
164:*9, 17* 165:*3*
166:*18* 170:2
172:*1, 7, 8, 11, 14,*
*19* 174:*21* 175:*24*
176:*4* 178:*9* 180:*2*
181:*23* 182:*22*
183:*2* 184:*12*

**auscultation** 97:*3*
**auspices** 187:*20*
**author** 38:*5* 79:*5,*
*6* 95:*11* 123:*7*
**authored** 94:*23*
**authoritative** 71:*23*
72:2 116:*13*
133:*10*
**authors** 80:*15*
95:6 116:*20*
152:*21*
**author's** 118:*1*
**availability** 98:*21*
**available** 28:*21*
42:*1* 61:*10, 11*
67:*5* 77:6 129:*17*
**average** 7:*23*
**awaiting** 92:*5*
97:*18*
**awards** 117:*15*
**aware** 48:*21* 63:*6,*
*14* 64:*20* 67:*23*
72:*20* 73:*3* 80:*1*
92:*13* 142:25
180:*10*
**ax** 69:*25*

**< B >**
**back** 9:*23* 10:*16*
18:*19* 29:*10* 31:6
34:*18* 37:*21, 25*
40:*24* 48:*4, 8, 12,*
*13* 52:*1* 62:*21*
76:*4* 77:*24* 81:*7*
82:*1, 8* 83:*18* 90:*4*
105:6 112:*23*
116:9, *21* 118:*17*
119:*10* 120:8
127:6 128:*13*
134:*3, 22, 24* 135:*4,*
*8, 12, 16, 19, 22, 25*
138:*17* 139:6, *7*
140:24 141:*2, 12*
142:2 146:*12*
152:*16* 154:*13*
157:*15* 159:*13, 18*
161:*4, 7* 163:*4, 8*
164:*19* 166:*7, 10*
167:2 169:*3, 5, 25*

170:*1* 171:*14*
176:*14* 178:2
**bad** 6:*7, 17* 140:*1*
**Baker** 94:*10, 11, 15*
**balls** 11:*18* 150:24
**bar** 173:*14*
**base** 61:*1* 89:*20*
**based** 14:*12* 16:*8*
20:*24* 29:*4* 34:*7*
37:*8* 38:*10* 46:*14*
47:2 50:*3, 7* 51:*19*
54:*18* 60:*13* 61:*8*
63:*16* 67:*4* 68:*12*
75:*17* 79:*9, 14*
80:*16, 17* 103:*16*
104:*7* 111:*22*
114:*2, 20* 120:*8*
121:*1, 23* 129:*11*
131:*4* 140:*20, 22*
141:*21* 146:*8*
147:*22, 23* 150:22
154:*5* 160:6 164:6
165:*23* 169:*21, 23*
171:*9* 173:*5* 175:*3*
182:*24*
**baseline** 81:*6, 15,*
*17* 107:*19* 115:2
118:9 123:*8, 21*
124:*17* 144:*1*
155:*24* 157:22
175:*3*
**basically** 34:*15*
68:25 89:*20* 97:*3*
99:*5* 145:*1*
**basing** 113:*22*
**basis** 128:*19* 151:9
**bat** 78:*24*
**batch** 97:*18*
**bates** 14:*19*
**bay** 159:*24*
**bear** 41:*16*
**bearing** 130:*23*
**beat** 147:*19*
**bed** 172:*23*
**began** 131:*24*
**beginning** 98:*12*
**begun** 92:*24* 98:*19*
**BEHALF** 2:*3, 8*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

**Beker** 8:*20*
**belabor** 157:*19*
**believe** 5:2 10:*23*, *24* 11:*23* 14:*10* 15:*15* 18:*8* 21:*1*, *12* 26:*13* 29:*4* 30:*1* 38:*4* 47:*24* 48:*11*, *21* 55:*10* 75:*22* 83:*19* 85:*12*, *22* 90:*13* 110:*8* 116:*23* 117:*21* 118:*20* 124:*6*, *19* 133:*14* 151:*24* 165:*2* 169:*22*
**believes** 152:*8*
**Benchmark** 41:*12* 42:*1*
**Bendiks** 65:*8*
**beneficial** 165:*9*
**benefit** 55:*23*, *24* 65:*21*
**best** 108:*8*
**better** 131:*18* 150:*5* 164:*5* 165:*9*, *15* 167:*2* 179:*3*
**beyond** 31:*23* 151:*6* 169:*10*, *11*, *19*
**bias** 81:*17* 149:*1*, *14*, *18*, *19*, *23* 150:*1*, *7* 151:*15*, *16*
**biases** 151:*14*
**bibliography** 61:*4* 62:*23*
**bilateral** 22:*13* 29:*18*
**bilaterally** 44:*25* 45:*2*
**bill** 149:*24*
**bills** 176:*6*
**binder** 41:*19*
**biomechanical** 82:*18*, *22* 86:*16*, *17*, *18*, *24* 87:*8* 108:*19*, *24* 138:*24*
**biomechanics** 82:*18* 83:*5*, *7*, *13*, *15*, *25* 84:*9*, *10*, *15*

**bit** 17:2 23:*16*
**blank** 181:*10*
**blast** 34:*14*
**bleeding** 69:*14*, *18* 160:*11*
**block** 41:*4* 53:*12*
**blocking** 56:*3*
**blocks** 52:*23* 53:*14*, *24* 54:*3* 147:*4*
**blood** 16:*9* 59:*6* 140:*7* 168:*6*, *8*, *15*
**blur** 107:*22*
**blurry** 75:*11*
**BMI** 139:*15*, *16*, *25* 140:*18* 156:*22*
**board** 32:*15* 87:*16* 91:*24* 92:*12*, *13*, *14* 93:*24* 99:*7*, *10*, *11*, *12*, *16*, *20*, *22*, *23* 108:*21*, *23*, *25* 109:*1* 110:*14* 113:*23* 114:*3*, *5* 121:*12*, *14*, *16*, *22* 122:*1*, *8*, *15*, *19* 129:*13* 187:*24*
**board-certified** 6:*3* 9:*14*
**boarded** 99:*22*
**boards** 99:*24*
**bodies** 125:*22*
**body** 8:*11* 16:*3* 50:*23*, *24* 86:*24* 129:*24* 140:*4* 145:*12* 185:*9*
**boiler** 173:*5*, *8*
**boilerplate** 170:*19*, *21*
**boils** 154:*11*
**bone** 158:*25*
**bones** 51:*17*
**book** 94:*6*, *24* 95:*11*, *12*, *13*, *14* 137:*20*, *23*
**books** 89:*1*, *4*
**borders** 169:*10*, *12*

**borne** 102:*18*
**bottocks** 163:*5*
**bottom** 180:*8* 181:*16*
**bouncing** 85:*4*
**bowel** 172:*22* 173:*12* 175:*7* 183:*20*
**Boyd** 1:*15* 188:*23*
**Bradford** 70:*22* 71:*5*, *10* 102:*3* 112:*20*
**brain** 57:*8*
**branch** 41:*3* 52:*23* 53:*12*, *14*, *24* 54:*3* 80:*21* 147:*4*
**Break** 3:*22* 51:*10*, *12*, *17* 81:*22*, *24*, *25* 94:*9* 153:*25* 164:*24*
**brief** 121:*4*
**bright** 168:*4*, *6*
**bring** 6:*6*, *17* 70:*5* 90:*16* 107:*25*
**brother** 180:*10*
**brought** 11:*7*
**bruise** 21:*6*
**Brzezinski** 38:*5* 118:*1* 123:*7* 143:*25* 144:*6*
**budget** 93:*12*
**bulge** 129:*8*
**bulges** 129:*7*
**bunch** 76:*15* 169:*8*
**burden** 34:*25* 35:*11*, *24* 36:*4* 135:*1*, *18*, *23* 173:*25* 176:*9*
**bureaucracy** 91:*23*
**burn** 40:*18*
**burning** 22:*21*
**buttocks** 159:*3* 163:*5*

**< C >**
**C2** 183:*8*
**C3** 44:*25* 45:*1*, *18* 46:*9* 48:*7* 53:*12* 183:*8*, *12*

**C3-C4** 54:*8* 128:*10*, *18* 142:*4*, *24* 143:*9*, *18* 144:*17*, *20* 155:*6*, *9*, *20* 165:*17* 167:*18* 170:*13* 174:*12*, *13*
**C4** 44:*25* 45:*1*, *18* 46:*1*, *9* 48:*7* 183:*8*
**C4-C5** 54:*8* 128:*4*
**C5** 45:*1* 46:*1* 127:*19*
**C5-6** 127:*22*
**C5-C6** 54:*9* 127:*25* 170:*6*
**C6** 45:*1*, *24*, *25* 46:*1* 48:*7*
**C6-C7** 54:*9* 128:*3* 169:*9* 170:*14*
**C7** 45:*2*, *25* 48:*7* 53:*12*
**C8** 45:*2*
**calcification** 127:*18*
**calculating** 86:*25*
**California** 105:*19*
**call** 9:*9* 11:*18* 77:*11* 86:*7* 91:*8* 96:*19* 98:*11* 136:*9* 150:*24* 157:*17* 159:*5* 161:*2* 167:*9* 182:*14*
**called** 5:*23* 9:*8* 70:*22* 82:*18* 85:*17* 87:*15* 91:*17* 97:*11* 126:*11*
**Calls** 43:*16* 45:*6* 53:*16* 64:*17* 68:*8* 136:*8*
**cancer** 62:*7*, *9*, *10* 71:*5* 74:*7*, *18*, *23* 102:*21*, *23*, *25* 103:*1* 111:*10* 112:*4*, *15*
**candidate** 48:*6*, *15* 50:*6*
**capable** 127:*10*
**caption** 187:*5*
**CAR** 1:*6* 25:*24*, *25* 26:*4* 33:*12* 34:*22* 35:*19* 53:*22*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 198 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

64:25  81:1  126:5
136:3  138:20
144:21  145:7, 9, 20
146:11  147:5, 13,
16  153:20  173:13
175:6  182:15, 16
183:14
**cardiac**  97:13, 25
**cardiologist**  97:17
**cardiology**  97:2
98:8
**cards**  93:13
**care**  67:10  76:22
105:4, 5, 7  132:19
163:24  164:2, 18
178:22
**career**  7:4  23:25
53:23  136:3
146:11  153:20
173:13  175:6
183:19
**Carragee**  116:11
118:12
**cars**  25:24
**Case**  1:5  5:1
11:8  19:8  27:11
28:9  33:17  34:7
35:12  49:3  51:8,
19  52:11  60:9
61:5, 19, 21  66:18,
23, 24  67:9  73:19
75:2  76:11  79:22
84:16  88:9  104:24
105:20  108:9
111:4, 5  113:3
114:18, 19  131:3
134:13, 14  137:1
138:12  143:22
144:5  146:22
150:25  151:1, 10
153:3, 4  175:23
184:6  188:10, 11,
14
**cases**  80:7  91:10
**catch**  22:15  53:8
**category**  20:1
141:17, 20
**causal**  52:17
61:15  104:13, 18

106:7  107:14, 15
108:2, 14  135:13
136:9  158:11
173:4
**causation**  61:3
62:12  67:8, 25
68:21  69:12  70:14
71:20, 21  72:10
75:4  79:2  84:4
88:9  89:3, 14, 25
90:1, 15  95:22
100:1, 3  101:11, 22,
24  102:24  103:8,
19  104:4, 16  106:2
107:10  108:10, 17
109:3, 10, 11
110:13, 19, 22
111:1, 3, 14  122:7,
14, 16  174:8
**cause**  21:24  31:22
36:5  47:12  51:5
59:21, 22  60:22, 23
62:6  70:25  90:2
102:21  108:7
112:22  115:9
119:2, 10, 17
120:17  127:21
135:2, 7, 12, 15, 17,
19, 24  136:5, 15
138:17  146:7
148:14  152:14, 21
153:10, 14, 18
154:2, 8, 16  155:5,
8  157:24  158:25
160:8  165:11
166:10  168:5
173:14  174:13
177:3  180:3  184:1,
13, 14, 15, 17
185:19  186:14
**caused**  23:14  35:5
37:16  53:23  61:24,
25  62:7  104:21, 25
106:9, 12, 16
123:15  148:8
152:11  157:3
170:15  172:6, 15
174:12  175:24
181:23

**causes**  60:3  69:7
70:25  71:4  102:23
119:8  135:21
166:9, 10  174:17
175:15
**causing**  34:12
90:4  111:10
112:23  123:12
134:22  135:4
146:11
**CCR**  1:15  188:23
**CDC**  37:19  70:25
167:6
**cellular**  125:18
**Center**  13:9, 13
22:12  23:8  27:23
29:10  36:9  39:6
40:10  53:5  56:7
94:22  157:8  158:8
172:3  173:23, 24
**centers**  173:9
**certain**  7:15  57:10
80:23  83:12
**certainly**  19:19
34:6  35:8  102:7
111:23  130:22
139:2  149:20, 23
154:17, 18  173:17
**certainty**  16:19
22:5  28:8  35:4
37:10  59:20  68:2
102:17  110:12, 16,
18  129:13
**certification**
108:23, 25  121:12,
13, 22  122:2, 9, 19
187:15
**certifications**  99:16
**Certified**  1:16
32:15  87:16  99:8,
10, 23  108:21
109:1  110:14
113:23  114:3
121:14, 22  129:13
187:19  188:2, 24
**certify**  187:4
188:15
**cervical**  8:20  18:5
23:8, 9  25:22

26:21, 22  30:3
31:14  35:5  37:3, 6
41:4  48:2, 6, 23
49:12  52:24  63:20
72:17  74:2, 15, 17
76:10  77:10, 23
78:8  90:12  115:16
123:3, 24  126:13,
15, 18, 22  127:1, 18
133:17  140:5
145:4  148:12
154:25  159:10, 13
160:12, 23  162:6
166:17  170:11
171:3  183:7, 12
184:14, 17
**cetera**  34:10  47:8
98:21  119:14
147:4
**chair**  172:20
173:11
**chairman**  116:12
**challenge**  162:16
181:14
**challenged**  181:16
**Challie**  96:6
**Champ**  94:9, 10
**change**  28:10
145:17
**changed**  6:23
95:24
**changes**  33:24
77:22  119:4
**changing**  50:12
**Chappuis**  48:3, 12
180:8, 9, 12  181:1,
16, 17  183:4
**Chapter**  41:24
65:6  94:4, 13, 14,
16, 23, 24  95:2, 7, 9
137:20
**chapters**  94:2, 4,
11, 12
**characteristics**
128:21  129:24
**characterized**
59:12  104:1
**charge**  96:7
188:13

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 199 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                    10/23/2025

**chart** 38:7 122:22, 23 123:23
**Che** 94:9
**check** 45:21 65:3
**chest** 134:18
**chief** 65:17 87:6 89:20 162:22
**children** 81:11
**Children's** 91:16 92:11 93:19
**Chiro** 157:9 158:3, 7 163:20
**chiropractic** 32:20 160:20 165:6, 12 166:19
**chiropractor** 32:19 120:11 178:7
**CHOA** 91:22 92:19 93:11, 16, 23
**choose** 71:18
**chose** 21:9 30:9
**chronic** 45:22 46:9 49:4 59:16, 21, 24 71:9 72:9 76:2 78:2 113:10 154:12, 15 156:11 178:14, 15
**chunk** 59:12
**cigarette** 71:4 102:21, 22 111:9
**circumstance** 168:12
**circumstances** 57:10
**citation** 141:9, 11
**cites** 100:20
**Civil** 5:14 61:20 66:20
**clarification** 96:17
**clarify** 16:4 21:7 90:16 99:7 107:9 123:16 131:19 169:22
**clarity** 107:23, 24, 25 108:1
**class** 82:16 86:3 87:12 89:16, 19
**classes** 82:17

**clear** 19:16 21:4, 11, 22 32:12 41:7 60:13 61:5 76:10 78:1 106:19 114:17 120:12 122:4 123:15 128:17 131:3, 14 157:23 174:9
**clearly** 33:19 34:11 37:5 63:6 128:19 178:11
**clinic** 85:1 92:2 93:12 95:19 98:3
**clinical** 10:21 15:22 16:13 17:8 24:3 51:19 54:11 64:8, 9 66:25 71:12 75:15 78:3, 4 107:5 109:13 110:20 111:24 113:12 114:2, 22 115:12 119:6 120:9 126:12 132:14 133:6, 15 148:11 155:17 160:6 171:23 172:1, 8, 13 174:22, 25 179:9
**clinically** 132:21
**clinics** 98:4
**close** 130:25 182:23
**club** 84:23
**clue** 182:14
**clues** 66:15
**coalescing** 118:4
**coaster** 179:13 182:18
**Coccyx** 12:23
**cognitive** 81:17
**coincidence** 46:24 147:25
**cold** 128:23, 24, 25
**collaborating** 92:18
**collected** 97:4, 15
**collections** 171:19
**College** 38:6 71:16 83:10

**collision** 33:3
**Collisions** 79:3
**Columbus** 84:22 85:1 92:3
**column** 119:13 130:6 133:1 159:20
**combination** 124:1, 6
**combined** 39:1 171:3
**combining** 118:4
**come** 51:14 66:22 68:15, 24 69:4 70:4, 8 90:15 105:13 111:21 113:21 119:8 120:8, 12 146:21 148:25 154:1 157:20 164:20 165:21 171:1
**comes** 104:4 164:20 166:8 167:7
**coming** 61:12 103:16 104:18 105:21 126:1 153:19 154:4 161:6 166:7 167:4 184:24
**commencing** 1:16
**commensurate** 150:17
**commenting** 46:12
**committee** 95:19, 23 96:1, 10, 21, 24 98:2 99:13
**committing** 81:16
**common** 38:1 49:20 81:11, 14 118:14 119:10 123:11, 17, 21 129:4 135:24 142:15, 17 147:1, 3, 6 154:12 155:23 166:10 167:13, 16 182:9, 11
**communicate** 96:9

**community** 63:9 106:22 131:9 136:9
**comorbidities** 104:9
**company** 97:10
**compare** 115:2
**compared** 86:21 103:22 125:25
**Comparison** 45:22 111:7
**Compensation** 79:3 93:8
**complained** 17:24 18:6 22:12
**complaining** 22:19 31:17 59:11 130:9 161:7
**complaint** 18:9 42:17 65:17 90:14 105:1 162:22 167:9, 12
**complaints** 81:7 90:12, 13 167:7, 13, 16, 17
**complete** 65:18 95:2 187:8
**completed** 91:21 92:4 94:21
**completely** 61:18 64:5 86:21
**complex** 45:25 128:3
**complicated** 23:17 98:16
**complication** 58:23
**complications** 58:21
**complied** 4:3
**comply** 101:9
**Composite** 3:9
**compound** 153:24
**Comprehensive** 79:1 101:21 180:25
**compressed** 23:14
**compressing** 64:4
**compression** 160:23 161:8

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 200 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                                10/23/2025

162:7, *12*
**comprised** 86:*4*
**computer** 34:*10*,
*16* 141:*18, 19*
**concern** 182:7
**concerning** 64:*1*
**conclude** 55:*21*
57:*4* 60:*11* 62:*14*
115:*1*
**concluded** 186:*23*
**conclusion** 24:*21*
33:*7* 65:*20* 68:*4*,
*16, 24* 69:*5* 102:*18*
103:*16* 105:*13*
106:*16* 111:*11, 17*
113:*21* 120:*8, 13*
123:*12* 124:*19*
126:*1* 136:*14*
154:*1, 5* 156:*13*
157:*19* 160:*17*
165:*21*
**conclusions** 61:*12*
104:*3, 11* 117:*5*
145:*5* 163:*10*
**conclusive** 102:*16*
183:*16*
**concurring** 135:*21*
**concussions** 71:*9*
**condition** 17:*18, 20*
20:*6* 33:*25* 34:*2, 3*
37:*2* 46:*17* 49:*4*
50:*8* 59:*24* 60:*1*
73:*13* 81:*18*
107:*20* 114:*25*
115:*24* 123:*19*
156:*21* 163:*25*
164:*1* 177:*11*
178:*14*
**conditions** 8:*21*
154:*13, 15* 156:*11*
178:*16* 179:*7, 14*
**conduct** 10:*19*
17:*5*
**conduction** 180:*10*,
*14*
**confirm** 30:*2*
54:*13* 55:*11*
171:*24* 172:*14*

**confirmed** 45:*23*
76:*4*
**confusing** 106:*4*
**confusion** 19:*16*
**conjunction** 94:*12*
**consensus** 63:*13*
**consent** 21:*9*
178:*23*
**consequence** 19:*17*
58:*21* 131:*6*
**conservative** 23:*19*
24:*6* 48:*4* 49:*22*
**consider** 17:*3*
23:*2* 48:*13* 74:*22*
138:*9* 143:*22*
**consideration** 149:*1*
**considered** 93:*10*
118:*5* 136:*14*
**considering** 163:*9*
173:*16*
**consistent** 16:*9, 15*
35:*8* 36:*20* 48:*1*
78:*12* 159:*14, 16*
160:*9* 162:*4*
170:*22* 177:*14*
**construction** 15:*15*
**contacted** 11:*13*
188:*4*
**contains** 62:*24*
**content** 141:*7*
**context** 66:*20*
90:*8* 145:*7, 9*
**continuation**
164:*17*
**continue** 87:*22*
**continued** 179:*13*
**continuing** 87:*20*
**continuity** 3:*22*
**continuum** 73:*25*
**contract** 188:*7, 9*
**contractor** 188:*3*
**contradict** 14:*14*
39:*23*
**contradicts** 171:*6*
**contradistinction**
159:*19*
**contribute** 94:*11*
136:*21* 137:*7*

138:*11, 13*
**contributing** 154:*19*
**contusion** 15:*5*
17:*18* 21:*17* 75:*19*
155:*16* 158:*24*
160:*7, 10* 177:*12*
**contusions** 12:*23*
36:*20* 75:*19* 76:*12*
90:*9* 113:*7* 132:*17*
159:*2* 177:*3, 17*
**conveniently**
156:*15*
**convey** 145:*22*
**COPD** 103:*1*
**cord** 45:*19* 64:*1, 5*
128:*11* 142:*4, 24*
143:*9* 144:*21*
145:*13* 155:*6, 10*
165:*18*
**Correct** 6:*10* 7:*18*
8:*13, 25* 9:*22*
10:*12* 11:*10, 20, 22*
20:*19* 22:*24* 23:*10,
12* 25:*2, 11* 27:*18*
28:*6, 23, 25* 29:*21,
23* 40:*6* 45:*3*
46:*20* 48:*16* 51:*12*
52:*15, 17* 53:*11*
58:*4* 63:*23* 67:*1, 6,
11* 74:*5* 87:*13*
92:*20* 99:*10* 123:*5*
134:*16* 137:*2, 4, 5*
148:*20* 172:*10*
185:*5* 187:*8*
**correctly** 12:*24*
22:*9*
**correlate** 64:*7*
**correlation** 107:*5*
115:*12* 171:*24*
172:*8, 14*
**cortisone** 20:*16, 24*
21:*5, 14*
**cost** 31:*25*
**council** 39:*12*
187:*25*
**Counsel** 4:*8*
187:*10, 11* 188:*10*
**country** 88:*24*
**COUNTY** 187:*3*

**course** 18:*24* 56:*3*
60:*18, 19* 70:*17*
82:*17, 18* 83:*5, 21,
25* 84:*2, 7* 85:*8, 9,
20* 86:*13* 87:*10, 15*
88:*7, 9, 10, 14* 89:*2,
24, 25* 90:*19, 20*
91:*5* 100:*16*
105:*18* 137:*17*
149:*11*
**courses** 83:*22*
88:*23*
**COURT** 1:*1, 16*
4:*3, 14, 16, 19*
12:*13* 68:*3* 70:*6*
103:*7, 13, 14, 18, 21*
105:*15* 120:*21*
168:*10* 183:*10*
185:*22, 25* 186:*5, 8,
11* 187:*19, 24*
188:*2, 5, 24*
**courts** 103:*20*
**cover** 188:*12*
**covers** 44:*15*
**COVID** 129:*25*
130:*2*
**create** 55:*6*
**created** 35:*10*
66:*24* 174:*15*
**credentials** 109:*7*
**criteria** 24:*3*
54:*21* 70:*23, 24*
71:*5, 8, 10* 102:*3*
107:*11* 112:*20*
133:*15*
**criticism** 21:*8*
**criticizing** 32:*12*
**CROSS-
EXAMINATION**
3:*2* 5:*25*
**CT** 28:*20, 24* 29:*1*
33:*19, 21* 45:*23*
50:*4* 63:*24* 76:*2, 4,
6, 7* 77:*21, 25*
78:*13* 87:*23*
115:*17* 120:*9*
127:*4, 5, 7, 8, 9, 10*
129:*15, 21, 22*
130:*4, 6, 8, 9, 12, 17,*

Case 5:24-cv-00276-CAR   Document 45   Filed 12/26/25   Page 201 of 230

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                              10/23/2025

*21, 24* 131:*1, 4, 9, 20* 132:*8, 9, 12, 22, 24* 133:*2* 147:*15, 17* 156:*8, 9* 157:*6* 160:*6* 169:*16, 20, 24* 170:*4* 174:*6* 176:*24*
**curious** 40:*11* 168:*21*
**curiously** 180:7
**current** 136:6
**currently** 6:*24* 82:*12* 83:*17, 24* 96:2 153:*4*
**curriculum** 84:*21* 85:*18*
**curve** 168:*18*
**customary** 188:*13*
**cut** 31:*8*
**CV** 10:*10* 91:*14* 95:*17*

**< D >**
**Dahlonega** 181:*1, 2*
**daily** 90:*20* 183:*24*
**damage** 26:*4*
**Daniel** 88:*17*
**dashes** 3:*22*
**data** 37:*20* 63:*15* 81:*3, 5* 97:*4, 15, 16, 19, 20* 102:*11* 103:*22* 136:*22* 145:*6* 157:*18*
**database** 80:*17, 20*
**databases** 80:*16* 145:2
**date** 4:*5* 15:*12* 20:*17, 18* 22:*15* 27:*16* 29:*14* 40:*8* 42:*21* 43:*5* 45:*11* 47:*11* 48:*9* 49:*13, 25* 50:2 53:*3, 8* 54:*10, 12, 14* 58:*1* 77:*24* 78:*7* 85:*9* 126:*25* 165:*3*
**dates** 43:*10, 20* 45:*21*
**day** 7:*24* 13:*15* 17:*16, 22, 24* 18:*7*

20:*9, 10* 27:*14, 21, 22* 29:*7* 35:*7* 36:*6, 8, 21* 37:*4* 47:*14, 23* 48:2 51:*20* 56:*17* 64:*10, 15* 77:*18* 78:*5* 113:*8, 12* 120:*10* 127:*6* 131:*4* 132:*17, 20* 148:*13* 155:*15, 18* 158:*12, 14* 162:*25* 163:*6* 164:*21* 166:*20* 171:*13* 172:*17* 174:*2, 23* 176:*19* 188:*19*
**days** 37:*20* 83:*5, 16, 21* 88:*7* 90:*18* 128:*16* 131:*22* 135:*5* 160:*21* 163:*21* 164:*5* 167:*9* 178:*9*
**dead** 147:*19*
**dealing** 23:*24* 92:*11* 138:*7*
**deals** 94:*24*
**decade** 38:*7, 9*
**December** 27:*2, 16* 44:*16*
**decision** 70:*7*
**decisions** 70:*2*
**deductive** 156:*16*
**Deeb** 2:*9* 4:*12* 5:*19* 13:*19* 14:*3, 7* 30:*25* 31:*4, 7* 35:*14, 21* 37:*17* 41:*22* 42:*7, 12* 43:*15* 44:*5, 13* 45:*6* 48:*19* 49:*15* 53:*3, 6, 16, 25* 57:*17* 64:*17* 66:*1* 67:*15, 21* 68:*7, 17* 69:*23* 72:*3, 12, 18* 73:*1, 8, 14* 74:*8, 19* 75:*8* 76:*18, 24* 78:*19* 79:*11, 23* 80:*10* 90:*6* 103:*10* 105:*24* 106:*24* 109:*15, 23* 110:*23* 112:*8, 16, 25* 114:*10* 117:*6*

118:*24* 131:*11* 138:*5* 140:*14* 143:*10* 146:*14* 152:*23* 153:*22* 155:*11* 166:*22* 175:*10* 178:*19* 179:*18* 186:*18, 20*
**Deeb's** 11:*13*
**deep** 95:*21* 97:*7* 98:*15*
**default** 148:*21*
**defendant** 4:*12*
**Defendants** 1:*10* 2:*8*
**defense** 39:*12* 130:*10* 132:*13* 151:*1*
**defer** 31:*11*
**deficits** 64:*13*
**defy** 143:*16* 168:*23*
**degeneration** 38:*8, 13* 46:*22* 60:*12* 62:*15* 137:*9* 138:*13, 14* 139:*13* 140:*12* 141:*1, 3, 5, 15, 23* 142:*17*
**degenerative** 8:*21* 17:*3* 33:*17, 20, 24* 34:*5* 38:*3* 45:*22* 46:*10* 49:*2, 3, 8, 22* 74:*4, 22* 75:*1* 76:*3* 77:*12, 19, 22* 78:*2* 115:*19* 122:*24* 126:*13, 16* 133:*8, 24* 134:*1, 11* 138:*18* 139:*21* 141:*13* 142:*9, 10* 147:*9, 10, 11* 156:*21* 166:*5*
**degree** 16:*19* 22:*5* 28:*8* 35:*4* 37:*10* 59:*20* 68:*1* 83:*1* 108:*18* 110:*15* 129:*13* 145:*19*
**degrees** 82:*25*
**deleterious** 140:*3*
**Delta** 145:*17*

**demand** 98:*22* 167:*11* 174:*24*
**demographic** 73:*5* 143:*14*
**demographics** 38:*23*
**demonstrative** 116:*4* 165:*25*
**denied** 27:*3* 187:*16*
**department** 116:*12*
**depend** 68:*19* 139:*14*
**depends** 84:*19, 20* 86:*10*
**DEPONENT** 4:*23* 5:*10* 31:*10* 81:*21, 25* 184:*19, 22* 185:*21*
**deposition** 1:*14, 18* 4:*7, 25* 5:*13* 19:2 50:*16* 101:*1* 162:*21* 173:*22* 185:*7* 187:*4* 188:*6, 12, 16*
**depositions** 6:*5* 52:*8*
**Derek** 1:*15* 185:*24* 186:*1* 188:*23*
**dermotomal** 183:*9*
**described** 145:*15* 185:*12*
**DESCRIPTION** 3:*8* 34:*8* 46:*12* 70:*15* 171:*7*
**deserve** 107:*1, 7*
**designed** 72:*9*
**despite** 119:*4*
**destiny** 50:*9, 13*
**detail** 18:*25* 38:*23* 103:*6* 156:*2*
**details** 26:*2*
**determination** 71:*4*
**determine** 36:*1* 62:*7* 100:*5* 109:*11* 114:*18* 149:*21* 154:*21*
**determined** 117:*19*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                          10/23/2025

**determining**
101:*10*  110:*21*
**develop**  45:*16, 17*
59:*16*  139:*13*
141:*15, 23*  142:*23*
143:*8*
**developed**  33:*10*
58:*20*  63:*3*  66:*18*
67:*9*
**developing**  95:*21*
112:*4*
**development**  47:*1*
124:*24*  136:*21*
137:*8*  138:*11*
**dgilliland@schnyder**
**lawfirm.com**  2:*6*
**diagnose**  129:*16*
131:*10*
**diagnosed**  14:*5*
15:*11*  22:*2*  126:*22*
128:*15*  134:*23*
**diagnoses**  80:*24*
113:*4, 7*
**diagnosing**  67:*12*
100:*21*  119:*16*
**diagnosis**  14:*12, 16*
15:*3, 4*  17:*16*  18:*4*
20:*8*  73:*24, 25*
75:*4, 14, 17*  76:*1,
10*  77:*4*  78:*4*
79:*18*  107:*12*
119:*6, 15*  126:*12,
14*  127:*3*  132:*17*
133:*7, 24*  137:*11,
14, 19, 21, 24, 25*
138:*1, 4*  148:*12*
155:*15, 17*  160:*5*
162:*4*  176:*25*
**diagnostic**  77:*7*
84:*6*  105:*22*
115:*11*  119:*7*
129:*14*  130:*7*
176:*23*  179:*8*
181:*5*
**dialogue**  3:*21*
**dictate**  30:*11*
**didactic**  10:*22*
85:*18*

**difference**  56:*22*
124:*21, 23*  184:*7*
**differences**  124:*20,
24*
**different**  34:*19*
61:*12, 19*  62:*2*
68:*16*  83:*22*  84:*23*
86:*21*  91:*18*  103:*8*
111:*15, 22*  142:*19*
145:*2*  150:*19*
157:*18*  170:*17, 18*
**differential**  119:*6,
15*
**differentiates**
137:*20*
**digital**  97:*6*
**digits**  162:*25*
**diminish**  165:*16*
**diminishes**  165:*1*
**diplomas**  9:*24*
**direct**  107:*2*
**DIRECT-**
**EXAMINATION**
3:*4*
**directly**  11:*12*
**director**  90:*23*
94:*9*  95:*24*  96:*6,
13*
**disability**  6:*9, 13,
15*
**disagree**  16:*4, 16*
32:*13*  76:*17*  77:*14*
146:*16*  163:*19*
170:*16, 17*  171:*9*
**disagreeing**  16:*22*
52:*6*
**disassembly**
187:*16, 18*
**disc**  22:*6*  28:*4*
33:*20*  34:*5*  35:*9,
10*  38:*8, 13, 14*
45:*18, 22, 25*  46:*9*
47:*21*  48:*6, 23*
49:*12*  51:*24*  58:*9*
63:*10, 25*  64:*4*
72:*17*  74:*1, 3, 4, 17,
22*  75:*1*  77:*10, 12,
17, 20*  78:*2*  79:*22*
80:*25*  100:*1*  112:*6*

113:*9*  114:*7, 13, 14*
115:*19*  119:*13*
123:*13*  126:*22*
127:*8, 11, 22, 23, 24*
128:*2, 4, 5, 7, 10*
129:*7, 16*  130:*20,
24*  131:*6, 10, 17*
137:*9*  138:*12, 13*
139:*13*  140:*8, 12*
141:*1, 2, 4, 13, 15,
23*  142:*4, 7, 8, 10,
16, 23*  143:*8, 18*
144:*17, 20*  145:*4,
21*  146:*1*  147:*15*
155:*5, 9, 20*  159:*17*
160:*24*  165:*14, 17,
25*  166:*13, 14, 16*
167:*18*  169:*9*
170:*10, 13, 15*
171:*2*  174:*12, 13*
177:*7, 19, 25*  178:*5*
179:*17*  182:*10*
184:*1, 14*
**discarded**  156:*18*
**discerning**  133:*3*
**disclose**  12:*15*
**disclosure**  11:*24*
188:*1*
**discovered**  165:*4*
**discovery**  11:*23*
**discs**  125:*12*
139:*21*
**disc's**  28:*11*
**discussed**  92:*20*
126:*14*
**discussion**  141:*8*
**disease**  33:*20*  38:*4*
70:*14*  72:*10*  73:*21,
22, 25*  74:*2, 4, 6, 7,
25*  75:*1, 2*  77:*2, 4,
8, 13, 20*  78:*2*  80:*7*
89:*3*  136:*22*  137:*8,
9, 11, 19, 21, 24*
138:*1, 3, 12*  140:*9*
141:*13*  158:*2*
**diseases**  77:*5*
**Disorders**  126:*14,
16*

**dispute**  12:*4, 5*
29:*2*  75:*12*
**disregard**  163:*17*
**disrespectful**  126:*9*
**disrupt**  57:*7*
**disruption**  133:*3*
**distinction**  106:*19*
**distraction**  162:*7*
**distribution**  159:*12*
**DISTRICT**  1:*1*
**DIVISION**  1:*2*
**doc**  115:*6*  172:*7, 8*
**DOCTOR**  5:*22*
11:*4, 7*  29:*23*
30:*10*  40:*14*  48:*12*
54:*7*  59:*5*  75:*6*
92:*15*  96:*5*  121:*14*
164:*19*
**doctors**  61:*12*
62:*1*  69:*20*  105:*20*
108:*4*  151:*11*
159:*23*
**Document**  3:*9*
33:*20*  39:*22*  70:*11*
73:*20*  75:*6*  77:*2*
97:*1*  133:*13*
**documentation**
17:*7*  25:*12*  26:*20*
30:*3, 8*  32:*18*
107:*16*  165:*6*
**documented**  16:*14*
25:*4, 6, 8, 21*  33:*17*
36:*21*  37:*5*  46:*6*
47:*18, 25*  58:*13*
65:*19, 20*  66:*11*
108:*3*  127:*25*
156:*20*  157:*13*
174:*4*  178:*6*
180:*23*
**documenting**
147:*15*
**documents**  91:*17*
**doing**  5:*6*  7:*19, 22*
10:*3, 22*  19:*1*
45:*12*  67:*24, 25*
68:*13*  85:*5*  86:*8*
91:*24*  96:*24, 25*
97:*13*  100:*13*
115:*11*  131:*18*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 203 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                          10/23/2025

132:7  149:*16*
151:*12*  173:*20*
**dollars**  32:*1*  176:*6*
**door**  171:*14*
**dormant**  20:*7*
**double**  32:*15*
99:*10*
**double-check**  13:*25*
**doubt**  88:*1*
**dozen**  88:*20*
173:*21*
**Dr**  1:*14*  4:7, *21*
5:*11*  13:*14, 15, 16*
14:*5, 22*  15:*12*
16:*17, 23*  20:*17*
21:*8, 16*  23:*11*
24:*8*  30:*12*  39:*6*
40:*17*  48:*3, 12*
53:*11*  55:6  65:*8*
76:*13*  82:*12*  92:*16*
93:*15*  94:*9, 10, 12,*
*15*  95:*3, 25*  96:*4, 5*
108:*18*  109:*9*
110:*1, 3, 18*  118:*11*
149:*24*  151:*2, 3, 15*
180:*8, 12*  181:*1, 15,*
*16*  183:*4*
**draft**  94:*15*  95:*1, 2*
**draw**  33:*7*
**drawn**  117:*5*
**Drew**  2:*4*  4:*10*
30:*25*  31:*1, 4, 7*
173:*14*  182:*13*
188:*16*
**drive**  138:*20*  150:*9*
**drives**  150:*7*
**driving**  26:*12, 13*
**Dropbox**  186:*11*
**due**  32:*10*  33:*16*
46:*21, 22*  140:*12*
141:*2*  168:*18*
175:*16*
**duly**  5:*23*
**duress**  130:*15*
**duty**  104:*22*
135:*16*

**< E >**
**E.R**  31:*23*

**earlier**  49:*19*
62:*22*  77:*21*  88:*11*
90:*22, 25*  91:*7*
92:*1*  100:*11*  101:*1*
108:*7*  117:*24*
119:*1*  122:*10*
166:*3*  167:*3*
**easily**  41:*18*
**EAST**  1:*8*
**easy**  9:*14*  98:*17*
130:*13*
**edema**  46:*15, 18*
115:*5, 15*  119:*14*
123:*18*  145:*13*
156:*6*  174:*20*
**editor**  94:*8*  116:*15*
**education**  34:*14*
83:*10*  87:*21*
**effect**  55:*23*  57:*11,*
*14*  140:*6*
**effective**  125:*21*
**effects**  140:*4*
**effusion**  17:*21, 22*
**eight**  65:*7*  82:*11*
95:*17*  163:*2, 21*
**eighties**  127:*7*
**either**  13:*1*  16:*15,*
*18*  54:*5*  56:*16*
93:*10*  148:*4*
180:*14*  181:*8*
185:*19*
**Eko**  97:*11*
**E-K-O**  97:*11*
**elaborate**  7:*5*
**elbow**  22:*8*  75:*20*
158:*24*  160:*7, 10*
**elected**  24:*8*
**electrophysiological**
44:*24*
**ellipsis**  3:*9*
**email**  186:*3*
**embarking**  98:*22*
**emergency**  130:*7*
132:*8, 10*  155:*16*
174:*22*  176:*21*
**EMG**  44:*18, 24*
45:*4, 9*  46:*4*
105:*22*  106:*8*
179:*16, 20, 22, 24*

180:*2, 9, 14, 19, 22*
181:*5, 19*  182:*12,*
*15*
**EMGs**  181:*6*
**emphasize**  107:*4*
**employee**  187:*9, 11*
**enable**  70:*7*
**encephalopathy**
71:*9*
**encompass**  21:*25*
**ended**  12:*13*
**endings**  56:*4*
**ends**  54:*24*
**engineer**  82:*19*
83:*3*  86:*16, 20*
98:*15, 20*  99:*6*
**engineering**  82:*22*
86:*17, 18*  108:*19,*
*24*
**engineers**  87:*8*
**enjoy**  10:*15*
**enroll**  92:*6*  93:*14*
**enter**  93:*8*
**entitled**  44:*7*
180:*5*  184:*23*
**Environmental**
71:*17*  136:*20*
137:*3*
**epidemiological**
72:*14, 22*  79:*20*
80:*6, 12*  81:*4, 5*
136:*22*  139:*4*
**epidemiology**
79:*15*  80:*5*  147:*2*
155:*22*  157:*22*
**epidural**  23:*8, 11,*
*13, 17*  24:*1, 9, 11,*
*18*  29:*12, 21*  31:*14*
36:*11*
**epidurals**  147:*4*
**episode**  184:*10*
**episodes**  116:*8, 21*
**equally**  112:*14*
**equals**  128:*25*
**equate**  142:*18*
**equipment**  93:*4*
98:*9*
**equivalent**  112:*12*

**ER**  17:*16*  18:*4, 7*
32:*18*  35:7  36:*21*
51:*20*  75:*17, 24*
76:7  77:*17*  106:*15*
120:*10*  155:*18*
157:*5*  158:*2*  160:*5*
162:*4*  173:*19*
**Erick**  79:*6*
**error**  67:*12, 19*
102:*8, 9, 13, 14, 23*
**esoteric**  143:*4, 13,*
*19*  144:*5*
**especially**  10:*18*
118:*16*  183:*8*
**essence**  78:*11*
162:*3*
**essential**  108:*2*
**essentially**  21:*22*
41:6  58:*4*  67:6
70:*12*  73:*23*  76:*11*
81:*15*  97:*23*  118:*3*
120:*2*  137:*10*
138:*15, 24*
**establish**  61:*23*
62:6, *12*  70:*25*
71:6, *11*  76:*2, 8*
89:*21*  108:*7*
115:*11*  119:*16*
123:*8*  176:*4*
**established**  69:*11*
77:*8*  111:*9*  113:*11*
118:*7, 9*  122:*13*
176:*2*
**establishes**  71:*19*
**establishing**  60:*22*
69:*12*  71:*20*  90:*2*
108:*2*  112:*21*
122:*14*  127:*8*
**establishment**
107:*12*
**estimated**  31:*25*
**estimates**  38:*3*
122:*23*
**estrogen**  125:*21*
**et**  34:*9*  47:*8*
98:*21*  119:*14*
147:*4*
**ethics**  99:*14*
**etiology**  59:*13*

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

**Eugene** 101:*23*
116:*11*
**evaluated** 176:*21*
**evaluation** 31:*23*
32:*19* 70:*14* 89:*2*
109:*13*, *14*
**evening** 91:*9*, *11*
**event** 17:*16*, *23*, *24*
21:*13*, *23* 27:*21*, *22*
29:*8* 32:*4*, *10*, *11*,
*16*, *24* 33:*18*, *19*
35:*3*, *5*, *7* 36:*16*, *22*
37:*4*, *11* 41:*7*
45:*11* 46:*5* 47:*6*,
*11*, *23* 48:*2* 50:*11*
51:*20* 55:*24* 59:*21*
61:*24* 62:*9* 64:*10*
73:*7*, *13* 76:6
77:*18* 78:*5*, *7*, *18*
104:*21*, *25* 105:6
106:*9*, *12*, *16*
109:*12* 110:*2*, *16*
111:*6* 112:*14*
113:*5*, *8*, *12* 114:*8*,
*24* 120:*10*, *11*, *13*
122:*18* 128:*8*
129:*8* 131:*4*, *7*
132:*20* 135:*14*
136:*15*, *20*, *25*
137:*1*, *7* 146:6
147:*21* 148:*14*
151:*20* 152:*11*, *13*
154:*2*, *22*, *23*
155:*15* 157:*3*, *24*
158:*12* 160:*15*
163:*21* 164:*5*
166:*2* 171:*20*
172:*1*, *15*, *19*
173:*19*, *24* 174:*3*,
*21*, *23* 175:*24*
176:*5*, *19* 180:*1*
182:*22* 183:*2*
**events** 80:*13*, *24*
84:*23* 113:*6* 173:*1*
**eventually** 157:*16*
**everything's** 162:*14*
**evidence** 15:*14*, *23*
30:*17*, *22* 33:*7*
37:*7* 44:*25* 45:*9*,

*13* 46:*5*, *15*, *16*
51:*8*, *19*, *20* 53:*19*,
*20* 57:*19* 60:*8*, *14*
64:*8*, *10*, *12*, *14*, *21*
73:*17*, *18*, *21*, *24*
74:*25* 75:*2*, *5*, *14*,
*15* 76:*1*, *5*, *7*, *8*
77:*2*, *6*, *8*, *9*, *13*, *16*
78:*1*, *4*, *6*, *7*, *14*, *15*
81:*4* 103:*17*
105:*12* 106:*15*, *17*
107:*17* 108:*8*, *16*
110:*11* 111:*15*, *16*,
*20*, *22* 114:*22*, *25*
115:*4*, *15* 118:*6*
120:*9*, *10*, *11*
123:*18* 124:*21*
125:*20*, *23* 126:*21*
128:*25* 129:*5*, *8*, *10*
131:*3*, *6* 133:*1*, *21*
136:*22* 142:*7*
143:*24* 144:*3*, *4*
145:*11* 146:*9*
147:*15*, *23* 148:*11*
149:*13*, *15* 151:*12*,
*23* 152:*10* 155:*21*
156:*1*, *5*, *12*, *17*, *18*,
*20* 157:*2*, *6*, *8*, *11*
158:*1*, *22* 160:*5*, *7*,
*13* 163:*9*, *13*, *14*, *17*
164:*3*, *4* 165:*11*
166:*15* 174:*20*, *25*
177:*2*, *4*, *5*, *10*
178:*11* 179:*4*
182:*25* 187:*8*
**Evidence-Based**
126:*12* 133:*6*
**exact** 38:*15* 49:*19*
147:*7* 169:*17*
**Exactly** 21:*7* 43:*7*
46:*25* 91:*1* 119:*18*,
*20*
**exaggerating** 152:*2*
**exam** 14:*13* 15:*12*,
*14* 17:*5* 18:*16*
20:*25* 36:*23* 37:*1*
39:*6*, *24* 40:*2*
47:*16*, *19*, *20*, *25*
52:*13* 64:*11*, *12*

65:*16*, *19* 66:*13*
97:*25* 106:*23*
109:*8* 110:*21*
158:*18* 159:*13*, *18*,
*22* 161:*23* 162:*3*
174:*4*, *6* 177:*12*
**examination** 10:*20*
16:*13* 18:*11*, *13*, *14*
47:*17* 65:*20* 77:*7*
85:*17* 94:*14* 95:*3*,
*8* 97:*13* 133:*23*
159:*7* 176:*23*
177:*5*
**examine** 92:*6*
111:*3*, *12*, *18*, *24*
112:*1* 158:*17*
159:*23*
**examined** 5:*24*
158:*21* 167:*22*, *23*
**examiner** 99:*12*
**examining** 97:*12*
101:*11* 113:*25*
**example** 71:*1*, *2*
80:*14*, *25* 86:*25*
93:*7* 100:*15*
102:*12*, *20* 104:*5*,
*23* 111:*7* 119:*3*, *5*
129:*25* 130:*4*
157:*15*
**examples** 64:*3*
71:*3* 114:*15* 119:*3*
**exams** 103:*23*
**excellent** 80:*15*
**excerpt** 137:*15*
**excuse** 25:*8* 92:*5*
**exerts** 58:*11*
**exhaust** 24:*5*
**EXHIBIT** 3:*5*, *9*
**exhibits** 186:*4*
187:*18*
**exist** 136:*19* 137:*6*
138:*10*
**expand** 15:*8* 128:*2*
**expect** 25:*4* 36:*25*
84:*15* 119:*18*, *21*
168:*14*
**expectation** 150:*16*
**expected** 52:*15*

164:*6*
**expenses** 93:*7*
**experience** 23:*23*
28:*12*, *16* 47:*3*
49:*10* 55:*14*, *17*
63:*16* 68:*13*
102:*12* 113:*23*
114:*15* 116:*4*
121:*2*, *7*, *18* 125:*10*
140:*12* 144:*20*
150:*18* 165:*24*
182:*10*
**experienced** 58:*15*,
*24* 116:*24* 124:*14*
144:*7*
**experiences** 152:*19*
**experiencing** 32:*7*
33:*4* 46:*23* 64:*15*
134:*24* 146:*12*
147:*25* 148:*1*
152:*20* 164:*12*
176:*14*
**experiment** 100:*7*, *9*
**expert** 11:*9*, *17*
16:*19* 22:*4* 24:*15*
28:*7* 32:*15* 35:*4*,
*12* 37:*9* 52:*3*
59:*19* 61:*2* 66:*22*
67:*8* 68:*11* 70:*4*
90:*15* 103:*19*
107:*24* 108:*14*, *17*
110:*12*, *13*, *15*
111:*2*, *16* 114:*20*
120:*12* 129:*12*
146:*8* 152:*9* 176:*3*,
*8* 182:*24*
**experts** 52:*9*
103:*7* 107:*25*
111:*9*, *11*
**explain** 31:*10*
58:*8* 70:*21* 75:*13*
111:*1* 138:*25*
146:*22*, *23* 154:*10*
158:*23* 174:*2*
**explained** 110:*5*
113:*5* 173:*2*
176:*18* 178:*14*
**explaining** 35:*2*
36:*3* 58:*9* 119:*9*

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                          10/23/2025

**explanation** 44:7
46:*3* 55:25 61:*17*
80:2 87:*17* 107:9
113:8 129:*20*
154:*12* 158:*19*
176:17

**explanations**
156:*14, 25*

**exposure** 73:6, *13*,
*18* 136:21 137:3
148:*11* 156:*1, 6, 12*
174:*20*

**express** 180:5

**expressed** 21:22
63:*11*

**expressly** 187:*15*

**extend** 184:22

**extending** 159:*11*

**extends** 169:*10, 11,*
*19*

**extensive** 133:*13*

**extremely** 81:*1*

**extremity** 81:8

**eyeballs** 128:*4*
169:*23*


**< F >**

**faces** 66:*13*

**facet** 51:25 134:*12,*
*14, 15* 177:*20*
178:*1*

**fact** 31:*16* 32:18
34:*23* 36:5 37:3
45:*1* 46:22 47:10
60:*3* 66:*23* 70:6
77:23 80:*14* 105:6
106:4 108:22
111:*4, 21* 116:4
117:*15* 118:*12*
121:20 123:3
129:*10* 132:15
133:2 142:6
148:10 150:7
153:*15* 156:8
165:*24* 169:*16*
174:2 177:*4*
184:*10*

**factor** 33:*8* 34:*1, 7,*
*17* 134:*21, 22*

135:*3, 12* 141:*12*
146:22 147:*13*
148:9 154:*19*

**factors** 32:*10, 25*
33:*12* 34:*20* 36:*3,*
*4* 58:7 79:*17*
125:*15, 16* 136:7, *8,*
*10, 12, 13, 18, 19, 20,*
*23, 24* 137:6
138:*10* 146:*19*
153:*14* 154:6, *7, 10*
173:*12, 16* 174:*11*
175:8, *14* 176:*10*

**facts** 43:*19, 20, 23*
103:*16* 111:*14, 16*
136:*18* 152:9
157:*1* 160:*19*

**faculty** 82:*13*
84:*21, 22*

**fail** 49:*21*

**failed** 48:5

**fails** 23:*18*

**fair** 9:*15* 10:*1, 7*
11:*16* 66:*21*
150:*17*

**fairly** 13:*4*

**fake** 40:*3*

**fall** 12:22 13:*17*
18:7 19:*18* 22:*23*
25:*9, 13* 27:20
28:*10, 12, 13, 14, 16*
31:*21* 32:*11* 33:*5,*
*13* 35:*18* 36:*6, 13*
38:*19* 41:*1* 45:*5*
46:*23, 25* 47:*14*
48:*18* 49:*10* 50:*1,*
*14, 19* 51:*3, 11, 13,*
*15* 53:*15* 57:*16*
60:*12* 62:*14* 63:*3,*
*4, 9, 21* 69:*14*
72:*16, 25* 79:22
86:*1* 90:*4* 109:*12*
112:*6, 23* 113:*16,*
*19* 114:8 116:25
119:*17, 23, 24*
124:*15* 125:*1*
126:*6, 23* 127:*1*
128:*16* 129:*1*
136:*5* 137:*1*

138:*11* 143:*18*
144:*7, 12* 145:*8, 22*
146:2 147:*5* 148:*1,*
*9* 152:*19, 20, 21*
153:*11, 13, 18*
155:*5, 8* 165:*15*
166:2 170:*16*
172:*7, 11, 17* 173:*1*
175:*8, 17* 176:*13,*
*20* 177:*16, 17*
178:*17, 18, 22*
180:*3* 184:*2, 3, 4, 6,*
*9, 12, 13, 17* 185:*4,*
*6, 13*

**falling** 119:*5*

**falls** 51:*5* 63:*17*
144:*16* 184:*11*

**false** 16:*12* 52:*4*
126:*24* 161:*3, 18*
162:8 168:*8, 15*

**familiar** 93:25
100:*12* 153:*7*
165:22 180:*12*
182:*4*

**fanny** 141:*19, 23*

**far** 26:22 96:*21*
108:*13* 119:*11*
145:25

**fast** 25:*24* 130:*13*

**faster** 125:20

**FBI** 182:*13*

**February** 54:6, *7,*
*15, 25* 91:2

**Federal** 5:*13* 68:*3*
80:*20* 100:8

**feeds** 151:9

**feel** 56:4 65:*3*
108:*15* 174:9

**feels** 166:20

**fell** 51:*3* 111:*19*
148:2

**fellow** 88:*16, 17*

**fellowship** 86:9
93:*20* 94:9 180:*13*

**felt** 140:5, *8*

**female** 124:*11*
143:*17* 144:*13*

**females** 38:*18*
63:2 72:*15, 23*

125:6, *20, 24*
140:*11*

**fictional** 160:*16*

**field** 9:*4, 8* 94:2

**fifteen** 31:25

**fifth** 157:2 162:25

**fifties** 33:*15* 38:*19*
63:2 72:*16, 23*
124:*14* 140:*11*
144:8 147:2

**file** 29:*15*

**filed** 188:*16*

**fill** 89:22

**final** 157:*19* 160:5
180:*24* 181:*19*

**financial** 149:*1, 14,*
*18, 23* 150:*1, 7*
151:2, *15, 16*

**financially** 187:*12*

**find** 17:*17* 41:*21*
42:*21* 95:*14* 98:*4*
121:5 143:*14, 16*
144:*4* 153:*11*
168:*23*

**finder** 66:22 70:6
106:*4* 111:*21*

**finding** 16:*8* 23:*1*
40:6 45:*24* 55:*17*
64:*1, 6* 99:*3*
123:*17* 129:*2, 4*
142:*18* 145:*14*
159:*19* 161:*17*
162:*12, 17* 166:*14*
168:*3, 13, 20*
169:*17* 172:*15*
173:2 174:*19*

**findings** 17:*4*
20:25 28:*24* 33:*17*
38:*15* 46:*2, 6*
47:*16, 20, 25* 64:8
65:*15, 16* 77:7
106:*9, 13* 113:*11,*
*12* 115:*12* 116:9
118:9, *13, 14, 18*
122:22, *24* 123:*11,*
*21, 23* 125:5
128:*21* 142:*14*
144:2 148:*12*
155:22, *23, 25*

157:*14*  160:*15*
161:*19, 24*  162:*3*
166:*5*  170:*12*
171:*17*  175:2, *4*
176:*25*  177:*13*
180:*3*  181:*23*
**fine**  21:*10*  108:*13*
**fingers**  120:*23*
**fingertips**  141:*9*
**finish**  75:*8, 25*
**finishing**  96:*22*
**Finnish**  118:*1*
**Firm**  2:*4*  186:*6*
188:*4, 5, 17*
**first**  5:*18*  9:*5, 6*
14:*25*  73:*12, 20*
74:*24*  75:*3*  79:*25*
80:*1*  93:*17, 21*
94:*15*  97:*16*  116:*8*
117:*1*  130:*6, 9*
131:*24*  132:*12*
142:*12*  152:*25*
159:*8*  162:*2*
163:*15*  168:*6*
169:*23*  171:*7, 16*
179:*24*  180:*4*
**fit**  136:*2*  158:*21*
**five**  15:*1*  31:*20*
32:*1, 2*  39:*14*
40:*25*  41:*24*  44:*22*
79:*8*  86:*5*  96:*2*
116:*18*  144:*4*
154:*3, 5*  155:*13*
156:*24*  163:*6*
164:*18, 19*  166:*19*
173:*12*
**five-page**  18:*24*
**flat**  169:*3, 4*
**flex**  84:*19*
**flexible**  84:*20*
89:*23*
**floor**  185:*10*
**fluid**  171:*18*
**focal**  64:*13*
**folder**  186:*11*
**folks**  139:*22*
**follow**  7:*10*  31:*24*
100:*14*  103:*5*
163:*18*

**followed**  100:*12*
116:*17*
**following**  25:*3*
37:*4*  54:*20*  101:*14*
187:*25*
**follows**  5:*24*
**force**  87:*1, 2*  171:*4*
**forces**  183:*25*
**foregoing**  187:*4, 7,
17*
**forensic**  61:*21*
67:*7*
**form**  3:*23*  5:*16*
13:*19*  14:*7*  23:*17*
35:*14, 21*  37:*17*
41:*22*  43:*15, 16*
45:*6*  48:*19*  49:*15*
53:*16, 25*  57:*17*
64:*17*  66:*1*  67:*15,
21*  69:*23*  72:*3, 12,
18*  73:*1, 8*  74:*8, 19*
75:*8*  76:*24*  78:*19*
79:*11, 23*  80:*10*
90:*6*  103:*10*
105:*24*  106:*24*
109:*15, 23*  112:*8,
16, 25*  114:*10*
117:*6*  118:*24*
130:*1*  131:*11*
138:*5*  140:*14*
143:*10*  146:*14*
152:*23*  153:*22*
166:*22*  175:*10*
178:*19*  179:*18*
**former**  95:*24*
96:*13*  99:*11*
116:*15*
**formulate**  111:*17*
**forth**  83:*9*
**fortunately**  51:*7*
64:*9*
**forward**  54:*21, 23*
136:*17*
**found**  88:*22*
116:*20*
**foundation**  19:*3*
35:*21*  61:*7*  98:*5, 6*
128:*20*  157:*20*

173:*4*
**foundations**  170:*18*
**founded**  78:*5*
**four**  5:*2*  13:*4*
20:*4, 13, 15*  31:*3,
20*  32:*2*  35:*19*
40:*25*  52:*23*  167:*4*
171:*15*  184:*20*
**four-hour**  19:*2*
**fourth**  136:*11*
156:*13*  162:*24*
**fractures**  132:*23,
25*  145:*12*
**frame**  123:*20*
**fraud**  151:6, *7, 10*
**free**  65:*3*
**frequency**  36:*12*
57:*16*  81:*12*
**Friday**  83:*23*
84:*17*  85:8, *9, 21,
22*
**Fridays**  83:*25*
**front**  12:*13*  13:22
22:*18*  34:*16*  65:*5*
89:*7*  128:*19*
141:*18, 19*
**fulfill**  101:*2*
**fulfilling**  10:*15*
**full**  8:*5*
**function**  157:*10*
163:*23*
**fund**  93:*2*
**funded**  98:*8*
**funding**  93:*3, 10*
98:*7, 13*
**funny**  158:*25*
172:*23*  173:*12*
183:*21*
**further**  103:*5*
163:*17*  188:*15*
**fuse**  49:*2*
**fusion**  48:*7, 15, 17,
23*  49:*12*  184:*17*
**fusions**  154:*25*
**future**  31:*22*  50:*6*
62:*21*

< G >
**GA**  2:*5, 11*

**gender**  124:*8, 20*
125:*1, 10, 15*
**general**  8:*4, 6, 9,
12*  69:*10*  81:*14*
101:*23, 24*  123:*8*
125:*13, 14*  138:*2*
141:*17*  144:*2*
**generally**  48:*24*
63:*8*  106:*21*  142:*8*
**generically**  138:*16*
**genetic**  125:*15*
**George**  94:*12*
**GEORGIA**  1:*1*
64:*23, 24*  65:*1*
103:*20*  181:*1, 2*
187:*2, 25*  188:*2, 18*
**getting**  54:*24*
74:*10, 11*  85:*19*
142:*19*  148:*23*
150:*10*  173:*11*
**gift**  93:*13*
**Gilliland**  2:*4*  3:*3*
4:*10, 21, 24*  5:*11,
20*  6:*1*  13:*20*  14:*4,
8*  31:*2, 6, 9, 12, 13*
35:*15, 22*  37:*18*
41:*23*  42:*8, 13*
43:*17*  44:*6, 14*
45:*8*  48:*20*  49:*16*
53:*4, 7, 18*  54:*1*
57:*18*  64:*19*  66:*2*
67:*16, 22*  68:*9, 18*
69:*24*  72:*4, 13, 19*
73:*2, 9, 15*  74:*9, 20*
75:*10*  76:*19, 25*
78:*20*  79:*12, 24*
80:*11*  81:*20, 23*
82:*2, 10*  90:*7*
103:*11*  105:*25*
106:*25*  109:*16, 24*
110:*24*  112:*9, 18*
113:*2*  114:*11*
117:*7*  118:*25*
131:*12*  135:*9*
138:*6*  140:*15*
143:*11*  146:*15*
148:*25*  152:*24*
153:*23*  155:*12*
166:*23*  175:*11*

Lamar vs. Wal-Mart Stores East                     Dr. Joseph Martino                                    10/23/2025

178:*20*  179:*19*
184:*21*  185:*1, 3, 18,*
*22*  186:*1, 7, 9, 13,*
*17*  188:*17*
**Give**  14:*17*  21:*6*
62:*22*  78:*24, 25*
84:*15*  102:*19*
108:*16*  109:*18*
117:*2*  150:*15, 23*
171:*1*  180:*4*
**given**  66:*9*  79:*18*
101:*19*  107:*20*
170:*11*  187:*8*
**giving**  10:*16*  121:*1*
**glad**  32:*25*
**go**  5:*3*  12:*13, 19,*
*20*  22:*3, 18*  25:*23*
26:*14*  29:*15*  31:*9*
41:*16*  42:*16*  44:*16,*
*20*  46:*13*  48:*8*
49:*15*  54:*10*  65:*8*
66:*3, 23*  74:*25*
83:*17*  92:*23*  96:*18*
97:*20*  105:*3*
113:*15, 17*  114:*7*
121:*15, 19*  127:*11*
128:*13*  134:*3, 16*
136:*11*  139:*3*
143:*8*  160:*18, 20*
161:*3, 5, 18, 25*
163:*20*  164:*20*
168:*12*  169:*25*
171:*21*  173:*21*
174:*23*  179:*21, 23,*
*24*  180:*24*  181:*2*
**goes**  24:*1*  29:*10*
44:*17*  114:*22*
127:*16*  147:*11*
166:*18*
**going**  4:*25*  5:*9*
12:*19, 20*  25:*24*
31:*10*  35:*23*  38:*8*
42:*16*  55:*5, 9*  57:*7*
77:*1*  79:*25*  91:*23*
93:*2, 10*  99:*3*
103:*12*  104:*19*
105:*2, 3, 8, 9, 10*
107:*2*  109:*17, 19*
120:*12*  128:*2*

138:*22, 25*  143:*12,*
*14, 15, 16*  144:*16*
145:*14, 21*  147:*12*
148:*18*  150:*3, 12*
151:*13*  153:*11*
154:*16*  156:*19*
158:*16*  161:*15*
162:*14*  163:*11*
169:*6, 22*  171:*13,*
*20*  180:*15*  181:*14*
182:*2, 3, 12, 23*
186:*2*
**gold**  60:*22*  69:*12*
71:*14, 20, 22*  72:*7,*
*8*  78:*17*  101:*17*
122:*13*
**good**  4:*21, 23*
22:*11*  50:*15*  57:*1,*
*3*  58:*16, 19, 22*
64:*9*  81:*21*  101:*23*
123:*25*  129:*21*
131:*1*  139:*14*
164:*21*  185:*21*
186:*20*
**gosh**  142:*25*
164:*23*
**Gotcha**  22:*17*  53:*6*
**gotten**  12:*6, 8*
36:*10, 12*  92:*25*
**gradual**  80:*7*
**graduate**  82:*25*
83:*10*  94:*19*
**gravity**  51:*1*
**gray**  124:*25*
142:*19*
**great**  151:*5*
**greater**  145:*16*
**greener**  96:*14*
**grind**  70:*1*
**ground**  28:*13, 16*
31:*21*  33:*13*  38:*19*
41:*1*  49:*10*  50:*23,*
*24*  51:*3, 5*  63:*3, 9,*
*17*  72:*16, 25*  90:*3*
112:*23*  116:*25*
119:*17, 24*  124:*14*
125:*1*  126:*5*  136:*5*
137:*1*  138:*10*

144:*7, 12*  145:*8, 23*
177:*16*  184:*9, 13*
**ground-level**  12:*22*
152:*19, 20*  153:*11,*
*13, 18*
**group**  118:*16*
129:*4*  142:*14*
170:*20*
**groups**  173:*7*
**group's**  133:*22*
**guess**  8:*12*  9:*16*
10:*2*  11:*2*  38:*24*
58:*7*  81:*9*  89:*6*
117:*1*  126:*8*
158:*19*  169:*6*
**guide**  70:*14, 15, 21*
**Guideline**  133:*6*
**guidelines**  24:*3*
126:*12*  133:*7, 16*
**Guides**  89:*2*
**guys**  156:*14*

**< H >**
**hair**  124:*25*  142:*19*
**half**  88:*20*
**Halting**  3:*9*
**hand**  4:*17, 20*  6:*8,*
*19*  7:*1*  8:*1*  182:*1*
**hands-on**  52:*13*
107:*5*  109:*13*
110:*20*
**happen**  14:*12*
27:*1*  28:*13*  114:*22*
123:*9*  174:*1*
**happened**  21:*13,*
*23*  32:*11, 23*  37:*12*
41:*8*  43:*6*  110:*2, 4,*
*8*  111:*6*  145:*15*
148:*2*  151:*20*
152:*14*  181:*23*
**happens**  32:*9*
**happy**  19:*2*  61:*3*
62:*22*  100:*25*
101:*8*  103:*5*
122:*11*  133:*19*
141:*10*  178:*24*
**hard**  9:*20*  38:*21*
184:*24*

**head**  26:*9*  78:*9*
90:*13*  121:*6*
137:*22*  161:*15*
175:*7*
**heading**  91:*21*
**health**  11:*3, 5*  60:*3*
**Healthcare**  91:*16*
92:*11*  93:*19*
**hear**  6:*16*  76:*20*
176:*3*
**heart**  97:*8*
**heavy**  58:*6, 11*
**height**  28:*12*
119:*24*
**held**  17:*20*  60:*21*
71:*14*  94:*24*  109:*2*
**help**  40:*19*  98:*15*
154:*18*  167:*11*
**helped**  55:*19*  99:*5*
**helps**  119:*2*
**hematomas**  145:*13*
**Henry**  28:*21*
127:*15*
**herniation**  28:*5*
35:*10*  45:*18*  46:*9*
47:*22*  63:*25*  74:*3*
79:*22*  81:*1*  123:*13*
126:*22*  127:*9, 11,*
*23, 24, 25*  128:*4, 7,*
*10*  129:*16*  130:*24*
131:*10*  142:*7, 24*
143:*9, 18*  144:*17,*
*20*  145:*4, 21*  146:*1*
155:*6, 9, 20*  159:*17*
165:*14, 17*  166:*4,*
*14, 16*  167:*18, 20*
169:*9, 10, 11*
170:*15*  174:*12, 13*
177:*25*  178:*5*
179:*17*  182:*11*
184:*1, 14*
**herniations**  22:*6*
38:*14*  46:*1*  51:*24*
58:*9*  63:*10*  64:*4*
72:*17*  74:*1, 17, 23*
77:*10, 18*  112:*6*
113:*9, 14, 15*  114:*7,*
*13, 14*  115:*19*
119:*14*  128:*3, 5*

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

130:*20*  131:6, *17*
142:*4, 8, 10, 11*
147:*15*  166:*1, 13*
170:*10, 13*  177:7,
*19*
**Herschel**  8:*19*
**hey**  156:*13*
**Hi**  4:*21*
**high**  129:*23*
145:*15*  175:2
**higher**  125:*24*
130:*19*  131:*15*
132:6
**highest**  118:5
**highway**  80:*22*
**Hill**  70:22  71:*5,
10*  102:*3*  112:*20*
**hip**  51:*12*
**hips**  51:*10*
**hire**  98:*14*  104:8
**hired**  11:8, *24*
12:*15*  68:2
**historically**  104:*18*
**history**  52:*16*
70:20  77:6  101:*12*
105:*21*  112:*1*
119:*4*  127:*15*
128:7  133:*23*
170:*12*
**hit**  26:*1*  50:*23, 24*
158:*25*
**Hold**  30:*25*  61:7
62:*16*
**holding**  61:7
**hole**  99:2
**home**  132:*16*
172:*25*  174:*23*
**honest**  126:*19*
135:*18*  150:*3*
151:*17*
**honestly**  91:*3*
**hormones**  125:*19*
**horrible**  104:*18*
**horse**  147:*19*
**hospital**  36:8
47:*14*  59:*1*  80:*17*
82:*14*  94:22
127:*15*  158:7, *14*

178:2
**hospitals**  80:*18*
**hot**  128:*24*
**hour**  145:*16, 17, 20*
184:*20*
**hours**  5:2  31:*3*
83:*12, 14*  167:5
**Houston**  82:*13*
83:6  85:*1*  92:2
93:*12*  95:*19*  98:*3,
4, 6*
**how-how**  6:*22*
**huge**  145:*1*
**human**  86:*24*
**hundred**  31:*25*
32:*1*  38:*10*  39:2
102:*25*
**hundreds**  80:*18*
103:*15*  176:5
**Hunk**  59:*15*
**hurt**  151:*21, 22*
161:*15*  162:*14*
**hurting**  162:8
**hyper**  168:*4*
**hypertension**  59:*10*
**hypertonicity**
161:*20*
**hypotheses**  69:7
**hypothetical**  19:*10,
12*  59:*19*

**< I >**
**idea**  95:*15*  141:*24*
**IDENTIFIED**  3:8
82:7  176:*19*
**identify**  119:2
136:*19*
**ignorance**  6:*12*  9:2
**ignore**  172:*3, 16,
18*  173:*19*
**ignoring**  81:*15*
156:*16*
**I-I**  10:*21*  40:5
**image**  16:6, 8
114:*23*  128:*18, 24*
168:*12*
**images**  46:*14*
107:*17*  115:*14, 15*
118:*21*  127:*13*

128:*1, 22*  134:*4*
146:5  156:*10*
166:7
**imaging**  17:8  29:7
33:*23*  60:*15*  84:6
87:*19*  105:*12*
113:*11*  114:*21*
122:*24*  129:*14*
146:5  157:*21*
171:8, *10*  173:8
**immediate**  47:5, *9*
80:8
**immediately**  25:*3*
146:*21*
**Impact**  89:*4*
143:*23*
**impacted**  7:8, *11,
14*
**implication**  132:*15*
**importance**  107:5
**important**  10:*19*
11:*3*  66:*16*  77:*3*
108:*1*  133:*23*
158:*12*  161:*4*
171:22, 25
**impression**  39:*11*
**improve**  30:8
48:*15*  97:*24*
**improved**  32:*20*
157:*10*  163:*23, 25*
164:*1, 2, 15*
**improvement**
29:*16*  57:*25*
178:*10*
**inaccurate**  16:*12*
**inappropriate**
103:2
**incentivized**  93:*14*
**incidence**  80:*23, 25*
81:*12*
**incident**  25:*16*
**incidental**  129:2
166:*14*  168:8
175:*1*
**incidents**  79:*17*
**include**  16:*3*  18:*4*
41:*11*  63:*1*  100:*24*

**included**  20:9
27:8  33:*21, 22*
39:*14*
**includes**  32:2  69:6
156:*20*
**including**  37:*21*
41:2  81:*7, 8*  84:*4*
106:*15*  166:*4*
173:8  187:*18*
**incorporated**  88:8
**incorrect**  47:*15*
127:*4*
**increase**  28:*14*
59:6
**increased**  34:5, *18*
139:*5, 7*  142:*2, 3*
167:*20*  170:*12*
**increases**  60:6
**increasing**  139:*20*
**incumbent**  111:*25*
**indent**  142:*4*
**indented**  128:*10*
**indenting**  45:*19*
**indents**  63:*25*
142:*24*  143:9
144:*20*  155:6, *9*
165:*17*
**independent**  188:*3*
**independently**
118:*18*
**index**  13:6
**indicate**  15:*22*
76:5  169:*12*
**indicated**  16:5
69:*16*  132:*21*
**indicates**  16:6
167:*21*
**indication**  45:*12*
**indicative**  160:*24*
**Indiscernible**  149:*3*
**individual**  136:*19*
142:*23*
**individuals**  118:*10*
**inductive**  145:*24*
156:*17*  157:*1*
**inferring**  132:*18*
**inflamed**  23:*14*
178:*1*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

**inflammation**
46:*16*  51:*25*
115:*15*  123:*18*
156:*7*
**information**  12:*7*,
*10*, *11*  43:*12*  102:*2*
179:*9*
**informed**  21:*9*
**infrequent**  131:*23*
**inherently**  80:*6*
**initial**  31:*23*  90:*14*
95:*1*
**initiated**  148:*7*
**injected**  56:*2*
**injection**  20:*16*, *24*
21:*5*, *10*, *11*, *15*
23:*9*  30:*17*  31:*14*,
*15*  48:*13*  54:*20*
58:*24*
**injections**  29:*24*
30:*11*  36:*11*  41:*4*,
*5*  48:*5*  58:*25*  65:*9*,
*11*, *21*  120:*5*
134:*14*  148:*23*
**injured**  67:*3*
**injuries**  12:*21*
13:*1*, *3*  16:*2*  21:*24*
22:*7*  36:*19*  51:*6*, *9*,
*14*, *18*, *23*  52:*1*
61:*25*  63:*19*  67:*13*
78:*9*, *18*  80:*23*
87:*1*, *2*  90:*4*
112:*24*  131:*2*
145:*12*, *13*  154:*2*
157:*24*, *25*  159:*3*
164:*7*  177:*1*, *2*, *15*,
*16*  178:*12*
**injury**  6:*8*, *19*, *23*
7:*1*, *2*, *13*, *16*, *22*
8:*1*, *24*  18:*24*  19:*6*,
*8*, *20*, *21*, *24*  23:*4*, *6*
59:*17*  67:*8*  69:*12*
70:*14*  73:*7*, *25*
75:*18*  78:*9*, *13*, *15*
79:*2*  84:*4*  88:*9*
89:*3*, *4*, *13*  90:*1*, *13*,
*15*  95:*22*  100:*1*, *21*
101:*11*, *22*  103:*19*
108:*10*  122:*18*

126:*18*  129:*11*
130:*6*  131:*5*  133:*1*,
*2*  146:*8*  159:*20*
160:*24*  163:*13*, *14*
**innocuous**  172:*24*
**insignificant**  181:*11*
**instability**  15:*14*
**Institute**  87:*6*
**institutional**  91:*23*
**instruction**  10:*22*
**instructional**  60:*18*
100:*15*  137:*17*
**insufficient**  33:*6*
**intact**  18:*13*  47:*17*
64:*12*
**intellectually**
135:*17*
**intelligence**  97:*8*
**intensity**  16:*7*
168:*4*
**intent**  137:*18*, *25*
148:*19*
**interchange**  137:*19*,
*24*
**interest**  92:*21*
**interested**  43:*24*
92:*22*  187:*12*
**interesting**  43:*2*
99:*2*  122:*5*  147:*18*
157:*14*
**interpret**  87:*19*
**interpretation**  84:*8*
112:*11*  171:*9*
**interpreting**  87:*23*
**interrupting**  31:*1*
**intervening**  174:*1*
**interventional**  50:*6*
**introduce**  4:*8*
**invasive**  184:*16*
**inverse**  143:*2*
144:*11*  153:*9*
**investigation**  109:*9*
**investigator**  91:*15*
95:*20*
**involved**  25:*17*
33:*3*  62:*1*  63:*17*
80:*19*  114:*1*  126:*5*
144:*21*  145:*3*

146:*22*
**involvement**  114:*13*
**involving**  80:*7*, *17*
170:*13*
**IRB**  92:*14*, *24*
93:*25*  96:*7*
**Ironically**  43:*4*
**irrefutable**  102:*22*
**irrelevant**  109:*14*
110:*21*  158:*4*, *5*
166:*8*
**issue**  12:*13*  88:*3*
102:*20*  104:*5*
107:*25*  132:*19*
139:*22*  151:*6*, *10*
179:*22*, *23*
**issues**  181:*18*
**item**  31:*20*  40:*25*
**items**  93:*5*
**its**  3:*23*  100:*5*
117:*9*

< J >
**Jack**  82:*13*  83:*6*
**JANET**  1:*4*  4:*10*
5:*1*  151:*16*  164:*1*
**January**  44:*17*, *21*
45:*2*  46:*4*  48:*3*, *10*
52:*22*  53:*4*, *9*, *10*
64:*25*  65:*7*  91:*2*
179:*25*
**jewelry**  58:*6*, *12*
**Jim**  180:*9*, *11*
**job**  11:*17*  62:*11*
154:*20*, *21*  167:*10*
175:*21*, *22*
**JOHN**  1:*9*
**Johnson**  54:*17*
**joint**  17:*13*  134:*14*
**joints**  49:*2*  134:*12*,
*15*  177:*20*  178:*1*
**Joseph**  1:*14*  4:*7*
5:*22*
**Josh**  93:*21*
**journal**  79:*7*
84:*23*  101:*13*, *21*
116:*7*, *10*  117:*12*,
*13*, *15*  133:*9*, *10*
171:*6*

**journals**  82:*23*
116:*13*  153:*5*
**Jr**  94:*10*
**judge**  12:*14*
**Judicial**  187:*25*
**jump**  96:*19*
**jumped**  123:*12*
**jumping**  136:*14*
**jury**  111:*15*
131:*20*  168:*10*
176:*12*

< K >
**keep**  12:*1*  76:*14*
**Kent**  80:*15*  144:*24*
**kind**  6:*8*  7:*23*
8:*17*  41:*24*  55:*17*
68:*23*  98:*16*  99:*2*
103:*2*  138:*24*
153:*24*  164:*20*
**knee**  12:*24*  13:*16*,
*18*  15:*4*, *5*  16:*9*, *24*
17:*19*  20:*20*  21:*6*,
*17*  22:*8*  41:*5*
42:*19*  51:*25*  75:*20*
90:*4*  94:*16*, *25*
105:*7*  156:*3*, *4*
157:*16*  160:*9*
167:*2*  176:*15*
177:*11*, *12*, *15*
**know**  6:*12*, *17*  8:*9*
9:*16*  10:*2*  12:*2*, *10*,
*24*  13:*12*  14:*19*
18:*24*  19:*4*  21:*7*
24:*2*  26:*15*, *18*
30:*7*  37:*24*  38:*22*
39:*3*  41:*5*  42:*17*
44:*1*  46:*2*, *11*
47:*24*  50:*15*, *22*
51:*1*, *2*, *7*, *18*  55:*2*
57:*10*, *12*, *13*, *22*
61:*14*  62:*9*  63:*11*
66:*3*, *23*  68:*24*, *25*
69:*1*, *21*  70:*2*
74:*13*  78:*11*  86:*25*
87:*2*  88:*25*  89:*21*
91:*10*, *22*  92:*14*
93:*22*  96:*19*  98:*3*,
*5*, *16*  100:*7*, *12*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

101:6, 8  102:1, 9,
12, 20, 21  103:4
104:24  107:1, 23
108:1, 18, 20  109:2,
18  110:6, 25  111:7,
8, 23  112:10  113:6,
9  114:23  115:6
117:1  118:10
120:18, 22, 23, 24
121:4, 5  124:7, 10,
13  125:2, 8, 14, 17,
22  126:7, 8  128:12
130:11, 21  131:22
132:5, 15  133:12,
14, 18  134:2, 18
137:22  138:15, 22
139:22, 25  140:16
141:8, 18  142:1, 6
143:12  144:9, 10
147:19, 20  148:7
149:25  150:2, 4, 6,
16, 18, 21  151:5, 17,
18, 19  152:7
154:19  155:22
157:5, 7, 14, 18
158:9  159:1, 23
161:22  162:11
167:3, 5, 8, 10, 15
168:5, 9  169:16
170:24  171:16
172:11, 24, 25
173:6, 17  174:2, 3,
7, 11, 13, 14, 16, 17,
18, 22, 24  175:1, 5
177:21, 22  178:3, 9,
10, 21  179:6, 8, 10,
15  180:8, 13, 18, 21,
22, 23, 24  181:15,
17  182:3  183:15,
23  185:19
**knowledge**  47:2, 3
61:1  68:12  70:1
87:22  100:17
108:8  113:23
114:3  121:1, 7, 17
145:22  150:18
165:24
**known**  13:3

**< L >**
**L3S1**  41:3, 4
**lab**  84:5
**labeling**  137:8
**LAMAR**  1:4  4:11
5:1  12:22  13:12,
15  14:6, 13  17:6
19:8, 17  20:1  22:5
23:8  24:9, 25  25:6,
8  29:9  33:23
38:16  39:7, 24
40:2  41:14  42:3, 5
45:4  48:4  49:4, 9
51:12  52:13  54:16,
19  55:4, 6  56:6
59:23  62:2, 5, 18
65:2, 23  66:7  67:2
69:14, 20  73:21
77:10  81:14  90:8
104:24  105:16
106:18, 20  108:4, 5
110:17  111:1
113:3  114:20
117:22  118:13
120:3, 15  122:25
126:21  130:8
132:16  134:13, 14
139:24  141:21
149:19  151:16, 18
154:10  166:15
167:16
**Lamar's**  13:17
53:22  63:20  67:10
68:4, 15  123:22
142:14  153:14
166:4  182:19
**land**  158:24
**landing**  159:3
**large**  104:14  147:7
**lateral**  18:17
75:21  159:11
**Law**  2:4  5:15
188:5, 17
**layperson's**  40:20
**lead**  38:5  62:20
71:9  79:6  80:15
96:4  118:1  123:6

**leading**  95:20
**leads**  156:13
**leap**  160:14
**learn**  24:14  86:23
**learning**  84:5
95:22  97:7  98:15,
20, 23  125:17
**leave**  30:12  39:8
103:4  174:10
**leaves**  171:14
**leaving**  136:3
**lec**  60:18
**lecture**  60:18
100:16  137:17
**lectures**  10:22
**led**  110:17  111:10
**left**  12:23, 24, 25
13:16  17:25  18:7,
20  21:18  22:8, 13,
20, 25  25:20  26:21
27:4, 6  29:19
30:23  31:14, 15, 16,
17  32:7  37:16
39:8  40:22  41:5
42:6, 19  44:10
64:16  65:3, 17, 22,
24  75:19  77:11
95:25  96:1  158:16
160:7, 10  163:5
167:19  181:20
**left-sided**  17:25
**legal**  136:8  176:8
**LEGEND**  3:9
**lesions**  57:16
**level**  24:19, 25
28:13, 16  31:21
33:13  38:19  41:1
45:22  49:10  51:3,
5  54:25  55:5, 9, 18
63:3, 9, 17  72:16,
25  79:10  80:8
90:4  92:21  116:25
118:5, 6  119:17, 24
124:14  125:1, 18
126:6  136:5  137:1
138:11  143:24
144:2, 3, 4, 7, 12
145:8  156:12
177:16  184:9, 13

**levels**  49:12
170:13
**library**  95:15, 16
**lice**  151:2
**license**  151:3
**lie**  55:4, 8
**lifespan**  140:3
**lifestyle**  34:11, 15
**lifetime**  139:2
**ligament**  127:19
**Ligamentous**  133:2,
3  145:12
**liked**  19:1
**likelihood**  38:8
142:16  145:23
154:14  175:1
**likes**  156:24
**limit**  184:20
**limitations**  41:14
42:4
**limited**  109:19
**limits**  161:25
**line**  130:6, 10
132:13
**linear**  86:25
**lines**  107:22
**link**  186:10
**list**  33:1  34:20
38:22  89:1  119:8
146:25
**listed**  89:8  95:5,
10  136:24
**listen**  10:25
**listening**  97:3, 8
**literally**  98:25
159:23
**literature**  37:23
62:19, 20  71:18
73:4  80:3  101:25
102:3, 19  121:3
130:22  135:5
139:8  140:22
153:7, 9, 12  168:21,
22
**litigation**  66:19, 21
**little**  17:2  23:16
162:1
**living**  183:24

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

**LLC** 2:*4* 187:*21* 188:*4, 14*
**load** 139:*17, 18, 20*
**local** 57:*11*
**logical** 157:*1*
**long** 14:*18* 58:6, *12* 77:15 131:25 141:*19* 167:*4*
**longer** 6:*19*
**longitudinal** 127:*19*
**long-term** 6:*13, 15* 62:*21*
**look** 14:*25* 15:*19* 17:*15* 18:2 27:*15, 24* 41:*18* 47:*16* 54:*10, 12* 56:*10* 59:2 77:*24* 80:*13* 81:*3* 88:*24* 101:9 105:*3, 5, 8, 11* 107:*19* 111:*5* 117:*8* 127:*12, 13* 128:*1, 14* 130:*3, 20* 132:*22, 24* 133:*1* 134:*3* 145:*18* 149:*24* 152:9 156:*1, 8, 9, 19* 157:*11, 13* 159:7 161:*23, 24* 163:*17* 165:2 168:*11* 170:*3* 171:*25* 173:22 175:*23* 178:*24* 181:6 182:*3* 185:*17*
**looked** 11:*24* 14:*25* 73:*4* 125:9 130:*23* 140:*23* 144:9 145:*1* 153:2 161:*1, 16* 168:*13* 171:*8*
**looking** 5:*3, 4* 14:*15, 20* 32:*25* 38:*25* 39:*1* 59:*4* 66:*13* 80:22 81:6 97:*5, 9* 102:*15* 115:*4, 5* 118:*8* 127:*13* 128:*21* 131:2 145:*2, 6* 146:*4* 169:*24*

181:*5*
**looks** 143:*15*
**lordotic** 168:*17*
**lose** 125:*20* 130:*13*
**loss** 168:*17*
**lost** 95:*25* 132:*1*
**lot** 5:*3, 4, 5* 9:*17, 24* 10:*3* 61:*15* 99:*4* 157:*8* 164:*23* 173:*7* 186:*3*
**loud** 171:*15*
**love** 109:*5, 6*
**low** 116:*9, 21* 143:22, *23, 24* 163:*4* 164:*19* 166:*7*
**lower** 4:*19* 52:*1* 81:*8* 125:*24* 163:*7* 178:*1*
**LP** 1:*8*
**lumbar** 8:*20* 34:*5* 37:*3, 6* 78:*8* 90:*12* 115:*16* 123:*24* 133:*8, 17, 25* 134:*1* 148:*13* 156:*4* 160:*12* 166:*17* 171:*2*
**lump** 59:*11*
**lung** 62:*7, 8, 10* 71:*4* 74:*7, 23* 102:*21, 23, 25* 111:*10* 112:*4*
**lying** 55:*11* 149:*9* 169:*3, 4*

**< M >**
**machine** 130:*3*
**machines** 131:*1*
**MACON** 1:*2* 58:*25* 59:*1*
**maintain** 87:*22* 107:*22*
**maintaining** 122:*1*
**maintenance** 121:*13, 22*
**major** 157:*24*
**majority** 120:*1* 169:*2*

**making** 127:*3* 165:9
**malalignment** 138:*20*
**male** 124:2
**males** 125:*5, 25*
**malingering** 152:*2*
**manage** 62:*3* 167:*11*
**management** 23:*19* 24:*1* 49:22 50:7 99:*8*
**managing** 11:*6* 62:*2*
**maneuver** 161:*11*
**manifest** 148:*2* 178:*16, 17, 21*
**manifested** 175:*8* 178:*2*
**manufactures** 97:*11*
**maps** 183:*9*
**March** 11:*14* 56:*6, 10* 79:*8* 91:*2*
**Marietta** 2:*5* 188:*18*
**MARKED** 3:*5* 82:*7*
**Martino** 1:*14* 4:*7, 16, 21* 5:*12, 22* 76:*13* 82:*12*
**Massachusetts** 24:*16*
**masses** 171:*18*
**masters** 84:*7* 87:*15*
**master's** 108:*18*
**material** 3:*21* 7:*3, 12*
**matter** 57:*23* 61:*2, 20* 67:*8* 86:*21* 98:22 108:*10* 110:*13* 111:*3* 118:*12* 153:*15* 186:*23*
**maximum** 57:*24*
**McCluskey** 94:*12* 95:*4*
**McLain** 2:*9*

**McMurray's** 15:*20, 22* 19:*10*
**mean** 14:*14* 21:*4, 8, 20* 40:*11* 61:*14* 78:*23* 96:*17* 100:6 101:*16* 110:*20* 111:*11* 124:*16* 126:*8, 19* 131:*16* 146:2 149:*14* 150:*11* 156:*4, 6* 160:*4* 163:*22* 167:*4* 175:*12*
**meaning** 34:*17*
**means** 140:*1*
**meant** 27:*9*
**measure** 47:*23*
**measures** 24:6
**meat** 59:*12, 15*
**mechanical** 139:*20*
**medial** 41:*3* 52:*23* 53:*12, 14, 23* 54:*3* 147:*4*
**medical** 6:*23* 13:2 22:*5* 31:22 32:*15* 57:*24* 59:*24* 60:*1, 17* 63:*8* 67:*10, 13, 19, 24* 68:*1, 4, 15* 69:22 70:*13* 71:*20* 83:*1, 10* 86:*8* 87:*21* 88:*15, 23* 90:*2* 94:*22* 95:*16* 100:*22* 102:*17* 107:*16, 24* 110:*12* 119:6 136:*9* 151:*3* 176:*6*
**medically** 20:*23* 24:*12* 30:*17* 170:*14* 172:6
**medication** 59:*6*
**medicine** 71:*13, 17* 82:*13* 87:*1* 95:*20* 151:*8* 159:*5*
**meet** 54:*20* 96:*11* 110:*1*
**meeting** 96:*12, 15, 20*
**meetings** 96:*18*
**member** 82:*13* 95:*18* 121:*13*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

**members** 71:*15*
92:*13* 95:*23* 96:*1,
2*
**Memorial** 82:*14*
**memorialization**
16:*17* 27:*11* 39:*13*
**memorialized** 26:*8*
36:*21* 52:*20* 55:*3*
66:*11* 125:*3*
147:*21* 164:*6*
**memories** 6:*17*
**memory** 6:*7*
**men** 124:*22*
**meniscal** 14:*16*
15:*21, 23* 16:*3, 15,
18, 20* 19:*17* 22:*1*
177:*10*
**meniscus** 14:*6*
15:*17* 19:*6, 7, 9, 12,
13* 21:*18*
**mental** 60:*3*
**mention** 15:*24*
16:*1* 21:*17* 32:*6*
**mentioned** 43:*20*
49:*18* 74:*7* 91:*6,
25* 96:*25* 102:*4*
108:*7* 113:*10*
117:*24* 122:*10*
136:*11* 146:*20*
158:*2* 166:*3* 167:*3*
**mentioning** 41:*6*
134:*18*
**mere** 142:*6*
**merely** 101:*5*
108:*6* 111:*19*
154:*9* 173:*5*
**merit** 122:*6*
**Merritt** 2:*9*
**met** 122:*3*
**meta** 38:*12, 25*
118:*3, 7*
**metaphor** 11:*19*
**meters** 51:*2, 3, 4*
145:*23*
**method** 52:*19*
60:*16, 21* 61:*9, 23*
68:*23* 69:*2, 6, 10,
11* 70:*5, 9, 10, 16,
20, 22* 71:*11, 13, 19*

72:*6, 9* 78:*17* 79:*9,
21* 101:*15, 17, 18*
102:*6, 8* 103:*15, 17*
106:*21* 107:*19*
112:*13, 19, 21*
119:*16* 122:*11, 14,
17* 127:*8* 130:*19*
136:*2* 137:*13, 18*
153:*17* 155:*4, 8*
183:*1*
**methodology** 69:*4*
73:*17* 79:*2* 101:*10,
22* 102:*13*
**methods** 93:*6*
**microvascular**
139:*22* 140:*9*
**microvasculature**
140:*6*
**MIDDLE** 1:*1*
**midline** 18:*18, 19*
35:*6* 36:*25* 37:*2*
155:*19* 159:*9, 13,
17, 25*
**might've** 91:*1*
**mild** 18:*9* 58:*5*
127:*20*
**miles** 145:*16, 17, 20*
**million** 37:*23, 25*
49:*19* 81:*2* 145:*10,
20, 25* 172:*25*
**Millions** 147:*3, 8*
**mind** 76:*21, 23*
146:*21*
**mine** 175:*13*
**minor** 17:*3* 26:*4*
62:*20* 144:*21*
157:*24* 164:*7*
177:*2, 3*
**Minton** 96:*6*
**minute** 81:*25*
143:*13* 181:*19*
**minutes** 130:*12, 16*
131:*25* 181:*20*
184:*25*
**mirror** 142:*21*
**mischaracterized**
35:*25*
**mischaracterizing**
135:*9* 176:*17*

**missed** 99:*17*
100:*19, 23*
**missing** 123:*5*
**misspoke** 105:*9*
**mistaken** 47:*24*
**misunderstanding**
86:*19*
**mixed** 89:*11*
**MMI** 157:*17*
**model** 95:*22* 97:*7*
98:*15*
**molecular** 125:*18*
**moment** 120:*25*
**Monday** 96:*12*
**money** 149:*4, 7, 8,
9, 16* 151:*4*
**monitor** 141:*18*
**month** 22:*22*
32:*13, 24* 36:*2, 18*
78:*5, 6* 114:*24*
148:*8* 158:*13*
160:*14*
**months** 21:*13*
23:*19* 25:*9, 13, 15*
41:*8* 45:*16* 46:*7*
85:*25* 167:*1* 180:*1*
**Morbid** 34:*4* 140:*1*
**morbidly** 139:*23,
25* 142:*23*
**morning** 4:*21, 23,
25* 96:*12*
**mortality** 140:*2*
**motion** 18:*12* 35:*7*
36:*24* 47:*20* 50:*11*
78:*10* 159:*14*
174:*5* 177:*13*
**motivation** 150:*9*
**motivations** 150:*8*
151:*24*
**motor** 18:*14*
25:*17* 33:*3* 77:*25*
79:*3* 80:*14, 19*
114:*1* 119:*24*
145:*3, 6* 156:*22*
**motorcycle** 119:*25*
**mouth** 105:*21*
**move** 28:*3, 4* 78:*11*
**moved** 96:*14*

**movement** 172:*22*
173:*12* 175:*7*
183:*20*
**moving** 54:*21, 22*
162:*13*
**MRI** 15:*11, 18*
16:*8* 19:*9* 20:*25*
37:*8* 38:*10* 45:*20*
46:*8, 20* 51:*21*
64:*6* 84:*8* 87:*19,
23* 106:*11, 13*
114:*23* 115:*2, 5, 7,
8, 10, 11, 12, 16, 25*
116:*4, 9, 21* 117:*18*
118:*4, 9, 13, 18, 21*
119:*1, 4, 7, 12*
120:*8, 17* 122:*21*
123:*3, 13, 22*
126:*25* 127:*2, 5, 7*
128:*21, 25* 129:*1,
12, 16* 130:*3, 11, 19*
131:*1, 10, 14, 16, 18,
24* 132:*5, 6, 10, 16,
20* 133:*4* 142:*11,
14* 147:*16, 17*
155:*22* 156:*2, 5*
157:*6* 160:*15*
164:*11* 165:*25*
166:*4, 7, 15* 167:*19*
168:*25* 169:*1, 21*
170:*23* 171:*11*
173:*2, 5* 174:*19, 24*
175:*2*
**MRIs** 28:*18* 33:*18*
63:*20* 105:*22*
169:*3*
**MSK** 87:*15*
**mud** 123:*15*
**multi-center** 92:*3*
**multiple** 13:*13*
71:*8*
**murmurs** 97:*9*
**Murphy** 92:*16*
93:*15, 16*
**muscle** 12:*25*
30:*18, 20* 35:*6*
39:*16* 40:*3* 42:*19*
75:*20, 22* 119:*11*
159:*12* 161:*13, 20,*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 213 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                          10/23/2025

*23* 162:*5*, *11*  163:*7*
165:*9*  166:*9*
**muscles**  75:*21*
161:*24*
**musculature**  161:*21*
**musculoskeletal**
81:*7*, *10*  84:*6*
87:*24*  167:*7*, *12*
**must've**  99:*17*
123:*15*
**mute**  66:*5*
**myofascial**  119:*11*,
*17*  120:*1*, *4*  161:*13*
165:*10*  166:*10*
178:*6*, *7*

< N >
**name**  80:*15*  93:*17*,
*21*  94:*5*  95:*10*
107:*23*  118:*1*, *2*
119:*25*  180:*8*
181:*16*  185:*23*
**names**  92:*8*, *10*
93:*23*  96:*3*
**narrative**  35:*8*
47:*21*  165:*13*
**narrow**  143:*19*
**narrower**  119:*8*
**nation**  145:*2*
**national**  80:*16*, *21*
99:*22*
**natural**  19:*22*
142:*18*  147:*10*
154:*14*  166:*5*
169:*4*
**nature**  22:*21*
**ndeeb@mmatllaw.c**
**om**  2:*12*
**NE**  2:*10*
**necessarily**  39:*14*
57:*4*  121:*11*
148:*21*  150:*5*
151:*25*  164:*25*
**necessary**  20:*23*
21:*2*  24:*12*  30:*18*
92:*23*  93:*5*  107:*21*
111:*2*  115:*4*
164:*18*
**necessity**  146:*23*

**neck**  17:*25*  18:*10*,
*11*, *16*, *17*, *19*  22:*12*,
*19*  23:*15*  24:*24*
25:*5*, *9*, *13*, *18*
28:*18*  29:*11*, *17*, *24*
30:*5*  33:*4*, *24*
34:*18*, *24*  35:*1*, *16*,
*17*  36:*8*, *9*, *24*
37:*16*, *21*, *25*  39:*16*
41:*15*  42:*4*, *18*
47:*19*  49:*23*  58:*9*
59:*6*, *9*, *13*, *15*
62:*21*  63:*3*  64:*15*
65:*12*, *20*  75:*22*
76:*3*  77:*10*  78:*11*,
*12*, *13*  81:*8*  90:*4*
105:*7*  112:*23*
127:*15*, *21*  130:*9*
131:*3*  134:*22*
135:*4*, *7*, *12*, *16*, *20*,
*21*, *25*  138:*17*
139:*6*, *7*  140:*24*
141:*2*, *12*  142:*2*
146:*12*  148:*1*
152:*16*  154:*14*
155:*18*  156:*3*, *5*
157:*15*  158:*15*
159:*2*, *11*, *15*  161:*7*,
*10*, *13*  162:*10*, *14*,
*23*  163:*7*  164:*8*, *18*
166:*19*  167:*1*
169:*1*, *4*  172:*24*
174:*5*, *18*, *21*  175:*8*
176:*14*  178:*1*, *5*, *8*
179:*17*  182:*10*, *19*
183:*5*, *20*  184:*2*
**need**  5:*5*  15:*8*
21:*14*  31:*22*  32:*4*,
*17*  36:*16*  41:*2*, *9*
50:*9*  53:*23*  59:*22*
61:*25*  73:*6*, *13*
99:*5*  101:*7*  104:*25*
106:*16*  107:*9*
110:*17*  120:*14*
130:*15*  135:*2*
136:*13*, *15*  137:*23*
138:*9*  146:*23*
147:*22*  148:*14*
152:*11*, *14*, *15*

154:*22*, *24*  155:*1*
156:*25*  157:*4*
167:*11*  175:*14*, *24*
179:*8*, *23*  183:*2*
184:*15*, *22*  186:*3*
**needed**  37:*12*
**needle**  24:*24*
**needs**  84:*20*, *21*
**negative**  15:*20*, *21*
19:*10*  27:*13*, *18*
**neglecting**  164:*3*
173:*15*
**negotiated**  93:*9*
**neither**  12:*5*  20:*4*
52:*19*  128:*9*
**nerve**  23:*14*  28:*15*
56:*4*  180:*9*, *14*
**nerves**  40:*19*  57:*12*
**nervoscularly**  47:*17*
**Neurodiagnostics**
180:*25*
**neurological**  18:*12*
22:*6*  23:*1*, *3*  36:*23*
64:*11*  65:*19*  174:*6*
**neurologist**  181:*9*
**neurology**  99:*8*
**neurovascular**
47:*19*
**neurovascularly**
64:*11*
**never**  28:*13*  37:*11*
39:*24*  45:*4*  53:*14*
57:*15*  72:*16*, *24*
114:*6*  125:*8*
143:*20*  184:*3*
**new**  22:*6*  34:*16*,
*17*  35:*10*  94:*22*
96:*5*  97:*5*, *24*
116:*9*, *20*, *21*
118:*18*  130:*25*
131:*1*, *6*  159:*16*
177:*7*
**news**  151:*9*
**Nice**  4:*24*
**Nicholas**  2:*9*  4:*12*
**Nick**  2:*4*
**nine**  70:*23*
**nomenclature**

170:*22*  171:*2*, *5*
**non**  86:*16*  155:*19*
**non-expert**  52:*2*
**nonsense**  169:*7*, *8*
**non-specific**  162:*12*
**nonverbal**  66:*8*, *15*
**noon**  82:*1*
**normal**  18:*12*, *13*
35:*7*  36:*23*, *24*
47:*18*, *19*  64:*10*
78:*10*  88:*4*  118:*9*
159:*14*  161:*25*
162:*1*  164:*22*, *25*
168:*17*  174:*5*, *6*
177:*13*
**North**  24:*4*  34:*13*
99:*14*  133:*16*
171:*4*
**note**  26:*25*  55:*3*, *6*
65:*5*  77:*3*  141:*11*
161:*19*
**noted**  47:*14*
**notes**  5:*4*
**Nothing's**  158:*5*
**noticed**  24:*13*
170:*4*
**notion**  48:*1*
123:*19*  152:*11*
153:*12*  157:*3*
159:*19*  177:*5*
**notoriously**  104:*3*
**novel**  97:*24*  99:*2*
**November**  41:*3*, *13*
42:*2*, *14*, *24*  43:*5*, *8*,
*25*  44:*3*  83:*20*
166:*25*
**Novocaine**  25:*5*
56:*1*, *3*
**NUMBER**  3:*8*
15:*1*  31:*20*  32:*2*
33:*14*  34:*1*, *2*, *3*, *19*,
*20*  40:*25*  44:*22*
75:*13*  76:*11*  77:*1*
79:*8*  83:*22*  84:*3*
123:*17*  136:*13*
145:*1*, *7*  146:*25*
147:*12*  155:*15*, *21*
157:*14*, *18*  163:*11*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 214 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

170:2, *18*  171:*15*
183:*23*
**numbers**  83:*12*
147:7
**numbness**  18:6, *9*
27:*3*  47:*13, 18*
65:2, *24*  158:*15, 20,*
22, *25*  160:8  162:*1*
**numerous**  62:*24*
70:*19*
**nurse**  54:*17*
**nutrients**  140:7
**NV**  18:*13*

**< O >**
**O.C.G.A**  4:*4*  188:7
**o0o**  186:*25*
**oath**  150:*13*
172:*12*
**obese**  139:*16, 23,*
25  140:9  142:*23*
144:*16*
**obesity**  34:4, *22*
35:*19*  136:2  139:*6,*
*19*  140:*1, 24*
141:*12*  154:*17*
156:22  173:*13*
175:6
**objection**  4:*9*
13:*19*  14:*3, 7*
35:*14, 21*  37:*17*
41:22  42:7, *12*
43:*15*  44:*5, 13*
45:6  48:*19*  49:*15*
53:*16, 25*  57:*17*
64:*17*  66:*1*  67:*15,*
*21*  68:*7, 17*  69:*23*
72:*3, 12, 18*  73:*1, 8,*
*14*  74:8, *19*  75:8
76:*18, 24*  78:*19*
79:*11, 23*  80:*10*
90:6  103:*10*
105:*24*  106:*24*
109:*15, 23*  110:*23*
112:8, *16, 25*
114:*10*  117:6
118:*24*  131:*11*
138:*5*  140:*14*
143:*10*  146:*14*

152:*23*  153:*22*
155:*11*  166:*22*
175:*10*  178:*19*
179:*18*
**objections**  4:*11, 13*
5:*16*
**objective**  11:*21*
40:6  47:*22*  106:*14*
107:*17*  161:*19*
163:*14*  179:8
**objectively**  100:*4*
**observed**  41:*13*
42:*3*  116:*18*
**obvious**  60:*23*
71:*1, 21*  90:*3, 5, 9,*
*10, 11*  112:22, *24*
115:*18*
**obviously**  117:*10*
132:*20*  139:*16*
149:8
**occasional**  58:*5*
**occasionally**  85:*5*
181:8
**occupation**  7:*13*
34:8  35:20  156:*23*
**Occupational**  71:*17*
**occurred**  50:*12*
135:*15*  146:7
**occurs**  118:*18*
**October**  1:*17*  4:5
13:*14*  14:*23, 24, 25*
15:*1*  16:*14*  20:*18*
21:*12, 15*  39:5
40:*9*  42:*16, 17, 18,*
22  43:*3, 4, 7*  44:*9*
59:*9*  187:*9*  188:*19*
**odd**  124:8
**oddest**  117:*1*
**offer**  24:8  150:22
178:*23*
**offered**  62:22
120:*15*  143:*25*
**offering**  36:2
**offhand**  165:*23*
**office**  11:*13*  12:8
75:7  114:*17*  181:2
**offices**  188:*4*
**oh**  5:*12*  14:*24*
25:*11*  32:9  46:*11*

53:*19*  58:*18*  69:*25*
142:*25*  148:*25*
149:*11*  185:*22*
186:*1, 20*
**old**  33:*15*  38:9
45:*21*  46:*1*  127:5
128:*25*  131:*22*
143:*17*  144:*12*
156:*10*
**olds**  38:*15*
**omission**  3:*21*
**omitted**  181:*13*
**once**  6:*21*  84:*3*
85:8  87:*21*  90:*21*
115:6
**oncologist**  62:7
**one's**  99:*17*
**one-time**  73:7
**one-year**  86:9
**ongoing**  91:*20*
**onset**  38:*20*  80:7
166:8
**open**  22:*18*  44:*23*
149:22  167:*25*
**opening**  89:22
**operation**  49:*20*
**opine**  48:*14*  169:7
**opined**  183:*4*
**opinion**  12:*20*
16:*11, 17, 19*  22:*3,*
*4*  28:7  30:*13*  32:*2,*
*8*  33:22  35:*4, 18*
36:5, *7*  37:9  39:*13*
46:*14*  49:9  52:*3*
55:22  59:20  61:6
62:25  72:8  104:*19*
108:*15, 17*  110:*15*
114:20  121:*3*
129:*12*  133:22
135:*13, 14*  140:*21*
146:8  147:20
149:*16, 17*  151:*17,*
*18, 21*  154:22
158:*11*  168:7
169:*23*  170:*19*
173:*4, 5*  174:8, *9*
176:8  180:*5*
182:*24*

**opinions**  11:*15*
13:7  19:*3*  21:*21*
27:*12*  48:*11*  52:2
60:*13*  61:7, *8, 15*
63:*12*  66:*18, 22*
67:*9*  68:*11, 12*
84:*15*  103:9
104:*13*  106:7
108:*14*  109:*3*
111:*16*  122:*16*
150:*14, 15, 22, 23*
165:*12*
**opposed**  133:*4*
**ordered**  181:7
**organs**  140:*4*
**original**  3:*23*
187:*21*  188:*15*
**originally**  15:*10*
**Orphans**  64:*23*
**Ortho**  64:*24*
**orthopedic**  6:*3*
7:*12*  8:*4, 6, 9, 10*
9:*14, 18, 21*  10:2
24:5  32:*16*  60:*19*
66:9  67:*13*  68:2,
*14*  70:*18*  71:*16*
79:*1, 7*  82:*15*  83:9
84:*10*  88:*1, 3, 4*
92:*1, 2*  93:*18, 20*
94:*3, 20*  99:*11, 12,*
*17, 19, 21, 24*
101:*21*  102:5
106:22  107:*4*
110:*14*  113:*24*
114:*4, 6*  116:*12*
121:*16*  122:*15*
129:*13*  131:8
167:9
**orthopedics**  81:*10*
83:*15*  84:*11, 13*
86:22, *23*  87:9, *18*
**osteophyte**  169:*11,*
*12, 19*
**outcome**  70:8
**outlined**  150:6
**outlining**  70:*11*
**outset**  36:*19*
**outstanding**  40:*14*

**overall**  149:*8*
**overarching**  147:*20*
**overexerts**  58:*5*
**overlap**  182:*11*
**overlapping**  182:*8*
**overweight**  139:*23*
**overwhelmingly**
 102:*16*

**< P >**
**P.C**  2:*9*
**p.m**  82:6  186:22,
*24*
**P.T**  42:*15*
**P-1**  82:*7*
**PA**  180:*11*
**Page**  3:*3, 5*  18:*14*
 19:*4*  31:*20*  32:*2*
 39:*14*  40:*9, 25*
 42:*14, 16*  53:*4*
 82:*11*  95:*17*
 127:*14*  133:*20*
 161:*18, 22*  166:*25*
 171:*22*  180:*24*
 181:*3, 9, 10*
**pages**  14:*18, 20*
 101:*2*  105:*11*
 146:*4*  157:*21*
 182:*25*  187:*7*
**paid**  12:*12*  150:*10,*
*11, 12, 14, 15, 20, 21*
**pain**  13:*16*  17:*25*
 20:*21*  21:*2*  22:*12,*
*19, 25*  23:*3, 5, 14*
 24:*18, 25*  25:*9, 13,*
*18, 20*  29:*11, 17, 18,*
*25*  30:*5*  31:*17*
 32:*6, 7*  33:*4, 5*
 34:*24*  35:*1, 16, 17*
 36:*8, 10*  37:*16, 21,*
*22*  40:*19*  42:*6, 18*
 47:*8*  49:*1*  50:*6*
 54:*25*  55:*5, 9, 18,*
*20, 25*  57:*7*  58:*5,*
*15, 22*  59:*7, 9, 16,*
*21, 24*  63:*3*  64:*15*
 65:*18*  99:*8*  105:*7*
 113:*8*  115:*7, 8, 9*
 116:*9, 21*  118:*17,*

22  119:*2, 3, 9, 10,*
*11, 17*  120:*2, 4, 17*
 127:*15, 21*  130:*9*
 134:*22, 24*  135:*4, 7,*
*8, 13, 16, 20, 22, 25*
 136:*6*  138:*17*
 139:*6, 7*  140:*24, 25*
 141:*2, 12*  142:*2*
 146:*12*  147:*25*
 148:*1, 17, 24*  152:*2,*
*4, 20, 22*  153:*19*
 157:*15, 16*  159:*13,*
*25*  160:*1, 9*  161:*7,*
*10, 13, 14*  162:*10,*
*23*  163:*2, 4, 6, 22*
 164:*18, 20, 22, 24*
 165:*1, 11, 16*  166:*7,*
*8, 9, 11, 19, 20*
 176:*14, 18*  177:*4,*
*18, 19*  182:*2, 3, 12*
 183:*5, 6, 9, 11, 13*
**painful**  17:*10, 14*
 55:*16*
**pains**  167:*2*
**pain's**  167:*1, 2*
**palpation**  18:*15*
 159:*10*
**paper**  118:*5*
 126:*11, 14, 17, 19*
**papers**  79:*20*
**paracervical**  75:*21*
**paragraph**  127:*17*
 171:*16*
**parameters**  107:*11*
**paraphrase**  76:*12*
**paravertebral**
 75:*21*  76:*5*  78:*14*
 171:*18*
**pared**  71:*11*
**paresthesia**  27:*3*
**paresthesias**
 158:*23*  159:*5*
 182:*1*
**part**  8:*11*  16:*3*
 61:*1*  66:*25*  70:*16*
 73:*25*  74:*3*  84:*9*
 87:*20, 25*  98:*18*
 101:*1*  121:*12*
 122:*19*  125:*13*

129:*24*  142:*18*
 149:*24*  153:*17*
 155:*4, 7*  163:*15*
 187:*17*
**partial**  15:*11*
**participated**  172:*19*
**particular**  23:*24*
 26:*17*  38:*1, 7, 12*
 41:*17*  57:*13*  60:*21*
 63:*13*  69:*2*  70:*15,*
*20, 24*  73:*19*  74:*21*
 79:*17*  81:*18*  86:*14*
 92:*16*  97:*12*  98:*21*
 99:*1*  101:*3*  102:*24*
 108:*22*  113:*6*
 114:*19*  118:*2*
 119:*3*  130:*1*
 137:*15*  157:*23*
 161:*17*  162:*17*
 168:*3, 14*  170:*20*
 171:*6*  181:*14*
**particularly**  67:*2*
 128:*23*  129:*2*
**parties**  187:*10, 12*
 188:*14*
**partners**  8:*19*
**part's**  98:*17*
**party**  188:*10*
**passenger**  26:*12*
**pastures**  96:*14*
**pathology**  119:*13*
**patient**  10:*18, 20,*
*25*  11:*3, 5*  23:*18,*
*22*  30:*10*  34:*14*
 58:*17*  62:*8*  65:*21*
 101:*11*  104:*13, 20,*
*23*  106:*23*  107:*13*
 110:*1, 21*  111:*4, 12,*
*18, 25*  112:*1*  114:*6*
 130:*1, 2, 14*  132:*1*
 143:*4, 6*  148:*20*
 161:*3, 4, 5, 13*
 162:*10*  165:*25*
**patients**  23:*24, 25*
 38:*24*  47:*4*  49:*19,*
*21*  55:*15*  61:*21*
 63:*17*  64:*4*  66:*12*
 92:*6*  104:*6, 17*
 114:*1*  118:*8*

119:*22*  120:*1*
 122:*25*  124:*2, 10,*
*13*  126:*4, 17*
 133:*24*  145:*1*
 166:*11, 12*  175:*4*
**patient's**  24:*22*
 101:*12*  114:*7*
 162:*14*  170:*12, 15*
 174:*18*
**pattern**  174:*15*
**pausing**  128:*13*
**paying**  163:*20*
 164:*3*
**payment**  150:*14, 23*
**Peachtree**  2:*10*
**pediatric**  92:*17, 19*
 93:*16, 18*  97:*17*
**peer**  37:*14*  60:*10*
 62:*13*  67:*18*  78:*16*
 79:*20*  82:*22*  99:*25*
 100:*20*  102:*19*
 113:*20*  117:*10*
 121:*8, 11, 15, 16, 18,*
*20, 23, 25*  122:*3, 8,*
*12, 18*  125:*6*
 144:*19*  165:*20, 6*
**peer-reviewed**
 152:*17*  153:*1, 5*
**people**  20:*8*  33:*15*
 39:*2*  51:*10, 17*
 62:*10*  80:*19*  81:*6*
 92:*10*  93:*23*  104:*6,*
*8*  119:*16*  123:*9*
 124:*8*  138:*25*
 139:*3*  140:*8*  147:*1,*
*3, 8*  159:*24*  167:*5,*
*12*
**people's**  150:*7*
**percent**  32:*20*
 37:*20*  38:*12, 14*
 54:*19*  56:*8, 25*
 62:*10*  102:*25*
 104:*6, 7*  129:*3*
 130:*24*  142:*10, 17*
 155:*24*  157:*10*
 162:*25*  163:*5, 23*
 164:*2, 5, 15*  165:*15*
 166:*3, 20*  167:*1, 2,*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                                    10/23/2025

*8* 169:*2* 175:*3*
178:*10*
**percentage** 147:*8*
163:*25*
**perfect** 132:*6*
**perform** 7:*24* 8:*7*,
*10* 93:*6* 103:*23*
**performed** 8:*5*
23:*11* 32:*3* 39:*6*
53:*12* 56:*3* 120:*15*
184:*16*
**performing** 151:*4*
**period** 7:*25* 67:*2*
110:*9* 116:*18*
172:*20, 21, 22, 23*
177:*23*
**periods** 58:*6, 12*
141:*20* 166:*24*
**permanent** 13:*2*
16:*2* 18:*23* 21:*24*
22:*7* 51:*22* 61:*24*
63:*19* 78:*13* 146:*7*
154:*2* 163:*13, 14*
178:*12*
**permission** 92:*5*
**person** 56:*17*
57:*22* 66:*8* 96:*8*
139:*17* 142:*6*
151:*19* 168:*25*
**personal** 125:*10*
**perspective** 6:*24*
13:*2* 40:*20* 145:*19*
**ph** 3:*22*
**phantom** 22:*1*
**phases** 98:*12*
**phenomenon**
168:*24*
**Phone** 2:*6*
**phonetically** 3:*22*
**photocopying**
187:*16, 19*
**phrase** 106:*5*
146:*16, 18*
**phrased** 106:*1*
109:*20* 140:*17*
**phrasing** 75:*1*
**physiatrist** 181:*8, 9*
**physical** 14:*13*
15:*12* 17:*5* 18:*10*,

*15* 19:*14* 20:*25*
23:*19* 24:*7, 10*
31:*24* 37:*1* 39:*6*,
*24* 40:*1* 41:*13*
42:*2, 4* 44:*2* 47:*16*,
*20, 25* 64:*12* 65:*16*
66:*13* 77:*6* 78:*10*
93:*5* 103:*23*
106:*23* 112:*2*
133:*23* 139:*18*
155:*2* 158:*18*
159:*6, 7, 18, 22*
161:*23* 162:*3*
174:*4* 176:*23*
177:*12*
**physicals** 97:*14*
98:*1*
**physician** 70:*3*
81:*16* 100:*5*
104:*12, 19, 22*
105:*1, 8, 9* 109:*1*
111:*24* 112:*2, 3*
148:*19*
**physicians** 52:*5, 8*,
*10, 12, 14, 20* 61:*18*
62:*1* 99:*23* 103:*23*,
*25* 104:*1, 2, 14*
106:*20* 107:*21*
108:*9, 13* 120:*7*
**physician's** 62:*11*
108:*5*
**pick** 29:*16*
**picked** 15:*18*
**Piedmont** 28:*21*
127:*14*
**pillars** 122:*1*
**pinky** 162:*2*
**placebo** 57:*14*
**placing** 139:*17*
**plaintiff** 159:*15*
176:*6*
**Plaintiffs** 1:*5* 2:*3*
**plaintiff's** 150:*25*
**plan** 15:*13*
**plasma** 29:*24*
31:*15* 36:*11* 58:*24*,
*25*
**plate** 173:*6, 8*
**platform** 98:*23*

**play** 125:*16* 155:*1*
176:*5*
**played** 21:*14* 32:*4*,
*17* 35:*3* 36:*16*
41:*2, 9* 46:*5, 6*
47:*1* 50:*12* 120:*13*
147:*22* 152:*15*
154:*22, 23* 183:*2*
**plays** 125:*11*
**please** 4:*8, 15*
75:*9* 89:*18* 162:*15*,
*18* 179:*2*
**plus** 155:*24* 166:*3*
**pneumonia** 130:*1*
**point** 20:*24* 22:*22*
23:*23* 24:*8, 11*
26:*19* 29:*6* 40:*11*
46:*2* 56:*2* 72:*15*,
*22* 103:*21* 111:*23*
120:*20* 123:*5, 10*
139:*5* 142:*12*
152:*18* 157:*19*
161:*22* 164:*15*
165:*2, 5, 7, 8* 171:*7,*
*8* 172:*13* 179:*4*
180:*4, 6* 181:*10*
182:*21* 184:*19*
**pointed** 64:*7*
109:*18*
**points** 157:*18*
165:*4* 179:*20*
**police** 26:*2, 3, 17*
**policy** 88:*2*
**polite** 169:*6*
**Polytech** 87:*6*
**Ponce** 95:*25* 96:*4*
**poor** 174:*9* 179:*8*
182:*19*
**Pope** 186:*7*
187:*20* 188:*3, 13*
**population** 37:*21*
38:*13* 79:*10, 18*
80:*7* 81:*14, 19*
107:*20* 123:*9*
124:*18* 129:*3*
143:*4, 6* 144:*2*
155:*25* 167:*8*
**populations** 81:*12*
112:*15*

**portion** 96:*19*
97:*25*
**pose** 135:*18*
**position** 28:*11*
79:*25* 88:*2* 169:*2*
**positioned** 26:*9*
**positive** 16:*13*
27:*19* 39:*7* 58:*19*
160:*23* 161:*3, 18*
168:*8, 16*
**positives** 162:*8*
**possibilities** 51:*16*
119:*9* 174:*14*
183:*22*
**possibility** 15:*17*
36:*2* 110:*11* 146:*1*
149:*6, 21, 23* 150:*6*
182:*16* 183:*3, 17,*
*22* 184:*17*
**possible** 12:*21*
17:*15* 26:*20* 28:*7*
51:*7, 17* 60:*5, 8*
100:*18* 110:*10*
111:*4* 130:*5*
135:*17* 154:*25*
156:*24* 167:*22*
173:*1* 175:*15*
184:*9, 10*
**possibly** 50:*7*
147:*14* 156:*21*
**posterior** 127:*19*,
*22*
**postgraduate** 60:*18*
**Post-traumatic**
19:*23, 25* 20:*1, 3*
**posture** 169:*4*
**potential** 151:*13*
**potentially** 51:*18*
**practice** 6:*23*
66:*25* 84:*9* 87:*19*,
*21, 25* 107:*24*
**practiced** 8:*4*
113:*24*
**practitioner** 54:*17*
**predicated** 70:*22*
112:*20*
**preexisting** 33:*16*,
*24, 25* 34:*2, 3* 35:*9*
37:*2* 46:*17* 49:*4*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 217 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                          10/23/2025

60:*12* 62:*15* 63:*10*
72:*24* 76:*3* 77:*22*,
*24* 78:*2* 112:*6*
113:*10, 14* 114:*16,
25* 115:*18, 24*
123:*19* 128:*19*
154:*13, 15* 156:*11,
20* 166:*5, 16*
178:*14, 16*
**pre-existing** 16:*24*
17:*20* 28:*5*
**premature** 24:*12*
**preparation** 85:*19*
**prepared** 109:*5*
**preparing** 85:*16*
97:*21*
**pre-participation**
97:*14*
**present** 127:*23*
162:*25* 183:*8*
**presents** 62:*8*
161:*4*
**pressure** 28:*15*
59:*6*
**presume** 30:*7* 51:*2*
**presumption** 127:*4*
148:*20* 150:*4*
**pretty** 64:*1* 133:*13*
**prevailing** 139:*18*
**prevalence** 38:*3*
79:*16* 80:*13* 81:*6,
15, 18* 107:*19*
118:*9* 122:*23*
123:*8, 21* 124:*17*
125:*25* 139:*21*
144:*1* 145:*3*
155:*24* 157:*22*
175:*3*
**prevertebral**
171:*18*
**previous** 91:*9*
154:*4, 5* 155:*14*
**pride** 10:*3, 13*
**primary** 9:*9, 10*
32:*18* 105:*4, 5, 7*
178:*22*
**principal** 91:*14*
95:*20*

**principles** 86:*24*
**print** 187:*6*
**printed** 181:*4*
**printout** 94:*4*
**prior** 6:*5* 7:*3, 13*
8:*2* 25:*24* 32:*24*
33:*19, 22* 41:*8*
43:*5* 45:*10* 77:*8*
97:*16* 104:*8* 105:*3,
5* 107:*8* 128:*7*
147:*13* 156:*21*
169:*17* 179:*7*
**private** 87:*21*
**probable** 170:*14*
172:*6*
**probably** 10:*3, 5*
11:*3* 41:*18* 84:*13*
96:*8* 98:*5*
**problem** 11:*6*
38:*1, 2* 48:*2*
104:*21*
**problems** 60:*3*
62:*21* 81:*11* 147:*1*
**Procedure** 5:*14*
25:*1, 2* 45:*12* 49:*2,
14, 17, 25* 53:*11*
55:*18, 19* 57:*5, 6,
14* 58:*16* 93:*6*
**procedures** 8:*6*
31:*23* 32:*3, 5, 17*
36:*17* 37:*12* 41:*2,
6, 9* 50:*10* 54:*11*
58:*21* 59:*9, 22*
61:*25* 104:*25*
106:*17* 120:*14*
135:*2* 136:*16*
146:*24* 147:*3, 6, 9,
22* 148:*6, 15, 16*
150:*3* 151:*4*
152:*12* 154:*11, 20,
24* 157:*4, 25*
175:*25* 183:*3*
184:*16*
**proceeding** 30:*14*
**proceedings** 187:*17*
**process** 92:*25*
96:*7* 97:*25* 98:*19*
99:*1* 100:*10, 21*
117:*11* 119:*6, 7*

121:*12* 122:*1, 19*
125:*18* 134:*11*
136:*12* 138:*18, 25*
142:*19* 147:*10, 11*
154:*17* 156:*16*
185:*14*
**produced** 26:*3*
75:*7* 116:*8*
**production** 101:*8*
133:*13*
**profession** 10:*4, 16*
167:*10*
**professional** 98:*24*
**professionalism**
99:*14*
**program** 24:*15*
82:*14* 86:*4* 94:*20*
**progression** 19:*22*
147:*10* 154:*14*
157:*1*
**prohibited** 188:*7*
**project** 84:*25* 85:*2*
87:*5* 91:*21* 92:*20,
21, 22*
**projects** 96:*25*
**prolific** 102:*1*
**pronounced** 12:*24*
**property** 26:*4*
**proportion** 125:*13*
**proposal** 91:*18*
**propose** 5:*15*
**proposing** 159:*15*
**protrusion** 127:*22,
23* 128:*18* 170:*4, 5*
**protrusions** 38:*14*
**proud** 10:*4*
**prove** 36:*4* 51:*21*
135:*1, 19, 23*
168:*10* 173:*15*
181:*22, 25*
**proved** 106:*11*
128:*23*
**proven** 19:*9* 72:*6*
**proves** 47:*11*
114:*24* 148:*14*
180:*2*
**provide** 11:*14*
30:*4* 61:*3, 21*
66:*22* 67:*7* 71:*18*

78:*23* 93:*12*
100:*25* 101:*1*
122:*11* 141:*10*
167:*5* 178:*24*
179:*2* 188:*5, 9*
**provided** 12:*2, 3*
29:*5* 39:*12* 50:*17*
73:*20* 75:*12* 77:*2*
84:*11* 93:*3* 105:*4*
133:*12, 15* 165:*13*
166:*6* 185:*15, 16*
**provider** 19:*4* 65:*1*
**provides** 122:*23*
**providing** 10:*21*
**provocative** 15:*21*
161:*11*
**provoke** 161:*12*
**PRP** 30:*3, 9, 17, 21*
41:*4* 65:*21*
**publication** 97:*21*
100:*20* 116:*14*
117:*11* 121:*10, 12*
122:*6*
**publications** 60:*20*
62:*24* 102:*7* 104:*7*
122:*4*
**publish** 101:*4*
118:*6*
**publishable** 153:*16*
**published** 37:*14*
38:*6* 60:*10, 16*
62:*13* 63:*14, 15*
67:*12, 18* 70:*13*
78:*16, 25* 79:*6*
80:*16, 20* 82:*21, 22*
88:*2* 94:*2, 18*
99:*25* 101:*12, 20*
102:*10* 103:*21*
109:*5* 113:*20*
116:*10* 125:*7*
133:*9* 139:*12*
141:*14* 142:*22*
143:*7* 144:*19*
152:*17* 153:*2*
165:*20* 167:*6*
171:*5*
**publishes** 70:*13*
**pull** 44:*20*
**pulse** 47:*23*

Case 5:24-cv-00276-CAR   Document 45   Filed 12/26/25   Page 218 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                           10/23/2025

purchased 93:4
98:9
purpose 23:13
48:22 115:11
123:7, 20 124:16
purposes 5:15
pursuant 5:13
187:23
pursuing 92:22
push 159:25
161:15
pushing 170:5
put 25:4 41:17
50:10 130:2, 3
146:25 147:12
151:25 159:24
171:12
putting 154:9
158:6, 10

< Q >
qualifications
68:20 108:10, 16
109:7, 8, 9
qualified 68:20
100:14 103:18
104:15 111:2
129:14 176:22
180:14
quantifying 103:22
quantum 160:13
question 5:17 6:6
20:12 24:11 26:23
28:2 38:21, 24
39:3 40:13, 16
41:25 42:9 43:18
46:3 50:15 52:25
62:16 63:5, 22
67:17 68:10 73:10,
11 74:11, 12, 14, 15,
16, 21 76:15 79:14
84:14 90:10 96:24
98:17, 18 100:6
101:3, 14 102:9
103:1, 2, 3 106:2, 5
107:2, 8 109:20, 21
110:6 111:8
114:17 117:13
120:25 123:25

126:3, 10 127:2
128:6 130:18
131:13 133:21
139:14 140:17, 18
142:13 143:15, 19
144:24 146:6
149:5, 22 150:2
151:5, 7 152:1
153:6, 24 157:12
158:20 162:15, 18
163:15, 16, 18
176:20, 21, 24
180:15 182:6, 21
185:2
questions 5:5
24:14 31:2 76:14,
16, 21 103:5
163:11 164:23
181:22 186:14, 19
187:6
quick 130:13
quiescent 20:7
quiet 20:7
quite 36:14 55:16
98:22 142:15
Quote 165:3
171:17

< R >
rabbit 99:2
radiated 64:15, 16
radiates 18:10
162:23
radiating 22:12, 19,
25 23:3, 5 25:20
26:21 29:18 163:5
radiation 29:17
radicular 23:14, 22
25:9, 13, 19 29:24
30:5 31:17 32:6, 7
33:5, 16 37:22
42:6 47:8 48:2
radiculitis 47:7
radiculopathy
17:25 18:5 23:9
25:22 26:21 29:11
32:14 34:13, 24
35:1, 17 36:1, 10
37:6, 7, 16 42:18

43:6 44:25 45:13,
17 46:21, 23 47:1,
4, 10, 12 51:24
63:3 77:11 78:8
90:12 126:13, 15,
18 132:14 148:13
159:6, 9 160:12
165:8 166:11
174:3, 25 179:16
181:5 182:6 183:8,
12 184:15
radio 36:11 57:15
radiofrequency
40:16, 18 54:8
56:8 148:23
radiographic 37:7
radiologist 16:7
46:8 64:6 87:16
115:21 127:25
128:5, 9 167:24
168:16 170:8, 10
171:7, 13 174:8
radiologists 169:5
radiology 16:5, 11
38:6 84:7 87:15,
24 88:5, 23 89:2, 5,
9 99:8 107:17
170:20 173:7
raise 4:17 180:15
raises 182:5, 16
raising 183:16
range 8:5 18:12
35:7 36:24 47:20
78:10 159:14
174:5 177:13
rare 81:1 145:9
rarely 132:2
rate 67:12 102:8,
9, 13, 15, 23
rates 67:19 188:13
rationale 21:1
30:13
rattled 77:15
reach 24:22 68:3
103:8 139:13
reached 57:24
read 12:20 22:9
27:1, 10 52:7, 9
77:1 109:6 115:21

123:14 137:25
138:1 155:17
170:8, 23 171:15,
22, 23 173:7
185:11
reading 1:17 3:21
15:19 134:6
151:10 168:16
187:13
ready 5:8
real 59:24 90:16
reality 81:9
realize 108:20
119:5
realizing 81:17
really 12:9 21:21
61:15 84:15 100:7
101:14 108:14, 15
125:2, 11 126:1
140:1 144:13
161:14 183:5
realm 59:18 86:23
reason 12:4 33:4
35:16, 17 46:13
54:4 55:4, 8, 10
102:11 129:21
132:25 134:24
146:12 148:22
179:7 185:14
reasonable 16:19
20:23 22:5 28:8
30:18 35:4 37:10
59:20 68:1 69:3
100:6 110:15
129:12 150:17
151:19
reasoning 145:24
reasons 34:23
152:3
recall 18:2 26:7,
11, 16 27:15 29:14
43:2 85:11 86:10
117:17, 20 124:3
126:19 134:8
recapitulate 100:9
receive 151:8
received 94:4
receiving 150:23
Recess 82:5

**recognition** 95:7, 9, 10

**recollection** 24:7 116:19

**recommend** 15:14 132:16

**recommendation** 154:25

**recommendations** 120:6 170:23 171:3

**recommended** 40:17 48:17 49:11, 24 54:8, 22 59:5 65:9, 11 120:7 171:24

**recommends** 29:24

**record** 13:25 14:15, 21 15:7 17:8 18:3 21:16 27:1, 3, 5, 10 28:1 30:1 65:7, 8 66:5, 10, 11 67:13, 19, 24 75:17 82:3, 8 100:3 107:16 112:12 157:5 158:7 180:25 186:15, 22

**recordings** 97:19

**records** 11:14 13:7, 9, 21 14:18 39:22 40:10 41:12 42:1, 15 53:2, 5 54:11 58:13 60:14 61:9, 11 64:23 65:16 67:4 68:5, 15 69:16, 22 75:24 78:3 100:22 105:4, 5, 11 114:21 146:4 155:18 157:21 158:2, 3, 7 160:21 172:1, 3 174:22 178:23, 25 182:25

**recurring** 84:2

**reduce** 40:19

**reduced** 187:6

**reemphasize** 132:12

**refer** 13:22 28:1 29:13 30:1 37:19

**40:24** 65:6 142:15 170:1

**reference** 101:19 122:12

**referenced** 89:25 117:25 173:21

**references** 60:25 61:4 100:24, 25 101:2

**referral** 188:12

**referred** 14:21 16:7 48:12, 13 55:16 144:23 164:11

**referring** 12:9 69:9 70:10 127:24 134:11

**refers** 18:13 94:13

**reflect** 23:6 25:16

**reflection** 183:12

**refrained** 46:12

**refute** 12:5 47:21

**refutes** 165:13 177:5

**regard** 16:12 167:15

**regarding** 62:17 65:17

**regardless** 9:13 24:23 125:1, 14 150:24, 25 153:13

**registry** 80:21

**regulated** 125:19

**Regulations** 187:24

**regurgitation** 27:10

**reimbursed** 150:16

**reiterate** 132:11

**related** 33:9 80:13 98:5 139:6 147:14 148:10 153:8 156:21 159:5

**relates** 73:17 84:12 136:23

**relating** 102:2, 3 118:11 138:1

**relationship** 29:20 47:10 108:3 124:7 158:11

**relationships** 121:19

**relative** 187:9, 11

**release** 165:5

**releases** 165:7

**relevancy** 84:14

**relevant** 70:21 84:13 109:2 126:9 136:10, 12, 13, 17, 18, 19, 23, 24 137:6 138:10 144:14 154:7, 10 173:16 176:9

**reliability** 100:5

**reliable** 52:19 61:8, 22 68:22 70:5 72:6 78:18 103:14 107:18 112:14, 20 117:4, 9 122:13 183:1

**reliance** 104:16

**relied** 17:7

**relief** 30:4 54:19 56:9, 25 58:15, 22

**relieve** 20:20 21:1 23:13 49:1 62:4 108:6 148:24

**relook** 126:2

**rely** 71:23 104:2, 12, 20 105:2, 10 106:6 107:15, 16, 18

**relying** 37:15 60:11 62:14 105:21 106:20 108:3 111:14, 16 113:21 165:21

**remainder** 78:3

**remember** 13:18, 21 26:5, 6 53:1 86:2 87:11 89:8 91:1, 3 126:1 128:13 131:22 133:11 171:16

**remind** 173:23

**remote** 4:7

**remotely** 1:15 4:9

**Renovation** 157:9 160:20 163:20 165:6, 11 166:18

**Rensselaer** 87:6

**repeat** 7:9 41:25 63:23 135:10

**rephrase** 73:11 74:16 109:22

**replace** 99:5

**report** 11:15 12:19 15:25 16:5, 11 18:20, 22, 24 19:3 21:19, 20, 22 26:2, 3, 17 27:6, 8, 9 29:5, 18 30:23 31:15, 16, 18 33:2, 21 39:8, 9, 10, 11, 12, 15 40:22, 24 41:11 44:10, 15 46:8 56:24 64:7 76:12 100:20 109:4, 6 123:14 127:12, 14 147:21 153:4 156:8, 9 163:8, 12 164:6 167:19, 25 169:20, 25 170:1, 3, 21 171:14, 17 173:9, 10 179:24 180:6, 16 181:12, 13, 15, 17

**reported** 24:25 29:16 44:2 54:19 56:8 81:2

**Reporter** 1:16 4:3, 15, 16, 19 185:23, 25 186:5, 8, 11 187:20 188:2, 11, 24

**reporting** 104:20, 21 161:6 179:6, 7 187:20, 24 188:3, 5, 9, 11, 14

**reports** 29:8 44:21 153:4 169:5 173:7 179:5

**represent** 13:24 14:11 77:4 117:3 187:7

Case 5:24-cv-00276-CAR   Document 45   Filed 12/26/25   Page 220 of 230

Lamar vs. Wal-Mart Stores East          Dr. Joseph Martino          10/23/2025

**request** 90:23
101:6, 8
**requested** 29:6
89:17
**requests** 133:13
**require** 24:1
120:4, 5, 6 154:11
**required** 83:11
86:23 91:9
**requirement** 83:8, 9
**requirements** 4:4
100:8
**requires** 87:18
**requiring** 157:25
**research** 84:24
85:2, 3, 5 86:8, 9
87:4 88:16 91:15,
17, 21, 25 95:18, 21,
23 96:10, 16, 21, 24,
25 97:22 98:2
100:1 125:17
**reserved** 1:18 5:2,
18 23:18 49:3, 21
187:14
**residency** 82:14
83:8 86:4 90:23
94:8, 19, 21
**resident** 84:25
87:7
**residents** 10:11, 17
82:15 83:12 84:4
85:16 86:5, 6
87:20 88:14, 18, 20
89:20 91:7, 11
92:1 98:10 128:24
129:15 130:17
131:19
**resolution** 129:23
130:19 131:15
132:6 157:17
**resolve** 13:3 19:14
20:15 24:23
**resolved** 55:24
67:4
**resolves** 20:4, 12
46:18
**respectfully** 16:16
**respond** 28:2

**response** 58:19
73:3 79:4 80:1
128:6 142:13
163:18 165:10
178:8
**responses** 66:8
**responsibilities**
88:19
**responsibility** 35:2
36:1
**responsible** 123:11
135:4 182:17
**responsive** 144:24
157:12
**responsiveness** 5:17
**Resrugens** 27:14
**rest** 78:3
**result** 63:18
**resulted** 77:7
**resulting** 126:15
**Resume** 82:6, 11
94:1
**Resuming** 13:20
14:4, 8 31:13
35:15, 22 37:18
41:23 42:8, 13
43:17 44:6, 14
45:8 48:20 49:16
53:7, 18 54:1
57:18 64:19 66:2
67:16, 22 68:9, 18
69:24 72:4, 13, 19
73:2, 9, 15 74:9, 20
75:10 76:19, 25
78:20 79:12, 24
80:11 82:10 90:7
103:11 105:25
106:25 109:16, 24
110:24 112:9, 18
113:2 114:11
117:7 118:25
131:12 138:6
140:15 143:11
146:15 152:24
153:23 155:12
166:23 175:11
178:20 179:19
185:3

**resurgence** 25:19
27:2
**Resurgens** 26:20,
25
**return** 56:13, 14
83:18, 19
**returned** 29:11, 17
56:7, 18, 20
**returns** 57:21
**revert** 138:1
**review** 11:14 16:8
18:3 33:22 38:10
46:14 50:4 59:2, 8
60:14, 15 66:4
67:13, 24 71:19
78:16 79:1, 20
80:16 82:22 91:24
97:18 100:3
101:20, 21 102:19
113:20 114:20
117:11 121:8, 11,
15, 16, 20, 25 122:3,
4, 8, 19 133:6
146:8 160:6
165:20 169:21
181:7
**reviewed** 13:7
17:9 37:14 60:10
62:13 64:23 67:18
68:15 100:1, 20
122:12 125:6
144:19 165:23
171:11
**reviewing** 68:4
69:22
**reviews** 67:20
70:19 121:23
**RFA** 41:3 54:21,
23, 24 55:15, 16, 22
56:2 57:10
**rich** 36:11
**ridiculous** 36:22
**right** 4:17, 19 5:8,
11 6:2 12:18
14:15 15:10 43:7
52:6 58:17 59:1
71:7 72:2, 7 75:6
78:24 81:20 85:15
96:4 112:24

117:24 121:6
129:22 138:8, 9, 19
139:19 141:11
150:20 158:16, 19,
24 159:24 162:22
163:1, 3 165:9
176:15 183:21
185:4 186:9, 13
**right-sided** 127:22
**risk** 34:5 60:6
79:10 80:8 106:4
136:20 139:5, 7
141:12 142:2, 3
151:2, 3
**Road** 2:10 45:16
**role** 21:14 32:4,
17 35:3 36:16
41:2, 9 46:5, 6
47:1 50:12 57:8
61:19, 21 62:2, 3,
11 67:1, 6 70:3
90:15 107:25
108:5 112:2, 3
120:14 125:11, 16
147:22 152:15
154:22, 24 155:1
175:22, 23 176:3, 4,
7 183:2
**roller** 179:13
182:18
**room** 130:7 132:9,
10 150:20 155:16
174:22 176:21
**root** 28:15
**Rosenberg** 13:14,
15, 16 14:5, 22
15:12 16:17, 23
20:17 21:8
**Rosenberg's** 21:16
**roughly** 69:20
125:12
**RPI** 87:5
**rude** 5:6
**rule** 68:3 135:16
136:5 152:21
153:18 155:5, 8
175:18, 20, 21
**ruled** 175:14

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 221 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

**Rules** 5:*14* 155:*19*
187:*23*
**ruling** 69:*7* 119:*7*
**run** 26:*1*
**running** 106:*4*
**runs** 16:*10*
**rupture** 87:*3*
**rush** 23:*21*

**< S >**
**safely** 137:*19*
**safety** 80:*22*
**sagittal** 115:*14*
128:*22*
**sake** 108:*1*
**Santos** 79:*6*
**saw** 13:*13, 15*
20:*17* 50:*15* 128:*4,*
*5, 9* 162:2 182:*14*
**saying** 55:*12*
69:*19, 21* 79:*13*
109:*13* 111:*8*
117:*22* 134:*25*
135:*10* 148:*3, 4, 5,*
*6* 149:*10* 154:*7*
172:*13* 175:*13*
181:*21* 182:*24*
**says** 13:*25* 15:*13*
30:*3* 33:*2* 73:*12*
76:*12* 77:2 80:*3*
90:*1* 91:*14* 94:*1, 4*
104:*23* 120:*18*
123:*14* 126:*16*
133:*20* 143:*17*
152:*3, 4* 169:*20*
170:*3* 171:*17*
172:*10* 173:*9, 10*
180:*25*
**scan** 28:*20, 24*
29:*1* 33:*19, 21*
45:*23* 50:*4* 63:*24*
76:*2, 4, 6* 77:*21, 25*
78:*13* 115:*17*
120:*9* 127:*4, 5, 7, 8,*
129:*16, 21* 130:*6, 8,*
*9, 12, 17, 21, 24*
131:*1, 4, 9, 20*
132:*9, 22, 24* 133:*2*
147:*15, 17* 156:*8, 9*

157:*6* 169:*16, 24*
170:*4* 174:*6*
**scanner** 130:*4*
**scans** 76:*7* 87:*23*
127:*9, 10* 129:*22*
132:*8* 160:*6*
176:*24*
**scenario** 19:*12*
63:*13* 153:*8, 10*
**schedule** 83:*17*
84:*19* 89:*16, 19, 23*
**schedules** 82:*16*
**Schnyder** 2:*4*
188:*4, 17*
**school** 97:*13* 98:*1*
**schools** 88:*23*
**science** 70:*6* 79:*16*
87:*8* 90:*2, 17*
**scientific** 30:*16, 22*
52:*19* 60:*16, 21*
61:*5, 9, 22, 23*
62:*19* 68:*23* 69:*2,*
*6, 10, 11* 70:*5, 9, 16*
71:*13* 72:*5* 80:*3*
102:*2* 103:*15, 17*
104:*7, 11* 107:*18*
112:*21* 117:*4*
121:*3* 122:*14*
139:*7* 168:*21, 22*
183:*1*
**scoli** 139:*3*
**scoliosis** 8:*22*
91:*15* 134:*19, 23*
135:*1, 3, 7, 11, 16,*
*19, 24* 136:2
138:*13, 16, 17*
139:*1, 2, 4* 143:*8*
146:*10* 152:*19*
153:*20* 154:*18*
156:*23*
**scope** 84:*9* 87:*18,*
*25* 151:*6*
**scratches** 69:*17*
**screen** 15:*6, 7*
34:*9, 16* 41:*18*
**screening** 97:*25*
**SE** 2:*5* 89:*19*
119:*12* 188:*17*

**seal** 187:*21* 188:*16*
**search** 121:*4*
**season** 85:*15*
**second** 14:*17* 51:2,
*4* 79:*15* 80:*20*
94:*14* 95:*21* 97:*18*
98:*18* 127:*17*
131:*1* 142:*12*
145:*23* 162:*24*
163:*15* 169:*24*
171:*8, 22* 180:*6*
**secretary** 89:*21*
**section** 44:*21*
53:*11* 54:*12*
**sections** 52:*23*
141:*8*
**security** 167:*10*
**sedentary** 34:*15*
141:*18*
**see** 4:*24* 5:*3* 9:*23*
10:*10* 11:*7* 12:*18*
14:*15* 15:*4, 6, 7, 13*
26:*2, 17* 27:2
42:*11* 44:*20* 50:*14,*
*18* 59:*3, 4* 61:*15*
65:*6* 66:*7, 8* 75:*7,*
*11* 89:*6* 109:*3, 5, 7*
110:*17* 115:*7, 8, 9,*
*10* 123:*13* 127:*14,*
*20, 22* 132:*19*
142:*16, 20* 156:*10*
157:*13* 159:*6*
160:*11* 163:*22*
168:*20* 169:*5*
170:*3, 8, 20* 175:*21*
179:*8* 181:*13, 15*
182:*12* 185:*4, 6, 9,*
*11, 18*
**seeing** 15:*3* 26:*5,*
*6* 53:2 127:*11*
131:*16* 177:*24*
**seeking** 185:*15*
**seen** 19:*1* 28:*13*
50:*20* 53:*20* 108:*8*
109:*4, 8* 114:*6, 14,*
*15* 127:*19* 142:*11*
166:*4* 168:*24*
182:*13* 185:*8, 19*

**self** 104:*20* 179:*5,*
*6*
**self-evident** 111:*6*
150:*20*
**self-learn** 99:*4*
**self-limiting** 13:*3*
19:*6, 7, 13, 20, 23*
**self-report** 106:*18*
**self-reporting**
104:*2, 13, 17, 24*
105:*2, 10, 14* 106:*7*
161:*6*
**semantics** 138:*8*
**semester** 83:*14*
84:*3, 18* 85:*8, 12*
86:*1* 90:*21*
**send** 62:*23* 101:*5,*
*7* 144:*25* 186:*5*
**sensation** 18:*13*
**sense** 103:*3* 152:*4*
154:*12*
**sensitive** 127:*5*
**sensitivity** 130:*24*
131:*16*
**sensory** 64:*12*
161:*25*
**sent** 48:*4* 65:*16*
82:*15* 132:*16*
**sentence** 3:*21*
75:*25* 77:*15*
**separate** 19:*25*
39:*1* 54:*12* 97:*15*
**September** 14:*20,*
*24* 16:*14* 22:*11, 16*
23:*7, 12* 29:*9, 14,*
*20, 22* 43:*3, 4* 44:*8*
106:*11, 12* 110:*2, 4*
**sequences** 115:*13*
128:*22* 168:*6*
**sequential** 168:*11*
**serious** 13:*1* 16:2
18:*23* 21:*24* 22:*7*
51:*6, 9, 14, 18, 22*
60:*1* 61:*24* 63:*18*
78:*9, 13* 116:*9, 21*
146:*7* 154:2
159:*20* 163:*13, 14*
177:*6, 14* 178:*12*

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 222 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

**seriously** 151:22
**services** 188:5, 10
**set** 14:17 61:4
 70:24 77:3 83:9
 112:11 186:10
**setting** 142:13
**seven** 152:12
 154:24 183:3
**severe** 41:14 42:4,
 5
**sharp** 162:23
 163:4
**shooting** 22:21
 47:8 162:23
**short** 98:22
**shortcut** 10:8
**shortcuts** 10:6, 9
**shorten** 140:2
**shorter** 119:8
**shortly** 37:4 51:21
 114:24 120:11
**short-term** 6:13
**shoulder** 12:23
 18:10 22:8 25:20
 26:21 65:9, 18, 22
 94:5, 14 95:3, 8
 156:4 159:11
 182:4, 11, 12 183:5,
 9, 11, 13
**shoulders** 22:13,
 20 29:19
**show** 34:25 45:20,
 21 77:22 115:24
 116:21 118:21
 119:2, 12 120:17
 124:17 125:23
 129:23 144:15, 17
 156:5 158:18
 168:10 173:25
 176:7, 9, 12 179:16
 183:11
**showed** 28:23
 32:19 44:24 78:14
 177:13 185:7
**showing** 34:15
 78:17 129:2
 178:10

**shown** 50:16
 103:25 104:17
 144:11
**shows** 37:20, 23
 38:7 51:8 62:20
 78:6 106:9 115:18
 116:5 118:17
 127:18 144:1
 147:2 153:10
 157:9 168:22
 178:11
**sic** 3:23 48:13
**side** 138:23
**sided** 37:16
**Sierra** 44:17
**sign** 159:8
**signal** 16:6 167:20
 168:4, 6 170:12
**signals** 57:7
**signature** 187:21
**signed** 180:7, 16, 18
**significance** 120:3
**significant** 33:23
 108:21 124:22
 125:16 140:3
 160:1, 2 177:6, 15
**signing** 1:18
 187:13
**signs** 78:10
 132:14 174:25
**similar** 74:17
 81:13 112:5, 7
 134:10 148:5
**simple** 19:14 47:7
 67:24 154:12
 166:14 185:5
**simply** 17:18 56:3
 132:24 160:16
**single** 78:18 80:24
 109:12 112:14
 114:8 122:18
 143:5, 14, 17
 168:25 172:18
 173:9
**sir** 5:10 6:4 13:5,
 8, 11 15:9 44:22
 172:5
**sit** 34:15 141:22

 150:12
**sitting** 141:19
**situation** 130:5
 132:2 136:4
**situations** 130:10
**six** 24:19 25:1
 31:20 32:2, 8
 40:25 46:7 64:4
 70:10, 11, 21 71:12
 78:17 79:9, 21
 83:14 101:17
 102:8, 16 122:7, 10,
 17 136:1 137:13
 153:17, 25 154:24
 155:4, 7 165:25
 166:1 178:9 180:1
**six-step** 106:21
 112:13, 19
**sixth** 154:4
**skilled** 24:6, 10
 31:24 155:1
**skills** 87:22
**sleep** 172:23
**slept** 183:21
**slice** 143:13
 168:14
**slices** 168:11
**slip** 19:18 22:23
 32:11 79:21
 109:12 129:1
 143:18 145:22
 146:2 170:15
 172:7, 10 173:1
 176:20 180:3
 184:13
**slippage** 134:7
**slowly** 135:11
**small** 16:10 19:13
 127:22 132:1
**smoke** 62:10
**smoking** 34:16
 71:4 102:21, 22, 25
 111:9 112:5
**sneeze** 47:7 172:21
**sneezing** 183:23
 184:1
**Society** 24:4 34:14,
 18 99:15 133:16
 171:4

**soft** 127:9 129:23
 131:2, 5 159:2
**software** 98:14, 20
 99:6 129:22
 130:25
**solely** 67:13
 100:22 104:12
**solicit** 98:19
**solitary** 80:24
**somebody** 139:11,
 12 143:8 144:19
**somebody's** 25:5
**someone's** 156:14
**something's** 43:6
**sophisticated** 52:18
**sorry** 6:11, 16
 16:14 22:15 34:1
 43:4 44:16 50:23
 53:8 54:7 56:18
 92:9 94:9 119:1
 122:4 137:25
 155:7 175:19
 185:23 186:1, 2
**sort** 11:18 34:17
 76:6 111:13
 130:15
**sorts** 81:7
**sought** 114:17
 146:5
**sound** 182:4
**sounded** 74:13
**sounds** 12:7
**source** 95:16
**sp** 71:1
**SPALDING** 187:3
**spasm** 30:19
 161:20
**spasms** 30:20
 39:16 40:3 163:7
**speak** 104:15
 117:14 129:14
 135:11
**speaking** 48:24
 76:15 138:16
 142:9
**specialize** 8:11
**specialized** 47:3
 68:12 113:22

Case 5:24-cv-00276-CAR   Document 45   Filed 12/26/25   Page 223 of 230

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

114:*3*
**specialty** 87:*9*
**specific** 38:*3* 61:*5*
69:*11* 73:*4, 11*
74:*21* 77:5 84:*8,*
*12* 88:*12* 95:7, *9*
97:*10* 104:*5*
115:*13* 122:*23*
128:*20* 144:*1*
**specifically** 16:*1*
18:*3* 31:*20* 40:*25*
51:*1* 71:*14* 80:*23*
84:*13* 87:*25* 97:*9*
103:*19* 109:*4, 25*
114:*18* 115:*5*
120:*24, 25* 125:*9,*
*22* 128:*14* 141:*4, 7*
146:*4, 5* 156:*3*
162:*6* 168:*12*
172:*10*
**specifics** 29:*14*
**specifies** 62:*17*
**specter** 182:*16*
183:*17*
**speculate** 50:*2*
68:*23* 148:*18*
**speculation** 43:*16*
45:7 53:*17* 64:*18*
68:*8*
**speculative** 68:*10*
**speech** 3:*9, 22*
**speed** 26:7 50:*22,*
*23, 24*
**speeds** 145:*16*
**speedy** 130:*15*
**Spelled** 3:*22*
**spent** 85:*4* 113:*25*
**spinal** 8:*21* 9:*11*
45:*19* 64:*1, 5*
119:*13* 127:*20*
128:*10* 130:*6*
131:*16* 133:*1*
142:*4, 24* 143:*9*
144:*21* 145:*13*
155:*6, 9* 159:*20*
165:*17*
**spine** 8:*14, 17* 9:*2*
13:*9, 13* 22:*11*
23:7 24:*4* 27:*23*

29:*10* 34:*13* 36:*9*
37:*3* 38:*3* 39:*5*
40:*10* 41:*5* 52:*24*
53:*5* 56:7 63:*21*
64:*24* 65:*1* 72:*17,*
*25* 74:*2* 76:*10*
77:*23* 92:*17, 19*
93:*16, 19, 21* 99:*15*
101:*13* 115:*16*
116:*10, 13* 117:*12*
122:*24* 123:*24*
124:*23* 125:*5, 12*
127:*1, 18* 131:*3*
133:*9, 16, 17*
134:*17* 138:*19*
139:*18* 140:*4, 5*
145:*4* 157:*8* 158:*8*
159:*10, 25* 166:*1,*
*17* 168:*18* 170:*11,*
*23* 171:*3, 4, 6, 12*
172:*3* 173:*23, 24*
180:*13* 183:*25*
**spoiler** 159:*1*
**spoken** 180:*11*
**Spondylolisthesis**
133:*8, 25* 134:*1, 3,*
*7*
**spondylosis** 134:*4,*
*10, 11, 17*
**sports** 87:*1* 95:*20*
97:*14*
**sprain** 16:*5, 12, 21*
75:*20*
**spring** 86:*1* 92:*25*
**spur** 45:*24, 25*
128:*3*
**Spurling's** 27:*13,*
*18, 19* 39:7 161:*8,*
*9*
**St** 2:*5*
**staff** 36:*21* 62:*23*
93:*20* 176:*22*
**stage** 97:*20*
**stamped** 14:*19*
**stand** 61:*16* 68:*11*
70:*2*
**standard** 60:*22*
69:*12* 71:*15, 20, 22*
72:7, *8* 101:*17*

107:*4* 122:*13*
132:*19*
**Stanford** 105:*19*
116:*12*
**start** 12:*19* 33:*16*
82:*1* 101:*23*
140:*12*
**started** 46:*23*
86:*14* 91:*10*
147:*24, 25* 163:*24*
164:2 176:*14*
**starts** 18:*9* 152:*19*
**state** 36:*18* 41:*1*
103:*20* 187:*2*
**stated** 31:*21* 36:*19*
67:*6* 187:*5*
**statement** 9:*15*
32:*1* 52:*4, 25*
74:*13, 14* 125:*4*
**STATES** 1:*1*
80:*18* 164:*1*
**stay** 91:*10*
**stenosis** 127:*20*
**step** 70:*10, 21*
73:*12, 16, 17, 20*
74:*24* 75:*3, 13*
76:*11* 77:*1, 9*
78:*17* 79:*9, 15, 21*
101:*17* 102:*8*
122:7, *10, 17* 136:*1,*
*11, 17* 137:*13*
153:*17* 154:*4*
155:*4, 8, 14, 25*
156:*1, 12, 13* 157:*2*
158:*1*
**steps** 70:*11, 23*
71:*12* 92:*23*
100:*11, 14* 102:*16*
153:*25* 154:*4, 5*
155:*14*
**stepwise** 100:*10*
**stethoscope** 97:*6,*
*10, 11, 12*
**stick** 24:*23*
**stiffness** 42:*19*
**stimulated** 165:*4*
**stinging** 22:*21*
**STIR** 115:*14*

128:*22*
**S-T-I-R** 115:*14*
**stop** 157:*15*
177:*19* 184:*24*
**stops** 157:*16*
**STORES** 1:*8*
**story** 104:*10*
**straight** 112:*12*
**strain** 12:*25* 26:*22*
35:*5* 75:*20* 161:*21*
162:*5, 11*
**Street** 188:*17*
**stretching** 162:*13*
**strikes** 11:*18*
150:*24, 25*
**struck** 185:*9*
**student** 88:*16*
**students** 86:*3, 8*
87:*11* 91:*4*
**studies** 17:*8* 29:*7*
37:*14* 38:*11, 25*
39:*1* 60:*11, 15*
62:*13* 63:*1, 7*
67:*18* 72:*14, 20, 22*
78:*16* 80:*12* 84:*8*
92:*12* 103:*24*
104:*4, 11* 105:*12,*
*17, 18, 22* 106:*11*
113:*11, 20* 114:*21*
117:*19* 118:*4, 8*
124:*6* 125:*3*
139:*12* 140:*23*
141:*4, 6, 14* 142:*22*
143:7 144:*6, 11, 15,*
*18, 19* 145:*5* 146:*5*
152:*18* 157:*21*
165:*20, 23* 166:*12*
167:*6* 171:*8, 10, 11*
180:*10, 15*
**study** 9:*17* 20:*25*
37:*8* 38:*7, 18* 39:*1*
46:*15* 51:*21* 61:*6*
80:*15* 91:*15, 19, 20,*
*25* 92:*3, 7, 16* 93:*2,*
*4, 8, 14* 95:*21*
96:*22* 97:*1, 4, 9*
98:*8, 10, 11* 102:*24*
106:*8* 115:*5, 16*
116:*17, 24* 117:*8, 9,*

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

**25**  118:2, *3*, *11*
123:22  124:2, 9, *13*,
*17*  125:25  126:*1*, 2,
*4*  142:*15*  143:5, *15*,
*17*, 22, 23, 25  144:5,
*17*, 23  152:21
153:2  156:2  157:6
179:*16*  180:*19*
181:21
**studying**  79:*16*
112:15
**subject**  61:2  67:7
86:*15*, 21  98:21
101:24  105:16
108:*10*  110:13
111:*3*  121:8  122:8,
*18*
**subjects**  38:*11*, *18*
84:4  89:*15*  92:6
93:*11*, *14*  116:17,
*20*, 24  117:5
122:22  144:6
**subpoena**  82:*15*
101:7
**subsequent**  32:9
33:9, *11*  37:8
47:12  120:6, *14*
148:7, *15*  154:8
158:*3*  172:*16*
176:5  178:*13*
**subsequently**  32:*13*
36:17  37:*13*
136:*16*  152:*13*
**subset**  73:5  143:*4*
**substantial**  7:*3*, *11*,
*14*
**substitute**  106:22
137:*11*
**subtle**  15:*17*
**successfully**  121:*21*
**suffer**  19:*17*  22:6
36:22  51:9, 22
72:*16*, 24  126:17
177:*1*  178:12
**suffered**  12:22
38:*19*  47:12  63:2
75:*19*  164:7

**suffering**  17:*13*
41:*14*  42:*3*, 5  49:5
62:*4*  108:6  120:*1*
**suffice**  171:*4*
**suggesting**  132:*18*
**suicide**  60:6
**Suite**  2:*10*
**summaries**  70:*19*
**summarize**  13:4
**summarizes**  18:23
**Summary**  133:6
**Summit**  44:*17*
**supermarket**  147:5
**superseding**  32:*10*,
25  33:8, *11*  34:*1*, 6,
*19*  36:*3*, *4*  58:7
134:21, 22  135:*3*,
*12*  136:7, 8  146:19,
*21*  147:*13*  148:9
153:14  154:6
175:14
**supervised**  24:7, *10*
31:24  155:*1*
**supple**  18:*11*
36:24  47:*19*  78:*10*
155:*19*  159:*15*
174:5
**supplies**  140:7
**supply**  140:7
**support**  30:*17*
37:8  60:20  62:25
63:*15*  106:*15*
123:*18*  148:*12*
149:*15*  153:*12*
165:*12*  172:9
175:23  179:9
**supported**  75:*4*, *14*,
*18*  76:*1*  77:5, *16*
125:6  157:5
160:*19*
**supports**  121:*3*
152:*10*  177:2
**supposed**  39:*11*
57:7
**supposes**  127:2
**sure**  7:7, *11*  9:20
10:8  11:*12*  12:9
14:2  26:2, *23*  30:6
33:*14*  39:*10*  44:*19*

58:22  63:5  66:*17*
67:*17*  68:*10*  73:*10*
89:*11*  90:21  94:7
103:*12*  117:2
136:7  155:*13*
162:*19*  164:*10*
172:*12*  179:*1*
**surgeon**  6:*3*, *19*, *21*
7:*13*  8:5, 7, 9, *10*,
24  9:*3*, *4*, 7, 9, *10*,
*14*, *18*, *21*  10:2
32:*16*  68:2, *14*
88:*1*, *4*  92:*17*, *19*
93:*16*, *19*, 20  99:24
110:*14*  113:24
114:*4*, 6  129:*14*
**Surgeons**  24:5
60:*19*  70:*18*  71:*16*
79:*1*, 7  83:9  84:*10*
88:*3*  99:*12*, *21*, 23
101:*21*  102:5
121:*17*  122:*15*
180:*13*
**surgeries**  7:*15*, *19*,
22, 23, 24  8:6, *15*,
*17*, *21*  9:*11*
**surgery**  7:23  9:2
37:25  38:*1*  50:7
93:*21*  94:*3*, 20
99:*11*, *17*, *19*  120:5
152:*16*  183:*3*
**Susanna**  54:*17*
**suspect**  130:5
**suspected**  129:25
**sustain**  36:*19*
143:*18*
**sustained**  48:*1*
177:*17*
**swear**  4:*15*
**swelling**  17:*19*, *21*,
22  76:5  78:*14*
171:*19*, 20, *21*
177:*14*
**sworn**  4:9, *18*
5:24  52:9
**syllabi**  82:*16*, *17*
88:22

**syllabus**  70:*17*
87:*14*  89:6, 24
90:*1*
**symptom**  23:5, 25
77:3  161:*12*
**symptomatic**  20:9
28:6  77:*17*  113:*16*,
*18*  114:8  123:*4*
164:*14*  166:*13*
**symptomatology**
174:*16*
**symptoms**  20:*14*
22:23  23:23  24:2,
22  25:*19*  29:*17*
30:8  33:9, *16*  34:6,
*13*, *18*  36:23  37:22
38:20  43:8, *21*, 25
44:*3*, 8, 9  47:8
49:*1*  54:20  58:8,
*14*  62:3  77:3
81:*13*  104:9  110:5
120:2  123:*12*
153:*15*  154:9
157:*17*  159:*4*
164:*12*  174:*18*
175:*15*  177:24, 25
178:5, 7, *13*  179:*10*,
*11*, *12*  182:8, *10*, *18*
**system**  136:8
**systems**  66:4

< T >
**T1**  115:*14*  128:22
**T2**  168:6
**tab**  29:*15*  42:*14*
44:22
**tabbed**  42:*15*
**table**  90:*17*  142:*15*
**tacit**  132:*15*
**take**  9:*15*  10:*3*, 6,
*13*  27:*15*, 24  52:16
54:*10*, *12*  56:*10*
59:2, 5  79:25
81:22, 23, 25  87:2
101:8  149:*1*
150:*21*
**taken**  1:*14*  5:*13*,
*14*  28:24  187:5

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 225 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                    10/23/2025

**takes**  55:22  91:24
130:*11, 12*
**talk**  25:23  96:8, 9
120:22  174:16
176:2
**talked**  21:17
100:*10*  157:7, 9
166:12  177:8
179:12
**talking**  7:25  42:22
*57:12*  69:*10*  92:15
97:*1*  106:2, *3*
107:*10*  109:25
120:*3*  125:14
145:8  153:*3*  156:2
161:*10, 20*  168:4
170:5  172:5
**Talks**  127:*15, 17*
166:6
**task**  171:4
**Tat**  168:18
**taught**  60:17
70:17  83:11, *13*
84:2  85:9, *20*
86:*12*  87:*10*  90:22
**teach**  10:*11, 17*
82:*14, 17*  83:5, *14,
16, 21, 22*  84:3, 7,
*17*  85:6, 7  86:17
88:5, 7, *10*  90:*18,
25*  98:25  128:24
129:9, *15*  130:16
131:*19*
**teaching**  83:*13, 17,
25*  85:4, 5  86:*19*
90:22, 24
**tear**  14:6, *16*
15:*11, 17, 23*  16:4,
*15, 16, 18, 20*  19:6,
*7, 9, 13, 17, 22*
21:18  22:*1*
**tears**  15:2*1*  19:*13*
177:10
**technically**  73:24
139:24
**technique**  127:16
167:23
**techniques**  127:9,

10
**technology**  97:5, *24*
**TELECONFEREN
CE**  2:*1*
**telemedicine**  54:*16,
18*  56:*14, 17, 20, 24*
57:22
**tele-zoom**  96:*19*
**tell**  10:*19*  18:*3*
50:*3*  103:7, *13, 14,
18*  104:*10*  105:14
110:*3, 12, 14, 18*
115:8, *13, 17*
118:22  119:2*1, 25*
125:9  127:6
137:*16*  147:7
150:12  154:*20*
165:23  169:*1*
183:7
**telling**  177:*1*
**temporal**  29:*20*
47:9  158:*11*
**temporarily**  56:4
**temporary**  96:6
158:23  159:4
160:8
**ten**  23:25  24:*19*
25:*1, 2*  55:*1, 25*
88:*20*  91:7  163:2,
*6*  164:*18, 19*
166:*19*
**tendency**  140:*9*
**tender**  18:*15, 18*
155:*19*  158:15
159:*10*
**tenderness**  18:*19*
35:6  36:25  37:2
159:*9, 17*  164:*8*
**tenure**  171:*11*
**term**  9:4, 5
**terminology**  170:2*1*
**terms**  21:*20*  24:2
26:6  29:*19*  38:2,
*13*  48:*11*  58:*19*
65:*15*  75:*3, 18*
78:*1*  81:4  83:*13*
84:*14*  87:*1*  89:9
100:8  102:*10*
138:7  139:*19*

145:*18*  158:*10*
162:6  166:*11*
173:*3*  174:*19*
178:*8*  181:*11, 18*
185:*12*
**test**  15:20, *21, 22*
19:*10*  27:14, *19*
39:7  45:*15*  160:24
161:8, *9, 14*
**tested**  100:4
161:24
**testified**  5:*24*
69:*17*  77:2*1*
141:*16*
**testify**  32:*14*
131:*19*  149:7
150:*13*  165:7
172:*12*  173:6
**testimony**  21:*11*
30:*13*  35:25  36:*13*
52:8, *9*  53:2*1*  54:2,
*5*  106:*17*  111:*20*
113:*14, 17*  115:23
116:*3, 5*  121:*1*
137:23  138:*3*
141:2*1*  146:*17*
150:*13*  151:*1, 7*
152:*13*  167:4
175:*13*  182:9, *24*
183:*10, 16*  184:*12*
185:*12*
**testing**  31:23  69:7
77:8  85:*19*  105:23
130:7  161:25
162:7, *13*  176:24
**tests**  66:9
**textbook**  73:23
94:2, *3, 8*  95:6
137:16
**textbooks**  62:25
84:*12*  89:8, *13*
107:4
**Thank**  4:*14*  5:*20*
31:*12*  162:22
185:2*1, 22*
**that'd**  65:6  66:2*1*
**That-that**  7:7
**theme**  147:*20*

**theory**  139:*19*
152:*11*  159:15
175:*16*  177:6
**therapist**  41:*13*
42:*3, 4, 10*  44:2
**therapy**  19:*14*
23:20  24:7, *10*
31:25  48:*14*  155:2
165:5, *8*
**thereof**  187:*17*
**thereto**  187:22
**thing**  11:4  46:2
57:*1, 3*  58:*16, 20,
22*  138:4  169:6
171:*13, 23*
**things**  9:25  12:*1*
34:8  52:*3*  60:8
87:*3*  93:*13*  107:*13,
21*  108:2  153:2
159:*3*  168:5  175:7
181:6  183:23
184:*18*
**think**  9:5  10:9
11:*13*  13:5  15:8
17:2  18:22  20:22
21:2, *21, 24*  23:*16*
24:*10, 11, 21, 22*
26:23  31:*19*  33:6
34:*20*  37:*19*  38:5,
*21*  39:*13*  40:5, *6,
20*  43:*1*  44:*15*
49:*18*  51:*16*  57:*3,
4, 9*  58:*18, 22*
59:*12, 18*  60:5
63:5, *12, 22*  66:20
68:6, *10, 11, 14, 19,
20*  69:2  70:20
73:*3, 12*  74:4
76:*17, 20, 21*  79:*13,
18*  80:2*1*  84:*11*
85:*13*  86:9, *10, 19*
88:*8, 15, 17*  89:*10*
90:8, *10*  91:*1*  93:9
94:*18*  95:15  96:2,
*5*  97:*19*  100:*17*
102:*10, 14, 18, 22*
103:*1, 12, 14, 24*
106:*1, 3*  109:2, *25*
110:5, *7, 10*  111:*13,*

Case 5:24-cv-00276-CAR   Document 45   Filed 12/26/25   Page 226 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                           10/23/2025

25  112:*4, 6, 12, 19*
113:*3*  114:*16*
117:*8, 9, 10, 25*
118:*1, 4, 23*  119:*1*
121:*6*  122:*5*
123:*25*  124:*21, 22,*
*25*  125:*10, 11, 16*
126:*9*  130:*22*
131:*13*  132:*11*
133:*2, 11*  134:*4*
137:*10, 12*  139:*15*
141:*6, 7, 16, 20*
142:*25*  143:*1, 2, 3,*
*5, 13, 19, 21*  144:*3,*
*13, 24*  147:*18*
149:*7, 20, 22, 25*
150:*19*  151:*6, 16*
152:*1, 2, 3, 5, 7, 10,*
*25*  153:*1, 3*  160:*13*
161:*10*  162:*2, 5, 7*
163:*12*  164:*24, 25*
166:*21*  167:*3*
168:*15*  169:*7, 25*
173:*21*  176:*8, 16*
177:*21*  178:*4, 6, 8*
180:*19*  181:*18*
182:*7, 21*  183:*15*
184:*10, 19*  185:*20*
**thinking**  156:*15*
**third**  22:*4*  73:*16,*
*17*  145:*14*  156:*12*
162:*24*  171:*13*
180:*24*
**thirty**  38:*10*  39:*2*
**thoracic**  8:*20*
123:*24*
**thorough**  10:*19*
112:*1*
**thought**  56:*18*
**thousands**  47:*4*
80:*19*  119:*21, 22*
176:*6*  181:*7*
**three**  13:*4*  20:*4,*
*13, 15*  22:*3*  23:*19*
34:*3*  35:*19*  46:*18*
67:*3*  82:*11*  86:*5*
95:*17, 25*  124:*1*
128:*5*  145:*5*
155:*23*  156:*1*

177:*23*  181:*3, 10,*
*20*
**threshold**  139:*15*
**thumb**  159:*24*
**Thursday**  1:*17*
**time**  4:*6*  5:*7*  6:*9*
7:*21, 25*  20:*24*
22:*19, 22*  23:*11*
24:*8*  26:*9*  29:*6, 10*
31:*6*  34:*9*  40:*12*
43:*1*  45:*2*  53:*13*
54:*18*  55:*11*  56:*2*
57:*24*  58:*6, 12*
59:*10*  65:*10, 17*
67:*3*  75:*13*  81:*21*
82:*4, 9*  85:*4*  87:*10*
109:*18*  110:*8*
111:*18*  115:*19*
116:*8*  130:*23*
139:*24*  141:*20*
143:*1*  150:*15*
165:*1, 16*  166:*24*
169:*6*  172:*1, 13, 20,*
*21, 22, 23*  177:*23*
179:*4*  182:*1, 22*
184:*5, 23*  186:*21*
**times**  11:*25*  12:*15,*
*16*  13:*13*  57:*13*
86:*12*  103:*15*
129:*20*  173:*22*
180:*11*  182:*10*
**timing**  47:*5*
**tingling**  18:*6, 9*
47:*13, 18*  65:*2, 24*
158:*15, 21, 22*
159:*1*  160:*8*
**tip**  120:*23*
**tires**  138:*21, 23*
**tissue**  127:*10*
129:*23*  131:*2, 5*
159:*2*
**title**  126:*16*
**titled**  79:*1*
**titles**  141:*6*
**today**  4:*22*  7:*1, 15,*
*17, 19*  131:*1*
134:*24*  146:*13*
185:*20*

**told**  12:*16*  50:*3,*
*20*  106:*20*  115:*8*
**ton**  41:*22*
**tool**  23:*20, 21*
97:*10*  130:*22*
**top**  89:*25*  121:*6*
137:*22*  146:*25*
**topic**  66:*6*  83:*7,*
*15*  84:*8, 12*  101:*24*
102:*1*  109:*7*
110:*25*  113:*9*
114:*12*  134:*17*
151:*8*  154:*6*
157:*23*
**totality**  105:*12*
117:*9*  147:*23*
153:*25*  154:*3*
160:*4*  182:*25*
**to-to**  11:*7*
**touch**  89:*20*
**track**  12:*1*
**traffic**  80:*22*
**trained**  68:*21*
69:*1*  84:*10*  93:*20*
100:*12*  159:*23*
180:*13*
**training**  24:*15*
47:*2*  68:*12*  69:*3*
83:*8*  85:*16, 17, 18*
87:*20*  100:*16*
104:*15*  113:*23*
121:*2, 7, 18*  127:*6*
131:*24*  150:*18*
165:*24*
**trajectory**  50:*8, 9,*
*13*
**TRANSCRIPT**  3:*9*
5:*18*  185:*7*  187:*8,*
*13, 17*
**transect**  87:*3*
**transpired**  56:*5*
**trapezius**  12:*25*
35:*6*  75:*22*  159:*12*
162:*5*
**trauma**  17:*13*
28:*6, 10, 14*  60:*11*
62:*14, 20*  72:*10*
76:*9*  80:*8*  81:*3*
109:*12*  112:*14*

114:*9, 14*  117:*19,*
*23*  118:*11*  119:*23*
129:*5, 8*  142:*7*
145:*11, 19*  159:*24*
167:*21*  168:*18*
**traumatic**  47:*6*
71:*9*  75:*18*  76:*6*
80:*13, 24, 25*
114:*13*  119:*13*
129:*8, 11*  130:*5*
132:*2*  142:*9*  146:*1*
155:*20*  165:*14*
166:*2*  184:*14*
**treat**  30:*21*  62:*3*
108:*6*  165:*8*
**treated**  62:*8*  69:*20*
110:*17*  119:*22*
**treater**  149:*19*
**treating**  10:*18*
47:*3*  52:*5, 7, 10, 12,*
*14, 20*  61:*18, 20*
62:*1, 11*  63:*17*
65:*1*  70:*3*  81:*16*
103:*25*  104:*2, 12,*
*14, 19, 22*  105:*1, 9*
106:*19*  107:*21*
108:*4, 5, 9, 13*
109:*1*  111:*24*
112:*2, 3*  120:*7*
148:*19*  165:*10*
**treatment**  21:*25*
23:*18, 21*  25:*19*
30:*18*  31:*22*  32:*21*
48:*4*  49:*7, 22*
50:*10*  58:*19*  67:*1*
70:*1*  106:*3*  107:*12,*
*13*  120:*6*  126:*13,*
*15*  133:*7, 24*  147:*9*
172:*16*
**trial**  66:*23*
**tried**  111:*1*
**trigger**  165:*3, 5, 7,*
*8*
**true**  6:*3*  9:*16*
10:*23, 24*  11:*9*
14:*6, 9, 10*  17:*11,*
*14*  22:*14*  24:*20*
28:*11, 13, 15, 17, 19,*
*20*  29:*4, 12, 25*

Lamar vs. Wal-Mart Stores East                    Dr. Joseph Martino                    10/23/2025

30:2  39:*17, 18, 20,*
*22*  40:*1, 19, 21*
41:*15*  44:*3, 4, 18,*
*25*  45:*1, 5, 19*
*47:14*  48:7  51:6
53:*15*  54:9  55:*1, 2,*
*12*  56:*9, 15*  57:*16,*
*25*  59:*17, 19*  63:*21*
64:*16*  65:25  66:*9,*
*13, 14, 16, 25*  67:*10,*
*14*  69:8  71:*23*
72:*10, 11*  75:2
77:*13, 15, 16*  79:*10*
87:*12, 16, 17*
104:*23*  107:6, *9, 14,*
*15*  115:7  116:*14,*
*16, 22*  117:*19, 21,*
*23*  118:*19, 22*
123:*1, 4*  126:*18, 23*
128:*11, 16*  133:*10*
134:*1, 15*  135:22
146:*13*  148:*17*
164:*12, 13, 19*
166:*8, 20*  168:*23*
179:*5*  187:*7*
**trump**  144:*3*
**truthfully**  20:*22*
**try**  30:*3, 6*  85:*15*
109:*18*  121:*4*
135:*11*  153:*24*
**trying**  6:*17*  26:*16*
98:*19*  185:*14*
**tunnel**  132:*1*
**turn**  114:*12*
**turned**  183:*20*
**turning**  173:*12*
**twelve**  25:*9, 13, 15*
**twenty**  32:*1*
**twist**  172:*24*
**two**  12:*20*  24:*9*
29:22  32:20  33:*21*
34:*3, 14*  35:*19*
38:*10*  39:2  46:*18*
74:*1*  77:9  80:*16*
83:*18*  84:*23, 24*
86:*7, 9, 10*  89:*1, 4*
94:*2, 11*  96:25
97:*15*  99:*16*  103:7
104:*4*  117:*3, 4, 5*

123:*17*  126:*5*
142:*8*  145:2  156:*1*
160:*21*  161:*18*
163:*11*  166:*1*
169:*17*  170:*17, 18*
173:*24*  174:*1*
177:*22, 23*  178:2,
*16*  179:*11, 14, 20*
182:*3, 5, 6, 14, 17*
**type**  34:*10, 11*
49:*19*  69:2  142:*10*
**types**  12:*1*  142:*8*
**typically**  8:*10*
46:*19*  55:22  63:*18*
66:*4*  83:*23*  90:*21*
96:*18*  145:*16*
165:*1*  180:22
181:*7*


**< U >**
**ugly**  150:*6*
**uh**  4:*24*  5:*1, 12,*
*16*  6:*14, 21*  7:*3, 17,*
*19*  8:*4, 5, 20, 21*
9:*16*  10:2, *5, 11, 17*
11:6  12:5, *11, 23*
14:*12, 19, 22*  16:*4,*
*5, 9, 11, 13, 23*  17:2,
*19, 20*  18:*3, 8, 17,*
*22*  19:3  20:7, *12,*
*15, 16, 18*  21:*12, 16,*
*25*  22:*1, 3*  23:*12,*
*22*  24:*3, 18*  26:*15*
27:*17*  29:*5, 19, 20*
30:*4, 12, 19*  33:*23*
34:*3, 8, 12, 14, 15,*
*17, 19*  35:*13*  37:*14*
38:*2, 4, 8, 17*  39:2,
*12*  40:*17*  41:*3, 17*
45:*1, 11*  46:*11, 21*
48:*8, 13*  51:*1, 10,*
*16, 17, 18, 25*  52:*20,*
*23*  53:*10, 12, 21*
54:*7, 13, 17, 22*
55:*14, 15, 17, 22*
56:*1, 5, 6, 7, 24*
57:6, *7, 10, 11, 12,*
*13, 15, 19, 21, 24*
58:*1, 4, 11, 15, 18,*

*20, 21*  59:*12, 13, 16*
*60:21, 25*  61:*1, 15*
*62:3, 5, 9, 17, 21, 22,*
*24*  63:*1, 11, 12, 13,*
*15, 16*  64:*20, 22, 24,*
*25*  65:*6, 8, 11, 15,*
*16*  66:*4, 5, 8, 10, 24*
*67:2, 5, 24*  68:*2, 21*
69:*1, 3, 6, 25*  70:*6,*
*7, 8, 10, 15, 19*  71:*4,*
*8, 11, 12, 13, 16, 17,*
*25*  73:*4, 13*  75:*1,*
*21, 22*  77:*17, 23*
78:*15*  79:6  80:*8,*
*17, 25*  82:*17*  83:*8,*
*13*  84:*14, 20, 22, 24,*
*25*  85:*6, 11, 12, 17*
86:*4, 5, 7, 8, 9, 15,*
*20, 21, 22, 24, 25*
87:*1, 2, 3, 5, 18, 22*
88:*15*  89:*14, 20, 21*
*90:10, 11, 14, 23, 24*
*91:19, 22, 23, 25*
*92:2, 5, 14, 22, 23*
*93:5, 7, 11, 15, 18,*
*22*  94:*3, 5, 8, 11, 13,*
*14, 15, 19, 21*  95:*1,*
*2, 13, 24, 25*  96:*4, 5,*
*7, 10, 13, 14, 24*
*97:2, 3, 5, 7, 8, 13,*
*14, 15, 16, 18, 21, 23,*
*24, 25*  98:*8, 10, 12,*
*18, 20, 21, 23, 24*
*99:2, 4, 11, 13, 19,*
*20, 21*  100:*7, 10, 11,*
*15, 17, 19, 20, 21*
*101:2, 6, 23, 25*
*102:1, 2, 3, 8, 10, 11,*
*14, 16, 17, 22*  103:*1,*
*2, 3, 8, 24*  104:*2, 3,*
*16, 24*  105:*7, 18*
106:*5, 10, 13*
107:*11*  110:6
111:*7, 23*  112:*13*
113:*4, 14, 25*  114:*6,*
*14, 16*  116:*5, 8, 19*
117:*8*  118:*5*
121:*15*  124:*7, 8, 12,*
*20, 22, 24*  125:*2, 7,*

9, *14, 16, 20, 24*
126:*8*  127:*14*
128:*23*  130:*14, 15,*
*19*  131:*21*  132:*19*
135:*6*  136:*5, 12*
137:*17*  139:*2, 20*
140:*6, 24*  141:*17*
142:*14*  143:*3, 8*
145:2  146:22
147:*19*  148:*6, 8, 19,*
*20*  149:*8, 20, 24*
150:*2, 4, 21*  151:*8,*
*18, 19, 20, 25*  152:*8,*
*9*  153:*3, 4, 5, 8, 16*
154:*3, 14, 15, 16, 25*
155:*7, 21*  156:*3, 22*
157:*6*  160:*5, 13, 14,*
*16*  161:*17, 23*
162:*1, 4, 6, 11, 23*
163:*11, 16, 18*
165:*7*  166:*5*
168:*21*  169:*7, 17*
170:*10, 18, 19, 20,*
*21, 23*  171:*8, 10, 12*
173:*2, 25*  175:*15*
176:*4, 21*  177:*15,*
*22*  178:*8, 14*  179:*5,*
*23*  181:*8*  183:*10*
184:*11*  185:*12, 15,*
*23*  186:*5*
**ultrasound**  84:*5, 6*
87:*24*
**Um**  5:*7, 16*  6:*6, 18,*
*22*  7:*21*  8:*14*  9:*1,*
*6, 10, 13*  10:*17*
11:*8, 16, 19*  12:*6,*
*11, 18*  13:*6, 14, 15,*
*16*  14:*9, 11, 21*
15:*10*  16:*14, 22*
20:*20, 22*  21:*3*
27:*8, 25*  28:*4*
31:*19*  34:*7, 8, 10,*
*13*  37:*7, 16*  38:*21*
40:*12*  42:*9*  45:2
49:*21*  50:*25*  52:22
53:*21*  54:*6, 18*
55:22  57:*15*  59:2
60:*10, 25*  65:*5, 18*
66:*7, 18, 20*  67:*3, 5*

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                10/23/2025

68:24  69:14, 21
70:9, 18, 21  71:18
81:5  82:18  83:24
84:7, 22  86:10, 12
87:1, 7, 19  88:1, 16
89:1, 7, 9, 16  90:18
91:18  92:24  93:4,
7, 9, 21  94:10  95:8,
25  96:1, 6, 19  97:2,
5, 20  98:9, 11, 13,
25  100:3, 4, 9
101:10, 22, 24
102:4, 10, 13
111:25  112:4, 11
113:9  114:12
118:10  125:1, 10,
12, 13, 19, 21, 22, 25
126:17  130:9, 11
131:8  133:3
138:19  141:18, 20,
25  144:25  146:11,
20  147:18  149:8
150:2, 13, 18, 24
151:15, 23  152:8
153:6  154:18
155:2, 4, 7  157:23
160:11, 12, 15, 24
161:18, 19  162:2, 5
163:7, 12, 19
164:17  165:22
167:19  170:18
171:12  176:7
177:8, 21  178:8
179:20  180:22
181:15  185:1, 13,
15, 22, 24  186:2, 21
umpire  11:18
unchanging  163:6
uncomfortable
66:12
uncommon  33:15
49:14, 17  61:18
undergo  147:2
underlying  13:17
15:16
under-report
104:8, 9
undersigned  187:19

understand  5:12
6:2  7:8  67:17
145:25
understanding  6:7
68:21  73:10  79:14
96:23
understood  185:6
underwent  123:3
155:2
undetermined
59:13
unfinished  3:9
unfortunate
151:20, 21
unfortunately
42:15  58:20
139:24
UNITED  1:1
universe  143:5
unnecessary  151:4
unrelated  117:19,
23
unreliable  104:3
unusual  55:17
86:16
upgrades  129:22
upper  81:8
USA  147:8
use  5:18  23:21
24:3  30:21  60:20
61:2, 8  62:18
68:22, 25  71:24
72:1, 5  84:6  97:2,
5, 24  98:23  100:22
101:16  107:18
116:5  127:7
129:15  131:9
133:15  143:2
uses  70:25  97:6
usual  188:13
usually  181:9

< V >
vaguely  43:2
valid  161:9, 12
168:3  181:13, 21
182:7
validate  121:17
validating  100:21

validity  104:20
105:10, 13, 18
106:6  157:2, 3, 4
162:16  174:9
179:6, 23  180:15
181:12, 14, 18
valuable  130:22
133:3
value  130:17
143:22, 23
vehicle  25:17  33:3
77:25  79:3  80:14,
19  114:1  119:20,
24  145:3, 6  156:22
velocity  145:17
verbatim  117:20
verdict  111:17, 22
verified  127:12
verify  104:22
105:6  121:17
version  170:22
171:5
versus  5:1  130:25
vertebrae  134:7
140:7
vertebral  145:12
vessel  16:9  168:9,
15
vessels  168:7
victims  119:23
video  1:14  4:7
50:14, 16, 17, 21
185:7, 8, 11, 13, 14
187:21  188:3, 14
VIDEOGRAPHER
4:5, 14  82:3, 8
185:24  186:14, 18,
21
view  139:5
violent  145:19
visit  13:16  29:23
39:17  40:7, 17
54:16, 18  56:14, 16,
25  65:24  158:14
162:2  163:24
164:9, 16  178:3
visits  24:9  32:20
visualization

127:10
volume  79:8
volunteered  98:10
volunteering  43:12
volunteers  38:11
93:8
vs  1:7

< W >
wait  130:16
walk  155:14
walked  64:14
walking  129:3
wall  9:23
Walmart  5:1  11:8,
12, 24  12:6, 12
27:20  33:5  36:6,
13  43:13  45:5
48:18  50:1  53:15
57:16  64:15  69:15
128:16  144:16
148:3  150:10
175:9
WAL-MART  1:8
wane  164:24
179:12
waning  179:14
182:18
want  5:7  13:24,
25  21:10  42:9
43:13  76:14  81:23
114:17  132:2
137:11  142:12
150:12  156:18
157:19  174:7
180:4, 6
waste  5:7
waveforms  181:3,
10
waves  164:20
wax  164:24  179:12
waxing  179:14
182:18
way  10:15  33:7
36:15  38:10  44:7
46:3  62:9  70:20
74:6  80:2  87:17
96:17  104:18
106:1  107:9

Case 5:24-cv-00276-CAR    Document 45    Filed 12/26/25    Page 229 of 230

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                          10/23/2025

109:20  111:7
115:21  119:14
125:23  127:3
129:20, 24  130:4
131:18, 21  132:6
133:18  138:7
140:5, 17  151:25
156:18  168:9
172:24  178:23
182:2
**weakness**  27:3
159:8
**wear**  19:22  138:22
**wears**  58:6, 11
**website**  98:4  167:7
**week**  85:6  96:15
151:9  165:15
**weekly**  83:11  84:2
90:20  151:9
**weeks**  13:4  20:5,
13, 15  29:22  46:18
55:23  83:18  84:24
129:1  155:23
173:3, 24  174:2
177:22, 23  178:2,
16
**weigh**  156:17
**weighed**  156:25
**weight**  53:22
139:9, 11, 12
140:11, 13  146:10
153:20  158:6, 10
183:18
**welfare**  11:5
**Well**  5:8  6:24, 25
7:17  8:4, 22  9:13
10:4, 14, 21  11:5
14:14  16:1  17:8,
13  18:22  19:25
20:6, 14  21:20
23:5, 16  24:21
25:3, 15  26:1, 3
27:8, 14, 25  28:1
30:6, 10, 12  31:10,
19  33:6, 18  34:25
35:11  36:14  37:19
38:21  39:10, 20
41:16  44:1  45:24
47:15, 19  50:2

52:5, 7, 14  55:2, 6
56:20, 22  57:3, 9
58:10  59:10  60:2,
7  61:14  62:24
66:3  67:23  68:19
69:9  71:24  72:5, 7
73:23  74:3, 10
75:3  78:23  79:13,
25  84:1  85:4  87:4
90:8, 14  91:6
98:16  100:6, 24
102:6, 9, 19  103:1,
24  105:1  109:25
112:10  113:3, 25
115:3  117:20, 24
120:18, 22  121:9,
11, 18  122:10
123:2  127:2
128:17  131:20
133:17  135:9
137:13  138:15
140:10  142:5
149:20  151:5
158:14, 22  159:1
160:8, 14, 18  161:1,
12, 21  169:1  170:1,
9, 17  171:3  172:5,
18  173:14, 23
176:12  177:9
180:21  181:22
182:6, 12, 22  183:7
184:3  185:18
**went**  6:8  13:12
24:15  26:16, 24
55:19  58:25  64:24
81:10  117:10
121:21
**we're**  19:1  82:3, 8
87:21  92:4  96:14
97:18  119:7  120:2
125:14, 17  138:7
145:8  161:22
168:4  173:20
184:20  185:13
186:20, 22
**we've**  92:24  97:15
157:7, 8  158:24
166:12  177:8

182:13
**wheels**  138:21
**who've**  119:23
**wig**  58:9
**wigs**  58:6, 12
**willing**  172:12
**wince**  66:12
**winded**  77:15
**wish**  164:4
**withdrawn**  187:15
**witness**  4:9, 15, 18
5:23  11:9, 17
24:15
**WNL**  161:24
**Wojciechowski**
96:5
**woman**  144:15
**women**  124:22
144:7
**won**  117:15
**word**  134:6, 10
137:11  139:25
150:22
**words**  6:25  47:5
168:2
**work**  6:20  9:20
10:3, 14  34:10, 11
141:17  186:12
**Workers**  79:3
**working**  85:2, 3
87:7  93:23  99:13
133:22  141:17
**world**  51:16  132:6
**worsening**  118:18
**worth**  134:18
145:6
**wreck**  25:24, 25
26:10  33:12  34:22
35:19  64:25
183:14
**wrinkles**  124:25
142:20
**wrist**  12:23  22:8
**writers**  141:15, 16
**writes**  34:23
**writing**  34:9
**written**  3:21
**wrote**  42:5

< X >
**x-ray**  134:19
**x-rays**  87:23
176:24

< Y >
**Yeah**  6:25  8:3
13:9  15:19  27:17
28:4  30:21  40:11
42:2, 25  43:1, 2, 18
48:12, 25  49:14
56:12  58:23  64:20
70:12  71:24  72:20
73:3, 12  74:3, 4, 12
81:23  101:19
112:19  116:3, 16
122:5  137:10
140:16  150:11
152:25  156:10
166:21  170:4
179:1  186:8, 11, 20
**year**  8:3  11:14
37:24  38:9, 14
70:17  83:12  85:13,
20, 23, 24  86:5, 7,
15  87:11  88:11
90:22, 24, 25  91:24
97:16  116:18
121:21, 23  143:17
144:12
**years**  33:14, 21
34:14  67:3  71:5,
10  86:5  87:5
97:15  111:10, 12
113:24, 25  114:2, 5
121:15  126:5
139:1  141:22
169:17  179:11, 14
182:3, 5, 7, 14, 17
**year's**  97:16  145:6
**Yep**  160:22
**yogurt**  144:16
**York**  94:22

< Z >
**zero**  24:19  25:2
54:25  55:19, 25

Lamar vs. Wal-Mart Stores East                Dr. Joseph Martino                        10/23/2025

102:*15, 24*   104:*14*
114:*24*   146:*2*
**Zoom**   1:*17*